# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **JOHN DOE #1-#14 and JANE DOE #1-#2,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| **vs.** ) | |
| ) | |
| **LLOYD AUSTIN, III, in his official** ) | |
| **capacity as Secretary of Defense, U.S.** ) | |
| **Department of Defense** ) | |
| ) | |
| **XAVIER BECERRA, in his official** ) | |
| **capacity as Secretary of the U.S.** ) | |
| **Department of Health and Human** ) | |
| **Services,** ) | |
| ) | **COMPLAINT FOR** |
| **FRANK KENDALL, in his official** ) | **DECLARATORY AND** |
| **capacity as Secretary of the Air Force,** ) | **INJUNCTIVE RELIEF** |
| **Department of the Air Force,** ) | |
| ) | **JURY TRIAL DEMANDED** |
| **CARLOS DEL TORO, in his official** ) | |
| **capacity as Secretary of the Navy,** ) | |
| **Department of the Navy,** ) | |
| ) | |
| **JANET WOODCOCK, in her official** ) | |
| **capacity as Acting Commissioner of the** ) | |
| **U.S. Food and Drug Administration, and** ) | |
| ) | |
| **CHRISTINE WORMUTH, in her official** ) | |
| **capacity as Secretary of the Army,** ) | |
| **Department of the Army,** ) | |
| ) | |
| **Defendants.** ) | |

# EX. 12: FDA RESPONSE TO CAALM CITIZEN PETITION (AUG. 23, 2021)



August 23, 2021

Linda Wastila, BSPharm, MSPH, PhD
Representative
Coalition Advocating for Adequately Licensed Medicines (CAALM)

Re: Citizen Petition (Docket Number FDA-2021-P-0786)

Dear Petitioner,

This letter responds to the citizen petition that the Coalition Advocating for Adequately Licensed Medicines (CAALM) (the Petitioner, you) submitted to the Food and Drug Administration (FDA, the Agency, we) relating to licensure of vaccines to prevent Coronavirus Disease 2019 (COVID-19) caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) (the CP).

In the CP, Petitioner requests that FDA:

1. "Confirm, in revised Guidance, that the FDA expects a minimum of 2 years of follow-up of participants enrolled in pivotal clinical trials, even if trials are unblinded and lack a placebo control";
2. "Require data demonstrating substantial evidence of clinical effectiveness that outweighs harms, in all special populations, as a condition of consideration of including these populations among the indicated populations" including the special populations "infants, children, and adolescents; those with past SARS-CoV-2 infection; immunosuppressed individuals; those with history of or current cancer; individuals with hematological disorders or autoimmune diseases; pregnant or nursing women; and frail older adults";
3. "Require data on the safety and pharmacokinetic profiles of the spike protein";
4. "Require data from biodistribution studies investigating the actual COVID-19 vaccines";
5. "Require data from pharmacovigilance systems in the US and globally documenting a thorough investigation of serious adverse events, carried out by independent, impartial individuals";
6. "Clarify in revised Guidance that safety data from individuals receiving more than 2 vaccine doses must be submitted";
7. "Ensure the inclusion of experts in gene therapy in the VRBPAC"; and
8. "Ensure that the analysis of data and decisions regarding any COVID-19 vaccine BLA application are informed by experts with no financial or research relationships with any vaccine manufacturers within the last 36 months, both within FDA and amongst the composition of the VRBPAC."

CP at 3-4.

**U.S. Food and Drug Administration**
**10903 New Hampshire Avenue**
**Silver Spring, MD  20993**
**www.fda.gov**

This letter responds to the CP in full.  FDA has carefully reviewed the CP and other relevant information available to the Agency. Based on our review of these materials and for the reasons described below, we conclude that the CP does not contain facts demonstrating any reasonable grounds for the requested action. In accordance with 21 CFR § 10.30(e)(3), and for the reasons stated below, FDA is denying the CP.

In this letter, we discuss the requirements for licensed vaccines.  We then turn to the requests contained in the CP.  We consider each of your requests in light of the legal standards for FDA action, and provide our conclusions based on the facts, the science, and the law.

## I.      Background

There is currently a pandemic of respiratory disease, COVID-19, caused by a novel coronavirus, SARS-CoV-2.  The COVID-19 pandemic presents an extraordinary challenge to global health. On January 31, 2020, the Department of Health and Human Services (HHS) issued a declaration of a public health emergency related to COVID-19.[1]  On February 4, 2020, pursuant to section 564 of the FD&C Act, the Secretary of HHS determined that there is a public health emergency that has a significant potential to affect national security or the health and security of U.S. citizens living abroad, and that involves the virus that causes COVID-19.[2]  On the basis of such determination, on March 27, 2020, the Secretary then declared that circumstances exist justifying the authorization of emergency use of drugs and biological products during the COVID-19 pandemic ("COVID-19 EUA Declaration"), pursuant to section 564(b)(1) of the FD&C Act.[3] In addition, on March 13, 2020, the Presidential declared a national emergency in response to COVID-19.[4]

Commercial vaccine manufacturers and other entities are developing COVID-19 vaccine candidates, and clinical studies of these vaccines are underway and/or have been completed.  Between December 11, 2020 and February 27, 2021, FDA issued emergency use authorizations for three vaccines to prevent COVID-19, including vaccines sponsored by Pfizer Inc. (Pfizer); ModernaTX, Inc. (Moderna); and Janssen Biotech, Inc. (Janssen), a pharmaceutical company of Johnson & Johnson.  FDA received a Biologics License Application (BLA) for the COVID-19 vaccine, BNT162b2, intended to prevent COVID-19 in individuals 16 years of age and older. As announced by FDA on August 23, 2021, the Agency is issuing a biologics license

---

[1] Secretary of Health and Human Services Alex M. Azar, Determination that a Public Health Emergency Exists (Originally issued Jan. 31, 2020, and subsequently renewed), https://www.phe.gov/emergency/news/healthactions/phe/Pages/default.aspx.
[2] HHS, Determination of Public Health Emergency, 85 FR 7316, February 7, 2020, https://www.federalregister.gov/documents/2020/02/07/2020-02496/determination-of-public-health-emergency.
[3] HHS, Emergency Use Authorization Declaration, 85 FR 18250, April 1, 2020, https://www.federalregister.gov/documents/2020/04/01/2020-06905/emergency-use-authorization-declaration.
[4] Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, issued March 13, 2020, https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

for this COVID-19 vaccine (COVID-19 Vaccine, mRNA; Comirnaty) to BioNTech Manufacturing GmbH.[5,6]

## II.    Vaccines That Are FDA-Licensed Meet Relevant Statutory Requirements

### 1.    Vaccines Are Shown to Be Safe, Pure, and Potent at the Time of Licensure

FDA has a stringent regulatory process for licensing vaccines.[7,8]  The Public Health Service Act (PHS Act) authorizes FDA to license biological products, including vaccines, if they have been demonstrated to be "safe, pure, and potent."[9]  Prior to approval by FDA, vaccines are extensively tested in non-clinical studies and in humans.  FDA's regulations describe some of the extensive data and information that each sponsor of a vaccine must submit to FDA in order to demonstrate the product's safety before FDA will consider licensing the vaccine.  FDA requires that the sponsor's BLA include, among other things, data derived from nonclinical and clinical studies showing the product's safety, purity, and potency; a full description of manufacturing methods for the product; data establishing the product's stability through the dating period; and a representative sample of the product and summaries of results of tests performed on the lot(s) represented by the sample.[10]

As is evident from the language of the PHS Act and FDA's regulations, the licensure process for a vaccine requires the sponsor to establish, through carefully controlled laboratory and clinical studies, as well as through other data, that the product is safe and effective for its approved indication(s) and use.  FDA's multidisciplinary review teams then rigorously evaluate the sponsor's laboratory and clinical data, as well as other information, to help assess whether the safety, purity, and potency of a vaccine has been demonstrated.[11]  Only when FDA's standards are met is a vaccine licensed.

FDA regulations explicitly state that "[a]pproval of a biologics license application or issuance of a biologics license shall constitute a determination that the establishment(s) and the product meet applicable requirements to ensure the continued <u>safety</u>, purity, and potency of such products."[12]  Therefore, the manufacturers of vaccines that have been licensed in the U.S. have necessarily demonstrated the safety of the vaccines within the meaning of the applicable statutory and regulatory provisions before the vaccines were licensed and allowed to be marketed.

For more information on FDA's thorough process for evaluating the safety of vaccines, see Appendix I of this letter, *Aspects of Vaccine Development and Process for Licensure.*

---

[5] BioNTech Manufacturing GmbH is the biologics license holder for this vaccine, which is manufactured by Pfizer Inc. for BioNTech Manufacturing GmbH (hereinafter "BioNTech").

[6] The basis for FDA's licensure decision is set forth in FDA's Summary Basis for Regulatory Action for the BioNTech application. This memorandum will be posted on fda.gov. We incorporate by reference the SBRA for the BLA.

[7] CDC, Ensuring the Safety of Vaccines in the United States, February 2013, https://www.cdc.gov/vaccines/hcp/patient-ed/conversations/downloads/vacsafe-ensuring-bw-office.pdf.

