1

2            **UNITED STATES DISTRICT COURT**
           **NORTHERN DISTRICT OF FLORIDA**
3            **PENSACOLA DIVISION**

4                          )
JOHN DOE, et al,              )
5                          )
            Plaintiffs      ) Case No: 3:21cv1211
6                          )
         v.                ) Tallahassee, Florida
7                          ) November 3, 2021
LLOYD AUSTIN, III           )
8 IN HIS OFFICIAL CAPACITY AS   ) 9:00 AM
SECRETARY OF DEFENSE US      )
9 DEPARTMENT OF DEFENSE, et al, )
                         )
10            Defendants.     )
_____ )

11

12         **TRANSCRIPT OF TELEPHONIC HEARING**
     **BEFORE THE HONORABLE ALLEN C. WINSOR**
13          **UNITED STATES DISTRICT JUDGE**
           **(Pages 1 through 87)**

14 <u>APPEARANCES</u>: (by telephone)

15 For the Plaintiffs:     Brandon C. Johnson
                    By:   BRANDON C. JOHNSON
16                         Attorney at Law
                        brandoncjohnson6@aol.com
17                    1815 Sudbury Road NW
                   Washington, DC 20012
18
For the Defendants:     United States Department of Justice
19                    Civil Division, Federal Programs Branch
                   By:   ANDREW E. CARMICHAEL
20                         Senior Trial Counsel
                   1100 L Street, N.W.
21                    Washington, DC 20005

22            *LISA C. SNYDER, RPR, CRR*
       **Official United States Court Reporter**
23    **111 North Adams Street, Tallahassee, FL 32301**
      **(850)567-1374 * lisasnydercr@gmail.com**

24
       *Proceedings reported by stenotype reporter.*
25    *Transcript produced by Computer-Aided Transcription.*

1        **P R O C E E D I N G S**

2        (Call to Order of the Court at 9:07 AM on Wednesday,

3   November 3, 2021.)

4            THE COURT:  Good morning.

5            We are on the record in case 3:21cv1211.  It's Doe

6   versus Austin.

7            We are here to talk about the motions for preliminary

8   injunction and also the motion to proceed anonymously.

9            I know we have a lot of people on the line.  This is a

10  public hearing, but obviously only the lawyers will be speaking.

11  And so if you are not in a speaking role, if you will mute your

12  line please.  That will help the rest of us communicate and cut

13  down on background noise and things like that.

14           I do just want to remind everyone, although we are

15  doing this telephonically for the convenience of the parties,

16  the rule against recording that would apply if we were in the

17  courtroom still applies here so no one is to record this.

18           Mr. Johnson, you are there for the plaintiffs and I

19  understand you will be most of the talking for the plaintiffs;

20  is that right?

21           MR. JOHNSON:  That's correct, Your Honor.

22           THE COURT:  Mr. Carmichael, you are there for the

23  defendants?

24           MR. CARMICHAEL:  Yes, Your Honor.

25           THE COURT:  Very good.

1          I do have some questions for both sides.  I do want to

2     give you all a chance to present however you'd like.

3          I want to start though with the motion to proceed

4     ananimously.  I have read the papers on that, including the

5     reply and I understand the arguments.

6          I do want to make sure I have the facts right in terms

7     of if there is any update about which -- and it was evolving and

8     different names were going over under the protective order at

9     different times, but I'd like an update on where we are with

10    what names are in the government's possession and which ones

11    aren't.

12         And then also I want to just clarify from the

13    government; I mean, you cited all of the pertinent Eleventh

14    Circuit cases that talk about the public's right and things like

15    that, but I just wanted to clarify if the position the

16    government has beyond that it's unfair for it not to know who is

17    who, and whether it asserts that even if it is provided all of

18    the names that the public still ought to know.

19         So we will start with the update portion of that,

20    Mr. Johnson.  Tell me how many of the plaintiffs' information

21    has been provided under the protective order and how many have

22    not.

23         MR. JOHNSON:  Yes.  So, a total of nine have disclosed

24    their identities and materials under the protective order.

25         I also have authorization from an additional five that

1    if the Court were to determine that they could not proceed

2    anonymously that they would disclose their identity under the

3    protective order.

4            There are only two that would remain anonymous even

5    under those circumstances.  And if it helps, should I identify

6    which John Does are currently disclosed?

7            THE COURT:  I don't know that I need that right now.

8    But the bottom line is everyone has either been disclosed or

9    would be disclosed except for two?

10           MR. JOHNSON:  Nine have been disclosed.  Five

11   additional will disclose.  And two I don't have approval to

12   disclose.  So they would be -- yeah.

13           THE COURT:  Okay.  Mr. Carmichael, you heard my

14   question about the government's view.  I just want to make sure

15   I understand it correctly.  Even if you got all 16 of them your

16   view is that, except with respect to Jane Doe 1, that they all

17   ought to be required to publicly disclose themselves?

18           MR. CARMICHAEL:  Yes, Your Honor.

19           Just the basics of that argument is that everybody --

20   for us, in the military, your vaccine status is readily

21   available because it's necessary to deploy, so commanders know

22   it, and everybody knows it, so it seems like the only purpose of

23   hiding vaccine status would be for the lawsuit -- going

24   anonymously for vaccine status.

25           If there was some other reason that was given, we

1    may -- like in Jane Doe 1, we may not have that position, but if

2    it's just vaccine status we didn't think that was appropriate to

3    proceed anonymously.

4            THE COURT:  Okay.  I understand the arguments on that

5    then.  If you want to add anything on your motion as to that,

6    Mr. Johnson, you're welcome to.  Otherwise we'll move to the two

7    preliminary injunction motions.

8            You tell me, did you have anything you'd like to add

9    on the anonymity?

10            MR. JOHNSON:  Yes, Your Honor.  And I don't believe

11    that's a correct characterization.  It's not exclusively their

12    vaccine status.  They are -- even the John Does, who have

13    disclosed, they have a number of medical conditions that, you

14    know, impact their medical privacy, religious exemption requests

15    where they are required to disclose their sincerely held

16    beliefs.  As well as some of the factors discussed in the reply,

17    which, you know, there could be other repercussions besides

18    compliance with the vaccine mandate if the government were to --

19    if the identities were to be disclosed outside the protective

20    order.  There could be additional avenues for retaliation not

21    only through the military chain of command but potentially

22    through other government agencies.

23            So, I just want to reiterate that the concern is not

24    solely regarding vaccine status, which, of course, is known to

25    chain of command.

1          THE COURT:  Right.  I understand that.  And like I

2     said, I think I understand the arguments.

3          It's a difficult standard for you in the Eleventh

4     Circuit on that topic.

5          And as to the medical conditions, and things like

6     that, there are avenues where people can proceed publicly, but

7     then have certain aspects of things sealed.  We certainly don't

8     have a situation where every medical malpractice plaintiff

9     proceeds anonymously because there is confidential records at

10    issue in the case and things like that.

11         And I guess the issue I have is a lot of your

12    arguments are at a pretty high level of generality on the

13    anonymity issue.  And you're talking about repercussions coming,

14    but from whom?  The whole point of the case is that there will

15    be repercussions for their decision here not to take the

16    vaccine.  And so -- beyond that, it seems like most of what you

17    are arguing is pretty general.  And I am just not sure it meets

18    the standard.  But tell me what's wrong about any of that.

19         MR. JOHNSON:  If I could just respond.

20         THE COURT:  Sure.

21         MR. JOHNSON:  I think you acknowledged, Your Honor,

22    that for the purpose of -- at least for the purposes of the

23    defense, and not to prejudice the defense, we have nine, and

24    potentially 14, who will disclose their identities to enable the

25    defense to respond and prepare their defense, so --

1          THE COURT:  Right.  But I guess that's somewhat

2     circlular because if the point is it's the defendants, and their

3     agents, who will be doing the unfair retaliation, and things

4     like that, they are going to know anyway.  And so we really are

5     left with the public and what the Eleventh Circuit says about

6     that is it's a pretty high standard.

7          I guess if the fear is, if my military supervisors

8     know I am participating in this lawsuit, there is going to be

9     repercussions.  Well, once they disclose under the protective

10    order the military supervisors do know that, right?  And

11    certainly if there were any relief given they would have to

12    know.  I'm not quite sure I see what you're saying.

13         MR. JOHNSON:  I would just add one point that if the

14    very modest and limited relief that we are requesting in terms

15    of a stay of disciplinary action were granted, for the limited

16    period necessary to brief the preliminary injunction, that will

17    mitigate any concerns about anonymity or disclosure -- excuse

18    me.  If you were to grant that relief, and give us a limited

19    amount of time for me to go back and get approval to discuss it

20    with them, then perhaps that will be a unique resolution to this

21    issue.

22         THE COURT:  Okay.  Well, you said -- you mentioned --

23    maybe I misunderstood -- briefing the preliminary injunction.

24    That's what we are here -- that's briefed.  We are here to

25    address that issue, right?  Or were you saying -- tell me again

 1    what you're asking, specifically.  The last statement.

 2          MR. JOHNSON:  In our motions we are requesting four

 3    different types of relief:  One, is a stay of the order -- the

 4    relative orders and the disciplinary action.  That's what I was

 5    referring to now.

 6          We are also discussing a TRO motion and a preliminary

 7    injunction motion.

 8          So, I guess I was referring to either granting the

 9    requested stay of disciplinary action or a TRO motion for a

10    limited period of time.

11          THE COURT:  I guess -- here is -- maybe this will help

12    with the other things.

13          As I read it, your TRO request was to have immediate

14    relief without notice to the other side, without a response from

15    the other side.  We are past that.  And so I think we are left

16    here with -- as to the constitutional claims and as to the

17    claims against DOD, just a straight Rule 65 preliminary

18    injunction.  And then a separate request, related request, for

19    an APA stay under whatever it is, Section 705.  I think that's

20    where we are.  Is that not -- is there a third piece or another

21    piece?

22          MR. JOHNSON:  I would just want to clarify that the

23    TRO, and preliminary injunction, and stay motions they were not

24    ex parte.  The only ex parte motion was the motion to proceed

25    anonymously.

1          THE COURT:  I get that.  What is the difference at

2     this point between a request for a TRO and a request for a

3     preliminary injunction?  It would be the same relief.  It's just

4     the TRO would be more limited until the PI could be briefed and

5     now we have briefed the PI.

6          MR. JOHNSON:  That is a fair characterization.

7          THE COURT:  All right.

8          Mr. Carmichael, do you want to respond to any of what

9     you just heard before we turn to the merits of the preliminary

10    injunction motions?

11         MR. CARMICHAEL:  Your Honor, I would just say if there

12    were particular redactions for medical purposes that plaintiffs

13    wanted to do I think the government is pretty flexible on that.

14    If there was like a particular medical condition we wanted to do

15    under seal, something like that, that's something that we

16    certainly wouldn't rule out.  And they can come to us and put

17    that part in the protective order.

18         THE COURT:  Here is what I'd like to do then and that

19    is turn to the preliminary injunction motions.  There were two

20    separate motions, as you all know.  But what I would like you to

21    do, as you go through your argument, Mr. Johnson, is just be

22    precise about which claims we're talking about at which times,

23    because I think there are different issues that apply to some

24    claims and not others.  And it can get complicated if we're just

25    talking too broadly about the overall mandate issues and things

1    like that.  So, I will let you proceed however you like.

2         I will say I want to hear specifically on the standing

3    issue as to the -- there are two overarching issues that I want

4    to hear about: One, a lot of the papers, at least the first

5    round of papers, talked about the EUA and the fact that the

6    government regulations don't allow a requirement that people

7    take a drug that only has an EUA.

8         The government has come back and said:  No, that's not

9    what we're doing.  Everyone is going to have the approved Pfizer

10   version.  They have said they have hundreds of thousands of

11   doses available and no one is going to be forced to take

12   anything else.

13        I want to know from your perspective how much, if any,

14   that changes where we are right now.

15        And then, two, a lot of your claims are against the

16   FDA and its decision as to the license and as to the EUA before

17   that.  And the government has raised standing as to those

18   claims.

19        It does seem like you've got a redressibility issue

20   there and that even if the FDA undid everything they have done,

21   either voluntarily or by Court Order, that doesn't necessarily

22   help your clients which seems like that would be a

23   redressibility problem.

24        So those are two things I would like to hear about,

25   but I also want to hear anything else you would like to say

1    about any of your claims.  So I will you proceed however you'd

2    like.

3          MR. JOHNSON:  Okay.  Well, I have prepared kind of a

4    short opening statement and general remarks.

5          THE COURT:  Sure.  That's fine.

6          MR. JOHNSON:  And I want to hit on some issues that I

7    don't think were developed adequately in our briefing.  I think

8    we hit the merits pretty well in the briefing, but some of the

9    injunction factors perhaps not as well.

10         First, let me just explain our theory of the case.

11   Defendants' central argument is that they are not only due

12   deference, but that their actions are, in fact, unreviewable

13   motivated because they are motivated by national security or

14   public health emergency concerns.

15         What they really mean is that the executive and

16   federal agencies are above law, above Congress, and above this

17   Court.

18         They are free to ignore the law expelling potentially

19   hundreds of thousands of service members and reducing a hundred

20   million, or more, Americans to second class citizens.

21         The federal vaccine mandates, which include the DOD

22   mandate as well as mandates for federal employees, federal

23   contractors, and we will probably see the OSHA mandates as soon

24   as this week, apply to up to a hundred million Americans.  But

25   they go beyond employment, and upheld they would amount to a

1   judicial endorsement of excluding over a hundred million

2   Americans from the workplace, potentially education, political

3   institutions, and social and cultural life.