[8] Vaccine Safety Questions and Answers, last updated March 2018, https://www.fda.gov/vaccines-blood-biologics/safety-availability-biologics/vaccine-safety-questions-and-answers.

[9] 42 U.S.C. § 262(a)(2)(C)(i)(I).

[10] 21 CFR § 601.2(a).

[11] Vaccines, last updated January 2021, https://www.fda.gov/vaccines-blood-biologics/vaccines.

[12] 21 CFR § 601.2(d) (emphasis added).

### 2. Vaccine Safety Continues to Be Monitored Post-Licensure

FDA's oversight of vaccine safety continues after licensure of the product.  Once the licensed vaccine is on the market, post-marketing surveillance of vaccine safety is conducted in order to detect any rare, serious, or unexpected adverse events, as well as to monitor vaccine lots.  FDA employs multiple surveillance systems and databases to continue to evaluate the safety of these vaccines.  In certain cases, FDA may require the manufacturer to conduct post-marketing studies to further assess known or potential serious risks.

For more information on post-licensure safety monitoring of vaccines, see Appendix II of this letter, *Aspects of Vaccine Postmarketing Safety Monitoring*.

## III. Discussion

The CP makes a series of requests regarding the data to be submitted in support of licensure of vaccines to prevent COVID-19.  Much of the key data supporting licensure applications is developed during the clinical trial process, which is subject to FDA's investigational new drug process.[13]

### A. Investigational New Drugs

Before a vaccine is licensed (approved) by FDA for use by the public, FDA requires that it undergo a rigorous and extensive development program to determine the vaccine's safety and effectiveness.  This development program encompasses preclinical research (laboratory research, animal studies[14]) and clinical studies.  At the preclinical stage, the sponsor focuses on collecting the data and information necessary to establish that the product will not expose humans to unreasonable risks when used in limited, early-stage clinical studies.  Clinical studies, in humans, are conducted under well-defined conditions and with careful safety monitoring through all the phases of the investigational new drug process.  FDA's regulations governing the conduct of clinical investigations are set out at 21 CFR Part 312.

Before conducting a clinical investigation in the U.S. in which a new drug or biological product is administered to humans, a sponsor must submit an investigational new drug application (IND) to FDA.[15]  The IND describes the proposed clinical study in detail and, among other things, helps protect the safety and rights of human subjects.[16]  In addition to other information, an IND must contain information on clinical protocols and clinical investigators.  Detailed protocols for proposed clinical studies permit FDA to assess whether the initial-phase trials will expose subjects to unnecessary risks.  Information on the qualifications of clinical investigators (professionals, generally physicians, who oversee the administration of the experimental drug) permits FDA to assess whether they are qualified to fulfill their clinical trial duties.  The IND

---

[13] See 21 CFR § 312.2 (explaining that the IND regulations apply to clinical investigations of both drugs and biologics).

[14] We support the principles of the "3Rs," to reduce, refine, and replace animal use in testing when feasible.  We encourage sponsors to consult with us if they wish to use a non-animal testing method they believe is suitable, adequate, validated, and feasible.  We will consider if such an alternative method could be assessed for equivalency to an animal test method.

[15] See 21 CFR § 312.20(a).

[16] For additional information regarding the IND review process and general responsibilities of sponsor-investigators related to clinical investigations see Investigational New Drug Applications Prepared and Submitted by Sponsor-Investigators; Draft Guidance for Industry, May 2015,  https://www.fda.gov/media/92604/download.

includes commitments to obtain informed consent from the research subjects, to obtain review of the study by an institutional review board (IRB),[17] and to adhere to the investigational new drug regulations.

Once the IND is submitted, the sponsor must wait 30 calendar days before initiating any clinical trials, unless FDA informs the sponsor that the trial may begin earlier.  During this time, FDA reviews the IND.  FDA's primary objectives in reviewing an IND are, in all phases of the investigation, to assure the safety and rights of subjects, and, in Phase 2 and Phase 3, to help assure that the quality of the scientific evaluation of drugs is adequate to permit an evaluation of the drug's effectiveness and safety.[18]

FDA's regulations provide that, once an IND is in effect, the sponsor may conduct a clinical investigation of the product, with the investigation generally being divided into three phases. With respect to vaccines, the initial human studies, referred to as Phase 1 studies, are generally safety and immunogenicity studies performed in a small number of closely monitored subjects. Phase 2 studies may include up to several hundred individuals and are designed to provide information regarding the incidence of common short-term side effects such as redness and swelling at the injection site or fever and to further describe the immune response to the investigational vaccine.  If an investigational new vaccine progresses past Phase 1 and Phase 2 studies, it may progress to Phase 3 studies.  For Phase 3 studies, the sample size is often determined by the number of subjects required to establish the effectiveness of the new vaccine, which may be in the thousands or tens of thousands of subjects.  Phase 3 studies provide the critical documentation of effectiveness and important additional safety data required for licensing.

At any stage of development, if data raise significant concerns about either safety or effectiveness, FDA may request additional information or studies; FDA may also halt ongoing clinical studies.  The FD&C Act provides a specific mechanism, called a "clinical hold," for prohibiting sponsors of clinical investigations from conducting the investigation (section 505(i)(3) of the FD&C Act; 21 U.S.C. § 355(i)(3)), and FDA's IND regulations in 21 CFR § 312.42 identify the circumstances that may justify a clinical hold.  Generally, a clinical hold is an order issued by FDA to the sponsor of an IND to delay a proposed clinical investigation or to suspend an ongoing investigation.[19]

### B.  The Citizen Petition

In the CP, Petitioner requests that before FDA licenses any vaccine[20] for COVID-19, the agency require certain data be submitted.  Because much of the relevant data is the kind that would be

---

[17] The IRB is a panel of scientists and non-scientists in hospitals and research institutions that oversees clinical research.  IRBs approve clinical study protocols, which describe the type of people who may participate in the clinical study; the schedule of tests and procedures; the medications and dosages to be studied; the length of the study; the study's objectives; and other details.  IRBs make sure that the study is acceptable, that participants have given consent and are fully informed of the risks, and that researchers take appropriate steps to protect patients from harm.  See The FDA's Drug Review Process: Ensuring Drugs Are Safe and Effective web page, last updated November 2017, https://www.fda.gov/drugs/drug-information-consumers/fdas-drug-review-process-ensuring-drugs-are-safe-and-effective.

[18] 21 CFR § 312.22(a).

[19] 21 CFR § 312.42(a).

[20] The CP refers to "granting" a license.  See, e.g., CP at 1.  FDA generally refers to *issuing* licenses, or *approving* a BLA.  See 21 CFR § 601.2(d); 21 CFR § 601.4(a).

5

gathered during clinical trials, we interpret the CP as asking that FDA require the sponsors to make the requested changes to their investigations, as well as, in some cases, to submit certain other data.  As explained above, with certain exceptions, clinical investigations in which a drug is administered to human subjects must be conducted under an IND submitted to FDA by the sponsor.  FDA's review of an IND includes a review of the study protocol which describes, among other things, the design of the clinical study, including the identified endpoints and methods for assessing the safety and effectiveness of the investigational product.

Below, we discuss the requested changes to the study design and other data submissions.

> ### 1. Petitioner's request to require data demonstrating "substantial evidence of clinical effectiveness that outweighs harms" in all "special populations"

Petitioner asks that, prior to issuing a license for a COVID-19 vaccine, FDA require certain types of *clinical* data, specifically:

> data demonstrating substantial evidence of clinical effectiveness that outweighs harms, in all special populations, as a condition of consideration of including these populations among the indicated populations.  Special populations include: infants, children, and adolescents; those with past SARS-CoV-2 infection; immunosuppressed individuals; those with history of or current cancer; individuals with hematological disorders or autoimmune diseases; pregnant or nursing women; and frail older adults.

CP at 3.

Petitioner refers to the ongoing phase 3 trials of COVID-19 vaccines for the Moderna, Pfizer, and Janssen products, and states that the trials "largely (or wholly) excluded" certain identified populations. CP at 5.  Petitioner states that there should be information about "what kind of efficacy" exists for these populations, and refers to "reduction in risk of symptomatic COVID-19 vs. reduction in risk of hospitalization or death." CP at 6.

Thus, Petitioner appears to request that FDA require evidence derived from clinical trials to provide evidence of effectiveness for each of the identified populations, and also that clinical trials be designed and conducted in each population to assess the effectiveness of these vaccines to prevent COVID-19 disease of varying severity in the specified populations.

In support of Petitioner's request, Petitioner asserts that "efficacy and safety of medicines often differs amongst populations" and that the risks of SARS-CoV-2 infection are "considerably lower in infants, children, and adolescents in comparison to adults." CP at 5.