4          Defendants are not above the law and this Court has

5   the authority to review their actions, make appropriate

6   findings, and grant the requested relief.

7          And I just reiterate the relief we request is not

8   unprecedented.  It is nearly identical to the declaratory

9   injunctive relief that was granted in *Doe v. Rumsfeld*, which

10  initially applied to a vaccine that was in an investigational

11  new drug status.  But it was expanded to cover the vaccine when

12  it was designated, or when it was granted emergency use

13  authorization.  So that is clear that the Court would not be

14  breaking new ground here.

15         As far as the injunction factors, I think we did cover

16  the merits pretty well in the briefing, but the other three I

17  just want to make a couple of general points.

18         First off, the -- and this goes into standing as

19  well -- the defendants mischaracterize the nature of our claims

20  as a challenge to military discipline or the military justice

21  system.  That is incorrect.  This is a challenge to a generally

22  applicable military regulation and what we would characterize as

23  a near universal employment regulation.

24         If this were a challenge to individual military

25  discipline proceedings it likely would not be justiciable in

1    this Court.

2           As far as irreparable harm, the defendants, in their

3    opposition, cited several cases where a discharge was found not

4    to be irreparable harm.  Those cases are inapplicable because

5    they involve military discharge proceedings for service members

6    who had -- who had committed serious offenses like drug

7    trafficking, weapons charges, and terroristic threats that would

8    be criminal under civilian or military justice.

9           Our plaintiffs have not committed anything -- have not

10   committed any criminal actions.  I don't think anyone contends

11   that these are criminal prosecutions, or that it would interfere

12   with the administration of military justice.

13          As far as the balance of equities and deference to DOD

14   and FDA, which are essential themes of this case, I would

15   reiterate that the DOD mandate is not specific to national

16   security or military readiness.  It is, once again, a universal

17   employment regulation.

18          It appears to be pretextual and irrational in that it

19   requires one hundred percent vaccinations, that even if we

20   assume they are correct might save dozens of lives, but it would

21   do so at the cost of the loss of hundreds of thousands of

22   service members discharged, careers destroyed, livelihoods

23   destroyed, as well as resulting deprivation of constitutional

24   rights.

25          As far as the public health concerns, again this gets

```
1    into the FDA.  The proposed relief would not reduce the

2    availability of any vaccine.  Anyone who wants to take a vaccine

3    would still be able to take it voluntarily.  Comirnaty is

4    apparently not available, and that's something we need to get

5    into it, so it could not remove it from the market because it

6    apparently is not in the market or available at the moment.

7    That is part of the reason we are here today, which addresses

8    their attempt to use the substitute different products under a

9    different regime with the products that they licensed.

10          THE COURT:  Can I ask a question about that?  That

11   gets to my redressibility concern.  If you are right about that,

12   and I don't know that there is evidence in the record to suggest

13   that you are -- in other words, that there is no Comirnaty out

14   there -- it's a very interesting topic this what you have called

15   the bait and switch.  And I definitely want to hear more from

16   the government on that.  But, if Comirnaty is unavailable, and

17   no one is going to get it, then how does invalidating the

18   approval of it change anything?

19          MR. JOHNSON:  Well, there's two aspects of the FDA's

20   actions.  So two causes, and I would characterize them both as

21   but for causation and proximate causation.

22          So assuming Comirnaty is available, which it's not

23   clear that it is, given the defendants' opposition claim that

24   it's not, quote unquote, in existence, so we don't know if it is

25   but let's assume that it is, then --
```

1          THE COURT:  I think they say in their affidavit that

2     there is hundreds of thousands of doses in the military's hands.

3          MR. JOHNSON:  Well, Your Honor, what they say, and

4     this is in the Marks affidavit that -- or excuse me -- the Rans

5     affidavit, is that there are hundred of thousands of, quote

6     unquote, BLA compliant doses that -- and we are using them.

7          Now BLA compliance does not mean it's Comirnaty.  They

8     are very specific.  They are saying that it was not manufactured

9     or labeled -- does not have the BLA labeling.  It's not clear

10    that it was BLA manufactured.  That's another question, given

11    that the crucial facts, like the manufacturing process, the

12    ingredients are not disclosed, and they appear to differ from

13    what is available regarding the EUA product.

14         The labeling is unquestionably different.  And the DOD

15    mandate requires the use of a fully-licensed vaccine consistent

16    with FDA labeling requirements.

17         Well, then we have Marks, from the FDA, explaining

18    that they have exercised their enforcement discretion not to

19    enforce the labeling requirement and other BLA requirements.

20         It's not clear how a non-enforcement decision can

21    convert an unlikely product into a licensed product or

22    retroactively license an unlicensed product.

23         THE COURT:  Well, what's licensed is the use of the

24    chemical.  And as I understand the evidence in this case, is

25    that the Comirnaty is chemically identical to what was known as

1    the Pfizer vaccine that was the subject of the EUA.

2         I know you say: Well, that's not clear.  I think they

3    said that in an affidavit, and maybe I am wrong about that, but

4    then this interchangeability argument, if they are right about

5    what this is, really comes down to you asserting a

6    constitutional right to have something labeled differently.  Is

7    that not where we end up?

8         I mean, in other words, the Comirnaty is the same

9    thing.  And it may be that they are doing things differently so

10   that they can, as you say, not terminate the EUAs of the

11   competing drugs.  This may be completely out of the norm.  I

12   don't know.

13        But if your claim is that your clients shouldn't be

14   required to take a drug that only has an EUA approval, and is

15   not licensed, and the evidence is that the batch that was

16   produced is licensed, then where does that leave you?

17        MR. JOHNSON:  Well, first off, we emphatically reject

18   the notion that they are, in fact, identical and there is no

19   basis in the record to conclude that.

20        And if you will give me a few moments I would like to

21   layout why that is the case.

22        THE COURT:  Sure.  Well -- yes; I will definitely give

23   you a chance to do that, but keep in mind the burden is yours

24   here.  So if there is no evidence one way or the other on that

25   topic, and I don't know whether it's ultimately dispositive or

1  not, but on the issue of whether they are the same, it would be

2  your burden to show that they are not.  Wouldn't it?

3            MR. JOHNSON:  If I would agree that we need to point

4  to facts in the record.  Understanding that we don't have our

5  experts here, but we can point to facts in the record in

6  existence at this time demonstrating that they are not the same

7  and that's what I would like to do.

8            THE COURT:  Okay.

9            MR. JOHNSON:  So I think the most, let's say,

10 probative evidence of this is in the FDA's summary basis of

11 regulatory action, which pages -- let's see.  It's pages 6 to 8,

12 and that is ECF 1-5.

13           If someone can turn to that I think everyone will see

14 that these pages are largely redacted.  And I just want to go

15 through the significance of these redactions to explain why, at

16 a minimum, they cannot show they are different -- or excuse me,

17 they are the same, as well as that -- excuse me.  I'm just

18 getting to my exhibit.

19           THE COURT:  Will you tell me the exhibit again?  This

20 is the approval letter, the August 23rd approval letter?

21           MR. JOHNSON:  No.  This is -- it is dated August 23rd.

22 It is entitled Summary Basis for Regulatory Action.  And it

23 is -- I think it's numbered Exhibit 4, but it's ECF Number 1-5.

24           THE COURT:  Okay.  That's Exhibit 3, as I have it

25 here.

1          MR. JOHNSON:  The approval letter, yes, is different.

2     That's correct.

3          THE COURT:  I may have the wrong thing up.  Bear with

4     me just a minute here.

5          MR. JOHNSON:  Of course.

6          THE COURT:  Okay.  I have got it here.  Sorry.

7          MR. JOHNSON:  So, 1-6 is not correct.  It is 1-5.

8          So, we will start with 8, which is the ingredients --

9     7 and 8 is the list of ingredients.  I guess as a preliminary

10    fact, we should -- I'm not a scientist.  I'm not a chemist.  But

11    there is a crucial difference between pharmaceuticals, which are

12    chemicals, and biologics, which are products of biological

13    processes.  So it is not something that is made simply through a

14    recipe.  There are ingredients, but equally important there is

15    the manufacturing process.

16         Starting with the ingredients, there are a number that

17    are redacted.  A number of the lipid components, as well as an

18    excipient on page 8, which is does not appear to be part of the

19    EUA formulation.

20         So there do appear to be some differences in

21    composition or ingredients.  But perhaps most importantly

22    there -- the manufacturing process on 6 to 7 is entirely

23    redacted.  We don't know what's in that.  That's also not

24    available in the EUA authorizations.  As well the manufacturing

25    locations on pages 12 to 13 are not disclosed.

1              A key distinction between the EUA and the licensed

2    product is the manufacturing process, the manufacturing

3    facilities, as well as the labeling.  But, there is a

4    significant and undisclosed substantive difference in these

5    products.  And it's not simply -- you know, what has prompted

6    this inquiry is all the hoops that the FDA and the DOD are

7    jumping through to say, Hey, this other thing is the same as the

8    thing we licensed -- the fastest licensing in the history of the

9    FDA, the unprecedented timeline.

10             Somehow, Pfizer and BioNtech -- I am not sure about

11   the pronunciation -- they were pumping out hundreds of millions

12   of doses per month.  Something like 200 million Americans are

13   vaccinated, not only with that but others.  But they are pumping

14   out hundreds of millions of doses of the EUA product per month.

15   Yet, here we are, I don't know, two and a half months later,

16   after the licensing and apparently nobody has it.

17             Instead, we have the FDA and the DOD exercising

18   enforcement discretion, and -- I don't know what all they are

19   doing -- and using language like "BLA compliant", rather than

20   this isn't licensed products.  But there appears to be some

21   significant backlog in the production process that's not

22   explained.  It's likely something to do with the manufacturing

23   facilities that's perhaps not -- perhaps they had to retool.

24   Perhaps -- there are any number of explanations, which we, you

25   know, would love to find out more about to understand.  But at

 1   one point they are pumping out hundreds of millions per month

 2   and now nobody can find any.

 3         Keep in mind, while the DOD is one of the largest

 4   employers in the country they still only need a few hundred

 5   thousand doses.  So why is it so hard to come by?  That's just a

 6   question that is raised by again all of these hoops.

 7         So, just to reiterate, they do appear to be

 8   differences in the ingredients and composition.  There are

 9   unquestionably differences in the manufacturing process and

10   facilities, which are undisclosed.  There is no basis in the

11   record to say that they are the same.

12         There is a strong basis in the record to say that they

13   are difference, again based on the differences in the number of

14   ingredients, as well as the fact that the EUA process does not

15   require any approval of the manufacturing process, or at least

16   not the same approval of the manufacturing process and

17   manufacturing facilities that the licensing application

18   requires.

19         THE COURT:  Okay.  So, I understand that, and I guess

20   there are some question marks about how this all unfolded, but

21   what the government says is they are not requiring anyone to

22   take anything that's not licensed.  And maybe they are relying

23   on this substitute thing.  Maybe not.  We will find out more

24   about that in a minute.

25         But if the requirement is limited to -- and it's says

1    it right in the guidance that's attached to your complaint that

2    they are not requiring anyone to take anything that is not

3    licensed -- then at least -- we will talk about the

4    constitutional claims in a minute -- but then as to the FDA, you

5    are just left with challenging the final approval of the

6    Comirnaty; correct?

7          MR. JOHNSON:  We are talking about the injury and

8    redressibility with respect to the FDA?  Was that the question,

9    Your Honor?

10          THE COURT:  Well, no.  It was a merits question.  I

11    guess with respect to no matter what the claim is I think there

12    is a redressibility issue with the FDA.

13          On the merits -- the claim against the FDA on the

14    merits, if your clients are only asked to take the licensed

15    Comirnaty, is just that the FDA acted arbitrarily and

16    capriciously in issuing the final approval of Comirnaty; right?

17          MR. JOHNSON:  So let me address the merits and the

18    standing in turn.  As far as the merits, yes; we agree that the

19    Comirnaty approval suffers from the large number of defects we

20    identified in briefings.

21          THE COURT:  What's your response to the record rule on

22    that?  Because it does seem like -- I mean, you have an

23    affidavit -- two affidavits really -- saying, it's not a good

24    drug.  There is obviously a debate about that out there.  But

25    you have to do more than just convince me that they shouldn't

1    have approved it.  I mean, it would be -- putting the standing

2    aside, it's a pretty high standard and you have got the record

3    rule to contend with which I am not sure how you get around

4    that.

5          MR. JOHNSON:  Okay.  Let me address the record rule,

6    so it doesn't get lost.

7          THE COURT:  Sure.

8          MR. JOHNSON:  We are also challenging the

9    interchangeability determination.  We believe that's a separate

10   cause of injury, and that that's a substantive injury in that

11   they are claiming that EUA, unlicensed experimental product that

12   is not manufactured, does not include the same ingredients as

13   the licensed product, is being administered pursuant to the

14   mandate.  And that is in violation of the informed consent

15   statute, 21 USC 360bbb-3, and some other regulations, as well as

16   10 USC 1107a, so I just want to put a placeholder down with

17   that.

18         THE COURT:  Sure.

19         MR. JOHNSON:  As far as the record rule, we believe

20   that the -- we would like to introduce extra record evidence,

21   but to prove a violation we don't.  We have identified, based

22   solely on the FDA's own records, the procedural violations --

23   the violations of their own regulations and guidance and

24   statute.