FDA addressed trial populations in the guidance.[21]  In the June 2020 guidance, FDA noted that while certain exclusions were recommended, for example "[e]xclusion of participants at higher risk of severe COVID-19 from early phase studies" in order "to mitigate potential risk of vaccine associated [enhanced respiratory disease] until additional data to inform that potential risk becomes available through ongoing product development,"[22]  FDA in general "encourages the

---

[21] Development and Licensure of Vaccines to Prevent COVID-19; Guidance for Industry, June 2020 (June 2020 Guidance), https://www.fda.gov/media/139638/download.
[22] June 2020 Guidance at 10.

inclusion of diverse populations in all phases of vaccine clinical development."[23]  FDA also noted in the June 2020 Guidance that "vaccine safety and COVID-19 outcomes in individuals with prior SARS-CoV-2 infection, which might have been asymptomatic, is also important to examine because pre-vaccination screening for prior infection is unlikely to occur in practice with the deployment of licensed COVID-19 vaccines."[24]

With respect to the pediatric population, the June 2020 Guidance acknowledged that "the safety and effectiveness of COVID-19 vaccines, may be different in children compared with adults"[25] and recommended that "considerations on the prospect of direct benefit and acceptable risk to support initiation of pediatric studies, and the appropriate design and endpoints for pediatric studies, should be discussed in the context of specific vaccine development programs."[26]

Although the June 2020 Guidance includes various recommendations, ultimately FDA licensure decisions are based on an evaluation of the entirety of the data contained in a BLA and a finding that a vaccine's benefits outweigh its potential risks.

In assessing benefits and risks, FDA takes into account a number of factors including, but not limited to, the evidence for benefit, the requested indication, severity of the disease or condition, treatment alternatives, and the type and severity of adverse events.  In general, the evidence for benefit is based on the results of clinical trials.  In some cases, vaccine clinical trials assess clinical disease endpoints.  In other cases, it may be scientifically acceptable to utilize immunogenicity endpoints.

In assessing benefits for particular populations, FDA is not limited to considering evidence of effectiveness based on clinical trial studies with disease endpoints.  In some cases, FDA may conclude that pediatric effectiveness can be extrapolated from adequate and well-controlled studies in adults.[27]  Furthermore, a study may not be needed in each pediatric age group if data from one age group can be extrapolated to another age group.[28]  There are times where it is scientifically appropriate to demonstrate effectiveness using scientifically accepted immune marker(s) of protection or to infer effectiveness for a population through immunobridging.

In assessing risks, FDA takes into account the type, frequency, and severity of any adverse events.

The benefit-risk assessment will be informed by the body of evidence about the vaccine's safety and effectiveness submitted by an applicant in the BLA, the severity of the target disease, and the target population.  Thus, in approving or authorizing a vaccine for use in a particular population (such as children), FDA will take into account the severity of the disease in the population as well as the benefits of the vaccine.

---

[23] Id. at 11.

[24] Id.

[25] Id.

[26] Id.

[27] See section 505B(a)(2)(B)(i) of the FD&C Act (21 U.S.C. 355c(a)(2)(B)(i)) (providing that "[i]f the course of the disease and the effects of the drug are sufficiently similar in adults and pediatric patients, the Secretary may conclude that pediatric effectiveness can be extrapolated from adequate and well-controlled studies in adults, usually supplemented with other information obtained in pediatric patients, such as pharmacokinetic studies").

[28] See section 505B(a)(2)(B)(ii) of the FD&C Act (21 U.S.C. 355c(a)(2)(B)(ii)) (providing that "[a] study may not be needed in each pediatric age group if data from one age group can be extrapolated to another age group").

To require the Petitioner's proposed across-the-board approach—i.e., of requiring effectiveness data from clinical trials specific to each population group and specifically designed to evaluate disease endpoints of varying severity (e.g., hospitalization and death) in all of the specified populations—would not reflect the scientifically valid methods of assessing safety and effectiveness described above.  Petitioner has not provided a scientific justification for why such tools as immunobridging or extrapolation across population groups cannot be used.  Therefore, we deny Petitioner's request[29] to require effectiveness data from clinical trials specifically designed to assess disease endpoints of varying severity (e.g., hospitalization and death) for each of the identified populations as a condition of licensing a COVID-19 vaccine.[30,31]

---

[29] In denying Petitioner's request, we do not dispute Petitioner's statement that the risks of SARS-CoV-2 infection can differ across population groups. That has been a feature of the pandemic's effects thus far, with children and adolescents generally experiencing a milder disease course compared to older adults. But as with adults, children and adolescents with underlying conditions such as asthma, chronic lung disease, and cancer are at higher risk than their healthier counterparts for COVID-19-related hospitalization and death. See generally Emergency Use Authorization (EUA) Amendment for an Unapproved Product Review Memorandum (pertaining to FDA's authorization of the Pfizer-BioNTech COVID-19 Vaccine for individuals 12 years and older), https://www.fda.gov/media/148542/download. These are features of COVID-19 that FDA may consider in weighing the risks and benefits of COVID-19 vaccines for different populations.

[30] With respect to Petitioner's statement that it is important to consider "how much efficacy exists" (CP at 6) for different populations, with the example of reduction of risk of hospitalization or death vs. reduction of risk of symptomatic COVID-19, we agree that severity of disease experienced by different groups is an important consideration that may be accounted for in a risk-benefit analysis.  What we disagree with is Petitioner's apparent request that FDA only accept the results of clinical trials that have different endpoints for different populations (e.g., hospitalization or death for a younger population and symptomatic COVID-19 for older populations).  A clinical trial endpoint of symptomatic disease for all populations included in the trial may provide sufficient information for FDA to adequately assess the risks and benefits of the vaccine, and FDA may evaluate the effectiveness of the vaccine in different populations by considering subgroup analyses of the data including analyses of vaccine effectiveness against disease of varying severity using pre-specified case definitions.

[31] With respect to Petitioner's statement that individuals with past SARS-CoV-2 infection "are likely to have immunity to subsequent infections for as long or longer than immunity conferred by vaccine," and that they "may also be at heightened risk for adverse effects," (CP at 5) we note that there is scientific uncertainty about the duration of protection provided by previous natural infection, but that the scientific community believes that vaccines may provide a longer duration of protection than that provided by natural infection. See CDC, COVID-19 Frequently Asked Questions, last updated August 2021, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html; Boyton, R. and D Altmann, 2021, Risk of SARS-CoV-2 reinfection after natural infection, Lancet, 397(10280):1161-1163, https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(21)00662-0/fulltext

In addition, you state that individuals with previous infection "may also be at heightened risk for adverse effects." CP at 5.  The sources that you cite for this proposition are unavailing.  First, the Krammer et al. publication (http://medrxiv.org/lookup/doi/10.1101/2021.01.29.21250653) does not assert safety problems with this population receiving COVID-19 vaccines; rather, the publication asserts that these individuals could receive only one dose of vaccine without negatively impacting their antibody titers and sparing them from unnecessary local and systemic adverse reactions (e.g., pain, swelling, fatigue, headache, chills, fever, muscle or joint pains) while also freeing up many urgently needed vaccine doses.  The Samanovic et al. publication (http://dx.doi.org/10.1101/2021.02.07.21251311) similarly does not identify safety concerns, but rather concludes that prior history of COVID-19 affects adaptive immune responses to mRNA vaccination.  The Camara et al. publication (https://www.biorxiv.org/content/10.1101/2021.03.22.436441v1) asserts only that the second dose may not be necessary in individuals with prior infection and that a second dose may cause a "possible contraction of their spike-specific memory T cell immunity," while also noting that "[o]ur study has clear limitations" and that "more detailed analysis of the phenotype of the spike-specific T cells induced by COVID-19 vaccines both in naïve and

## 2. Petitioner's request to require data on the safety and pharmacokinetic profiles of the spike protein

Petitioner asks FDA to "[r]equire data on the safety and pharmacokinetic profiles of the spike protein" prior to licensing any COVID-19 vaccine. CP at 6. In support of this request, Petitioner states that "[i]n-situ production of SARS-CoV-2 spike protein is the target mechanism of action of all COVID-19 vaccines with an EUA at present. Therefore, the safety profile of the spike protein itself (i.e., in the absence of virus) must be thoroughly understood in the range of populations on the indications list." CP at 6.

This request relates to the technology used to make the COVID-19 vaccines that have been authorized by FDA for emergency use. The Pfizer-BioNTech and Moderna vaccines contain a piece of mRNA that instructs cells in the body to make the distinctive "spike" protein of the SARS-COV-2 virus. The Janssen COVID-19 vaccine is manufactured using a specific type of virus called adenovirus type 26 (Ad26) that delivers a piece of the DNA that is used to make the distinctive "spike" protein of the SARS-CoV-2 virus.