25         First, let's start with the statute and regulations.

1   Approval requires the use of, quote unquote, well-controlled

2   clinical studies.  The EUA was granted based on about two

3   months' of data for studies that we concede were

4   well-controlled.  However, after that point, they proceeded to

5   unblind them.  They removed the control group.

6          The FDA regulations do not permit approval based

7   solely on a partially or uncontrolled study, which is the result

8   of the FDA's decision to unblind, or at least to look the other

9   way while Pfizer did it.

10         It's not clear that the FDA approved it, but their

11  approval was based on Pfizer's unblinding.  And their answers in

12  the Marks' declaration are unsatisfactory.  It's something like

13  it is a delicate balancing act of judgment, or something.  But

14  it's just conclusory statements saying, Yeah, it happened, but

15  it doesn't matter.  That is simply not sufficient to carry their

16  burden under the APA.

17         There is also the fact that vaccine development and

18  approval is typically a 10-year process that was completed in a

19  matter of months without the completion of any clinical trials.

20  This is in the record.

21         The FDA's guidance specified that the trial should go

22  for at least one or two years, and should include key special

23  populations like the ones our plaintiffs belong to, namely those

24  with previous infections, who may develop natural immunity,

25  women of childbearing potential, and several other medical

1  conditions that may have put people at heightened risk of

2  adverse effects, or they may have less defenses.

3          The FDA is also on record as refusing to convene an

4  advisory committee.

5          The advisory committee, while not mandatory, the

6  regulation, which provides meaningful standards for review, sets

7  forth a number of high priority factors and Comirnaty hits

8  essentially all of them.

9          So, first off, you know, there are significant

10  regulatory differences.  It was foreseeable, and I think known,

11  that a vaccine -- it would be used to justify a vaccine mandate.

12          THE COURT:  Let me interrupt.  Back to the record.  I

13  understand you are saying you would like to put those things in.

14  I guess --

15          MR. JOHNSON:  My point is they are the record.  That

16  is the record.

17          THE COURT:  Well, let me ask the question I was going

18  to ask, which is your declarations are not part of that record.

19  And a lot of the arguments you're making maybe have other

20  support in the record, or -- but they are thematically some of

21  the things that are talked about in Dr. Ruby and -- is it Dr.

22  McCollough affidavit.  But as to the FDA claim, how is it that I

23  would be permitted to consider those in this case?

24          MR. JOHNSON:  Every claim that I have made is based

25  solely on FDA regulations, statutes, FDA guidance, and the

1   documents submitted in the licensing proceeding.

2        So the unblinding --

3        THE COURT:  No.

4        MR. JOHNSON:  -- that's part of the BLA application

5   itself.  That is part of the six months' of data that Pfizer

6   submitted.  So that gets us the well-controlled, or the lack of

7   a well-controlled study.

8        THE COURT:  But, Mr. Johnson, the question was how can

9   I consider those affidavits, and it sounds like you are saying I

10   don't need to.  Are you saying those are off the table then,

11   or --

12        MR. JOHNSON:  I do not concede.  I just want to make a

13   point that --

14        THE COURT:  Well, then if you don't concede that, then

15   you need to answer the question then about how it is that I

16   would be able to consider those in an APA challenge.

17        If you think I should consider them, you need to tell

18   me how I can because it seems to me that the law would require a

19   pretty substantial showing on your part before I can go beyond

20   what was in the administrative record.

21        Of course we don't have the administrative record

22   here, but I think we all agree those two declarations from Dr.

23   Ruby and Dr. McCollough are not in it.

24        The question is, if you want me to consider those you

25   need to tell me how I would legally be authorized to consider

1   those.

2          MR. JOHNSON:   Apologies.   I misunderstood the

3   question.

4          We do address this in some detail in the briefs.   The

5   argument is where you see an agency acting improperly in a

6   number of ways, you see a number of violations of their own

7   regulations and procedures, the differences in their normal

8   decision-making process, resignation of senior officials

9   purportedly due to political interference and purposes.   We have

10  the Marks' declaration saying that one of the reasons they can't

11  grant -- you should not grant this injunction is because it

12  would -- it could increase or promote vaccine hesitancy, which

13  tells -- which indicates that fighting vaccine hesitancy and

14  promoting vaccine mandates was one of the underlying purposes

15  for the very rushed and improper approval process.

16         There were improper purposes in this unprecedented

17  timeline for approval.   So cases like *Tummino v. Torti,*

18  *Department of Commerce v. New York,* provide grounds for going

19  beyond the administrative records when there appears to be

20  either an agency motivated by improper purposes, or even if not

21  improper, extra statutory criteria.

22         In this case, the extra statutory criteria is the

23  desire to promote a vaccine mandate.   That is not in the

24  statute.   That is not their job.   They look at safety, potency

25  and purity.   They are not a public health agency.   There are not

1    there to promote vaccines.  They have a very limited statutory

2    mandate.  And the record that we have before us, including the

3    Marks' declaration, demonstrates that they were motivated by

4    extra statutory purposes.

5              THE COURT:  Okay.  So that would be a finding -- an

6    evidentiary finding of bad faith, or something like that, that

7    would then allow those to be taken into consideration?

8              MR. JOHNSON:  Yes.

9              THE COURT:  Okay.  All right.  I didn't mean to get

10   you off track.  You can go back to --

11             MR. JOHNSON:  Okay.  If I recall correctly, we were

12   still discussing the merits of the FDA claim as well as the

13   standing, and in particular the redressibility.

14             THE COURT:  Yeah.  And I think, just to sort of

15   streamline things, I think what we ought to do is continue on

16   with this, and then we will separate the constitutional

17   arguments for sort of round two.

18             So, on your APA claims, and your claims against the

19   FDA and the standing against the FDA, limit it to those things,

20   and then we will give Mr. Carmichael a chance to weigh in and

21   then come back to you for the constitutional arguments, and any

22   rebuttal that you have on the APA and FDA thing.

23             MR. JOHNSON:  Thank you.  Just to summarize, we

24   believe there are two distinct unlawful actions by the FDA that

25   have resulted in injury to our clients.  We have talked about

1    the licensing of Comirnaty at length.

2            A second is the interchangeability determination which

3    allows, or at least that the DOD expressly relied on, is it's

4    not entirely clear that DOD mandates only licensed products.

5    The Air Force guys and the Surgeon General say something else.

6    The DOD comes back and says they are going to use BLA compliant.

7    I don't know what the DOD's position.  They seem to want to have

8    it both ways, but let's just assume that they are allowing EUA

9    vaccines to be used interchangeably with licensed vaccines, so

10   effectively mandating EUA vaccines that are not licensed.

11           THE COURT:  Wait a minute.  When you're talking about

12   the FDA's interchangeability action, what was the FDA's action

13   as to that?  Are you talking about what they call a

14   discretionary non-enforcement decision, or is there some

15   specific action that you are referring to about the

16   interchangeability determination?

17           MR. JOHNSON:  So, in the -- there were three documents

18   listed -- issued on August 23rd; one was the Comirnaty approval

19   letter, the second was an EUA expansion for the EUA vaccine, the

20   third was the summary basis of regulatory action that we just

21   discussed.

22           In the EUA letter, page 2, note 8, they state that the

23   two are interchangeable.  They make the assertion, without proof

24   or evidence, that they have the same formulation.  We discussed

25   why we contest that statement.

1          But, based on this footnote, the Air Force and the DOD

2     Surgeon General adopted this guidance.  There are many other

3     guidance documents adopting the interchangeable language, which

4     they also describe as you can use it "as if".  You can use the

5     EUA vaccine "as if" it were the licensed product.

6          So, it is this interchangeability determination which

7     is the but for cause of the DOD's guidance that would allow an

8     experimental vaccine to be mandated.  So we believe that that is

9     a separate cause of injury.

10          Now, the defendants do claim that that's, quote

11     unquote, committed to agency and discretion.  And make the

12     further, and unjustified, leap that it is precluded from

13     judicial review.  That is incorrect.  That's a separate topic we

14     can address.  We addressed that in the reply brief in some

15     detail.

16          In any case, those are the two unlawful FDA actions;

17     each of which has resulted in injury to our plaintiffs, or will

18     result to an imminent injury to our plaintiffs.  That is

19     something we will get to.

20          So in terms of redressibility, in order -- you know,

21     vacating the Comirnaty approval, remanding it for

22     reconsideration, that would address one aspect of plaintiffs'

23     injuries.

24          THE COURT:  Only if the military then said no one has

25     to get vaccinated; right?

1          MR. JOHNSON:  Well, if the DOD -- again the DOD has --

2     they are trying to have it both ways.  If the DOD -- the

3     language in the DOD mandate, the August 23, Secretary of Defense

4     memo, stating that only licensed products, in accordance --

5     fully FDA licensed products, in accordance with FDA labeling,

6     and whatever else, can be mandated, if that is truly the DOD's

7     position, and they are not going to try to substitute an EUA

8     product, then yes.

9          THE COURT:  But don't you have to show that -- I mean,

10    on the redressibility, at this stage wouldn't it be your burden

11    to show that they wouldn't?  The record that you have presented

12    is that they said, at some point, you know, by such and such a

13    date we're going -- either by the date that the FDA approves

14    something, or by September something, whichever is quicker,

15    we're going to require everyone to get vaccinated.

16          If that's the case, I think the way that read was

17    their plan was to require the EUA if there was no approval.

18          And so if I did what you're asking me to do, and take

19    away the FDA approval, then the question is, is that going to

20    eliminate the vaccine mandate, or just change it, and perhaps in

21    some ways make it worse for your clients?

22          And I think to show redressibility you would have to

23    show that there is a likelihood that if the FDA tomorrow, on its

24    own, or otherwise, just said, "We take back what we said about

25    Comirnaty", I think you would have to show that the likely

1  outcome of that would be the military saying, "Now there is no

2  vaccine mandate."

3          Isn't that what you would have to show?

4          MR. JOHNSON:  So, at that point, the DOD mandate would

5  be -- it would be illegal because it would violate Section 10

6  USC 1107a.  They have not obtained a presidential waiver of

7  informed consent.

8          THE COURT:  I thought 1107a was the experimental one.

9  Is that not right?

10          No; you're right.  That's emergency use.  I'm sorry.

11  Go ahead.

12          MR. JOHNSON:  1107a has a set of procedures to obtain

13  a presidential waiver that has not been obtained.  Based on the,

14  I believe, July 6, Office of Legal Counsel memo, ECF Number

15  33-4, at least as of July, the DOD's position was they cannot

16  mandate an EUA vaccine absent a presidential waiver.  They do

17  not have one, therefore if the FDA were to withdraw approval, or

18  the approval were to be vacated tomorrow, then simultaneously

19  the DOD mandate would also be invalidated.  They would need to

20  seek a presidential waiver.  It's interesting that they haven't.

21  I don't want to speculate why.  I would have to assume that they

22  don't believe they can get one, that they don't need one, or

23  they can't get one, but the fact is they haven't.

24          THE COURT:  Are you just saying they haven't said

25  otherwise, or is it in this record that there is no presidential

1    waiver?

2            MR. JOHNSON:  They have not said otherwise.  I believe

3    that that waiver would have to be published in the Federal

4    Register.  I may wrong about that.  We may have to confirm that,

5    but I don't believe there is -- if there were a secret waiver

6    sitting around on someone's desk I think someone would have

7    mentioned it.

8            THE COURT:  Okay.  All right.

9            MR. JOHNSON:  So, that would -- vacate would address

10   that injury.  A finding that the interchangeability

11   determination is unlawful.  It's clearly contrary to the

12   statutory scheme, and I have a few things to say about that.

13           That would also readdress any injury that might result

14   to the extent the DOD, or the Armed Services, sought to

15   administer the EUA vaccine "as if" or pursuant to the mandate

16   "as if" it were a licensed vaccine.

17           THE COURT:  Okay.  Just a moment.  Let me look at my

18   notes here.

19           Okay.  Tell me again -- you answered this a moment

20   ago, but what the government says about Comirnaty is that they

21   have a supply of Comirnaty.  And they say the plaintiffs have

22   set forth no reason why they think they would be vaccinated with

23   anything else.  You say, well, maybe that's not true.  But if it

24   is true, then you are left with the APA claim without

25   considering -- well, absent a showing of bad faith, without

1   considering your affidavits, just that the FDA didn't follow its

2   own processes and acted arbitrarily in approving the Comirnaty.

3           And then what else as to the FDA would you left with

4   at that point?

5           MR. JOHNSON:  Well, first, I would like to clarify I

6   don't believe that the government has said they have Comirnaty.

7   They have a roundabout way of saying they have BLA compliant

8   lots they are treating as if it's Comirnaty, but I haven't

9   seen -- I don't recall seeing a statement that they actually

10  have it in their possession and are using it.  That would be a

11  good question.

12          THE COURT:  We will ask that question, but I am

13  looking at -- I'm looking at page 50 of their response, ECF page

14  number 50.  "DOD has a supply of Comirnaty", and they cite -- I

15  think that's the Marks' affidavit that says hundreds of

16  thousands.

17          MR. JOHNSON:  The Marks' affidavit.

18          THE COURT:  Well, the brief is what I am reading from,

19  it says Comirnaty.  The affidavit may be more general.  Maybe

20  that's a typo.  We will explore that in a minute here.