Your request appears to be premised on the notion that licensure should be contingent on sponsors' conducting safety studies of a specific protein produced by the COVID-19 vaccines that is designed to elicit an immune response. Contrary to the assumption underlying your request, it is not scientifically necessary to require toxicological or pharmacokinetic studies in individuals to evaluate specific features of a vaccine outside the context of evaluating the vaccine as a whole. In making a licensure decision, FDA determines whether the data and information provided by a manufacturer have demonstrated that a vaccine is safe, pure, and potent. In making a determination about the safety of a vaccine, the agency evaluates the complete manufacturing process and whether specific features of a vaccine are such that the finished product itself, when used at the recommended dose, is safe for the recipient. FDA applies its

---

recovered individuals are needed to answer these questions." Petitioner also references a preprint by Levi et al. (https://www.medrxiv.org/content/10.1101/2021.02.01.21250923v2). In the published version of that study, the authors conclude that "[o]ne vaccine dose is sufficient in symptomatic SARS-CoV-2-exposed subjects to reach a high titer of antibodies, suggesting no need for a second dose, particularly in light of current [sic] vaccine shortage." Levi et al. One Dose of SARS-CoV-2 Vaccine Exponentially Increases Antibodies in Individuals Who Have Recovered from Symptomatic COVID-19, J Clin Invest. 2021;131(12):e149154: https://www.jci.org/articles/view/149154). Levi et al. does not identify safety concerns with COVID-19 vaccines.

We note that history of infection prior to vaccination is not usually known in adverse event reports (either because it wasn't reported, or because it could have been asymptomatic and the patient never knew they had infection). Likewise, there could be a reporting bias for a reporting system like VAERS, which relies on vaccine recipients, healthcare providers, or others to initiate reports to the system, because individuals who were infected previously might be more likely to report adverse events. However, FDA, together with CDC, has not become aware of data from VAERS to suggest an increased frequency of adverse events in vaccinees who were infected with SARS-CoV-2 prior to vaccination. FDA and CDC Medical Officers conduct on-going review of certain, serious adverse events of special interest for the COVID vaccines. These reviews often include examination of the narrative and other fields which would contain information about past infection, if provided. Additionally, CDC and the VAERS Program contractor collect follow-up medical records for certain serious reports. Teams of physicians, nurses, and other reviewers abstract key clinical details, including medical history, from these records. The reviewers conducting these on-going surveillance efforts have not identified patterns of adverse events associated with prior infection.

sound scientific judgment in evaluating vaccines and other biological products, and ensures that vaccines licensed by the agency are safe within the meaning of the PHSA, the FD&C Act, and implementing regulations.

With respect to the spike protein feature of vaccines for COVID-19, while there have been numerous claims on social media suggesting that the spike protein is toxic,[32] there are in fact no reliable scientific data to indicate that the spike protein is toxic or that it lingers at any toxic level in the body after vaccination.  Below, we list the publications you cite in footnotes 15-28 of your petition in support of what you describe as "safety concerns" with the spike protein feature of authorized vaccines.[33]  The left column identifies the relevant footnote in your petition and the accompanying citation, and the right column describes FDA's analysis of the publication.  The information in the right column explains why you have not in fact presented data showing safety problems with the spike protein feature of vaccines that would cause the vaccines to be unsafe.

| Publication cited by Petitioner in support of "safety concerns" regarding spike protein | FDA analysis |
|---|---|
| Footnote 15: Ogata AF, Cheng C-A, Desjardins M, Senussi Y, Sherman AC, Powell M, et al. Circulating SARS-CoV-2 Vaccine Antigen Detected in the Plasma of mRNA-1273 Vaccine Recipients. Clin Infect Dis [Internet]. 2021 May 20; Available from: http://dx.doi.org/10.1093/cid/ciab465 | This work conducted in a small number of individuals (n=13) documents that shortly following administration of the mRNA-1273 COVID-19 vaccine, SAR-CoV-2 spike protein was detectible in the plasma of 11 of the 13.  Clearance of the protein from the circulation was associated with the development of IgG and IgA antibodies. The authors suggest a mechanism that might have led to the findings, based on the immune response to the vaccine. This paper documents the appearance of spike protein in plasma and its clearance with development of an immune response. This publication does not provide evidence that authorized COVID-19 vaccines are unsafe. |
| Footnote 16: Kuba K, Imai Y, Rao S, Gao H, Guo F, Guan B, et al. A crucial role of angiotensin converting enzyme 2 (ACE2) in SARS coronavirus-induced lung injury. Nat Med [Internet]. 2005 Aug;11(8):875–9. Available from: http://dx.doi.org/10.1038/nm1267 | This article relates to SARS-CoV, the causative agent of SARS, an atypical pneumonia that occurred in several countries in 2002-2003. It was published in 2005 before the discovery of SARS-CoV-2 and the development of vaccines to prevent COVID-19. Therefore, the reports in this publication do not present safety concerns about the use of the spike protein in vaccines. |
| Footnote 17: Chen I-Y, Chang SC, Wu H-Y, Yu T-C, Wei W-C, Lin S, et al. Upregulation of the chemokine (C-C motif) ligand 2 via a severe acute respiratory syndrome coronavirus spike-ACE2 signaling pathway. J | This 2010 publication describes in vitro studies with SARS-CoV. It was published in 2010 before the discovery of SARS-CoV-2 and the development of vaccines to prevent COVID-19. The publication therefore does not present any evidence of safety |

[32] See, e.g., FactCheck.org, COVID-19 Vaccine-Generated Spike Protein is Safe, Contrary to Viral Claims, https://www.factcheck.org/2021/07/scicheck-covid-19-vaccine-generated-spike-protein-is-safe-contrary-to-viral-claims/ (describing spread of social media claims about the spike protein); Lin, R., 2021, Busted: 3 dangerous social-media myths about COVID-19 vaccines, LA Times, https://www.latimes.com/california/story/2021-06-03/covid-19-vaccine-myths-busted (same); Dupuy, B., 2021, Spike protein produced by vaccine not toxic, AP, https://apnews.com/article/fact-checking-377989296609 (same).
[33] See Sec. 3(b) of the CP, which refers to footnotes 15-28 as support for asserted safety concerns with the spike protein.

| | |
|---|---|
| Virol [Internet]. 2010 Aug;84(15):7703–12. Available from: http://dx.doi.org/10.1128/JVI.02560-09 | concerns related to the formulation of COVID-19 vaccines. |
| Footnote 18: Patra T, Meyer K, Geerling L, Isbell TS, Hoft DF, Brien J, et al. SARS-CoV-2 spike protein promotes IL6 trans-signaling by activation of angiotensin II receptor signaling in epithelial cells. PLoS Pathog [Internet]. 2020 Dec;16(12):e1009128. Available from: http://dx.doi.org/10.1371/journal.ppat.1009128 | This publication pertains to SARS-CoV-2 infection and disease progression, but does not relate to vaccines to prevent COVID-19. The publication therefore does not present any evidence of safety concerns related to the formulation of COVID-19 vaccines. |
| Footnote 19:  Zhang S, Liu Y, Wang X, Yang L, Li H, Wang Y, et al. SARS-CoV-2 binds platelet ACE2 to enhance thrombosis in COVID-19. J Hematol Oncol [Internet]. 2020 Sep 4;13(1):120. Available from: http://dx.doi.org/10.1186/s13045-020-00954-7 | This publication pertains to SARS-CoV-2 infection and disease progression, but does not relate to vaccines to prevent COVID-19. The publication therefore does not present any evidence of safety concerns related to the formulation of COVID-19 vaccines. |
| Footnote 20: Suresh SJ, Suzuki YJ. SARS-CoV-2 Spike Protein and Lung Vascular Cells. Journal of Respiration [Internet]. 2020 Dec 31 [cited 2021 May 25];1(1):40–8. Available from: https://www.mdpi.com/2673-527X/1/1/4 | This publication states that "it is critical to understand the biological effects of this [spike] protein on human cells to ensure that it does not promote long-term adverse health consequences" and that "[f]urther work is needed to understand the effects of various SARS-CoV-2 spike protein segments" used in vaccines.  But the publication does not in fact report any adverse effects of authorized vaccines. Nor does it conclude that use of spike protein in authorized vaccines causes the vaccines to be unsafe. |
| Footnote 21:  Angeli F, Spanevello A, Reboldi G, Visca D, Verdecchia P. SARS-CoV-2 vaccines: Lights and shadows. Eur J Intern Med [Internet]. 2021 Apr 30; Available from: http://dx.doi.org/10.1016/j.ejim.2021.04.019 | This article summarizes the features of several COVID-19 vaccines and discusses potential interactions between the spike protein of vaccines with the cardiovascular system. The article notes "[t]he basic mechanisms …require further research…" and that newer vaccines might be developed; however, it does not state that the spike protein itself should be studied in people. |
| Footnote 22:  Han M, Pandey D. ZMPSTE24 Regulates SARS-CoV-2 Spike Protein-enhanced Expression of Endothelial Plasminogen Activator Inhibitor-1. Am J Respir Cell Mol Biol [Internet]. 2021 May 18; Available from: http://dx.doi.org/10.1165/rcmb.2020-0544OC | This publication pertains to COVID-19 disease, but does not relate to vaccines to prevent COVID-19. The publication therefore does not present any evidence of safety concerns related to the formulation of COVID-19 vaccines. |
| Footnote 23: Rhea EM, Logsdon AF, Hansen KM, Williams LM, Reed MJ, Baumann KK, et al. The S1 protein of SARS-CoV-2 crosses the blood-brain barrier in mice. Nat Neurosci [Internet]. 2021 Mar;24(3):368– 78. Available from: http://dx.doi.org/10.1038/s41593-020-00771-8 | This publication pertains to COVID-19 disease, but does not relate to vaccines to prevent COVID-19. The publication therefore does not present any evidence of safety concerns related to the formulation of COVID-19 vaccines. |
| Footnote 24: Idrees D, Kumar V. SARS-CoV-2 spike protein interactions with amyloidogenic proteins: Potential clues to neurodegeneration. Biochem Biophys Res Commun [Internet]. 2021 May 21;554:94–8. Available from: http://dx.doi.org/10.1016/j.bbrc.2021.03.100 | This publication pertains to COVID-19, but does not relate to vaccines to prevent COVID-19. The publication therefore does not present any evidence of safety concerns related to the formulation of COVID-19 vaccines. |
| Footnote 25:  Lei Y, Zhang J, Schiavon CR, He M, Chen L, Shen H, et al. SARS-CoV-2 Spike Protein Impairs Endothelial Function via Downregulation of ACE 2. Circ Res [Internet]. 2021 Apr 30;128(9):1323–6. Available | This publication pertains to the S protein, but does not relate to vaccines to prevent COVID-19. The publication therefore does not present any evidence of safety concerns related to the formulation of COVID-19 vaccines. In fact, the publication |