21          So, again, the question was you would be left with the

22  claim that they shouldn't have approved Comirnaty, and what

23  else?  You were starting to respond.

24          MR. JOHNSON:  Solely with respect to the FDA, or are

25  we also talking about the DOD?

1          THE COURT:  No.  Just with respect to the FDA.

2          MR. JOHNSON:  Right.  So we have two categories of

3     claims against the FDA; the first is the Comirnaty approval, the

4     second is, I will call it, the interchangeability determination.

5          THE COURT:  That would go away, right?

6          MR. JOHNSON:  We're not making constitutional claims

7     or informed consent claims against the FDA directly.  They are a

8     causal factor in the DOD's violations.

9          THE COURT:  I get that.  So if you just have the

10    Comirnaty approval and then the interchangeability, the

11    interchangeability would become moot if it's actual Comirnaty

12    that they are using; right?

13         MR. JOHNSON:  I disagree.  We don't -- we don't know

14    how much they have.  And, again, there is this large number of

15    documents and guidance and then they seem to have dug in their

16    heels on the fact that they can give the EUA vaccine to service

17    members, so they clearly intend to do it.  They haven't

18    rescinded the guidance.  Their opposition provides no indication

19    that they would stop administering it.

20         THE COURT:  The premise of my question was that

21    everyone gets Comirnaty.  And that's what they have said.  They

22    have said, You have no reason to think you would get anything

23    other than that Comirnaty, and that they have plenty.  That's

24    what they have told this Court.  If that's right then the

25    interchangeability issue is beside the point.

1          MR. JOHNSON:  In that hypothetical then, yes, we would

2     be back for the FDA to the APA claims and in regard to improper

3     approval, or unlawful approval of Comirnaty.

4          THE COURT:  That would be it against the FDA.  And

5     then against the DOD, again constitutional arguments we will

6     talk about later, but you just have your notice and rule making

7     issue.  And that would be all, correct?

8          MR. JOHNSON:  So, as far as the DOD, however they

9     reach their decision -- I think we still have APA claims going

10    to their issuance of the mandate.  It's a two-page memo that

11    says it's necessary to protect the Force and things of that

12    nature.  I think there are number of grounds for APA challenges

13    that it is arbitrary and capricious, you know, the standard

14    range of claims unsupported by substantial evidence, contrary to

15    law.

16          In addition, even putting aside the APA's notice and

17    comment rule making, we don't concede that point.  We think they

18    were required to; but, however they were required to modify the

19    regulation, there are two crucial exemptions in AR 40-562, which

20    applies to all service members, that provides, first, in

21    paragraph 26B, an exemption for those with previous infections.

22          According to the DOD, there are 250,000 documented

23    cases among service members, so they have denied without any

24    process, or notice, or even changing the regulation that a

25    presumptive exemption for 250,000 service members -- and let's

1    keep in mind, this is still on the books.  Whether they have to

2    go to the APA, or another process, if they are going to

3    eliminate an exemption they should revise the regulation in some

4    way.

5          THE COURT:  But, isn't that a notice in rule and

6    making argument?  I understand what you are saying.  I looked

7    the AR 40-562 and it does say there are -- can be medical

8    exemptions.  I am not sure it says that anyone who has a natural

9    infection is categorically exempt.  I think it says that's a

10   factor that whoever the decider of the medical exemption should

11   take into account.

12         But I think you're probably right that this guidance,

13   the new mandate that's at issue here, is inconsistent with

14   what's said in AR 40-562.  I'm not sure about that, but it seems

15   like they had this existing regulation and now they're doing

16   something different.

17         But the question is, what does that mean when they

18   have an existing regulation that then they don't comply with, or

19   change through some other proclamation, I think you're saying

20   it's a notice and comment rule making APA claim, which I think

21   it would be.  You have the problem of whether there can be such

22   a claim statutorily, given that this is a military issue.  But,

23   if you're wrong about that, and if it is -- I know there is

24   discussion in the briefs about whether this is a military

25   function or an employment function -- but if you are wrong on

1    that, then what is the violation?  What is the claim?

2          I mean, in other words, you're saying they are not

3    complying with their -- what they said before in this other

4    publication, but how does that translate into something that the

5    federal court would do something about?  Do you see what I am

6    saying?

7          MR. JOHNSON:  Yes.  Let me try to lay that out perhaps

8    more clearly than it is in the brief.

9          There are two aspects to the APA argument.  There is

10   also a due process argument.  But the military affairs

11   exemption, which we addressed in some detail in the reply brief

12   why we don't think it applies here, that is only for rule

13   making.

14         That does not mean that the DOD, or other branches,

15   are categorically exempt from the APA.  They are not.  I would

16   note that *Doe v. Rumsfeld* was also an APA decision where the

17   actions of the Department of Defense were found to be arbitrary

18   and capricious.

19         I don't think the defense claims that the DOD is

20   categorically exempt from APA judicial review and the various

21   factors laid out, arbitrary and capricious, contrary to law,

22   exceeding statutory authority.

23         THE COURT:  Let me stop you there.  I agree with what

24   you are saying there.  And I doubt the government will disagree.

25   I guess my question is -- and maybe you're getting there -- but,

1   is the position that any time you do something that's contrary

2   to some existing publication, like AR 40-562, that that is, per

3   se, arbitrary and capricious?  Is that argument?

4          MR. JOHNSON:  I don't want to make this a categorical

5   statement.  It is arbitrary and capricious here.

6          THE COURT:  Well, but is that because -- I understand

7   you're saying it's completely arbitrary to require this under

8   any circumstance, and you would be making the same argument if

9   they had gone through notice and rule making, I assume.  The

10  point you're making is these vaccines are not something that

11  anybody ought to be forcing anyone to do.  That's the argument.

12  I understand that.

13         MR. JOHNSON:  I guess it gets into, you know, it is

14  the law on the books.  It is what -- the government is supposed

15  to be -- the rules it's supposed to follow.  These rules are

16  legislative rules.  They establish rights and obligations for

17  individual service members as well as the Department of Defense.

18  They establish the obligation to receive certain vaccinations

19  and they provide procedures to pursue an exemption.

20         The exemption, it could be categorical, it could be

21  individual, but specifically eliminating it on a categorical

22  basis would require them to actually change the rules.

23         THE COURT:  Now you are back to a rule making

24  argument.  That's what I'm saying.  So you either have this,

25  okay, the mandate has effectively changed AR 40-562, and the

1   only way you can change AR 40-562 is by going through a formal

2   rule making procedure.  That argument I understand.

3        I think it's a difficult argument given the exemption

4   that both sides have talked about in the brief for military

5   affairs.

6        I think the argument that, well, this isn't a military

7   affair because it's something that is capable of being applied

8   in the private sphere is a difficult argument.

9        But my question is, if you're right on that argument,

10  and there should have been a rule making, then that's that.  But

11  if you're wrong on that argument, what is the other argument

12  that this mandate violates the APA as to DOD?

13       And I understand part of that is that it is entirely

14  arbitrary because of the Israel study and scientists know about

15  natural infection, and things like that.  And I understand that

16  the argument that it's arbitrary and capricious, period, whether

17  it's gone through a formal rule making, or just been announced

18  by somebody, or however it came to be, that it's an arbitrary

19  policy.  I understand that argument.

20       But is there another APA argument?  In other words, is

21  there some claim that they are obligated to just follow this

22  rule, and can't ever change it, or can't declare anything

23  contrary to it?  Is that a third argument?  Do you see what I'm

24  saying?

25            MR. JOHNSON:  I do.  And perhaps I am struggling to

1    articulate it.

2          Yes; there is a different argument.  It is simply --

3    and it really perhaps gets more into due process and fair

4    notice.  Let's just say they don't have to follow any process at

5    all in changing the rules, but if they change the rules they

6    have to change the rules.  They should have just -- okay, you

7    want to make a COVID exception.  Add a COVID exception.  Write

8    it in there.  Where is it?  It's not there.  It's just a memo

9    saying, we are going to ignore this rule on the books, across

10   the board.  We are going to treat it like it's not there.

11         So, perhaps that is -- again, that's perhaps getting

12   into constitutional due process arguments.

13         THE COURT:  It sounds like a notice and rule making

14   argument or notice and comment.

15         MR. JOHNSON:  Well, there is a constitutional aspect

16   and due process aspect, because one reading the rules would not

17   have any notice whether under the APA, or the due process

18   clause, that that is what the law is.

19         One reading that would look at it and say, Well people

20   with previous infections should at least be entitled to apply

21   for immunity, or, excuse me, for exemption.  That option, that

22   is in the regulations, has been eliminated for 250,000 members

23   without actually changing the rule on the books.

24         THE COURT:  Right.  So that's a rule making argument.

25         The argument is they had to go through rule making to

1  change it and that sort of features into due process.  I am sure

2  you are not making an argument that whenever the military

3  dictates something people have a due process right to know what

4  went behind it and things like that, as a general matter.

5           MR. JOHNSON:  It's not an APA notice in rule making

6  argument.  It is a due process fair notice argument that people

7  need to know what the law is.

8           THE COURT:  Okay.  And was that something you

9  presented before right now?

10           MR. JOHNSON:  We may have to amend our complaints to

11  get into constitutional aspect.

12           THE COURT:  Okay.  Anything else before we turn to the

13  constitutional argument?  If not, we will stop right there, I

14  will hand it over to Mr. Carmichael, and then we will come back

15  for constitutional aspect of things.

16           MR. JOHNSON:  Just one point, Your Honor.  At our

17  first hearing, on October 8, you asked why we were filing on

18  October 6 challenging an August 23 mandate.  I just wanted to

19  elaborate on the response to give you context.

20           While our position on August 23, it included no

21  deadlines for guidance.  That guidance was not issued until

22  early to mid September.  The Army, for example, September 14th.

23           We were not contacted by any clients until after that,

24  primarily during the week of September 20-24.  We needed to

25  review their claims and establish important issues like do they

1     need to exhaust administrative remedies before we file anything

2     in Court.  We concluded that they did not.

3               So, when looking at the timing of the filings, keep in

4     mind there was no guidance available to service members for

5     weeks afterwards.  And then we had to develop our claim.

6               So instead of looking at it in perhaps a seven week

7     period, it's more like a two week period, from our perspective,

8     and maybe another week or two from our plaintiffs' perspective,

9     to understand what the deadlines were, what the requirements

10    were.

11              We just want you to have that context when you

12    consider our request for emergency relief and understanding why

13    we filed when we did.

14              THE COURT:  I appreciate that.  And I will tell you

15    that was -- the question was directed at the emergency relief on

16    an extremely expedited time period.  We are where we are now.  I

17    wanted to give the government a chance to respond because there

18    is a lot going on in this, and that's why we are here.  And I

19    think it made sense to have an orderly presentation of all this.

20    And I appreciate the arguments on both sides.  I appreciate that

21    update.  It's not something that is an issue as we sit here

22    today, the seven week time period, or whatever the time period

23    was between the August announcement and the filing of this case.

24    But thank you for that nonetheless.

25              Mr. Carmichael, what we will do I will let you respond

1  to any of that.  I do have some questions.  I will let you start

2  how you'd like, and then I will chime in with questions.  And,

3  again, we will save the constitutional issues for the second

4  round of this hearing.

5         MR. CARMICHAEL:  Yes, Your Honor.  I do have some

6  points that I was going to run through.  But, obviously, I mean,

7  I am going to pause.  And if at any pauses, or any time, you

8  know, feel free to ask any questions and I will immediately

9  divert to your questions.

10         THE COURT:  Thank you.

11         MR. CARMICHAEL:  I want to note upfront, though, just

12  how truly extraordinary plaintiffs' motion for preliminary

13  injunction is.

14         They seek to overturn a military readiness decision

15  made by the Secretary of Defense, after consulting with the

16  Chairman of the Joint Chiefs, the Service Chiefs, and the

17  Service secretaries -- the highest level of the military both

18  uniform and civilian.

19         In the government's motion, we have also filed several

20  declarations providing further background regarding the military

21  need to add the COVID-19 vaccination to the list of nine other

22  vaccinations required for all service members.

23         Some of the points made in those declarations are

24  already well known to the public, such as the fact that one of

25  the Navy's 11 aircraft carriers was rendered non-operational by

1    COVID-19 while on deployment to the South Pacific.

2            (Indiscernible) such as extra quarantine requirements

3    the military has had to impose that have been a drag on

4    operational readiness for more than 18 months, and adds time for

5    a unit to prepare for deployment.  Or, the limitations on

6    in-person training exercises across the services, and the

7    limitations on our training with other countries.

8            Plaintiffs spent several pages of their motion reply

9    questioning these military judgments, claiming that the COVID-19

10   vaccine mandate is not necessary for the military and will

11   actually have a negative effect on military readiness.

12           They even have their expert, a psychologist, who has

13   no apparent connection to the military, opine on these issues.

14           Of course they asked this Court to rely on the

15   judgment of plaintiffs' counsel to override the military and

16   enjoin the decision of the Secretary of Defense.

17           Even if just applied to individual plaintiffs this is

18   extraordinary.  The Court cannot sit in judgment and weigh the

19   military's operational risks from losing a particular service

20   member to a particular unit, or a particular mission, much less

21   how an outbreak might impact the whole unit.

22           Like what the Supreme Court stated in *Winter versus*

23   *NRDC,* this case not a close call.  There the Supreme Court said

24   the lower court should have deferred to Navy's declarations

25   regarding the importance of sonar operations, and likewise here

1   the Court should defer to the professional judgment of the

2   military.