| | |
|---|---|
| from:<br>http://dx.doi.org/10.1161/CIRCRESAHA.121.318902 | concludes by stating: "vaccination-generated antibody and/or exogenous antibody against S protein not only protects the host from SARS-CoV-2 infectivity but also inhibits S protein-imposed endothelial injury." |
| Footnote 26: Zhang L, Richards A, Barrasa MI, Hughes SH, Young RA, Jaenisch R. Reverse-transcribed SARS-CoV-2 RNA can integrate into the genome of cultured human cells and can be expressed in patientderived tissues. Proc Natl Acad Sci U S A [Internet]. 2021 May 25;118(21). Available from: http://dx.doi.org/10.1073/pnas.2105968118 | This publication pertains to SARS-CoV-2 infection, but does not relate to vaccines to prevent COVID-19. The publication therefore does not present any evidence of safety concerns related to the formulation of COVID-19 vaccines. |
| Footnote 27: Suzuki YJ, Nikolaienko SI, Dibrova VA, Dibrova YV, Vasylyk VM, Novikov MY, et al. SARS-CoV-2 spike protein-mediated cell signaling in lung vascular cells. Vascul Pharmacol [Internet]. 2021 Apr;137:106823. Available from: http://dx.doi.org/10.1016/j.vph.2020.106823 | This publication pertains to SARS-CoV-2 infection, but does not relate to vaccines to prevent COVID-19. The publication therefore does not present any evidence of safety concerns related to the formulation of COVID-19 vaccines. |
| Footnote 28: Suzuki YJ, Gychka SG. SARS-CoV-2 Spike Protein Elicits Cell Signaling in Human Host Cells: Implications for Possible Consequences of COVID-19 Vaccines. Vaccines (Basel) [Internet]. 2021 Jan 11;9(1). Available from:<br> http://doi.org/10.3390/vaccines901003 | This publication states that "it is important to consider the possibility that the SARS-CoV-2 spike protein produced by the new COVID-19 vaccines triggers cell signaling events that promote [pulmonary arterial hypertension]," and that it important to monitor vaccinees for long-term consequences.  While the publication advocates experimental animal studies, it does not provide any data suggesting that the vaccines cause any harm. |

In sum, you have not demonstrated why FDA is scientifically or legally obligated to require "data on the safety and pharmacokinetic profiles of the spike protein."  In other words, you have not demonstrated why it is scientifically or legally faulty for FDA to make licensure determinations without requiring the specific requested safety data on the isolated spike protein in individuals. Therefore, we deny your request.[34]

### 3.  Petitioner's request to require data from biodistribution studies

Petitioner asks FDA to require "data from biodistribution studies investigating the actual COVID-19 vaccines."  CP at 7.  Petitioner asserts that data submitted thus far by Moderna and Pfizer "suggests that the vaccines distribute widely in the body, including to the liver, brain, heart, lung, adrenals, ovaries, and testes, among many other tissues."  CP at 7.  Petitioner further states that "instead of presenting novel biodistribution studies of the COVID-19 vaccine formulations, sponsors presented substitute studies to FDA for an EUA during the pandemic." CP at 7.  Therefore, according to Petitioner, "novel biodistribution studies investigating the

---

[34] We note that in addition to generally requesting "data on the safety and pharmacokinetic profiles of the spike protein," you request that studies investigate the spike protein's link to certain identified health outcomes (e.g., related to coagulopathy, reproduction, etc.).  See Sec. 3(c) of the CP.  Because we conclude that you have not supported the need for the requested type of data that is specific to the isolated spike protein, we deny your requests that FDA require that the studies producing such data examine the identified health outcomes.  It is worth pausing to acknowledge that you premise some of the health outcome data requests on information that you attribute to VAERS.  While VAERS is a critical part of FDA's post-market safety monitoring system for vaccines, reports to VAERS are not confirmed to be associated with vaccination.

actual COVID-19 vaccines are necessary." CP at 7. Petitioner further states that the studies are important "to characterize long term adverse effects and better understand potential mechanism(s) of action of short and long term harms. . . " CP at 7.

FDA addressed biodistribution studies in the June 2020 Guidance in the section regarding toxicity studies. FDA recommended biodistribution studies "if the vaccine construct is novel in nature and there are no existing biodistribution data from the platform technology."[35] FDA specified that biodistribution studies may not be necessary in certain situations "if the COVID-19 vaccine candidate is made using a platform technology utilized to manufacture a licensed vaccine or other previously studied investigational vaccines and is sufficiently characterized."[36]

Petitioner has not demonstrated the need for biodistribution studies of "the actual COVID-19 vaccines." For example, it is not scientifically inappropriate to support a BLA with biodistribution data for a surrogate protein produced using the platform technology, for example if imaging on such protein can be performed to visualize the location of the protein expression. Because Petitioner has not explained why such alternative approaches cannot be used, we deny Petitioner's request.

### 4. Petitioner's Request to Require Data from Pharmacovigilance Systems Documenting an Investigation into Serious Adverse Events

Petitioner asks FDA to require "data from pharmacovigilance systems in the US and globally documenting a thorough investigation serious adverse events, carried out by independent, impartial individuals." CP at 8. Petitioner states that "COVID-19 vaccines have now been administered to hundreds of millions of individuals, and it is vital that all reports of SAEs [significant adverse events] are thoroughly investigated to determine whether the vaccine played any role in the SAE." CP at 8. Petitioner also states that the investigation "must be carried out by independent, impartial individuals." CP at 9. Thus, Petitioner appears to be asking for "thorough investigation" into serious adverse events.

It is unclear whether Petitioner is requesting that individual manufacturers perform the pharmacovigilance, or if Petitioner asks that FDA do so. Given that post-marketing surveillance systems are conducted both by sponsors and FDA, we interpret the request as asking that FDA ensure that both the agency and sponsors conduct the requested investigations.

Petitioner has not demonstrated any failures to conduct "thorough investigations" into post-marketing serious adverse events, so it is unclear what additional action FDA could take in response to the CP. Therefore, we deny this request.

FDA agrees that post-marketing surveillance plays an important role. FDA is monitoring the safety of the Authorized COVID-19 Vaccines through both passive and active safety surveillance systems. FDA is doing so in collaboration with the Centers for Disease Control and Prevention (CDC), the Centers for Medicare and Medicaid Services (CMS), the Department of Veterans Affairs (VA), and other academic and large non-government healthcare data systems.

---

[35] June 2020 Guidance, at 7.
[36] Id.

In addition, FDA participates actively in ongoing international pharmacovigilance efforts, including those organized by the International Coalition of Medicines Regulatory Authorities (ICMRA) and the World Health Organization (WHO). These efforts are in addition to the pharmacovigilance efforts being undertaken by the individual manufacturers for authorized vaccines.  A coordinated and overlapping approach using state-of the art technologies has been implemented.  As part of our efforts to be transparent about our COVID-19 vaccine safety monitoring activities, FDA is posting summaries of the key safety monitoring findings on the FDA website.[37]

*Passive Surveillance*

VAERS is a national passive surveillance vaccine safety database that receives unconfirmed reports of possible adverse events following the use of a vaccine licensed or authorized in the United States.  Passive surveillance is defined as unsolicited reports of adverse events that are sent to a central database or health authority. In the United States, these are received and entered into VAERS, which is co-managed by FDA and CDC. In the current pandemic, these reports are being used to monitor the occurrence of both known and unknown adverse events, as providers of COVID-19 vaccines are required to report serious adverse events to VAERS.