3           Let's also not lose sight of their ask regarding the

4   FDA.  To enjoin both emergency use authorization and the full

5   licensure of the Pfizer COVID-19 vaccine.  Invalidating the EUA

6   will not even help the plaintiffs, but it will make the Pfizer

7   vaccine not available for adolescents and children.

8           THE COURT:  Is it available now?  Help me understand

9   this.  I've been very confused by this Comirnaty versus the

10  Pfizer EUA, whether they are the same.  You said in your brief

11  that the military has actual Comirnaty, not just EUA drug that's

12  the same.  Is that right?  And -- because my understanding, from

13  the papers filed in this case, was that part of the

14  justification for the continued EUAs, as to the other options,

15  was the unavailability of this.

16          Can you just tell me what the status of that is?

17          MR. CARMICHAEL:  Yes, Your Honor.  In page -- the

18  Marks' declaration, specifically, addresses that.  I think

19  that's 31-13 on the docket, and it is paragraph 9.  And, it

20  specifically says that it's the same formulation.  So we do have

21  it -- because we have had it for while.  We don't have anything

22  labeled "Comirnaty."

23          THE COURT:  That's what I was asking.  So, the reason

24  the other EUAs are still approved is because Comirnaty proper --

25  labeled properly is not available.  Is that correct?

1          MR. CARMICHAEL:  Well, that's part of it, but the main

2     reason is that there is no -- well, there are several reasons.

3     I would say one of the bigger reasons is that there is no --

4     it's not approved for adolescents and children.  And the booster

5     shot is not approved.  So the EUA has to be in place because

6     there is no like approved version for children and adolescents.

7          THE COURT:  The EUA, as to the others, my

8     understanding like Johnson and Johnson is not approved for

9     children either; correct?

10          MR. CARMICHAEL:  Yes; that's true.  And the EUA has to

11     be in place for Moderna and Johnson and Johnson.

12          THE COURT:  The reason it's not been revoked is

13     because there is not availability of Comirnaty?

14          MR. CARMICHAEL:  Well, there isn't because Comirnaty

15     is not approved for those other -- for those -- for those other

16     ones.  Right now it's not available.  So that's --

17          THE COURT:  Wait a minute.

18          MR. CARMICHAEL:  -- the reason is the availability.

19          THE COURT:  No.  No.  I'm talking about -- so

20     Comirnaty is not available?  What does that mean, Comirnaty is

21     not available?

22          MR. CARMICHAEL:  Well, it's -- there is no labels.

23     Like nothing is coming in labeled Comirnaty because it takes a

24     little while to make.  And you are not going to just throw out

25     the ones with the same formulation -- the exact same

1   formulation.  So we are using the ones that are the same

2   formulation for, you know, the Pfizer vaccine, but we are not

3   using the EUA for Johnson and Johnson and Moderna.

4          THE COURT:  You are talking about for the military?

5          MR. CARMICHAEL:  For the military.

6          THE COURT:  I guess my question is as -- FDA has not

7   withdrawn the EUAs as to Johnson and Johnson, and so forth,

8   because the position, I guess, is that for Comirnaty to be

9   available it has to be labeled properly?

10         MR. CARMICHAEL:  They haven't withdrawn it for

11   Johnson -- you know, because it's a different product, I guess,

12   is the main reason -- is for that.  And there is not sufficient

13   Comirnaty available.  There is not sufficient Pfizer.  So the

14   other drugs still need to be used, voluntarily.  If there is not

15   sufficient, you know, amounts of the Pfizer to go worldwide we

16   still have to keep the EUA -- or EUA in place, or FDA will still

17   have to keep the EUA in place for Moderna and Johnson and

18   Johnson.  But those aren't being required.  You can meet the

19   requirement with taking those voluntarily, but they are not

20   being required.

21         THE COURT:  Let me ask this, is it -- you have said in

22   the papers that Comirnaty is available in the military.  But do

23   you mean Comirnaty, or do you mean a drug that's identical to

24   Comirnaty?

25         MR. CARMICHAEL:  It's a hard question, right, because

1   it is identical, right?  So is it labeled "Comirnaty"?  No.  It

2   is not labeled Comirnaty as far as I know.

3          THE COURT:  Is there anything in the world that's been

4   produced that is labeled Comirnaty?

5          MR. CARMICHAEL:  I don't know.  I mean, I don't know

6   if it is -- I don't know if it is.  I know it is approved.  DOD

7   told me they haven't seen one with the actual label.

8          THE COURT:  So if someone in the service said, I want

9   to take -- I will take it but it has to be the label --

10          MR. CARMICHAEL:  It has to have that label?  Yeah;

11   they would not get it.

12          THE COURT:  And then what would happen?

13          MR. CARMICHAEL:  If they said, I will take the Pfizer

14   vaccine, but I want to see the Comirnaty label, almost certainly

15   they wouldn't get it.  I've heard it's coming in, but I've heard

16   it's coming in for a while, but we already have the fully

17   approved Pfizer one.  We have plenty of that.

18          THE COURT:  There has not been any change -- in other

19   words, the Pfizer that people were taking 10 months ago, or six

20   months ago, your position is, and you say this is supported by

21   the Marks' declaration, it's chemically identical to what would

22   be labeled Comirnaty today if anyone actually produced Comirnaty

23   today?

24          MR. CARMICHAEL:  Yes.  That's correct.

25          THE COURT:  And there has been no change.

1          And then what about -- my understanding was there was

2     some aspect of this that Pfizer was telling FDA which batches

3     were produced in which facilities because some were approved and

4     some were not.  Do I have that right?

5          MR. CARMICHAEL:  That's true.  There is the biologics

6     license application.  And we do have those as well.  We have

7     those with biologics licenses.

8          THE COURT:  So were the service members be required to

9     take something that was not in an approved facility?

10          MR. CARMICHAEL:  I don't think there is a policy right

11     now where the service member can specifically request the BLA.

12     I think the BLA is on the vial.  And you could look it up.  But

13     I am not aware of a particular policy where you can specifically

14     request a BLA lot.

15          But I would turn to -- I would say that sort of ties

16     in with the ripeness situation, because that's kind of an

17     as-applied challenge.  Where if somebody were to specifically

18     say, you know, I want a -- I want a BLA approved lot.  And I am

19     not getting it.  And I am going to wait until I do get it.  And

20     then, you know, those options -- those things, that particular

21     claim, could be raised through the military.

22          THE COURT:  What would happen there?  Are you telling

23     me that was an argument that would be considered if someone

24     wants something that was made in an authorized facility?

25          MR. CARMICHAEL:  I mean, it would certainly be

1    considered.  Whether or not -- whether or not it would be

2    successful, you know, I'm not sure.  I don't -- whether or not

3    it would be successful, I don't think that would be a

4    requirement.  But like it may -- it certainly could be

5    considered.  A commander could certainly say, Okay, well, I do

6    have another lot right here so I am just going to give you that,

7    and does that solve your issue.  So, I think that particular

8    question is more of an as-applied challenge to the specific

9    individual that needs to be brought up through that method,

10   through the ripeness once that claim is ripe.

11             THE COURT:  How would that be raised?  Because I

12   guess -- I thought that both parties sort of suggested that if

13   it weren't a facial challenge to a regulation, or a policy, that

14   the Eleventh Circuit precedent would preclude judicial review.

15   Is that not your position?

16             MR. CARMICHAEL:  Yeah.  For -- you could bring it -- I

17   think a service member can always challenge their discharge, and

18   if the reason for a discharge is that, I think that it sort of

19   comes up through the discharge process.

20             THE COURT:  Litigated there, not here?

21             MR. CARMICHAEL:  It can eventually come here, because

22   the service member can challenge their discharge in federal

23   Court.  That's why --

24             THE COURT:  Is that right?

25             MR. CARMICHAEL:  Just like a court-martial.  A

1  court-martial would take a long time because it goes through the

2  habeas process.  But a discharge usually, once the discharge is

3  final, that's the point where they can come to federal court and

4  say, you know, the Board of Inquiry, or the Administrative Board

5  was unlawful for these various reasons, and they get reviewed as

6  to their individual case.

7          THE COURT:  What is the process for that?  In other

8  words, if someone were discharged you're saying they can come

9  into a federal district court to challenge that?

10         MR. CARMICHAEL:  Yes.  We cited a couple of cases.

11 Some of the ripeness cases that we had actually had -- were

12 discharge cases and they came too early.  And you can come, it

13 just has to be -- the military has to be done.  They have to

14 have written -- they have to have made that decision and

15 finalized it before they can -- before they can come into court.

16 Essentially they have exhausted their military remedies.  And

17 that's how that gets decided on the as-applied challenge.

18         THE COURT:  But I guess my -- is that an APA claim or

19 what is that process?  If someone is discharged --

20         MR. CARMICHAEL:  Yes.  APA.  It's under the APA.  Yes,

21 Your Honor.

22         I mean, most of these are brought to the court of

23 federal claim when they have a money component in them, but you

24 can bring it to federal court and say, My discharge was unlawful

25 for these reasons and ask it to get set aside.  And we do see

1   those all over the country.  It's just we see them at that

2   point.  We don't really see them at this point in the process.

3           THE COURT:  I see.  On the standing, tell me -- on the

4   redressibility as to the FDA, the plaintiffs have said that as a

5   matter of law they could not require an EUA without a

6   presidential waiver, which I think is a correct statutory

7   argument.  Do you disagree with that?

8           MR. CARMICHAEL:  So, specifically talking about 1107a.

9   I will clarify that point.  There is no presidential waiver for

10  that, so -- but we think that -- you know, this sort of ties in

11  with the point about the authority for the secdef to -- he has

12  very wide authority to grant -- I mean, to impose a vaccine

13  mandate.  So all those limitations under 10 USC 1107 and 10 USC

14  1107a, which could be seen as reviewed under the APA contrary to

15  law, and that's how it would be.  But I don't think that --

16  neither of those apply here because -- it's not 1107 because

17  it's not an investigational new drug.  And it's not 1107a

18  because we are not mandating the EUA drug.  We're only mandating

19  the fully approved one.

20          THE COURT:  I understand that.  In terms of

21  redressibility, my initial thought was, well, if the FDA were --

22  if the approval of the Pfizer vaccine were invalidated then the

23  only way the vaccine mandate could continue is if there were a

24  mandate for EUA.  And my initial thought was -- and I think you

25  said in your paper -- that the Secretary said he was going to do

1    one with or without the approval of the Pfizer vaccine.  And so

2    invalidating the Pfizer approval -- the Pfizer license --

3    wouldn't readdress the plaintiffs' injuries because they would

4    be stuck with the mandate either way.

5           What you're saying is there is no presidential waiver,

6    and so I think the statute would preclude a mandate of EUA.  And

7    so maybe that factors into the redressibility analysis.

8           Do you see what I am saying?

9           MR. CARMICHAEL:  Yes.  I think it goes more to that

10   that would be much more than obviously the Court would ever need

11   to address the -- address the concerns.  Obviously, that would

12   be significantly broader.

13          For right now, since there is only one approved drug,

14   if you did strike down the FDA approval of the Pfizer one, we

15   would have -- DOD would have to pause and they would have to go

16   and try to get that presidential waiver.  So it would probably

17   provide however amount of time that takes to get that

18   presidential waiver.

19          THE COURT:  So are you saying it is redressable?

20          MR. CARMICHAEL:  I would say that that would -- I

21   wouldn't think that is the appropriate remedy at all though.

22          THE COURT:  I understand that.  But, I guess you were

23   saying they have no standing against -- to make claims against

24   the FDA, which is totally separate from your merits arguments as

25   to the FDA, obviously.  But I understood the argument to be FDA

1  is not causing their problem here.  And it sounds like maybe now

2  you're saying if the FDA's approval went away the plaintiffs'

3  problems would go away, at least temporarily.  So, it seems like

4  if that's the case they would have standing as to the FDA.

5          Is that not right?

6          MR. CARMICHAEL:  Well, I mean, a different court

7  actually held that they did, in the *Null* court that we cited in

8  there.  I think it's more of a causal link going down the chain

9  that this is pretty far on the causation link.  So I think

10  that's why we would say it doesn't have standing as our

11  causation, you know, more than -- if the question is, would this

12  readdress -- would this cause them not to have to go through

13  a -- not to be vaccinated temporarily, I think the answer is

14  yes.

15          THE COURT:  Okay.

16          MR. CARMICHAEL:  I think --

17          THE COURT:  And I think that's what was different in

18  *Null.*  I don't see any argument in *Null* that the state's mandate

19  was contingent on the approval.  But maybe not.

20          Okay.  I guess in *Null*, I think it enjoined the

21  mandate itself and so the vaccine approval was irrelevant, which

22  it would be here if -- sort of I guess opposite.  The chicken

23  and the egg kind of thing.  If there were no mandate, then the

24  plaintiffs getting the FDA approval vacated would do them no

25  good.  But, anyway -- obviously the standing --

1          MR. CARMICHAEL:  Yes, we would agree with that.

2          Like, it would -- the mandate -- the mandate is what

3     plaintiffs, in our mind, should be challenging, if they were

4     challenging it for a facial challenge.  Obviously, we think it

5     needs to go through the ripeness process and needs to play out.