As part of FDA and CDC's multi-system approach to post-licensure and post-authorization vaccine safety monitoring, VAERS is designed to rapidly detect unusual or unexpected patterns of adverse events, also known as "safety signals."  VAERS reports generally cannot be used to determine if a vaccine caused or contributed to an adverse event or illness.  If the VAERS data suggest a possible link between an adverse event and vaccination, the relationship may be further studied in a controlled fashion.[38]

Anyone can make a report to VAERS, including vaccine manufacturers, private practitioners, state and local public health clinics, vaccine recipients, and their parents or caregivers. Surveillance programs like VAERS perform a critical function by generating signals of potential problems that may warrant further investigation.

*Active Surveillance*

Active surveillance involves proactively obtaining and rapidly analyzing information related to millions of individuals and recorded in large healthcare data systems to verify safety signals identified through passive surveillance or to detect additional safety signals that may not have been reported as adverse events to passive surveillance systems. FDA is conducting active surveillance using the Sentinel BEST (Biologics Effectiveness and Safety) System and the CMS system, and is also collaborating with other federal and non-federal partners.

*BEST*

---

[37] https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/covid-19-vaccines?
[38] FDA, VAERS Overview, available at https://www.fda.gov/vaccines-blood-biologics/vaccine-adverse-events/vaers-overview

To elaborate further, the BEST system,[39] which is part of the Sentinel initiative,[40] comprises large-scale claims data, electronic health records (EHR), and linked claims-EHR databases with a data lag of approximately three months. The system makes use of multiple data sources and enables rapid queries to detect or evaluate adverse events as well as studies to answer specific safety questions for vaccines. The linked claims-EHR database makes it possible to study the safety of vaccines in sub-populations with pre-existing conditions or in pregnant women. The major partners for BEST currently are Acumen, IBM Federal HealthCare, IQVIA, and Columbia University and many affiliated partners such as MedStar Health, BlueCross BlueShield of America, the Observational Health Data Sciences and Informatics (OHDSI), OneFlorida, University of California and several others.[41]

Using BEST, CBER plans to monitor about 15 adverse events[42] that have been seen with the deployment of previous vaccines but have yet to be associated with a safety concern for an authorized COVID-19 vaccine at this time. CBER further plans to use the BEST system to conduct more in-depth analyses should a safety concern be identified from sources such as VAERS.

*CMS*

FDA has worked over the past several years with CMS to develop capabilities for routine and time-sensitive assessments of the safety of vaccines for people 65 years of age and older using the Medicare Claims database.[43] Because it was already in place, this system was immediately put into use for COVID-19 vaccine surveillance to monitor for adverse events.[44]

---

[39] Biologics Effectiveness and Safety (BEST) System, https://www.fda.gov/vaccines-blood-biologics/safety-availability-biologics/cber-biologics-effectiveness-and-safety-best-system

[40] FDA's Sentinel Initiative, https://www.fda.gov/safety/fdas-sentinel-initiative

[41] To confirm the utility of the BEST system for situations such as COVID-19 vaccine surveillance, a test case was conducted. This study aimed to replicate a previous study by the CDC's Vaccine Safety Datalink (VSD) (Klein et al. Pediatrics 2010) that examined the databases and analytic capabilities of the new system. The objective of this study was to test the new system's ability to reproduce the increased risk of febrile seizures in children receiving the first dose of measles-mumps-rubella-varicella (MMRV) vaccine, compared to that of MMR and varicella vaccines separately but on the same day. The results of the study met the objectives and demonstrated the ability of the BEST Initiative data network to run a complex study protocol at multiple sites using a distributed data network and the Observational Medical Outcomes Partnership Common Data Model (organizing disparate data sources into the same database design using a common format).

[42] CBER, Background Rates of Adverse Events of Special Interest for COVID-19 Vaccine Safety Monitoring, Draft Protocol (December 31, 2020), https://www.bestinitiative.org/wp-content/uploads/2021/01/C19-Vaccine-Safety-AESI-Background-Rate-Protocol-2020.pdf

[43] CMS, Standard Analytical Files (Medicare Claims) – LDS, https://www.cms.gov/Research-Statistics-Data-and-Systems/Files-for-Order/LimitedDataSets/StandardAnalyticalFiles

[44] As one example of the capabilities of this system, FDA, CMS, and CDC evaluated the risk of Guillain-Barré syndrome (GBS) following influenza vaccination after CDC's Vaccine Safety Datalink, identified safety signals suggesting an increased risk of GBS following high-dose influenza vaccinations and Shingrix vaccinations during the 2018-2019 influenza season. CBER, CDC, and CMS formed working groups in February 2019 to refine these safety signals in the CMS data.

During the current pandemic, FDA, CMS, and CDC have already used the Medicare data to publish a study showing that frailty, comorbidities, and race/ethnicity were strong risk factors of COVID-19 hospitalization and death among the U.S. elderly.[45]

In summary, in collaboration and coordination with several different partners, FDA has assembled passive surveillance systems – including VAERS – and active surveillance systems that can detect and refine safety findings with the Authorized COVID-19 Vaccines in a relatively rapid manner. These systems can also potentially be leveraged to assess safety in specific subpopulations and to assess vaccine effectiveness.

Petitioner points to a CDC webpage on COVID-19 vaccines that discusses 4,863 reports to VAERS of death after COVID-19 vaccination that describes the monitoring that is conducted in connection with such reports.[46]  Petitioner suggests that this is inadequate because of an FDA response to a question posed by one of the CP signatories on the proportion of VAERS death reports for which FDA/CDC staff had reached out to families to collect follow-up information. In that response,  FDA stated that "the VAERS system is not designed to determine causality of adverse events" and thus "there is not a mechanism to follow-up with families for additional details."[47]  However, there  are indeed procedures in place to conduct continuous monitoring of VAERS data, including deaths (though the procedures do not involve following up *with families*).  When FDA and CDC receive reports of deaths in VAERS, there is a mechanism for requesting and evaluating other types of follow-up information, including associated health records, such as hospital discharge summaries, and medical and laboratory results, death certificates, and autopsy reports.[48]

### 5.  Petitioner's Request to Include Gene Therapy Experts on the Vaccines and Related Biological Products Advisory Committee (VRBPAC)

Petitioner requests that FDA ensure the inclusion of gene therapy experts on the VRBPAC because "there is a need to consider safety with the informed perspectives of those with expertise in gene therapies."  CP at 9-10.  In support of this request, Petitioner states that the vaccines produced by several manufacturers are gene based and that "[t]heir mechanism of action differs substantially from all other vaccines that have been used on populations globally, as these novel

---

[45] Hector S Izurieta, David J Graham, Yixin Jiao, Mao Hu, Yun Lu, Yue Wu, Yoganand Chillarige, Michael Wernecke, Mikhail Menis, Douglas Pratt, Jeffrey Kelman, Richard Forshee, Natural History of Coronavirus Disease 2019: Risk Factors for Hospitalizations and Deaths Among >26 Million US Medicare Beneficiaries, *The Journal of Infectious Diseases*, 223: 6: 945–956 (2021), https://doi.org/10.1093/infdis/jiaa767 https://academic.oup.com/jid/article/223/6/945/6039057
[46] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/adverse-events.html.
[47] Petitioner refers to a Letter to the Editor authored by one of the CP signatories that includes questions the signatory posed to FDA, and FDA's responses.  See https://www.bmj.com/content/372/bmj.n149/rr-25.
[48] See Shimabukuro et al., Safety monitoring in the Vaccine Adverse Event Reporting System (VAERS), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4632204/ (stating that "For reports classified as serious, the VAERS contractor requests associated health records, including hospital discharge summaries, medical and laboratory results, and death certificates and autopsy reports for deaths. Additional MedDRA terms might be added based on information obtained through follow-up. Also, for serious reports where the patient has not recovered from the adverse event by the time the report was filed or recovery status was unknown, a follow-up letter is sent to the reporter at one year requesting information on recovery status if that information is still not known").

vaccines work on the premise of gene delivery, and may therefore be considered a type of gene therapy." CP at 9.

The VRBPAC's members are selected "among authorities knowledgeable in the fields of immunology, molecular biology, rDNA, virology; bacteriology, epidemiology or biostatistics, vaccine policy, vaccine safety science, federal immunization activities, vaccine development including translational and clinical evaluation programs, allergy, preventive medicine, infectious diseases, pediatrics, microbiology, and biochemistry."[49]  Additionally, an advisory committee may consult with experts.[50]  FDA may also add temporary voting members to the VRBPAC, for example to provide relevant expertise.[51] The VRBPAC's role is to advise FDA.  The VRBPAC does not make regulatory decisions.

The premise of the CP is that certain actions need to be taken "before serious consideration is given to granting a BLA of any COVID-19 vaccine."  CP at 1.  But it is FDA, not VRBPAC, that is authorized to determine whether to approve a BLA.  Indeed, the Public Health Service Act confers this authority to the Secretary of the Department of Health and Human Services, and this authority has been delegated to the Commissioner of FDA.  Because FDA is authorized to approve a BLA, we do not agree that the composition of an advisory committee is determinative of whether to approve or seriously consider approving a BLA.  Accordingly, we deny your request.