6     But it's really the mandate and not the FDA approval.

7          THE COURT:  Right.  Well, I guess it's either or.

8     They would say if the mandate is invalidated as arbitrary and

9     capricious, for example, then obviously they would get full

10    relief without saying or doing anything about the FDA.  But if

11    they can't succeed on that, and if the FDA approval were

12    unlawful and went away, then I think what you're saying is they

13    would be -- their problem would be readdressed?  Again, that's

14    just jurisdictional issues.  That's not the merits.

15         MR. CARMICHAEL:  Yeah.  I think you're right.  The

16    redressibility points would be made for that.

17         For the ripeness one, I would kind of go back to that.

18    I'm happy to pivot to anything that you want to ask me about,

19    Your Honor, but I think ripeness -- plaintiffs just heavily rely

20    on the *Doe v. Rumsfeld* case, which the government has maintained

21    for a long time was wrongly decided, particularly on the

22    ripeness issue.

23         I would point out in *Doe v. Rumsfeld,* the Court

24    specifically goes through and notes some of the circuit law on

25    this, and notes the Eleventh Circuit law, and that how

1  plaintiffs would not be able to bring the claim in the Eleventh

2  Circuit, but says that the court is not bound by that.  So -- of

3  course, this Court is.  It's bound by the Eleventh Circuit law

4  and not by a district court case in DC.

5          I would also say on the merits, three other courts

6  disagreed with *Rumsfeld*.  And even after the fact, when the

7  military did not give anybody retroactive relief for prior

8  discharges, other courts in the DDC said the military was right

9  to conclude that *Doe v. Rumsfeld* was decided in error, or was at

10  least it is plausible -- they didn't actually straight-up say it

11  was in error, but they allowed not to give retroactive relief on

12  that basis.

13          THE COURT:  Okay.

14          MR. CARMICHAEL:  On the merits, I think the merits of

15  the claim that we were discussing are easily decided as to the

16  vaccine mandate.  There is -- the Secretary is granted wide

17  authority in this particular matter.

18          THE COURT:  But that does not reach -- it's not wide

19  enough to include mandating an EUA drug without a presidential

20  waiver.  You agree with that, correct?

21          MR. CARMICHAEL:  Well, yes, Your Honor.  I mean,

22  obviously you can't violate 1107 and 1107a.

23          THE COURT:  And if he did, if the mandate just said --

24  if there had never been a Pfizer approval, and there was no

25  presidential waiver, and you said there is not a presidential

1    waiver, and he did that, would be a proper APA challenge?

2         MR. CARMICHAEL:  Yeah.  I think that -- so if the

3    mandate violates 1107a, then it is contrary to law under an APA.

4    So I think that that's how that works, and it gets set aside

5    that way.  Obviously, that's not our position, that it does not

6    violate those, but that is how we believe that it would get --

7    the mechanics of it to be struck down would be that.

8         THE COURT:  Let me ask this, if the mandate is to get

9    an approved drug, but -- and they say, you know, you can get an

10   EUA drug if you choose, that's completely optional, but what you

11   have to do is get an approved drug, and there is no approved

12   drug available, then is that a lawful mandate?  In other words,

13   if it's an elusory right to get an approved drug because, as the

14   plaintiffs would say, their approval is really meaningless if

15   it's just out there in theory but not available anywhere, then

16   is that an 1107a violation?

17        MR. CARMICHAEL:  I would say that it depends on how

18   long the service has to comply with the mandate, probably.  So,

19   you know, if you said -- if you knew approval was coming right

20   away -- this is kind of hypothetical.  I don't think we are in

21   this situation but I don't know if that would be on its face --

22   but, if you said you have to do it within 30 days, and there is

23   nothing available within 30 days --

24        THE COURT:  But, isn't that the situation if there is

25   no -- I mean, in other words, for it not to be that, don't you

1    have to rely on this idea that the -- what was formerly known as

2    the EUA Pfizer vaccine counts as Comirnaty even if it's not

3    labeled that way?

4              MR. CARMICHAEL:  Yeah.  I think that we are -- the DOD

5    is relying on the FDA statements there.  Yes, absolutely.  They

6    are relying on the fact that it is the same formulation and that

7    it is approved.

8              So, you know, I guess if that were determined to be

9    wrong that could probably cause that to be -- that could be a

10   problem.  We obviously don't think that that would be the case.

11   And we think that we have the Marks' declaration, and the public

12   information, is more than enough to support that determination.

13             THE COURT:  Okay.  But you don't know if a single

14   service person has taken actual Comirnaty; correct?

15             MR. CARMICHAEL:  Well, I mean the label, Your Honor,

16   it would just be -- I think if we're going down that route where

17   we have to, you know, where the label sort of matters that much,

18   I think we probably would have to look at 1107a, and does

19   that -- is that really what that was intended to?  If it's

20   something that's the exact same formulation would it violate

21   1107a, if it doesn't have the actual label when the FDA says it

22   doesn't have to have the label.  I certainly don't think that

23   would violate 1107a.

24             THE COURT:  Okay.  But FDA is relying on that

25   distinction at least in part to justify the continued EUA; isn't

1    it?

2            MR. CARMICHAEL:  I'm sorry.  Which distinction, Your

3    Honor?

4            THE COURT:  Between a chemically identical agent that

5    is on the one hand labeled Comirnaty, and on the other hand the

6    EUA pre-Comirnaty Pfizer vaccine.

7            MR. CARMICHAEL:  Well, I think that the EUA is in

8    place for -- is in place for other reasons, not necessarily

9    because of that.  I mean, they are relying -- they are deciding

10   not to enforce a labeling because we wouldn't want to throw out

11   the same exact formulation.  It takes a little while to make

12   that so they wouldn't want to throw out all of that and then

13   pause vaccination with Pfizer for -- until labeling -- the same

14   formulation that be labeled Comirnaty.  That's the reason that

15   the enforcement mechanism is there.

16           THE COURT:  I understand that.  And certainly I am

17   sure lots of this was being produced before it even had the EUA,

18   and I'm sure that there were things rolling off the line the day

19   that the Comirnaty approval happened.  But is it your

20   understanding that the substance Pfizer is manufacturing today

21   is EUA material, or is that Comirnaty?

22           MR. CARMICHAEL:  Well, it's the same -- it's the same

23   formulation.  I think it's sort of like a -- once the -- I would

24   say everything that they are manufacturing today is under the

25   approved license, rather than -- but, you know, rather than the

 1  EUA it's the approved license.  Now that it is approved

 2  essentially it's all Comirnaty, even if it wasn't, you know,

 3  even if it didn't have that label.

 4          THE COURT:  Why would it not have the label if it's

 5  produced today?  I understand for the stuff that was not

 6  pipeline, or in storage, or in transit.

 7          MR. CARMICHAEL:  I don't know if it's getting

 8  manufactured.  I don't know if it's getting manufactured with --

 9  with the current label right now, so I probably shouldn't speak

10  to how it's getting manufactured.  I can just speak to how it's

11  coming in to DOD.  And for that I can say that it is coming in

12  with the -- with the -- from BLA approved lots.

13          THE COURT:  Okay.

14          MR. CARMICHAEL:  And they are getting the EUA, but

15  it's the exact same formulation and they have ones that are the

16  exact same manufacturing facility as well.

17          THE COURT:  Okay.  And that's what -- your affidavit

18  says is BLA compliant and that's what you mean by that?

19          MR. CARMICHAEL:  Yes.

20          THE COURT:  That's -- and you're telling me that

21  nobody is going to be -- anybody who would otherwise face

22  discipline will have the opportunity for a BLA compliant

23  vaccine?

24          MR. CARMICHAEL:  I can't say that as a broad policy

25  because the military hasn't issued a broad policy that says

1  that.

2        THE COURT:  Well, what would the alternative be?

3        MR. CARMICHAEL:  The alternative is a -- one that came

4  from a non-BLA site.  So those are essentially the two that DOD

5  has right now; a BLA site and not a BLA site.  They are exactly

6  the same formulation.  And the only difference is that the

7  manufacturing site is BLA approved.

8        THE COURT:  Okay.  So, some service members would be

9  required to take non-approved non-BLA compliant drugs?

10        MR. CARMICHAEL:  I can't say that for a fact.  I think

11  I can say that there is not a policy that requires them only to

12  take BLA approved drugs.

13        THE COURT:  Okay.

14        MR. CARMICHAEL:  You know, so even if you -- for that

15  particular issue, I would say, you know, if the Court was

16  considering something along those lines, like that would be, you

17  know -- if you were -- if you were trying to do the most limited

18  order, like that could be an order that went into place.  But it

19  wouldn't be striking down the entire thing if the Court was

20  troubled by that particular issue.

21        THE COURT:  I understand that.  I guess the question

22  is, if you have a particular service member who says, I want to

23  take -- I will take it but I want the compliant -- BLA compliant

24  version.  And the answer is, You must take -- there is none

25  available and so your choices are to take a non-BLA compliant

1    dose, or face discipline; how would that -- and there is no

2    presidential waiver, which you have said there isn't, how would

3    that comply with 1107a?

4            MR. CARMICHAEL:  Well, I think -- so, we don't have an

5    indication that that exact thing is happening.  I think it could

6    get reviewed on an individual record, and if somebody had an

7    individual case that would do it.  You know, I think that's more

8    likely to be brought up in there because there is certainly no

9    policy of not providing BLA approved ones.  It's just they have

10   both and they are using them interchangeably.

11           THE COURT:  Right.  But the policy is either to

12   require the vaccine, whether it's BLA compliant or not, or the

13   policy is to require the vaccine, but only those that are BLA

14   compliant.  And I thought the latter was what you had said in

15   the briefs that was at issue here.  Maybe I misunderstood.

16           MR. CARMICHAEL:  Yeah.  I mean, we -- we did not

17   specifically say that there was a policy that, you know -- a

18   policy to only get BLA complied ones.  We did not say that.

19           THE COURT:  Well, what you said --

20           MR. CARMICHAEL:  I am happy to clarify that as to what

21   we specifically said.  And, you know, I understand with choosing

22   words and that sort of stuff.  We -- when, specifically, we have

23   both potentially.  We have BLA compliant and non-BLA compliant,

24   and are using them interchangeably.  I don't know what would

25   happen if an individual service member said, I want just the BLA

1    one.  You know, the lots are publicly available.  We could -- a

2    service member probably could figure out whether they are

3    getting a BLA one or not.

4           I will just say on that particular point, I don't

5    think that that was probably the intention of Congress on 1107a,

6    was to sort of get into the weeds of BLA compliant or not.

7           I think the service's interpretation of 1107a is

8    certainly reasonable that once it's approved -- once it's

9    approved they could interchangeably use BLA compliant and not

10   BLA compliant, because it's the same formulation.

11          THE COURT:  Well, if it's the same formulation, I

12   accept that based on the evidence that you have presented, and I

13   know that the plaintiffs say they are not so sure but they have

14   not shown that -- I don't think -- to be not true.  But the

15   approval includes the facilities, and those types of things, and

16   so EUA, as I understand it, has a lot more relaxed standards for

17   all of that.  And it just seems like there is a reason why the

18   Comirnaty is treated differently than even BLA compliant

19   non-Comirnaty, and I'm not sure what that is.

20          But, at any rate, it seems like if Congress has said,

21   well, here is what you have to do if anyone is going to be

22   mandated to take something that's not licensed, and you have to

23   get a presidential waiver, and DOD does not get a presidential

24   waiver, and then says, Well, this wasn't -- this isn't licensed

25   because it wasn't in a proper facility, but chemically it's the

```
 1    same, that's good enough.  I'm not sure how that works.
 2            MR. CARMICHAEL:  I would say, like -- our argument on
 3    that would be that we can defer to the agency's interpretation
 4    of that.  And then FDA could rely on -- I mean, the DOD is
 5    entitled to rely on the FDA for that.  But I would say the
 6    difference between the BLA compliant and Comirnaty is nothing
 7    but the label.
 8            THE COURT:  And the location, right?  They are --
 9            MR. CARMICHAEL:  Well, BLA compliant means it's at the
10    location.
11            THE COURT:  Yeah.
12            MR. CARMICHAEL:  There is a difference between BLA
13    non-compliant and BLA compliant.  It is the location.  You're
14    right, Your Honor.
15            THE COURT:  I think you have a better argument that it
16    is -- that a BLA compliant would count than you do as to a
17    non-BLA compliant.
18            But, when you are talking about Chevron, whose
19    judgment would I be deferring to there on the interpretation of
20    1107a.
21            MR. CARMICHAEL:  It would DOD's, specifically.  I
22    think there is interpretation of how to -- how to interpret
23    1107a.
24            THE COURT:  But, how do you interpret -- if you look
25    at the text of it -- walk me through that interpretation.
```

1           MR. CARMICHAEL:  The interpretation would be that once

2    the -- once it is used, because it's the same -- because it's

3    the same formulation, once the product is approved, that we are

4    no longer required to get that presidential waiver, essentially,

5    because the product can be used interchangeably as if they were

6    the same one.

7           THE COURT:  Okay.  Anything else on any of the topics

8    that we have discussed?  Otherwise we will go back to Mr.

9    Johnson and hear about the constitutional issues.

10          MR. CARMICHAEL:  Again, Your Honor, just briefly on

11   the other ones -- and I don't think you will have many questions

12   about --

13          THE COURT:  Sure.

14          MR. CARMICHAEL:  But, so the -- for overturning the

15   FDA license, we think that the entire argument on that is based

16   off of speculation.  We haven't even produced the administrative

17   record.  And to sort of overturn it without the administrative

18   record would -- is a heavy ask and we certainly don't think that

19   is appropriate.  There is more than enough in the Marks'

20   declaration to get us through a preliminary injunction on that.