### 6.   Petitioner's Request that FDA Ensure That Experts Within FDA and Amongst VRBPAC Have No Financial or Research Relationships With Any Vaccine Manufacturer's Within 36 Months

Petitioner requests that FDA "[e]nsure that the analysis of data and decisions regarding any COVID-19 vaccine BLA application are informed by experts with no financial or research relationships[52] with any vaccine manufacturers within the last 36 months, both within FDA and amongst the composition of the VRBPAC."[53]  CP at 10.  In support of this request, Petitioner states disclosure and transparency would demonstrate the independence of FDA decision making and that an evaluation of data by "competent individuals with independence from vaccine manufacturers" would be in the public interest.[54]  CP at 10.

---

[49] See FDA's Website on Vaccines and Related Biological Products Advisory Committee, https://www.fda.gov/advisory-committees/blood-vaccines-and-other-biologics/vaccines-and-related-biological-products-advisory-committee.

[50] 21 CFR § 14.31.

[51] See https://www.fda.gov/advisory-committees/vaccines-and-related-biological-products-advisory-committee/charter-vaccines-and-related-biological-products-advisory-committee.

[52] You do not describe what you mean for there to be a conflict related to "research relationships."  You refer only to disclosure requirements established by the International Committee of Medical Journal Editors (ICMJE) (presumably that organization's document related to providing readers of manuscripts with information about interests that could influence how they receive scientific work), but an online form we found for ICMJE does not use or define the term "research relationship."  See https://cdn-links.lww.com/permalink/jbjs/d/jbjs_2017_03_30_tashjian_e15_sdc1.pdf.  That form does describe financial conflicts of interests, see id., and given the CP's statement that decisions should be made by individuals with "independence" we assume you refer to financial or employment-type conflicts.

[53] CP at 10.

[54] CP at 10.

FDA acknowledges the value in maintaining a positive public perception of how FDA conducts its activities and ensuring that the decisions FDA employees make, and actions they take, neither are, nor appear to be, tainted by any conflict of interest. Ethical requirements for both advisory committee and staff are described in statute and regulation.[55]

FDA has addressed the evaluation of financial interests by special Government employees (SGEs) and FDA employees in the 2014 Guidance for the Public, FDA Advisory Committee Members, and FDA Staff: Public Availability of Advisory Committee Members' Financial Interest Information and Waivers[56] (Financial Issues Guidance) and has addressed the evaluation of appearance issues in the 2016 draft Guidance for the Public, FDA Advisory Committee Members, and FDA Staff: Procedures for Evaluating Appearance Issues and Granting Authorizations for Participation in FDA Advisory Committees (Appearance Issues Draft Guidance).[57] The 2016 draft guidance, when finalized, will represent the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. As described in the Appearance Issues Draft Guidance, "[t]o protect the credibility and integrity of advisory committee advice, FDA screens advisory committee members carefully for two categories of potentially disqualifying interests or relationships: (1) current financial interests that may create a recusal obligation under Federal conflict of interest laws; and (2) other interests and relationships that do not create a recusal obligation under Federal conflict of interest laws but that may create the appearance that a member lacks impartiality, known as 'appearance issues.'" The Appearance Issues Guidance explicitly contemplates that a Research Relationship might raise an appearance issue.[58]

FDA employees also are subject to strict ethical requirements.[59] FDA employees, as well as their spouses and minor children, are prohibited from holding financial interests, like stock, in certain businesses regulated by FDA. This includes many companies working in the drug, biologic, medical device, food, and tobacco industries, among others.[60] In addition, certain restrictions apply to FDA employees working on particular matters involving parties with whom the employee has served as officer, director, trustee, general partner, agent, attorney, consultant, contractor or employee.[61]

Although both the VRBPAC members and FDA employees are subject to ethical requirements, the requirements do not involve a 36-month prohibition. For example, FDA is authorized by statute to grant waivers to allow individuals with potentially conflicting financial interests to participate in meetings where it concludes, after close scrutiny, that certain criteria are met.[62] In addition, the restrictions that apply to FDA employees working on particular matters involving parties with whom the employee has served as officer, director, trustee, general partner, agent,

---

[55] See, e.g., 18 U.S.C. § 208; See also the description of Ethics Laws and Regulations on FDA's website, available at: https://www.fda.gov/about-fda/ethics/ethics-laws-and-regulations

[56] https://www.fda.gov/media/83188/download. "Most FDA advisory committee members are appointed as SGEs." Financial Issues Guidance at 3.

[57] https://www.fda.gov/media/98852/download.

[58] See Appearance Issues Draft Guidance at 14-15.

[59] For a summary of relevant requirements, see the description of Ethics Laws and Regulations on FDA's website https://www.fda.gov/about-fda/ethics/ethics-laws-and-regulations.

[60] See Prohibited Financial Interests for FDA Employees, https://www.fda.gov/about-fda/ethics/prohibited-financial-interests-fda-employees.

[61] 5 CFR § 2635.502.#

[62] See 18 U.S.C. § 208(b)(1) and (b)(3).

attorney, consultant, contractor or employee apply when the employee has served *within the last year*--but not longer.

In evaluating your request, we are guided by these laws and regulations, which do not contain a 36-month prohibition.  We also note that you have not demonstrated that any FDA employees or members of the VRBPAC have been improperly involved in the agency's review of COVID-19 vaccines. We are also guided by our consideration of one of the purposes served by an FDA advisory committee, which is that it permits the agency access to a range of perspectives from experts with the most current knowledge. We believe that applying our existing standards for conflict of interest will address the perception concern that the CP articulates, while appropriately balancing the agency's need for current outside expertise.  Accordingly, we deny your request.

### 7.   Petitioner's Request to Revise the 2020 Guidance to Require 2 Years of Follow-Up

Petitioner requests that FDA "[c]onfirm, in revised Guidance, that the FDA expects a minimum of 2 years of follow-up of participants enrolled in pivotal clinical trials, even if trials are unblinded and lack a placebo control."  CP at 4.  You state that "two year follow-up from trials allows the detection of commonly experienced longer-term adverse effects that may not manifest until many months following vaccination" and would add to the data collection in clinical trials in certain ways that you identify.  CP at 4.

FDA's June 2020 Guidance describes FDA's expectations for follow-up of participants enrolled in clinical trials.[63]  FDA does not at this time see a need to revise its guidance documents, because FDA may communicate to individual sponsors whether there is a need to support a BLA with a particular duration of follow-up for a clinical trial.  While guidance documents allow the agency to articulate its interpretation of or policy on a regulatory matter (21 CFR § 10.115(b)), there are also times where FDA's advice would be specific to an individual manufacturer.

In addition, we note that there are many reasons why it may be appropriate to license some vaccines based on follow-up of participants for less than two years.  For example, if a clinical trial enrolls subjects rapidly and the primary endpoint is the incidence of a disease such as COVID-19 which occurs frequently, cases may accumulate quickly and may allow FDA to assess the benefit-risk profile of the vaccine based on a shorter clinical trial duration and participant follow-up.  By contrast, if a clinical trial enrolls subjects more slowly and assesses a disease with lower incidence, more time may be needed to accumulate a database that allows statistically meaningful comparisons to be drawn between the vaccine and control groups.  FDA's benefit-risk analysis may reasonably take into account the historical experience with vaccines, and the fact that most adverse events that are plausibly linked to vaccination occur within two months of vaccination.[64] Furthermore, vaccine trials involve different types of endpoints, with some trials focusing on immunogenicity endpoints and some focusing on disease endpoints.  All of these features impact the type and duration of data needed to evaluate the benefits and risks of a vaccine.

---

[63] See, e.g., June 2020 Guidance at 12.
[64] Table VI. National Vaccine Injury Compensation Program. Rockville, MD: Health Resources and Services Administration, 2017 (https://www.hrsa.gov/sites/default/files/hrsa/vaccine-compensation/vaccine-injury-table.pdf. opens in new tab).

For all of these reasons, we deny Petitioner's request.

8. **Petitioner's Request that FDA Revise its Guidance Document to Address Safety Data from Individuals Receiving more than 2 Doses**

Petitioner states that FDA should "[c]larify in revised Guidance that safety data from individuals receiving more than 2 vaccine doses must be submitted by vaccine manufacturers."  CP at 9. Petitioner states that the safety profile of multiple doses must be considered.  CP at 9.

FDA does not at this time see a need to revise its guidance documents, because FDA may communicate to individual sponsors whether there is a need to provide the agency with data to support the possible use of more than 2 vaccine doses.  While guidance documents allow the agency to articulate its interpretation of or policy on a regulatory matter (21 CFR § 10.115(b)), there are also times where FDA's advice would be specific to an individual manufacturer. Accordingly, we deny Petitioner's request.

### a. Conclusion

FDA has considered Petitioner's requests. For the reasons given in this letter, FDA denies the requests in Petitioner's citizen petition. Therefore, we deny the CP in its entirety.