21   And we certainly think that the administrative record would hold

22   up to any sort of scrutiny.

23          I would just sort of -- I would like to close, again,

24   on just in general deferring to the military's judgment on these

25   sort of things.  And maybe this goes to the arbitrary and

1   capricious, but this is not an unusual thing to add a vaccine to

2   the ones mandated by service members.  There is nine on there.

3   We have had a vaccine mandatory program, in general, since World

4   War II.  And even in causes before that we had situational

5   vaccine mandates.  So in that case the necessity of a vaccine

6   mandate the Court should defer to the military.

7           THE COURT:  And that's a response to the argument that

8   DOD's determination was arbitrary and capricious?

9           MR. CARMICHAEL:  Yes.

10          THE COURT:  Anything else?

11          MR. CARMICHAEL:  No, Your Honor.

12          THE COURT:  Mr. Johnson, you can have a brief rebuttal

13  on what you've heard.  I don't want to go too much longer.  And

14  then we will turn to the constitutional issues.  I do have some

15  questions on that.

16          And then just moving forward what we will do then I

17  will give Mr. Carmichael an opportunity to respond on the

18  constitutional issues and then I will give you the last word on

19  that in rebuttal, Mr. Johnson, since it's your motion.  And then

20  we will conclude.  So, go ahead.

21          MR. JOHNSON:  Great.  Thank you.  Not so much

22  rebuttal.  I just want to highlight a few points that I'm sure

23  you heard but I just want to reiterate.

24          We heard that there is no Comirnaty available.  It

25  appears that the DOD is not in possession of any Comirnaty.

1          While the DOD wants to characterize this as purely a

2     labeling issue, it just doesn't make sense.  I will explain it

3     if you will give me a moment.

4          It's not clear if it's being manufactured.  It's not

5     clear if any completed manufacturing lots are available.  Again,

6     they are retroactively licensing a different product.  We have

7     pointed to evidence in the record showing there is different

8     ingredients.  There are clearly different standards for

9     manufacturing and locations.

10          I think it's especially significant that they are

11     relying on BLA compliance to show that it's equivalent to a

12     licensed product, when in the same paragraph they acknowledge

13     there is no BLA enforcement.  BLA compliance requires some sort

14     of BLA enforcement.  Pfizer and BioNtech are aware that their

15     requirements are not going to be enforced.  So I don't see how

16     anybody could rely on a BLA compliance finding when the FDA has

17     told them there shall be no enforcement of these requirements.

18          So, I point this out --

19          THE COURT:  I thought the enforcement issue was they

20     weren't going to enforce the requirement that it be labeled the

21     way Comirnaty would be labeled.

22          MR. JOHNSON:  That is -- yes.  They're not enforcing

23     labeling requirements, but it opens the question, is there

24     anything else they are not enforcing.

25          It seems like a lot of trouble to go to when you are

1   supposedly manufacturing the BLA product.  It's coming off the

2   production line, but somehow you can't find a label for it?  It

3   just -- I just want to draw attention to why this doesn't make

4   sense.

5           If you are manufacturing it, in accordance with the

6   BLA, why don't you slap a BLA label on it?  It suggests that

7   there is something more going on here, Your Honor, and that's

8   the point of my rebuttal.

9           THE COURT:  Okay.

10          MR. JOHNSON:  The other points in the discussion of

11  why the DOJ doesn't agree with the decision in *Doe v. Rumsfeld* I

12  think is very important.

13          They acknowledge -- and this is relevant more to

14  irreparable harm -- that -- if I understood correctly -- their

15  position is that the DOJ -- DOD's position, excuse me, is that

16  when there is a discharge due to non-compliance with the vaccine

17  mandate subsequently found to be unlawful that no retroactive

18  relief was available there, or should be available here.

19          I think that really contradicts their argument that

20  plaintiffs can be made whole and that there is a chance for, you

21  know, future compensation, or correction, if they were

22  discharged or disciplined based on a vaccine mandate such as the

23  one found to be unlawful.  So I just want to highlight that with

24  respect to the irreparable harm claims.

25          THE COURT:  Okay.

```
1              MR. JOHNSON:  We can move on.

2              THE COURT:  Very good.

3              On the constitutional argument, maybe you could

4    start -- you said in the papers what other courts have gotten

5    wrong in terms of identifying the right at issue.  And I take it

6    you're not saying there is a constitutional right to not have

7    vaccines, generally.  And it seems like your argument is that

8    there is a constitutional right to not have this vaccine that's

9    been sort of developed in the unique context that it has been.

10   Is that a fair statement of what the right that is at issue here

11   for your due process claim -- or if not, tell me what the

12   specific right is that underlies your constitutional claim.

13             MR. JOHNSON:  Thank you, Your Honor, and you are

14   correct.

15             We are not asserting a blanket refusal, a blanket

16   constitutional right against vaccinations.  We are concerned --

17   our claim concerns the rights not to receive an unwanted,

18   unnecessary, and unproven experimental vaccine.  And the

19   discussion we have just heard demonstrates our plaintiffs are

20   going to get the EUA vaccine.  There is no Comirnaty available.

21   There is more to it than labeling.  They are different.  We have

22   gone through that and --

23             THE COURT:  We have gone through that.  But if

24   Comirnaty did drop in -- a truck load arrived tomorrow, what's

25   left of your constitutional argument?
```

1          MR. JOHNSON:  First off --

2          THE COURT:  Because the reason I ask that is -- just a

3    minute -- the reason I ask that is you have in the papers

4    characterized the right -- and I think you said it just now --

5    the right not to receive an experimental or untested, and things

6    like that.  And so I guess the question is, if Comirnaty is

7    available do you have a constitutional right to refuse the

8    licensed Comirnaty?  And if so, what's that right?

9          MR. JOHNSON:  Yes, we do.  Let me just do a

10   30,000-foot view of our claims and then I will dig into the

11   substance of those.

12          The primary authority for vaccine mandates is *Jacobson*

13   *v. Massachusetts.*  There are crucial differences here.  One, is

14   Jacobson was a state legislative mandate.  The current mandate

15   is a federal administrative mandate without any congressional

16   authorization.  We have discussed the proven vaccine versus the

17   experimental.  I want to get into that, but I want to put that

18   to the side.

19          THE COURT:  Wait a minute.  If it's a substantive due

20   process right then it wouldn't matter if Congress came in and

21   blessed this exact policy; would it?

22          MR. JOHNSON:  I don't believe Congress could impose it

23   either under this -- under substantive due process.  But,

24   certainly it can't be done by federal administrative action

25   which is what we have at-hand here.  So I would just focus on

1     the distinction between state legislation and federal

2     administration.

3              THE COURT:  Okay.  But if it's a substantive due

4     process right I don't think that's a meaningful distinction.  In

5     other words, if you have a substantive right to anything the

6     state can't intrude on that, or the federal government; right?

7              I agree with your premise that *Jacobson* is not the end

8     all be all.  It's different.  A lot has happened in the Supreme

9     Court in terms of substantive due process since then.  The facts

10    do matter.  But I guess at the end of the day there has to be an

11    identifiable right that's at issue and I am not sure what that

12    is here.

13             MR. JOHNSON:  Well, right, so let me just reiterate it

14    and I hope this will make things -- hopefully clarify matters.

15             So, again it is a right to refuse, not just any

16    vaccine across the board, it is one that is -- regardless

17    whether it is EUA or licensed, it's still a novel technology and

18    we question -- and I think we made this clear in our papers --

19    that whether this is a vaccine, or simply a medical treatment,

20    there is a risk here that we're going to constitutionalize the

21    term "vaccine" while the definition of vaccine has changed.

22    It's not only novel technology, it's a novel definition.

23             The very week that the approval was granted the CDC

24    changed the definition of vaccine and vaccination from something

25    that provides immunity -- which is well-understood.  That is

1    what traditional vaccines do -- to something that merely

2    provides protection.  That is in recognition that this is a

3    fundamentally different medical treatment than conventional

4    vaccines, like the small pox vaccine at issue in *Jacobson.*

5           It provides, apparently, very good short-term

6    protection, but rapidly declining to less than 50 percent after

7    six months based on a number of studies.  It doesn't have the

8    features of normal vaccines.  It has only been in development

9    for a year.  So whether we call it EUA or licensed, it's still a

10   very novel technology.

11          And I think that has -- the FDA's determinations I

12   don't think changed the constitutional issues of questions here.

13   Simply granting approval through a rushed process, that is

14   riddled with substantive and procedural deficiencies, does

15   not -- does not entitle the federal government to deprive a

16   hundred million, or more, people of their constitutional rights.

17          So, I think even though --

18          THE COURT:  What is the -- I mean, and maybe the fact

19   that it's difficult to answer is an important point here.

20          I am going to ask a question about the flu vaccine.

21   And don't mistake me.  I'm not suggesting they are the same.

22   And certainly a lot of what you have said is correct in terms of

23   this is unusual.  It was a different approval process.  There is

24   some questions about the efficacy out there that are being

25   debated.  But I am trying to identify the precise constitutional

1    right that you're talking about here.

2           And so the question is -- again not to say they are

3    identical -- but the question is, is there a constitutional

4    right not to take the flu vaccine?  And if there is, or isn't,

5    tell me what -- the Supreme Court in *Glucksberg,* and others,

6    have said you have to be -- a strong history, and all this that,

7    as you know.  Help me understand what the precise right at issue

8    is here.

9           It seems like you are just saying overall there is a

10   lot of questions here and we don't want to take it and that's --

11   I understand that, but --

12          MR. JOHNSON:  Well, that's why -- and I am attempting

13   to do so, and that's why I want to draw attention to the

14   specific language that we are asserting, which is again

15   unwanted.  That's clear.  That's not enough.

16          Unnecessary; we're going to get to that, meaning it's

17   not efficacious.

18          It's unproven.  The safety risks are unknown.

19          And it provides limited or no public health benefits.

20          It is an entirely novel technology, and that's why we

21   say unwanted, unnecessary, unproven medical treatment rather

22   than conceding that this is a vaccine that could -- that

23   actually provide public health benefits.  It hasn't been around

24   long enough to prove that.  And the data that we have from the

25   few months of use show rapidly declining efficacy to below

1   50 percent and the need for booster shots.  And we don't know

2   how much is required.

3          It doesn't prevent infection or transmission, so it

4   doesn't provide public health benefits.

5          Data studies are emerging.  And I think we are not

6   limited to the administrative record here on these

7   constitutional claims that --

8          THE COURT:  Well, that's true.

9          MR. JOHNSON:  -- the vaccinated and unvaccinated

10  spread it at apparently equal rates.  It provides limited to no

11  protection against rapidly emerging variants that are now

12  dominant.  It was developed using a variant that is now

13  obsolete, or excuse me, in existence rendering the vaccine

14  apparently obsolete.

15         So each of those four terms: Unwanted, is understood;

16  unnecessary, I want to unpack; unproven, that goes to the lack

17  of, you know, proven safety, proven benefits for many

18  populations; and, lack of public health benefits and medical

19  treatment, because we do not concede that it is a vaccine

20  because the technology is different, its effects are different,

21  and, therefore, the constitutional significance of the right is

22  significant.  So, those are the four elements of the right we

23  are asserting.

24         THE COURT:  Okay.  You've not seen another court that

25  has applied strict scrutiny to any sort of vaccine or mandate

1  like this; have you?

2          MR. JOHNSON:  Strict scrutiny?

3          THE COURT:  Or any heightened scrutiny.

4          MR. JOHNSON:  So *Roman Catholic Diocese v. Cuomo,*

5  while it's not necessarily a vaccine case, I think it should be

6  the standard that this Court should follow.

7          THE COURT:  That's a free exercise case.  You're going

8  to have heightened scrutiny there when you're treating religious

9  people differently than non-religious people; right?

10          MR. JOHNSON:  It is a free exercise case.  *Jacobson*

11  was not.  But it's been found to be a free exercise case and it

12  has been used to limit free exercise rights.

13          But I think *Cuomo* provides the model that we should

14  follow in evaluating infringements on fundamental rights.

15          THE COURT:  But, what's the fundamental right?

16          MR. JOHNSON:  First off, it's substantive due process

17  rights that we have discussed here, but as a result of the

18  enforcement of the mandate it will deprive plaintiffs a property

19  interest; they will likely lose government benefits.  They will

20  likely lose a liberty interest in practicing their professions,

21  since their profession is really limited to the military.  Their

22  most likely future employment would be with a federal agency, or

23  a federal contractor, or a large company like an airline that

24  will be subject to a mandate.  They will no longer be eligible

25  for employment.

1          THE COURT:  The problem with that is -- by that logic

2   anything -- any regulatory issue in the military would then

3   implicate those rights.  If they say you have to keep your

4   haircut, or wear this uniform, and someone is disciplined for

5   that, they're going to have the same consequences.

6          I guess -- I understand the overarching claim, which

7   this is a bad policy decision.  This is harmful.  This is not

8   going to make the military better.  It's going to make it worse.

9   It's going to, you know, threaten people's health.

10          MR. JOHNSON:  And that's very important.

11          THE COURT:  And I understand the argument there.  But

12   you have to close that in to an actual well-established right.

13   And the cases just don't support that that would be something

14   here that would invoke a heightened scrutiny.