Sincerely,

Peter Marks, MD, PhD
Director
Center for Biologics Evaluation and Research

cc: Dockets Management Staff

### Appendix I: Aspects of Vaccine Development and Process for Licensure

**A.     Vaccines are Biologics and Drugs**

Vaccines are both biological products under the Public Health Service Act (PHS Act) (42 U.S.C. § 262) and drugs under the Federal Food, Drug, and Cosmetic Act (FD&C Act) (21 U.S.C. § 321).  The PHS Act defines a "biological product" as including a "vaccine…or analogous product…applicable to the prevention, treatment, or cure of a disease or condition of human beings."  42 U.S.C. § 262(i)(1).  The FD&C Act defines drug to include "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man."  21 U.S.C. § 321(g)(1)(B).

Under the PHS Act, a biological product may not be introduced or delivered for introduction into interstate commerce unless a biologics license is in effect for the product.  42 U.S.C. § 262(a)(1)(A).

**B.     Clinical Investigations of Vaccines**

Before a vaccine is licensed (approved) by FDA and can be used by the public, FDA requires that it undergo a rigorous and extensive development program that includes laboratory research, animal studies, and human clinical studies to determine the vaccine's safety and effectiveness.

The PHS Act and the FD&C Act provide FDA with the authority to promulgate regulations that provide a pathway for the study of unapproved new drugs and biologics.  42 U.S.C. § 262(a)(2)(A) and 21 U.S.C. § 355(i).  The regulations on clinical investigations require the submission of an Investigational New Drug application (IND), which describes the protocol, and, among other things, assures the safety and rights of human subjects.  These regulations are set out at 21 CFR Part 312.  See 21 CFR § 312.2 (explaining that the IND regulations apply to clinical investigations of both drugs and biologics).

The regulations provide that, once an IND is in effect, the sponsor may conduct a clinical investigation of the product, with the investigation generally being divided into three phases.  With respect to vaccines, Phase 1 studies typically enroll fewer than 100 participants and are designed to look for very common side effects and preliminary evidence of an immune response to the candidate vaccine.  Phase 2 studies may include up to several hundred individuals and are designed to provide information regarding the incidence of common short-term side effects, such as redness and swelling at the injection site or fever, and to further describe the immune response to the investigational vaccine.  If an investigational new vaccine progresses past Phase 1 and Phase 2 studies, it may progress to Phase 3 studies.  For Phase 3 studies, the sample size is often determined by the number of subjects required to establish the effectiveness of the new vaccine, which may be in the thousands or tens of thousands of subjects.  Phase 3 studies are usually of sufficient size to detect less common adverse events.

If product development is successful and the clinical data are supportive of the proposed indication, the completion of all three phases of clinical development can be followed by submission of a Biologics License Application (BLA) pursuant to the PHS Act (42 U.S.C. § 262(a)), as specified in 21 CFR § 601.2.

## C.    Biologics License Applications

A BLA must include data demonstrating that the product is safe, pure, and potent and that the facility in which the product is manufactured "meets standards designed to assure that the biological product continues to be safe, pure, and potent."  42 U.S.C. § 262(a)(2)(C)(i).  FDA does not consider an application to be filed until FDA determines that all pertinent information and data have been received.  21 CFR § 601.2.  FDA's filing of an application indicates that the application is complete and ready for review but is not an approval of the application.

Under § 601.2(a), FDA may approve a manufacturer's application for a biologics license only after the manufacturer submits an application accompanied by, among other things, "data derived from nonclinical laboratory and clinical studies which demonstrate that the manufactured product meets prescribed requirements of safety, purity, and potency."  The BLA must provide the multidisciplinary FDA reviewer team (medical officers, microbiologists, chemists, biostatisticians, etc.) with the Chemistry, Manufacturing, and Controls (CMC)[65] and clinical information necessary to make a benefit-risk assessment, and to determine whether "the establishment(s) and the product meet the applicable requirements established in [FDA's regulations]."  21 CFR § 601.4(a).

FDA generally conducts a pre-license inspection of the proposed manufacturing facility, during which production of the vaccine is examined in detail.  42 U.S.C. § 262(c).  In addition, FDA carefully reviews information on the manufacturing process of new vaccines, including the results of testing performed on individual vaccine lots.

FDA scientists and physicians evaluate all the information contained in a BLA, including the safety and effectiveness data and the manufacturing information, to determine whether the application meets the statutory and regulatory requirements.  FDA may also convene a meeting of its advisory committee to seek input from outside, independent, technical experts from various scientific and public health disciplines that provide input on scientific data and its public health significance.

As part of FDA's evaluation of a vaccine as a whole, FDA takes all of a vaccine's ingredients into account (including preservatives and adjuvants).  FDA licenses a vaccine only after the Agency has determined that the vaccine is safe and effective for its intended use, in that its benefits outweigh its potential risks.

---

[65] Also referred to as Pharmaceutical Quality/CMC.

### Appendix II:  Aspects of Vaccine Postmarketing Safety Monitoring

Post-marketing surveillance of vaccine safety is crucial to detect any rare, serious, or unexpected adverse events, as well as to monitor vaccine lots.  Manufacturers often conduct post-marketing observational studies.  However, FDA also uses multiple tools and databases to evaluate the safety of vaccines after they have been licensed and used in the general population.

The Vaccine Adverse Event Reporting System (VAERS) is a national passive surveillance vaccine safety database that receives unconfirmed reports of possible adverse events following the use of a vaccine licensed in the United States.  VAERS is co-administered by FDA and the Centers for Disease Control and Prevention (CDC).  Anyone can make a report to VAERS, including vaccine manufacturers, private practitioners, State and local public health clinics, vaccine recipients, and their parents or caregivers.  Surveillance programs like VAERS perform a critical function by generating signals of potential problems that may warrant further investigation.

It is often difficult to determine with certainty if a vaccine caused an adverse event reported to VAERS.  Many events that occur after vaccination can happen by chance alone.  Some adverse events are so rare that their association with a vaccine is difficult to evaluate.  In addition, VAERS often receives reports where there is no clear clinical diagnosis.  FDA draws upon multiple sources of data and medical and scientific expertise to assess the potential strength of association between a vaccine and a possible adverse event.

Monitoring and analysis of VAERS reports typically includes daily in-depth medical review of all serious reports, statistical data mining techniques, and epidemiological analysis.  We look for patterns and similarities in the onset timing and clinical description.  We review published literature to understand possible biologic hypotheses that could plausibly link the reported adverse event to the vaccine.  We review the pre-licensure data and any other post-marketing studies that have been conducted.  We also consider "background rate," meaning the rate at which a type of adverse event occurs in the unvaccinated general population.  When necessary, we discuss the potential adverse event with our federal and international safety surveillance partners.  We also carefully evaluate unusual or unexpected reports, as well as reports of "positive re-challenges" (adverse events that occur in the same patient after each dose received).  When there is sufficient evidence for a potential safety concern we may proceed to conduct large studies, and we may coordinate with our federal, academic and private partners to further assess the potential risk after vaccination.  In addition, when potential safety issues arise, they are often presented to various U.S. government advisory committees, including the Vaccines and Related Biological Products Advisory Committee, the Advisory Committee on Immunization Practices, the Vaccines Advisory Committee, and the Advisory Committee on Childhood Vaccines, and are often discussed with experts from other countries and from the World Health Organization (WHO).  Federal agencies that assist in population-based vaccines safety studies include the Centers for Medicaid and Medicare (CMS), the Department of Defense (DoD), and the Indian Health Services (IHS).  In addition, we generally communicate and work with international regulatory authorities and international partners to conduct studies in vaccine safety.

The Vaccine Safety Datalink (VSD) project has actively monitored vaccine safety in more than 9.1 million people nationwide, over 3% of the US population.  The VSD can monitor vaccine safety with near real-time surveillance systems, which is particularly important for new vaccines.  If there is a vaccine safety signal in the VSD, chart reviews and case series analyses are done

when assessing the possible association between a vaccine and an adverse event.  If needed, VSD is able to use its large health care database to further evaluate specific vaccine safety concerns.

The Clinical Immunization Safety Assessment (CISA) is a national network of six medical research centers with expertise conducting clinical research related to vaccine safety.  The goals of CISA are: to study the pathophysiologic basis of adverse events following immunization using hypothesis-driven protocols; to study risk factors associated with developing an adverse event following immunization using hypothesis-driven protocols, including genetic host-risk factors; to provide clinicians with evidence-based guidelines when evaluating adverse events following immunization; to provide clinicians with evidence-based vaccination or revaccination guidelines; and to serve as a regional referral center to address complex vaccine safety inquiries.  Advances in genetics and immunology continue to help us further assess the safety of vaccines, and FDA has established a genomics evaluation team for vaccine safety.

Finally, the Sentinel Initiative is a national electronic system that will continue to improve FDA's ability to track the safety of medical products, including vaccines.  Launched in May 2008 by FDA, the Sentinel System will enable FDA to actively query diverse automated healthcare data holders – like electronic health record systems, administrative and insurance claims databases, and registries – to evaluate possible safety issues quickly and securely.  The Sentinel Initiative will cover 100 million people in the U.S.  It is also anticipated that Sentinel will facilitate the development of active surveillance methodologies related to signal detection, strengthening, and validation.

24