15          MR. JOHNSON:  So let me respond to both of those

16   points.  We discussed the difference in legal authority.  We

17   discussed the distinction -- you know, unwanted.  That's not in

18   dispute.

19          Unproven; we have explained what that means.  No

20   health benefit, limited efficacy.

21          Unnecessary goes to safety.  There are -- the risks

22   from this vaccine, the reported injuries, are orders of

23   magnitude higher than any other vaccine ever seen.  And more

24   importantly, the benefits are not proven.  There has been no

25   attempt to show what the benefits would be for people, like

1   plaintiffs, who are younger and healthier who have a minimal

2   risk of one in -- I don't know how many -- thousands.  It

3   doesn't account for the fact that younger people, especially 12

4   to 30, are subject to extremely heightened risks of heart

5   problems and other disorders.

6          THE COURT:  But those are all policy arguments and

7   they are -- I understand the arguments.  The question is, who

8   gets to make those decisions.  And if there is not a right at

9   issue that would implicate a heightened scrutiny, then there is

10  a lot of deference to government generally, and of military

11  specifically.  And so I guess if --

12         MR. JOHNSON:  Well, while we don't -- let me just

13  discuss why I don't believe it would survive rational basis

14  review, and perhaps then we can move on to what a strict

15  scrutiny analysis might look like.

16         THE COURT:  Okay.  I understand the argument.  I read

17  your reply brief on the rational basis.  We all know rational

18  basis is a very deferential review.  I have not seen any cases

19  that anyone cited saying something like this could not survive

20  rational basis.  I understand the argument.  I think that's a

21  difficult argument if rational basis applies, but you can add to

22  that if you'd like.

23         It's essentially the same argument you just laid out,

24  just that no rational policymaker could go down this road.  And

25  given what the Supreme Court and the Eleventh Circuit have said

1    about rational basis review I just think that is a very

2    difficult argument, and a very high burden you would have to

3    make to say that it's completely irrational.  May not be good

4    policy.  May be the wrong choice.  But that's not what courts

5    are here to sort through.

6              MR. JOHNSON:  Well, then I will try to be brief, if I

7    may.

8              THE COURT:  Sure.

9              MR. JOHNSON:  Because it ties into, again, yes, it's

10   deferential.  One of the principle issues here is deference to

11   DOD and FDA.  So, the deference issue goes to both the

12   constitutional and statutory claims.

13             We contest that -- using the example, the asserted

14   justification we believe is a pretext.  We're not sure what the

15   justification is.  It hasn't been explained, but it cannot be

16   military readiness or health and welfare of the troops.

17             Given the minimal risk to the troops, there has been

18   no attempt to provide, or at least in the public record, a cost

19   benefit analysis of the benefits and risks of this policy.

20             The closest we've seen is in defendants' opposition

21   where they acknowledge that something like 23 service members

22   have died in the entire COVID epidemic; 12 per year, or

23   something like that, out of an average of 1200 per year, so

24   about one percent.

25             At the same time they are looking to dismiss tens of

1    thousands, if not hundreds of thousands, of experienced trained

2    service members at a devastating cost of readiness.

3            It's not that we're trying to substitute our judgment.

4    It's just that when you see a policy that has results that are

5    contrary to the stated purpose you have to question whether that

6    purpose is actually a pretext for another purpose.  And that

7    should trigger heightened scrutiny from the Court when the

8    government is providing a pretextual basis for the policy.

9            THE COURT:  Okay.  Back to why there should be

10   heightened basis.  I think that's where we got sidetracked and

11   started talking about rational basis.

12           MR. JOHNSON:  As far as heightened scrutiny, we have

13   discussed that due process, but again the consequences of

14   vaccine refusal will certainly impact fundamental rights.  If

15   plaintiffs were dishonorably discharged, they would necessarily

16   be deprived of their Second Amendment rights to bear arms, which

17   is an enumerated right.

18           They are already being restricted from travel.  There

19   are proposals to restrict air travel and interstate travel to

20   the unvaccinated.  So, the consequences of vaccine refusal are

21   likely to implicate fundamental rights where the Court has

22   heightened scrutiny.

23           I should add many plaintiffs do have pending religious

24   accommodation requests.  We have not made those claims here

25   because they have not been denied.  If they are denied, we will

1  likely amend the complaint and then the Court can consider First

2  Amendment and free exercise violation.

3          THE COURT:  Okay.  Anything else on the

4  constitutional?

5          MR. JOHNSON:  I would just like to go to the equal

6  protection claim, which hasn't got a lot of attention in the

7  briefing.  So, we asserted two grounds for equal protection; one

8  is the discrimination apparently against US citizens who will

9  nearly uniformly be subject to a vaccination requirement,

10  whereas unauthorized aliens entering the country are uniformly

11  exempt from it.  There can be no rational basis.  And because

12  it's based on alienage, it should qualify for strict scrutiny.

13          Secondly, the government action itself is creating a

14  discrete and insular minority that will be derived of a wide

15  range of rights, including the right to work, the right to

16  education, likely soon the right to travel, and many areas have

17  excluded the unvaccinated, like New York City, from simply

18  shopping or cultural life.

19          So this is simply the first step toward creating a

20  minority that could amount to judicial endorsement of the

21  creation of a discrete and insular minority that will be

22  second-class citizens, and not enjoy the same rights as enjoyed

23  by the vaccinated.  Despite the fact that the vaccination

24  provides limited, or none at all, public health benefits.

25          I would just add that the motivation for creating this

1    category of American citizens appears to be at least partially

2    based on animus towards the vaccinated.  I think --

3              THE COURT:  Unvaccinated.

4              MR. JOHNSON:  I think President Biden's September 9

5    remarks are specifically significant in this regard where he

6    expressed anger and frustration stating he was "losing patience

7    with the unvaccinated who are harming us all."

8              That is not correct, factually, but it does, I think,

9    offer a window into the underlying motivations for the executive

10   orders that were issued that same day.

11             THE COURT:  Okay.  Thank you, Mr. Johnson.

12             Mr. Carmichael, response on the constitutional issues.

13             MR. CARMICHAEL:  Thank you.  Yes, Your Honor.  I think

14   we addressed them very throughly in our papers.

15             Our main points is that the constitutional issues are

16   very weak here.  If the Court can -- if the state can do it for

17   the general welfare in *Jacobson,* of course, the military can add

18   one more vaccine to its mandatory list that it's had for

19   decades.  And no Court has found that it should be strict

20   scrutiny, and certainly it wouldn't be strict scrutiny against

21   the military.

22             And for the same reasons obviously the equal

23   protection would fall because the mandate itself also shows that

24   it applies to everybody in the military.

25             So, I don't have anything else on the constitutional.

1  If you have -- unless you have any questions I did want to go

2  back an address just a couple of points that Mr. Johnson made in

3  his rebuttal.

4         THE COURT:  Sure.

5         MR. CARMICHAEL:  So Mr. Johnson said specifically that

6  this is the only chance, and you can't set aside -- I think he

7  said you can't un-do a discharge.  That's not true.  You can

8  undo -- down the road, under the APA, a discharge can be

9  set-aside and there is lots of case law that supports that and

10 supports our argument that this isn't ripe just yet because that

11 would be the regular forum to bring it.

12        He did bring up, you know, the enforcement.  And I

13 think you correctly said the enforcement goes to labeling.  And

14 that's correct, that the enforcement part goes to the labeling.

15        And then I would say that the Court has expressed some

16 concerns about 1107a.  We think, at best, that particular issue

17 is a close call for plaintiffs.  But, the other three factors

18 for preliminary injunction are not close calls at all.  They

19 strongly favor the military independence on the other issues.

20 And the Court -- the plaintiffs would have to win on all four,

21 not one particular statutory issue that may be a close call.

22        THE COURT:  Thank you.  Anything else?

23        MR. CARMICHAEL:  No, Your Honor.

24        THE COURT:  Okay.  Mr. Johnson, I will give you the

25 last word they are your motions.  But I do want to ask on that

1  last point about the 1107a, that we talked about at some length,

2  is there any indication in any of your affidavits that any of

3  your plaintiffs or clients have been required to take something

4  other than BLA compliant.

5          MR. JOHNSON:  They have all been informed of their,

6  you know, deadline.  There is --

7          THE COURT:  But I guess --

8          MR. JOHNSON:  -- at least two have asked about BLA

9  compliance, or licensed vaccine versus EUA, and been told, no;

10  EUA is all that is available.

11          THE COURT:  There is BLA compliant and EUA.  I guess

12  my question is, is there anyone who said -- been told the only

13  thing available to them is non-BLA compliant and that's all

14  that's available?

15          MR. JOHNSON:  I don't think non-BLA compliant has ever

16  been used.  It has been -- the EUA product is available without

17  any discussion of BLA.

18          THE COURT:  So you don't know one way or the other

19  whether -- people that have been presented with EUA drugs,

20  whether that EUA drug that's available to him or her is BLA

21  compliant or not BLA compliant?  You just don't know?

22          MR. JOHNSON:  What I should say is plaintiffs -- at

23  least one or two plaintiffs have asked for -- I think two have

24  asked specifically for Comirnaty, and been told it was not

25  available.

1              THE COURT:  Okay.  But what was available -- but

2    something was available and we don't know if --

3              MR. JOHNSON:  Yes.  The EUA vaccines were available.

4              THE COURT:  And we don't know whether they were BLA

5    compliant or not?

6              MR. JOHNSON:  We do not.

7              THE COURT:  Okay.  All right.

8              MR. JOHNSON:  As has been discussed, they would not

9    have been labeled with the BLA labeling.  So they -- neither

10   they nor their healthcare provider probably knew.

11             THE COURT:  Well -- my understanding of the record is

12   the military has, or the FDA has that information about which is

13   and which is not BLA compliant.

14             At any rate, I will give you a chance to wrap-up with

15   anything you like, Mr. Johnson, and we will adjourn.  I am not

16   going to rule right this second.  I will tell you more about

17   that in a minute, but go ahead if you have anything further.

18             MR. JOHNSON:  First, a clarification regarding the

19   unavailability of retroactive relief for a discharge for an

20   unlawful mandate.

21             I had thought that Mr. Carmichael was saying that that

22   was the DOJ's -- or the DOD's position, that these -- there is a

23   2002 case, I believe, where a discharge was upheld even after

24   the DC district court's decision that the mandate was unlawful

25   and no relief was provided and that that was upheld by the

1   Court.  I thought that that is what DOD's position was, so I was

2   simply trying to restate my understanding of it.

3           If that's not the case, I'm not sure why they were

4   discussing that case.

5           Second, I will be brief, I just, again, I think we

6   have addressed the merits in depth.  The other factors,

7   irreparable harm, I just want to return to make sure that the

8   Court is clear on situations faced on our plaintiffs.

9           First off, the cases discussed by defense counsel all

10  concern individual discharges resulting from criminal

11  prosecutions.  That is -- implying that there was no irreparable

12  harm from a discharge or from a criminal prosecution.  That's

13  not the case here.

14          We are not looking for relief from disciplinary

15  actions or individual disciplinary actions.  The facial

16  challenge that has resulted already in harm to our plaintiffs

17  that I just want to highlight.

18          In particular three plaintiffs have had medical

19  exemptions denied that they should have been entitled to, based

20  on their previous infections, or history of cancer and other

21  serious medical conditions.  So, they have been harmed by the

22  unavailability of that exemption.

23          There are a number of religious accommodation

24  requests, but there are many indications that none of them will

25  be granted.  We have a document from the Marine Corps,

1     October 25th.

2           As of October 25th, zero out of thousands of our

3     requests have been granted, so our requests are likely futile so

4     I don't think that should be a consideration.

5           Several plaintiffs, and I can provide a summary of the

6     current plaintiffs that have suffered disciplinary actions due

7     to vaccine refusal, as well as their non-promotion status.  John

8     Doe number nine and 10 are in non-flight status.

9           People -- many have -- promotions have been held up.

10    Apparently after November 1 unvaccinated service members are not

11    eligible for promotions, or they cannot be promoted even though

12    they are otherwise eligible for a promotion.

13          Finally, regarding the RA requests, even if granted,

14    many may still be separated because they will -- the

15    accommodation will not permit them to perform their duties.

16          And, finally, everybody in the US Navy and Marine

17    Corps who is unvaccinated the current guidance is that

18    administrative separation proceedings will begin effective

19    November 28th.

20          THE COURT:  Okay.

21          Well, I want to thank you both sides for the briefing

22    and also for the argument today.  This has been a little more

23    extended of a schedule than ordinarily I would do in a

24    preliminary injunction, but I am going to get an order out as

25    soon as I can.  I can't promise it will be in the next day or

1    two, but it will be as soon as I can.  And if either of you has

2    anything else to discuss today, logistical or otherwise, we can

3    talk about it now, otherwise we will adjourn.

4            Mr. Johnson, anything from the plaintiffs'

5    perspective?

6            MR. JOHNSON:  No, nothing for the plaintiffs.

7            THE COURT:  Okay.  Mr. Carmichael?

8            MR. CARMICHAEL:  No, Your Honor.

9            THE COURT:  Thank you both.

10           We will be adjourned.  Have a good day.

11       (Proceedings concluded at 11:29 AM on Wednesday, November

12   3, 2021.)

13                       * * * * * * * *

14           I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
15   Any redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy are noted within the
16   transcript.

17

18   /s/ Lisa C. Snyder                    11/4/2021

19   Lisa C. Snyder, RPR, CRR                 Date
     Official U.S Court Reporter
20

21

22

23

24

25