# EXHIBIT 5

# SUPREME COURT
# OF THE UNITED STATES

IN THE SUPREME COURT OF THE UNITED STATES

- - - - - - - - - - - - - - - - - - -

NATIONAL FEDERATION OF INDEPENDENT  )

BUSINESS, ET AL.,                   )

       Applicants,          )

       v.                   ) No. 21A244

DEPARTMENT OF LABOR, OCCUPATIONAL   )

SAFETY AND HEALTH ADMINISTRATION,   )

ET AL.,                             )

       Respondents.         )

       and                  )

OHIO, ET AL.,                       )

       Applicants,          )

       v.                   ) No. 21A247

DEPARTMENT OF LABOR, OCCUPATIONAL   )

SAFETY AND HEALTH ADMINISTRATION,   )

ET AL.,                             )

       Respondents.         )

- - - - - - - - - - - - - - - - - - -

Pages:  1 through 139

Place:  Washington, D.C.

Date:   January 7, 2022

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.   20005
(202) 628-4888
www.hrccourtreporters.com

1

```
 1     IN THE SUPREME COURT OF THE UNITED STATES

 2   - - - - - - - - - - - - - - - - - -

 3   NATIONAL FEDERATION OF INDEPENDENT )

 4   BUSINESS, ET AL.,                  )

 5              Applicants,             )

 6              v.                      ) No. 21A244

 7   DEPARTMENT OF LABOR, OCCUPATIONAL  )

 8   SAFETY AND HEALTH ADMINISTRATION,  )

 9   ET AL.,                            )

10              Respondents.            )

11              and                     )

12   OHIO, ET AL.,                      )

13              Applicants,             )

14              v.                      ) No. 21A247

15   DEPARTMENT OF LABOR, OCCUPATIONAL  )

16   SAFETY AND HEALTH ADMINISTRATION,  )

17   ET AL.,                            )

18              Respondents.            )

19   - - - - - - - - - - - - - - - - - -

20              Washington, D.C.

21         Friday, January 7, 2022

22

23       The above-entitled matter came on for oral

24   argument before the Supreme Court of the United

25   States at 10:00 a.m.
```

2

1    APPEARANCES:

2    SCOTT A. KELLER, ESQUIRE, Washington, D.C.; on behalf

3        of the Applicants in No. 21A244.

4    BENJAMIN M. FLOWERS, Solicitor General, Columbus,

5        Ohio; on behalf of the Applicants in No. 21A247.

6    GEN. ELIZABETH B. PRELOGAR, Solicitor General,

7        Department of Justice, Washington, D.C.; on behalf

8        of the Respondents.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Official - Subject to Final Review

3

1                C O N T E N T S

2    ORAL ARGUMENT OF:                          PAGE:

3    SCOTT A. KELLER, ESQ.

4        On behalf of the Applicants in No. 21A244    4

5    ORAL ARGUMENT OF:

6    BENJAMIN M. FLOWERS, ESQ.

7        On behalf of the Applicants in No. 21A247   42

8    ORAL ARGUMENT OF:

9    GEN. ELIZABETH B. PRELOGAR, ESQ.

10       On behalf of the Respondents               72

11   REBUTTAL ARGUMENT OF:

12   SCOTT A. KELLER, ESQ.

13       On behalf of the Applicants in No. 21A244  137

14

15

16

17

18

19

20

21

22

23

24

25

Official Subject Fine Record

4

```
 1                    P R O C E E D I N G S
 2                                    (10:00 a.m.)
 3            CHIEF JUSTICE ROBERTS:  Justice
 4    Sotomayor is participating remotely this
 5    morning, as, in this application, Mr. Flowers
 6    from Ohio will also be participating remotely.
 7            And we will hear argument first this
 8    morning in Application 21A244, National
 9    Federation of Independent Business versus the
10    Department of Labor, and the consolidated case.
11            Mr. Keller.
12            ORAL ARGUMENT OF SCOTT A. KELLER
13        ON BEHALF OF THE APPLICANTS IN NO. 21A244
14            MR. KELLER:  Mr. Chief Justice, and
15    may it please the Court:
16            OSHA's economy-wide one-size-fits-all
17    mandate covering 84 million Americans is not a
18    necessary, indispensable use of OSHA's
19    extraordinary emergency power which this Court
20    has recognized is narrowly circumscribed.
21            Just three days ago, the. U.S. Postal
22    Service told OSHA that this ETS's requirements
23    are so burdensome for employers that the
24    federal government is now seeking an exemption
25    from its own mandate for the Postal Service.
```

      1    That's because OSHA's economy-wide mandate

      2    would cause permanent worker displacement

      3    rippling through our national economy, which is

      4    already experiencing labor shortages and

      5    fragile supply lines.

      6         OSHA has never before mandated

      7    vaccines or widespread testing, much less

      8    across all industries.  In fact, the June

      9    healthcare COVID ETS and the 1991 bloodborne

     10    pathogen rule both rejected vaccine mandates

     11    and widespread testing, and those were even

     12    just for targeting healthcare workers.

     13         And, here, OSHA's vaccine-and-testing

     14    mandate treats virtually all industries'

     15    workplaces and workers the same.  But even

     16    Congress's rescue plan identified high-risk

     17    workplaces, and OSHA itself here recited state

     18    data confirming that certain industries, like

     19    healthcare and correction facilities, are

     20    higher risk.

     21         Our nation's businesses have

     22    distributed and administered hundreds of

     23    millions of COVID vaccines to Americans.

     24    Businesses have encouraged and incentivized

     25    their employees to get vaccines.  But a single

6

```
1    federal agency tasked with occupational
2    standards cannot commandeer businesses
3    economy-wide into becoming de facto public
4    health agencies.
5           So this Court should immediately stay
6    OSHA's unprecedented ETS before Monday, when
7    OSHA begins enforcement.
8           I welcome the Court's questions.
9           JUSTICE THOMAS:  Mr. Keller, how are
10   we to decide when an Emergency Temporary
11   Standard or Emergency Temporary Standards are
12   necessary?  What factors do you think we should
13   use?
14          MR. KELLER:  Justice Thomas, I think
15   the first factor that you would have to look at
16   is, is this an indispensable or essential
17   measure that necessarily would require looking
18   at what are the alternatives available.  You
19   would have to also look at, necessary to what
20   end?  And it's to abate a grave danger.  And
21   it's for an emergency.  It's in a temporary
22   setting.  So the factors you'd want to consider
23   are, what are the risks, and not only what are
24   the risks for any isolated situation but
25   compared to an everyday risk?
```

 1          And, here, when OSHA itself has never

 2    mandated vaccines or widespread testing before,

 3    that itself, even in its 10 prior ETSs, which

 4    courts blocked almost all of the challenges to

 5    these prior ETSs, all of those are factors that

 6    would absolutely determine the scope of what

 7    OSHA could do here.

 8          In fact, in the June ETS, what OSHA

 9    said was:  "OSHA recognizes that many states

10    have taken action to protect employees with

11    mandatory requirements that may not be

12    appropriate for an ETS on a national level."

13          JUSTICE THOMAS:  The -- the -- you

14    know, when -- in -- in McCulloch versus

15    Maryland, Chief Justice Marshall, in looking at

16    necessary and proper, saw "necessary" as more

17    expansive than that as certainly modified by

18    "proper" or in the context of "proper."  So it

19    just suggests that "necessary" can be really

20    necessary or not necessarily really necessary.

21          MR. KELLER:  And -- and --

22          JUSTICE THOMAS:  The -- and -- and I

23    just think that, you know, the -- you need more

24    than to say, oh, a lot of bad things could

25    happen to interpret what that means.  Is it

```
 1    restrictive?  Is it very firm?  Is it
 2    super-necessary?  And if it is, why?
 3              MR. KELLER:  Justice Thomas, the --
 4    the reason why it would be something
 5    approaching the indispensable or essential
 6    definition of "necessary" here is there's a
 7    very key intrastatutory textual clue.  The
 8    emergency power must be necessary.  The regular
 9    power that OSHA wields has to be reasonably
10    necessary or appropriate.
11              JUSTICE THOMAS:  So when do we
12    determine that?  Suppose -- you argue also this
13    is -- the vaccine's been around quite some
14    time.  COVID has been around even longer.  So
15    the -- the government could have had a -- a
16    notice and comment.  So, if it's been -- if you
17    have -- if it's susceptible to notice and
18    comment, then how do you analyze it in that
19    context?  You can't just say, well, it's
20    emergency; therefore, it has to be absolutely
21    necessary.  It would seem that that would
22    undermine your definition or your notion of
23    "necessary."
24              MR. KELLER:  Well, I think Judge
25    Larsen for the Sixth Circuit was absolutely
```

1    correct in saying that just because something's

2    temporary doesn't mean that there could somehow

3    be more power.  And what this Court has said is

4    this emergency power is narrowly circumscribed.

5    And regardless of wherever the line would be

6    drawn, I think this ETS is far past it.

7            And I think the federal government has

8    some serious line-drawing problems of its own.

9    I believe OSHA, under the theory that's been

10   advanced, could have shut down and had a

11   national work lockdown at the beginning of the

12   pandemic.  I would submit that this Court in

13   Industrial Union, in saying that OSHA had no

14   clear mandate in the Act to have that wide a

15   power over the American industry, is also a

16   factor that would go into this Court construing

17   what "necessary" means in light of that.

18           JUSTICE THOMAS:  So the fact that it

19   is temp -- that it's emergency sort of ups the

20   ante, that "necessary" has to be more

21   restrictive?

22           MR. KELLER:  Yes, because of plain

23   text, the comparison within the OSH Act, also

24   statutory context --

25           JUSTICE KAGAN:  I --

1          MR. KELLER:  -- and the major

2    questions doctrine.

3          JUSTICE KAGAN:  -- I guess, Mr.

4    Keller, I -- I don't understand the point.

5    Whatever "necessary" means, whether it's

6    necessary and proper or whether it's something

7    more than that, why isn't this necessary to

8    abate a grave risk?

9          This is a pandemic in which nearly a

10   million people have died.  It is by far the

11   greatest public health danger that this country

12   has faced in the last century.  More and more

13   people are dying every day.  More and more

14   people are getting sick every day.  I don't

15   mean to be dramatic here.  I'm just sort of

16   stating facts.

17         And this is the policy that is most

18   geared to stopping all this.  There's nothing

19   else that will perform that function better

20   than incentivizing people strongly to vaccinate

21   themselves.

22         So, you know, whatever "necessary"

23   means, whatever "grave" means, why isn't this

24   necessary and grave?

25         MR. KELLER:  Because, Justice Kagan,

11

1    the standard for what would be necessary for

2    this extraordinary use of emergency power is

3    not what is the best way of accomplishing it.

4         JUSTICE KAGAN:  It's an extraordinary

5    use of emergency power occurring in an

6    extraordinary circumstance, a circumstance that

7    this country has never faced before.

8         MR. KELLER:  What OSHA needed to do

9    here, though -- and we do not contest that

10   COVID is a grave danger, but when -- a power

11   for it to be necessary, for instance, the Third

12   Circuit said in wielding what is supposed to be

13   a delicately exercised extraordinary power, the

14   agency has to consider and explain

15   alternatives.

16        The agency here complained that its

17   non-mandatory guidance wasn't being followed

18   and then, instead of saying that maybe some of

19   those mandatory guidance -- some of those

20   guidances could have been made mandatory, it

21   jumped immediately to a vaccine-or-testing

22   mandate.

23        Moreover, OSHA typically --

24        JUSTICE KAGAN:  Mr. Keller, I -- I

25   guess I -- I just don't see this as a

1    situation, you know, a typical arbitrary,

2    capricious situation where we say, oh, you

3    didn't consider an alternative carefully

4    enough.

5          We all know what the best policy is.

6    I mean, by this point, two years later, we know

7    that the best way to prevent spread is for

8    people to get vaccinated and to prevent

9    dangerous illness and death is for people to

10   get vaccinated.  That is by far the best.

11         The second best is to wear masks.  So

12   this is a policy that basically says, we are

13   still confronting thousands of people dying

14   every time we look around, and so we're going

15   to put into place the policy that we know works

16   best, which is to strongly incentivize

17   vaccination and to insist that unvaccinated

18   people will wear masks and test.

19         I mean, that's just -- like, why isn't

20   that necessary?  What else should be done?

21   It's -- it's obviously the policy that's --

22   that's geared to preventing most sickness and

23   death, and the agency has done everything but

24   stand on its head to show quite clearly that no

25   other policy will prevent sickness and death to

Official Subject Final 12/29

13

1    anywhere like the degree this one will.

2              MR. KELLER:  Justice Kagan, first of

3    all, states could have policies like this.

4    Private businesses could have policies like

5    this.  And even OSHA in its June healthcare

6    COVID ETS -- and that was only for healthcare

7    workers -- did not mandate vaccines.

8              Instead, what it did there, similarly

9    to how OSHA proceeds in many contexts, is it

10   says, employers, give us a plan, and then, if

11   there are heightened needs in particular

12   workplaces, then additional measures can be put

13   into place.  But this is covering economy-wide,

14   all industries, 84 million Americans --

15             JUSTICE KAGAN:  Well, that's if that

16   rule --

17             CHIEF JUSTICE ROBERTS:  That's one of

18   your main -- that -- that's one of your main

19   objections, that this is not a workplace issue,

20   it's -- it's an out-in-the-world issue, is that

21   right?

22             MR. KELLER:  That's right, Mr. Chief

23   Justice.

24             CHIEF JUSTICE ROBERTS:  Well, but how

25   focused on the workplace does something have to

1    be before you will say that OSHA can regulate

2    it?

3         Think, for example, of an assembly

4    line, you know, workers sitting next to each

5    other for a significant length of time, working

6    together in close -- close contact.  That

7    presents a different kind of risk than is

8    typical in the outside world.

9         So could OSHA say that for businesses

10   with assembly lines, the workers must be

11   vaccinated?

12        MR. KELLER:  No, not vaccinated.

13   OSHA, though, could potentially, going by

14   industry by industry or workplace by workplace,

15   have measures such as what some of their

16   guidance have suggested, like, you know,

17   potentially barriers.  But I think all of this

18   would be kind of --

19        CHIEF JUSTICE ROBERTS:  Well, but

20   those are sort of -- as Justice Kagan has been

21   -- been discussing, those are sort of, you

22   know, not as good.  And why wouldn't OSHA have

23   the authority to do the best approach possible

24   to address what I guess you agree is a special

25   workplace problem?

1          MR. KELLER:  Well, Mr. Chief Justice,

2     I don't think the standard here can be the best

3     because, if it was the best, then that would

4     mean that OSHA could ban all people from coming

5     into the workplace.  I think that is a power

6     that Congress, when it created OSHA, was --

7          CHIEF JUSTICE ROBERTS:  Well, so

8     the -- so the agency is acting, you know, less

9     aggressively than it might otherwise do but in

10     an effective way to address the problem.

11          MR. KELLER:  But, as soon as we get to

12     the point where we're talking about a less

13     aggressive way, there are other alternatives.

14     There could have been plans.  There could have

15     been the man -- the non-mandatory guidance that

16     was then put into place.  Jumping to a

17     vaccine-or-testing mandate when OSHA has never

18     exercised that power is --

19          CHIEF JUSTICE ROBERTS:  Well, it is a

20     pressing -- there is some pressing urgency to

21     addressing the problem and to have them sit

22     down and say, okay, what else could we do?  We

23     have to have notice -- well, notice and

24     comment, which I guess -- are you insisting

25     that that be part of the process?

1           MR. KELLER:  In this situation, yes.

2    I mean, you have the Postal Service and Amtrak

3    saying many employees will be -- will quit.

4    Here, there are reports --

5           CHIEF JUSTICE ROBERTS:  Well, just

6    because --

7           MR. KELLER:  -- and we have --

8           CHIEF JUSTICE ROBERTS:  -- the post

9    office can't do it efficiently doesn't mean

10   that private industry can't.

11          MR. KELLER:  But I think what this

12   shows is workplaces are different.  And instead

13   of doing an economy-wide vaccine-or-testing

14   mandate for all purposes, OSHA needed to at

15   least consider, as it identified, there are

16   certain instances where healthcare workers and

17   otherwise -- in those industries where there is

18   a heightened risk, that's where there's a

19   workplace occupational problem.

20          JUSTICE BREYER:  Well, it is -- it's

21   -- well, okay, I -- I want to ask a provisional

22   question.  Are -- are you still really asking

23   this Court now today -- I mean, I assume your

24   arguments are -- you have good arguments in

25   your brief, and so does the government.

 1             So I'll assume for the sake of

 2    argument that they're both fairly good

 3    arguments, okay?

 4             MR. KELLER:  Thank you.

 5             JUSTICE BREYER:  All right.  Now

 6    that's an assumption, right, but make that

 7    assumption with me.  Are you still asking us to

 8    issue a stay and stop this from taking effect,

 9    like issue a stay today or tomorrow or Sunday

10    or Monday or Tuesday?

11             I mean, the reason I ask that is there

12    are several elements, we have some discretion

13    there, and -- and you know it was brought up.

14             I mean, there -- there were

15    three-quarters of a million new cases

16    yesterday.  New cases.  Nearly three-quarters,

17    700-and-some-odd thousand, okay?  That's 10

18    times as many as when OSHA put this rule in.

19             The hospitals are today, yesterday,

20    full, almost to the point of the maximum

21    they've ever been in this disease, okay?

22             And you heard references, studies, I

23    mean, they -- they vary, but some of them say

24    that the hospitalization is 90 percent or maybe

25    60 percent or maybe 80 percent, but a big

1     percent, filled up yesterday or the day before

2     with people who are not vaccinated, okay?

3          So that's -- we're talking about now.

4     And think of the stay requirements.  It's both

5     the balance of harms.  It's also public

6     interest.  Can you ask us -- is that what

7     you're doing now, to say it's in the public

8     interest in this situation to stop this

9     vaccination rule with nearly a million people

10    -- let me not exaggerate -- nearly

11    three-quarters of a million people, new cases

12    every day?  I mean, to me, I would find that

13    unbelievable.

14         MR. KELLER:  Justice Breyer, we are

15    asking for a stay before enforcement takes

16    effect Monday, and the reason for that is this

17    is an unprecedented agency action.

18         JUSTICE BREYER:  Yeah, yeah --

19         MR. KELLER:  We do not --

20         JUSTICE BREYER:  -- I know you have

21    all good arguments that it isn't good.  They

22    have arguments that it is good.

23         Okay.  I'm asking you a different

24    question, and the question is:  How can it

25    conceivably be in the public interest with

19

1    three-quarters of a million people yesterday,

2    goodness knows how many today -- I don't want

3    to repeat myself, but you have the

4    hospitalization figures growing by factors of

5    -- of 10, 10 times what it was.

6         You have hospitalization at the

7    record, near the record.  You have -- you have

8    -- I mean, you understand the thing -- things

9    as well as I.  And so I repeat my question, to

10   me, it's unbelievable, but I want to hear what

11   you say.

12        How can it be in the public interest,

13   which is a requirement, how can it be a balance

14   of harms in this case, assuming the arguments

15   aren't off the wall on the government's side,

16   and believe me, they're not.  Okay, that's what

17   I want to hear the answer to.

18        MR. KELLER:  Justice Breyer, states

19   can act, private businesses have acted on

20   historic levels.  This is going to cause a

21   massive economic shift in the country, billions

22   upon billions of non-recoverable costs.

23   Testing also is not frequently available.  This

24   is in our appendix at page 374.

25        Among those employers who have

1    attempted to do so, only 28 percent are able to

2    find adequate providers to ensure that weekly

3    testing is available for the employees.

4            If Congress intended to give an

5    occupational health agency the power to mandate

6    vaccines across the country, it needed to do so

7    clearly.  States can do it.  Businesses have

8    done it and are able to do it.

9            The question is not what is this

10   country going to do about COVID.  It's who gets

11   to decide that.

12           JUSTICE KAGAN:  Well, who does get --

13           JUSTICE ALITO:  And, Mr. Keller --

14           CHIEF JUSTICE ROBERTS:  Maybe, at this

15   point, we can go justice by justice.

16           Justice Thomas, anything further?

17           JUSTICE THOMAS:  Not for me.

18           CHIEF JUSTICE ROBERTS:  Justice

19   Gorsuch?

20           JUSTICE GORSUCH:  Oh.  I do have a

21   couple of questions, Mr. Keller.

22           First, the government says that the

23   major questions doctrine and the federalism

24   canon, for example, don't apply to this Court's

25   consideration of this case or any other unless

1    the statute before us is first found to be

2    ambiguous.

3              What's your understanding?

4              MR. KELLER:  Well, two points.

5              If you need to even reach the question

6    of whether there's ambiguity -- and we think

7    the term "necessary" is clear in context, it

8    has to mean indispensable or essential -- that

9    would be a term where potentially the

10   government in their interpretation would reach

11   ambiguity.

12             But, regardless, the major questions

13   doctrine is also in service of avoiding

14   non-delegation concerns, and the non-delegation

15   concerns that this Court recognized in

16   Industrial Union and citing Sharepoint --

17             JUSTICE GORSUCH:  I -- I -- I'm -- I'm

18   sorry to interrupt you, but that might -- that

19   wasn't quite my question.  I apologize if I

20   didn't make it clear enough.

21             But the government says that we only

22   consult those doctrines, the federalism canon

23   and the major questions doctrine -- I think the

24   Court understands what they are but only

25   consults them after finding a statutory

1    ambiguity.  Do you disagree?

2         MR. KELLER:  I disagree in that the

3    major questions doctrine is also a -- a -- a

4    doctrine that would avoid non-delegation

5    concerns.  So even if there were a clear

6    statutory term, non-delegation concerns and how

7    to interpret that statute would factor in.

8    Regardless, I think the term "necessary" here,

9    there's plenty of room to implement the major

10   questions doctrine there, in addition to all of

11   the workplace-tethered languages in the plain

12   text and statutory context.

13        JUSTICE GORSUCH:  And then, secondly,

14   I would like to understand your argument and

15   your colleague's argument from Ohio, I believe

16   it is, why the Court should enter a stay

17   immediately.  I -- you've asked for immediate

18   relief.  Why should the Court grant immediate

19   relief?

20        MR. KELLER:  The short version is, as

21   soon as businesses have to put out their plans

22   and this takes effect, workers will quit.  That

23   itself will be a permanent worker displacement

24   that will ripple through the national economy.

25        So we can talk about the billions in

23

1    non-recoverable costs that the government even

2    concedes, and we can talk about the lost

3    profits and lost goodwill and lost business

4    reputation, and we can talk about the

5    businesses that are going to be put out of

6    business.  Our appendix at pages 375 to 80

7    quotes many businesses saying this would be

8    catastrophic, it would bankrupt our -- our

9    company, it would be the most devastating event

10   our company has ever experienced.

11          That's why we're here.  We're asking

12   for an extraordinary stay.  We understand the

13   gravity of the situation.  But, in balancing

14   the sheer size and scope of this emergency

15   power that is supposed to be exercised

16   delicately and the national economic

17   implications of this when states and businesses

18   can and have acted, we are entitled to a stay

19   in this posture.

20          CHIEF JUSTICE ROBERTS:  Justice Alito?

21   Sorry to have gone out of order there.

22          JUSTICE ALITO:  No, no, fine.

23          Mr. Keller, I just want to make sure I

24   understand what we should focus on here.  Is

25   the question whether this ETS is necessary to

1    protect the health of the general public, or is

2    it whether it is necessary to protect just

3    employees and not even all employees but only

4    unvaccinated employees, people who have chosen

5    independently not to be vaccinated and do not

6    want to be vaccinated?  Is that the proper

7    focus?

8            MR. KELLER:  Correct, the latter,

9    Justice Alito.  As OSHA has said, the grave

10   danger here is to the unvaccinated worker who

11   is exposed to COVID.

12           JUSTICE ALITO:  Thank you.

13           CHIEF JUSTICE ROBERTS:  Justice

14   Sotomayor.

15           JUSTICE SOTOMAYOR:  Yes, counsel.  I

16   -- I quibble with that in part.  The

17   unvaccinated worker affects other unvaccinated

18   workers but affects vaccinated workers.  We

19   have proof of that with Omicron.  And it's not

20   just death, but there is illness, and for many

21   with preexisting conditions or immunological

22   problems, there are severe consequences even

23   when vaccinated.  So I think the grave danger

24   is to both.

25           But, Mr. Fletcher, are you -- you seem

Official Subject to Final Review

25

```
1    to be importing into "necessary" a concept of

2    strict scrutiny.  Am I correct?

3              MR. KELLER:  No, Justice Sotomayor.

4    The "necessary" analysis does have to account

5    for alternatives, but we're not asking anything

6    close to a least restrictive means analysis.

7    What we're saying is the agency --

8              JUSTICE SOTOMAYOR:  All right.  So, if

9    you're not, I know that your experts are

10   predicting catastrophes, but they've done --

11   experts opposed to OSHA regulations have done

12   the same for decades, and the catastrophes have

13   failed to happen.  And there are exemptions.

14   The Post Office -- the -- the Postal Service is

15   looking for them -- is looking at one of them.

16   I'm sorry, OSHA is looking at one from -- from

17   the Postal Service, and there are probably

18   other private and public entities who can seek

19   exemptions as well.

20             But putting all of that aside, who

21   makes that judgment about the seriousness of

22   the effect?  I always thought it was the

23   agency.  It's not judges.  And it's not experts

24   because experts have conflicting opinions.

25             I always thought that all we had to
```

1    look at was whether an agency had substantial

2    evidence before it to conclude that all of the

3    economic ramifications that you're speaking

4    about -- and this is what I think they found in

5    Earl Rebone.  Where am I wrong that that's an

6    agency judgment?  There is certainly

7    substantial evidence to -- to support their

8    judgment.  It's a very huge record they

9    compiled.  They looked at a massive amount of

10   data across many, many industries and in many,

11   many different states.  Please tell me why, if

12   we're going to issue a temporary stay -- and I

13   think this was Justice Breyer's question -- we

14   would have to accept your version of the facts

15   as opposed to the agency's?  Aren't we supposed

16   to accept the agency's?

17          MR. KELLER:  I think even if you

18   accept the agency's facts, there are now, as

19   Your Honor just mentioned, CDC guidance

20   contradicting foundational assumptions of this

21   ETS.  That's in our reply brief at page 7, and

22   Your Honor just mentioned that.

23          But, regard -- regardless, even OSHA

24   has said that 1 to 3 percent of employees will

25   quit.  That is significant.  Our declarations

Official Subject to Final Review

27

     1    at Appendix 308, 316, 320 --

     2              JUSTICE SOTOMAYOR:  Counsel, yes, that

     3    may be true.  But we are now having deaths at

     4    an unprecedented amount.  Catching COVID keeps

     5    people out of the workplace for extraordinary

     6    periods of time.  And there have been proof in

     7    certain industries, like the medical industry,

     8    that when vaccine's mandated -- and there's no

     9    mandate here for a vaccine.  There is a masking

    10    mandate, no different than there is when we

    11    tell people that if there are sparks flying in

    12    the workplace, wear -- you have -- workers have

    13    to be provided -- have to wear a mask.  So

    14    that's no different in my mind than this.

    15              So this is not a vaccine mandate.

    16    There are costs and deaths and other things

    17    countervailing to the fact that there might be

    18    1 to 3 percent of workers who leave.

    19              MR. KELLER:  And, here, vaccines have

    20    been made available.  I also think there's a

    21    textual clue within the OSH Act at 29 U.S.C.

    22    655 that --

    23              JUSTICE SOTOMAYOR:  You forget that

    24    there are certain states now that are stopping

    25    employers from requiring vaccines.  There are

1    certain states stopping employers from

2    requiring masks.  Why shouldn't the federal

3    government, which it has already decided in

4    OSHA, to give -- Congress has decided to give

5    OSHA the power to regulate workplace safety,

6    have a national rule that will protect workers?

7         MR. KELLER:  Congress would have to

8    clearly state in a statute if it wanted to give

9    an occupational health agency the power to

10   require employees to get certain medical

11   treatment.  It's one thing to say --

12        JUSTICE SOTOMAYOR:  There's no

13   requirement here.  It's not a vaccine mandate.

14        MR. KELLER:  Well --

15        JUSTICE SOTOMAYOR:  It's something

16   totally different.

17        MR. KELLER:  -- it --

18        JUSTICE SOTOMAYOR:  And I don't know

19   how much clearer than 651 Congress -- Congress

20   could have been.  It charges OSHA with

21   developing innovative methods, techniques, and

22   approaches to dealing with occupational safety

23   -- occupational safety and health issues.

24        I don't know how much clearer you can

25   be, if you're Congress, to tell an agency in an

1    emergency do what's necessary.  I don't think

2    Congress can do it.  Do you?

3          MR. KELLER:  If Congress was going to

4    give an occupational health agency this type of

5    power to essentially regulate directly the

6    employee, rather than telling employers these

7    are the types of things that you would want to

8    do within your workplace, it would have had to

9    provide that clearly.  And that --

10         JUSTICE SOTOMAYOR:  So what's the

11   difference between this and telling employers,

12   where sparks are flying in the workplace, your

13   workers have to be -- wear a mask?

14         MR. KELLER:  When sparks are flying in

15   the workplace, that's presumably because

16   there's a machine that's unique to that

17   workplace.  That is the --

18         JUSTICE SOTOMAYOR:  Why is the human

19   being not like a machine if it's spewing a

20   virus, bloodborne viruses?  Are you questioning

21   Congress's power or desire that OSHA do this?

22   It already in 1991 told OSHA to issue

23   regulations with respect to Hep C and B.

24         MR. KELLER:  Justice Sotomayor, I

25   think that exactly proves our point, that

1    Congress knows how to enact a statute when it

2    wants to give OSHA power --

3              JUSTICE SOTOMAYOR:  It didn't enact a

4    statute.  OSHA proposed regulations, it didn't

5    act fast enough, and Congress told it to act

6    faster.

7              MR. KELLER:  And --

8              JUSTICE SOTOMAYOR:  So it wasn't

9    Congress who proposed it.  It wasn't Congress

10   who devised it.  Congress gave OSHA the

11   responsibility to do these things, and Congress

12   was saying get to it.

13             MR. KELLER:  And what Congress said in

14   there was not you now have statutory authority

15   to regulate all communicable diseases.  It was

16   bloodborne pathogens, and even that rule did

17   not mandate vaccines or widespread testing.

18             CHIEF JUSTICE ROBERTS:  Justice Kagan?

19             JUSTICE KAGAN:  Mr. Keller, your --

20   your very last comment in your first part of

21   your argument I want to come back to because

22   your very last sentence, you said the question

23   is, who decides?  And I think that that's

24   right.  I think that that is the question.

25             Respectfully, I -- I think it has a

1   different answer than the one that you give, so

2   I'll just sort of put a different version of it

3   to you, which is, you know, you're -- I'm sure

4   you're right that there are all kinds of public

5   health and economic tradeoffs that have to be

6   made in a policy like this, all kinds of

7   judgments on the public health side, on the

8   economic side, how those two things ought to be

9   balanced against each other.

10          So who decides?  Should it be the

11   agency full of expert policymakers and

12   completely politically accountable through the

13   President?  This is not the kind of policy in

14   which there's no political accountability.  If

15   people like this policy, they'll go to the

16   polls and vote it that way.  If people don't

17   like it, they'll vote that way.

18          This is a publicly -- a politically

19   accountable policy.  It also has the virtue of

20   expertise.  So, on the one hand, the agency

21   with their political leadership can decide.

22   Or, on the other hand, courts can decide.

23   Courts are not politically accountable.  Courts

24   have not been elected.  Courts have no

25   epidemiological expertise.

1          Why in the world would courts decide

2     this question?

3          MR. KELLER:  Congress and states and

4     governors wielding emergency power are the ones

5     that have the power -- and we acknowledge that

6     -- over vaccines.  The idea that OSHA would be

7     the agency in the federal government that's not

8     even under the Department of Health and Human

9     Services, that does not have expertise over

10    communicable diseases like the FDA or CDC

11    maybe, that would just be a very odd place for

12    Congress to large -- to lodge such a sweeping

13    power over the American people.

14         JUSTICE KAGAN:  Well, OSHA has a lot

15    of expertise about workforces and about the

16    dangers that workforces can confront individual

17    employees with.  And I'm sure OSHA also talked

18    to other agencies within the federal government

19    to consider public health issues and brought

20    that knowledge to bear as well with its

21    knowledge of -- of how workplaces function and

22    -- and, again, came out with a -- a

23    well-supported policy that has political

24    leadership behind it and all the political

25    accountability that one could wish for.

1          And why is it that courts would

2     displace that judgment and say it is up to us

3     to decide about vaccination policy in the

4     employment settings of this country?

5          MR. KELLER:  Well, first of all, what

6     OSHA did here was not an industry-by-industry

7     analysis.  I mean, the line it drew, for

8     instance, with the hundred-or-more employee

9     lines, they said they were doing that because

10    they thought the larger companies were the ones

11    that had the administrative capacity to do it.

12    It wasn't because they were denser working

13    environments.  You could have a company with a

14    hundred employees and every single person is

15    working somewhere else.

16          Even the narrow exception that they

17    have raised, even they say that 9 percent of

18    landscapers and 5 percent of highway workers

19    are the only ones that would qualify for their

20    exclusively working outside exemption.  So even

21    occupations in which you would think someone is

22    almost exclusively working outside, they are

23    still covered by this ETS.

24          It's those types of internally

25    inconsistent positions that aren't taking

1    account of the full problem that could have

2    been explained and should have been explained.

3            JUSTICE KAGAN:  Thank you, Mr. Keller.

4            CHIEF JUSTICE ROBERTS:  Justice

5    Kavanaugh?

6            JUSTICE KAVANAUGH:  I want to follow

7    up on Justice Kagan's who decides question

8    because I do think that gets to the -- the

9    heart of this.

10           You're relying on the major questions

11   canon in saying that when an agency wants to

12   issue a major rule that resolves a major

13   question, it can't rely on statutory language

14   that is cryptic, vague, oblique, ambiguous.

15           But the critique of -- of that canon

16   and the difficulty in applying it is figuring

17   out when something is major enough.  We've

18   applied it five or six times in the last 40

19   years, and you know the cases, and they're

20   important, and we'll talk about them, I'm sure,

21   as the argument goes on.

22           But how -- how -- what should we look

23   at to say this one is the kind of rule that

24   rises to the level of the benzene rule or the

25   tobacco rule that we found to be major?

35

1      What -- what should we look at?

2            MR. KELLER:  So Alabama Realtors just

3      said the sheer size and scope.  Size would

4      account for the overall economic impact.  This

5      covers 1.8 million establishments.  The number

6      of people affected would be another factor.

7      This covers 84 million or two-thirds of the

8      private workforce.  The amount of money, King

9      versus Burwell said billions in cost, and,

10     here, we have that even conceded by OSHA.

11           The scope also.  All of the 10 prior

12     ETSs that OSHA has done, none of them have

13     mandated vaccines.  None of them have mandated

14     widespread testing.  Only one in June even

15     dealt with COVID.  The rest were all workplace

16     toxins, and most of those challenges were

17     upheld -- or, sorry, most of those challenges

18     were vindicated by the courts.

19           And so the scope of what the agency

20     has done before, in addition to the widespread

21     effects, those would be the factors that you'd

22     analyze.

23           Also, is this a profound and earnest

24     debate over a question of vast politically --

25     vast political and economic significance?  I

1    don't at this point believe that the federal

2    government is contesting that this absolutely

3    satisfies that.

4         JUSTICE KAVANAUGH:  And one follow-up

5    question.  Suppose it is major enough, so

6    accept that position for the sake of this

7    question.  Suppose the statutory language is

8    general, broad, but doesn't speak specifically

9    to the issue in question, but it is general and

10   broad language.

11        How do we sort out -- so you don't

12   necessarily say the language is ambiguous.  But

13   it also doesn't speak specifically to the

14   issue.  How -- how would you suggest we sort

15   out that kind of question?  I realize you're

16   going to say this language is different, but

17   how would you sort out that kind of question?

18        MR. KELLER:  You look at the plain

19   text.  From Brown & Williamson, we know you'd

20   also look at the statutory context, and I also

21   think the statutory context here is incredibly

22   important.

23        When you have the distinction between

24   the emergency power and the regular power --

25   this was the dialogue earlier with Justice

37

 1    Thomas about necessary versus reasonably

 2    necessary or appropriate -- all of those

 3    textual clues, where powers have been lodged

 4    within the federal government, the fact that

 5    this is within the Department of Labor rather

 6    than Department of Human and Health -- Health

 7    and Human Services, also King versus Burwell

 8    too on, is this the agency that has expertise

 9    over communicable diseases?  No, it's not.

10         JUSTICE KAVANAUGH:  Do you think the

11    agency could do this under its general power

12    then?

13         MR. KELLER:  No, I do not think that

14    the agency could do an economy-wide

15    vaccine-or-testing mandate across the entire

16    economy.  It has never done that even through

17    its regular power.  It didn't do that in June

18    in an ETS targeting healthcare workers,

19    arguably the most heightened high-risk

20    workplace.

21         JUSTICE KAVANAUGH:  Thank you.

22         CHIEF JUSTICE ROBERTS:  Justice

23    Barrett?

24         JUSTICE BARRETT:  Mr. Keller, I want

25    to return to the discussion you were having

1    with both the Chief Justice and Justice Kagan

2    earlier about whether the vaccine-or-test

3    requirement addresses -- is necessary to

4    address a grave danger in the workplace.

5          I think you would be hard pressed to

6    contest the Chief's point that there are some

7    workplaces in which the danger to employees is

8    different than that that they face out in the

9    world.  A meat-packing plant or a healthcare --

10   the dentist.

11         And I think what you're saying --

12   well, I think this is what you're saying, and I

13   want to be sure that I understand it, that I'm

14   correct.  I think what you're saying is that

15   even if there are some industries or some

16   people who would face a great risk and this

17   might be necessary to address that risk, so, in

18   other words, if OSHA had adopted a more

19   targeted rule, you might not be contesting that

20   or you would not be contesting that, that the

21   problem here is its scope and that there's no

22   differentiation between the risk faced by

23   unvaccinated 22-year-olds and unvaccinated

24   60-year-olds or industries, you were just

25   talking about landscapers and people who work

1    primarily outdoors, those, and workers who work

2    in an inside environment all day long.

3              So is that the distinction that you're

4    making?  You're not disputing what Justice

5    Kagan said, that, you know, this is a grave

6    danger and that in some circumstances this rule

7    might be necessary, but just the scope of it

8    makes it different?

9              MR. KELLER:  That's right, Justice

10   Barrett.  But -- but I just want to be very

11   clear about this.  Wherever that line is, this

12   ETS is so far beyond that line.  Congress

13   identified and even OSHA identified, for

14   instance, certain healthcare scenarios.  For

15   instance, you know, if you're treating COVID

16   patients or you're a scientist in a laboratory

17   handling COVID samples and researching them, of

18   course, that's going to be a very different

19   case.

20             But, here, what OSHA did was

21   economy-wide.  It said it --

22             JUSTICE BARRETT:  Well, I understand

23   that.  And you're saying that that's the

24   problem.  You're not contesting that if we were

25   talking about healthcare workers or a

1    meat-packing plant, you're not contesting that

2    OSHA could rely on its emergency power to

3    impose this kind of requirement in that

4    context.

5             MR. KELLER:  That's right.  I would

6    still want to know what their explanation was

7    --

8             JUSTICE BARRETT:  Sure.

9             MR. KELLER:  -- and all of the

10   substantial evidence, but, yeah, of course,

11   that's a very different case.  And I know

12   that's always not a satisfactory answer.  But,

13   here, this ETS is so far beyond healthcare

14   workers and what Congress identified in the

15   rescue plan as truly high-risk workplaces.

16            JUSTICE BARRETT:  Right.  So you're

17   saying that when we take the definition of

18   "necessary," particularly when contrasted with

19   "reasonably necessary" and the general grant of

20   authority, that it means something more and

21   that when we're looking at grave danger, there

22   had to be a more targeted industry-by-industry

23   analysis?

24            MR. KELLER:  Yes.

25            JUSTICE BARRETT:  Okay.  And a

1    follow-up.  Would you be here making these same

2    arguments if this were just a masking and

3    testing requirement and not the vaccine portion

4    of it?

5          MR. KELLER:  Yes, I think that

6    mandatory testing is still a mandatory medical

7    procedure.  OSHA has never, even in a regular

8    rule, done a blanket, widespread testing regime

9    over 84 million Americans.

10          JUSTICE BARRETT:  What if it was just

11   masking?

12          MR. KELLER:  I think we -- I don't

13   think OSHA has the ability to set by emergency

14   rule nationwide COVID policy.  You know, the

15   more that we back out of this and the more we

16   say, well, if it's not an emergency rule or if

17   it's targeted to a particular workplace, you

18   know, I think there can be debates about that.

19   But, as long as they're trying to set a

20   blanket-wide -- economy-wide policy by an

21   emergency rule, OSHA does not have that power.

22          JUSTICE BARRETT:  Thank you.

23          CHIEF JUSTICE ROBERTS:  Thank you,

24   counsel.

25          Mr. Flowers, I don't quite know where

1    to look, but are you still on the line?

2              MR. FLOWERS:  I am, Mr. Chief Justice.

3              CHIEF JUSTICE ROBERTS:  Thank you.

4    You may proceed.

5              ORAL ARGUMENT OF BENJAMIN M. FLOWERS

6          ON BEHALF OF THE APPLICANTS IN NO. 21A247

7              MR. FLOWERS:  Mr. Chief Justice, and

8    may it please the Court:

9              OSHA typically identifies a workplace

10   danger and then regulates it.  But, here, the

11   President decided to regulate a danger and then

12   told OSHA to find a work-related basis for

13   doing so.  This resulted in the vaccine

14   mandate, a blunderbuss rule, nationwide in

15   scope, that requires the same thing of all

16   covered employers, regardless of the other

17   steps they've taken to protect employees,

18   regardless of the nature of their workplaces,

19   regardless of their employees' risk factors,

20   and regardless of local conditions that state

21   and local officials are far better positioned

22   to understand and accommodate.

23             So sweeping a rule is not necessary to

24   protect employees from a grave danger as the

25   emergency provision requires.  And I want to be

43

1    clear that states share OSHA's desire to bring

2    this pandemic to a close, but the agency cannot

3    pursue that laudable goal unlawfully.

4          I welcome your questions.

5          JUSTICE THOMAS:  So you're saying,

6    Mr. Flowers, that the first step in OSHA's

7    regulation is to identify the workforce, the

8    problem in that workforce, and then regulate

9    that?

10          MR. FLOWERS:  That is typically how

11    OSHA proceeds.  I don't know that there's a

12    requirement that says they must do that, but I

13    think part of the problems we're seeing with

14    this rule is it's not truly intended to

15    regulate a workplace danger; it's -- it's --

16    it's a danger that we all face simply as a

17    matter of waking up in the morning.

18          JUSTICE THOMAS:  Well, but --

19          MR. FLOWERS:  And I -- and I -- I'm

20    sorry.

21          JUSTICE THOMAS:  I'm sorry to

22    interrupt you, but I -- the other part of my

23    question is, can a danger be so acute in the

24    society that it is brought into the workforce

25    and could hence be regulated by its mere

Official Subject to Final Review

44

1    presence there and by the fact that it is so

2    acute?

3              MR. FLOWERS:  It -- I think what they

4    need -- let -- all right.  Let me answer this

5    in two steps.  I can first define what we mean

6    by "work-related danger" and then talk about

7    how that applies here, and I think that'll get

8    to your question.

9              So, in terms of what we mean by

10   "work-related danger," I think one way to think

11   about that is, has the employer done or failed

12   to do something that creates a risk the

13   employee faces?  And then the problem with

14   applying that here is, if you look at their own

15   explanation for what the risk is -- this is at

16   61411 of the Federal Register -- they say the

17   reason there's a risk in every workplace is you

18   interact, you come into contact with people at

19   the workplace.

20             When you define the risk that broadly,

21   that is not something that's arising out of the

22   workplace.  That's a risk we face when we wake

23   up, when we're with our families, when we stop

24   to get coffee on the way to work, at work, when

25   we go to lunch, and in the evening if we go to

45

1    a sporting event or a concert.

2            So this kind of goes to Justice

3    Barrett's question, I believe, that if they

4    were to focus on a risk arising out of a -- a

5    particular aspect of the workplace that creates

6    a -- a risk of a different nature, like being

7    packed closely together in a meat-packing

8    plant, that could fairly be described as a

9    work-related danger.

10           JUSTICE KAGAN:  Mr. Flowers --

11           MR. FLOWERS:  But this cannot.

12           JUSTICE KAGAN:  Sorry.  Sorry to

13    interrupt.  Do you know of any workplaces that

14    have not fundamentally transformed themselves

15    in the last two years?  I mean, maybe like --

16           MR. FLOWERS:  I --

17           JUSTICE KAGAN:  -- landscapers, they

18    work outside.  But, I mean, this idea that

19    there are only a few select workplaces that are

20    affected by COVID, I would have thought every

21    workplace has been affected by COVID.  Every

22    workplace sent their workers home.  Every

23    workplace had to make adjustments to the way

24    they do their business.

25           I'm trying to figure out, like, why

 1    this is a blunderbuss approach when everybody

 2    knows from living their normal lives that every

 3    workplace has been affected by this, save for,

 4    you know, a few here and there.

 5         MR. FLOWERS:  So the way I would

 6    answer that is to say just about every

 7    workplace has been affected, but that doesn't

 8    mean the work is arising from the workplace.

 9    To take another example, if we look at

10    terrorism, there's some risk of terrorism that

11    we face when we wake up in the morning.  We

12    face it at home, in public, and at work.  And

13    we adjusted to that after 9/11.  If you see

14    something, say something.  Ideas like that.

15         Now the fact that you face that work

16    -- that risk when you go to work doesn't make

17    it a workplace risk.  It means it's an

18    ever-present risk.

19         JUSTICE KAGAN:  Well, why -- why not?

20    I mean, this is a -- the combination of lots of

21    people all going in to one indoor space and

22    having to deal with each other for eight hours,

23    10 hours, however many hours a day, in those

24    settings, the combination of the environment

25    and the people that are in that environment

1    create a risk, I would think.  I mean, tell me

2    if I'm wrong about this.  I would think that

3    workplace risk is about the greatest least

4    controllable risk with respect to COVID that

5    any person has.

6              You know, everything else a person can

7    control.  You can go to the baseball game or

8    not go to the baseball game.  You can decide

9    who to go to the baseball game with.  But you

10   can't do any of that in workplaces.  You have

11   to be there.  You have to be there for eight

12   hours a day.  You have to be there in the exact

13   environment that the workplace is set up with.

14   And you have to be there with a bunch of people

15   you don't know and who might be completely

16   irresponsible.

17             Where else do people have a greater

18   risk than at the workplace?

19             MR. FLOWERS:  Well, I think one thing,

20   with their families, which they have to spend

21   even more time with, especially if they have

22   children going to school and things of that

23   nature.  But, in response to does the risk -- I

24   mean, of course, the risk arises at the

25   workplace, but it's important to focus on the

```
 1    risk they're talking about.  They're not
 2    talking about jobs where people do congregate
 3    in settings like that that changes the nature
 4    of the risk.
 5            They say every single workplace where
 6    people come inside for even a little bit is
 7    covered.  And so they've defined the risk to
 8    mean simple human contact.  And it could be no
 9    more contact than you have at the grocery store
10    or when you drop your kids off at school or
11    when you go to a -- a friend's house.
12            JUSTICE KAGAN:  Well, Mr. Flowers, in
13    fact --
14            MR. FLOWERS:  And that's the problem.
15    We're not --
16            JUSTICE KAGAN:  -- in fact, what --
17    what this rule does is it says we're not going
18    to regulate some people.  People who work
19    outdoors, forget about it.  People who work
20    alone, we don't have to worry about them.  But
21    people who work in the way that lots and lots
22    and lots of people work, which is surrounded by
23    other people in indoor spaces, you know, with
24    -- without their own offices, you know, with
25    cubicles or with -- in -- in -- in other mass
```

1    settings, you know, that's where the greatest

2    risk is.  Not just that's where the risk of

3    ordinary life is.  That is, in fact, where the

4    greatest risk is.

5            MR. FLOWERS:  And if they had taken

6    that approach, they would have a much better

7    argument, but they don't because there are many

8    jobs here, including, for example, landscapers,

9    who may spend a little bit of time inside, five

10   minutes a day, to get the keys or punch their

11   time card --

12           JUSTICE BREYER:  Well, is this right?

13   Is this right?

14           MR. FLOWERS:  -- but who are covered

15   --

16           JUSTICE BREYER:  What this says, what

17   I -- I mean, my law clerks have been busy

18   beavers on this case, I promise you, and what

19   they have on this issue is that there are

20   exceptions here.  There aren't exceptions

21   business by business, but there are exceptions,

22   those who work from home, alone, or

23   substantially outdoors, or those who can show

24   that their conditions, practices, means,

25   methods, operations, or processes make their

1    workplaces as safe and healthful as the ETA --

2    as the ETS can obtain a variance, okay?

3            So they did make some distinctions.

4            MR. FLOWERS:  Well --

5            JUSTICE BREYER:  Not industry by

6    industry, but my question really is, that I'd

7    like to turn this to, is a stay.  You heard

8    what I asked.  I mean, you know, 750 million

9    new cases yesterday or close to that is a lot.

10   I don't mean to be facetious.

11           But that -- that -- that's why I said

12   I would find it, you know, unbelievable that it

13   could be in the public interest to suddenly

14   stop these vaccinations.  And the only answer

15   that was given was a lot of people will quit.

16           Well, OSHA considered that.  My

17   wonderful law clerk has 61475, 63422, 61466, 61

18   474 and 475, those are pages.  I don't think

19   you should read all 61,000, but, nonetheless,

20   there are at least five or 10 pages where they

21   went into this, and they said, in our view,

22   hmm, yeah, that's right, some people may quit,

23   maybe 3 percent.  But more may quit when they

24   discover they have to work together with

25   unvaccinated others because that means they may

 1    get the disease.  Okay?

 2           And more will quit because they'll be

 3    -- maybe die or maybe they'll be in the

 4    hospital or maybe they'll be sick and have to

 5    stay home for two weeks.  So they did the pros

 6    and cons.

 7           So I'd like to take Justice Kagan's

 8    questions, which I think I share on the merits,

 9    and just ask you, are you asking us both still

10    to issue a stay today, tomorrow, Monday, and

11    why, if you are?

12           MR. FLOWERS:  We are seeking an

13    immediate -- thanks for the question.  We are

14    seeking an immediate stay.

15           As an initial matter, I think Alabama

16    Realtors takes their argument about the

17    beneficial effects of their legal action off

18    the table.  If the Court considers it illegal,

19    then it's not in the public interest and it's

20    proper to enjoin it.

21           Now the Court may say -- or stay it,

22    rather.  The Court may decide that there's a

23    better way to unwind the illegal action than a

24    judicial action, and I think that's what

25    Justice Kavanaugh's concurrence in the first

1    Alabama Realtors got to.

2            But what it can't do is say we judge

3    that these are very -- in our view, this

4    illegal action will lead to good effects, and

5    so we will allow that to happen.

6            To Justice Kagan's question about the

7    who decides point, Congress tell -- told us who

8    decides at 2112 -- 28 USC 2112 says that courts

9    can issue stays, and the reason for that is

10   they recognize that this was without notice and

11   comment, and unless the courts could step in to

12   abate illegal actions, nobody would be able to

13   do so.

14           And that's especially important here,

15   where the -- the action they're, in our view,

16   mandating but at least strongly encouraging,

17   vaccination, cannot be undone.

18           Finally, the other point in the public

19   interest is one awkwardness of this situation

20   is that the ETS is focused on what was really a

21   different pandemic.  It's all about the Delta

22   variant.  Now we are on to Omicron.

23           And as my presence here as a triple

24   vaccinated individual by phone suggests and as

25   Justice Sotomayor suggests and as the amicus

1    brief from the American Commitment Foundation

2    shows, vaccines do not appear to be very

3    effective in stopping the spread or

4    transmission.

5            They are very effective in stopping

6    severe consequences, and that's why our states

7    strongly urge people to get them.  But I think

8    that makes it very hard to look at the numbers

9    they give and assume that they still apply

10   today --

11           JUSTICE SOTOMAYOR:  Counsel --

12           MR. FLOWERS:  -- where things are

13   entirely different --

14           JUSTICE SOTOMAYOR:  -- counsel, those

15   numbers show that Omicron is as deadly and

16   causes as much serious disease in the

17   unvaccinated as Delta did.  The numbers, look

18   at the hospitalization rates that are going on.

19   We have more affected people in the country

20   today than we had a year ago in January.

21           We have hospitals that are almost at

22   full capacity with people severely ill on

23   ventilators.  We have over 100,000 children,

24   which we've never had before, in -- in serious

25   condition and many on ventilators.

54

1          So saying it's a different variant

2     just underscores the fact that without the --

3     without some workplace rules with respect to

4     vaccines and encouraging vaccines, because this

5     is not a vaccine mandate, and -- and requiring

6     masking and requiring isolation of people who

7     have tested for COVID, because none of you have

8     addressed that part of the ETS is to say

9     something that should be self-evident to the

10    world but is not, which is, if you're sick, you

11    can't come into work.  The workplace can't let

12    you into the workplace and you shouldn't go on

13    unmasked.

14          Tell me what's irrational about rules

15    of that nature when it is the workplace that

16    puts you into contact with people that will put

17    you at risk.

18          MR. FLOWERS:  I don't know that we've

19    argued that the requirement is irrational.

20    And, indeed, there may be many states subject

21    to their own state laws that could impose this

22    themselves or private businesses.  So we're not

23    making that there's still some --

24          JUSTICE SOTOMAYOR:  So, if it's within

25    the police power to protect the health and

1    welfare of workers, you seem to be saying the

2    states can do it, but you're saying the federal

3    government can't even though it's facing the

4    same crisis in interstate commerce that states

5    are facing within their own borders.

6         I -- I'm not sure I understand the

7    distinction why the states would have the power

8    but the federal government wouldn't.

9         MR. FLOWERS:  The federal government

10   has no police power if we're asking about that.

11        JUSTICE SOTOMAYOR:  Oh, it does have

12   power with respect to protecting the health and

13   safety of workers.  We have -- we have --

14   accept the constitutionality of OSHA.

15        MR. FLOWERS:  Yes.  I took you to be

16   asking if they had a police power to protect

17   public health.  They -- they absolutely have

18   the --

19        JUSTICE SOTOMAYOR:  No, they have a

20   police power to protect workers.

21        MR. FLOWERS:  I would not call it a

22   police power.  I think the Commerce Clause

23   power allows them to address health -- sorry,

24   is there a question?

25        CHIEF JUSTICE ROBERTS:  No.  But it's

1    --

2           MR. FLOWERS:  It allows them to

3    address health in the context of the workplace.

4           JUSTICE SOTOMAYOR:  Exactly.

5           CHIEF JUSTICE ROBERTS:  It's a good

6    time to move to our sequential questioning.

7           Justice Thomas?

8           JUSTICE THOMAS:  Mr. Flowers, there's

9    been some talk -- suggestion or at least it

10   seems to be implied that the vaccinations are

11   efficacious in preventing some degree of

12   infection to others.

13          Could you talk about that,

14   particularly as I remember in the filings that

15   the 18 to -- that the younger workers, the

16   20-year-olds who are unvaccinated are actually

17   safer than the older workers who are

18   vaccinated.  So there are obviously some

19   differences.

20          Would you just talk about how

21   efficacious the vaccine is in the workplace?

22          MR. FLOWERS:  So I want -- first, I

23   want to be very clear.  We're -- we are strong

24   promoters of vaccination because they do stop

25   serious illness.

57

        1           In terms of stopping infection and

        2    transmission, at least with the current

        3    variant, it appears the numbers suggest to be

        4    far less effective.  But -- but -- and then, in

        5    terms of the comparison you were asking about,

        6    I think it's hard to define "grave," what the

        7    grave danger in the abstract.  What we can at

        8    least mandate or at least demand from the

        9    agency is internal consistency.

        10          And if you look at their own data, the

        11   CDC data from the last week of October,

        12   unvaccinated individuals 18 to 29 were as

        13   likely to die as vaccinated 50 to 64-year-olds

        14   and five times less likely to die than

        15   vaccinated 65 and up.  Hospitalization was --

        16   between 18 and 49, that's not even just the

        17   young -- was about as likely as vaccinated 65

        18   and up.

        19          If you look at the Griffin study that

        20   they cite at 61418 of the Federal -- of the

        21   Federal Register, unvaccinated and vaccinated

        22   both had low risks of death and ICU.

        23          As a societal matter, we are not

        24   debating that COVID is serious, and it has

        25   incredibly grave risk for some people, not for

58

1    everybody.  And, finally, I'd point you to the

2    Scovy Study.  Again, they cite that at 61418 of

3    the Federal Register.  It showed that

4    vaccinated individuals who are 65 or older are

5    twice as likely to die as unvaccinated

6    individuals 18 to 49.  And keep in mind that's

7    18 to 49, not 18 to 29.  So that's -- it would

8    probably be even more skewed if you looked at

9    the -- the younger demographic.

10         JUSTICE THOMAS:  Would the State of

11   Ohio have the -- in your -- I'm not saying this

12   would be an approach you would take, but we --

13   you had earlier a discussion about whether or

14   not the federal government had police powers in

15   the workforce, and you suggested that the state

16   has those police powers.

17         Could the State of Ohio do what you

18   say OSHA cannot do?

19         MR. FLOWERS:  In terms of -- yes, my

20   position is the State of Ohio at least could

21   mandate vaccinations not only for workers but

22   for all individuals.

23         Now I think that's an important point

24   to stress is we're talking here as though OSHA

25   is the only entity that can regulate this, an

Official Subject - Final Review

59

         1    agency that no one thought had anything to do

         2    with the pandemic until months, if not years,

         3    into it.

         4          But we have the states and we have

         5    private businesses and they're not sitting on

         6    their hands.  And -- and individuals are doing

         7    things to try and bring this pandemic to a

         8    close or at least learn to live with it.

         9    Indeed, this Court, without any requirement

        10    from OSHA, has found ways to -- to safely

        11    conduct business.

        12          JUSTICE THOMAS:  I think my point is

        13    rather that there seemed to be -- seems to be a

        14    suggestion that this is all or nothing, that

        15    the other governmental bodies do not have

        16    police powers to regulate certain activities.

        17    And you've answered my question.  Thank you.

        18          CHIEF JUSTICE ROBERTS:  Justice

        19    Breyer?

        20          JUSTICE BREYER:  A quick question, I'm

        21    just curious.  I was searching for an example.

        22    Universal risk inside and outside the

        23    workplace, including the workplace, can OSHA

        24    regulate it?  Can OSHA regulate fire risks?

        25          MR. FLOWERS:  Yes.  We don't draw the

Official Subject 68-5 Final 4/3/00

60

```
1    distinction between in -- in the workplace and
2    out of work.
3              JUSTICE BREYER:  Okay.  If they can
4    regulate fire risks, then why can't they
5    regulate this risk?
6              MR. FLOWERS:  Because the difference
7    with the fire is that there's something about
8    the workplace, for example, not providing
9    safety equipment to put out the -- put out the
10   fire.
11             JUSTICE BREYER:  Well, people throw
12   matches.
13             MR. FLOWERS:  They smoke.
14             JUSTICE BREYER:  They smoke.  Sometime
15   -- oh, they shouldn't, but they do.  And -- and
16   -- or they throw a match or they -- you know, a
17   lot of causes, such as --
18             MR. FLOWERS:  Right.  That's right.
19             JUSTICE BREYER:  -- fall --
20   crushing -- crushing people into -- not
21   crushing them.  They come in the same room.
22   You understand the point.  Okay.  The
23   difference is?
24             MR. FLOWERS:  I do.
25             JUSTICE BREYER:  Say it again so I
```

61

1   catch it.

2           MR. FLOWERS:  Sure.  I want to be -- I

3   want to be very clear about this.  We accept

4   the line that's been drawn forever in Forging

5   Industry that simply the fact that a risk

6   exists outside the workplace doesn't mean you

7   can't address it when it's inside the

8   workplace.

9           What we dispute is the idea that a

10   risk that is ever present in all places can be

11   regulated simply because it's also in the

12   workplace.

13           And so you can regulate -- to be

14   clear, OSHA could regulate COVID-19 in the

15   workplace when the employer does something like

16   packing individuals very closely together in a

17   poorly ventilated area that -- that -- that

18   enhances or changes the nature of the risk, I

19   should say.  But that's not the risk they say

20   they're regulating.  Again, 61411 of the

21   Federal Register, they say the risk is you'll

22   come into contact with individuals.

23           And the risk of encountering an

24   individual is an ever-present risk we face at

25   home, at work, and everywhere else.

Official - Subject to Final Review

62

```
1              CHIEF JUSTICE ROBERTS:  Justice Alito?
2              JUSTICE ALITO:  I want to come back to
3    the question I asked Mr. Keller in light of all
4    that's been said this morning so far about
5    public health, about the value of vaccine to --
6    vaccines to the general public, because I want
7    to make sure I understand precisely what the
8    question is before us.
9              And what I took from Mr. Keller's
10   answer, which seems to be right, is that the
11   question is whether there is a grave danger for
12   unvaccinated workers, period.
13             What the Secretary said was "employees
14   who are unvaccinated are in grave danger from
15   SARS COVID virus, but employees who are fully
16   vaccinated are not."  So the -- the purpose --
17   if this is to be sustained, it has to be on the
18   ground that it presents a grave danger to
19   unvaccinated workers who have chosen to be
20   unvaccinated.
21             That's my understanding of the issue,
22   but maybe I haven't understood it correctly.
23   Is that your understanding?  And I'll ask the
24   Solicitor General the same question, or at
25   least I hope she will address it.
```

1          MR. FLOWERS:  That is my
2     understanding.  And I don't see how there could
3     be another understanding because the emergency
4     provision specifically says that such emergency
5     standard, meaning the precise one at issue,
6     must be necessary to protect employees from the
7     danger at issue.  So the broad societal effects
8     are not -- are not at issue.
9          JUSTICE ALITO:  And protection of
10    vaccinated employees, who may face some danger
11    of contracting the virus, was not the basis for
12    this rule, is that correct?
13         MR. FLOWERS:  Correct.  And I would go
14    further and say they cannot rely at all on the
15    risk to vaccinated workers because they
16    conclude -- this is 61419 of the Federal
17    Register -- that no one who's vaccinated is --
18    is in grave danger.
19         JUSTICE ALITO:  Thank you.
20         CHIEF JUSTICE ROBERTS:  Justice
21    Sotomayor.
22         JUSTICE SOTOMAYOR:  Counsel,
23    unvaccinated people you showed or you -- you
24    pointed to young people who had a different --
25    or had the same death rate as vaccinated older

Official Subject 68-5 Filed 02/04

64

 1    people.

 2            But the point is that it's not the

 3    risk to the individual that's at question; it's

 4    that risk plus the risk to others.  And

 5    unvaccinated people -- and the agency has shown

 6    in its studies that unvaccinated people affect

 7    other unvaccinated people.  And they vary in

 8    age and can be of ages and of conditions where

 9    the effect will be serious, if not death.  So

10    we're not talking -- I -- I -- I don't know how

11    comparing apples to oranges in terms of the

12    risk factors makes any sense.

13            But, secondly, if the grave risk is to

14    unvaccinated people, then how do we take that

15    out of the equation, that it's not the risk

16    just to them but the risk that they pose to

17    others, including unvaccinated people?

18            MR. FLOWERS:  So I'll -- I'll answer

19    in two steps.  On the apples to oranges, I

20    think it's vital because their -- they have to

21    be internally consistent.  And their own logic

22    is that nobody who's vaccinated faces a grave

23    danger.  So unvaccinated folks of certain ages

24    are at lower risk of death and even

25    hospitalization, that has -- that is relevant

1    to calculating --

2            JUSTICE SOTOMAYOR:  But lower risk

3    doesn't --

4            MR. FLOWERS:  -- the overall grave

5    danger.

6            JUSTICE SOTOMAYOR:  -- lower risk

7    doesn't mean no risk.  And lower risk can go

8    into the calculus of saying I -- we see -- and

9    that's what they said -- the risk to

10   unvaccinated people of all ages and all

11   conditions, and when you remain unmasked or

12   unvaccinated, you put yourself at risk, but you

13   put others.

14           MR. FLOWERS:  Right.

15           JUSTICE SOTOMAYOR:  Others,

16   unvaccinated people at risk and people who are

17   vaccinated.  They may be at a lesser risk, but

18   the grave risk remains to people of all ages

19   and conditions that are unvaccinated.

20           MR. FLOWERS:  Right, but -- but the

21   problem is they've defined numerical

22   probabilities that are equal to be grave in one

23   case and not grave in the other, and that is

24   the definition of irrational.

25           In terms of spread, their own ETS says

1    it's unclear the degree to which vaccinations

2    reduce transmission.  They appear to have a

3    positive effect, and they appear, at least with

4    Delta and previous variants, to stop

5    contracting it in the first place.  So, again,

6    if you look at the American Commitment

7    Foundation brief, it's highly doubtful that

8    that -- that the numbers are going to be

9    comparable when it comes to the Omicron

10   variant.

11          CHIEF JUSTICE ROBERTS:  Justice Kagan.

12          JUSTICE KAGAN:  Mr. Flowers, just

13   continuing on that, if I understand your

14   answers to Justice Thomas and to Justice

15   Sotomayor, you basically said a couple things.

16   You said:  Well, you know, we understand that

17   18- to 29-year-olds, even though they're not

18   going to die or wind up with very serious

19   injuries, that they can spread.  You don't --

20   you don't doubt that, that those people spread

21   to other people who might be more vulnerable?

22   You don't doubt that, right?

23          MR. FLOWERS:  That's right, but the

24   problem for -- for --

25          JUSTICE KAGAN:  Okay.  So just -- I --

1    I'm sorry to cut you off, but I just wanted to

2    state that as, like, the premise.  And then the

3    question is:  Well, you said, well, the agency

4    itself says that the danger is to other

5    unvaccinated people, older people,

6    immunocompromised people, whatever.  And -- and

7    -- and you seem to be saying that because it's

8    to other unvaccinated people, kind of they

9    assumed the risk and the agency's power runs

10   out.  Is that what you're saying?

11        Because I don't know about that kind

12   of doctrine in the OSH Act or any place else in

13   administrative law, that because you can say

14   that, you know, somebody would prefer not to be

15   regulated, the agency loses its power.

16        MR. FLOWERS:  That's not -- that's not

17   quite the point we're making.  It's -- one --

18   it goes to two points.  The first is necessity.

19   So, if everyone who's vaccinated is not in

20   grave danger, then a narrower solution is, if

21   they think have the power to vaccinate, to

22   require the people in grave danger to be

23   vaccinated, and they are -- they are removed

24   from the grave danger and the other individuals

25   are -- are not affected.  So I think that's the

1    key point there.

2             JUSTICE KAGAN:  Okay.  Thank you.

3             CHIEF JUSTICE ROBERTS:  Justice

4    Gorsuch?

5             JUSTICE GORSUCH:  Mr. Flowers, I'd

6    like to return to the question of -- of who

7    decides.  And I think we've all kind of come to

8    the point where we all agree that states have

9    -- have a wide police power under our

10   constitutional system that Congress has to

11   regulate consistent with the Commerce Clause

12   and -- and make the major decisions while

13   agencies can do the work that Congress has

14   given them to do but not other kinds of work.

15   And the major questions doctrine kind of

16   regulates that interaction between Congress and

17   agencies.

18             So it's not that judges are supposed

19   to decide some question of public health.  It's

20   about regulating the rules of the system to

21   ensure that the appropriate party does.

22             And so the question in my mind really

23   turns a lot on the major questions doctrine in

24   this case.  Is this one that has been given to

25   the agencies to decide or one that Congress has

1    to make as a major question under our federal

2    system?  And I haven't heard a lot of

3    discussion about that.

4         The Solicitor General says that the

5    major questions issue only comes into play when

6    a statute's ambiguous, and I'd like to give you

7    an opportunity to explain your view.

8         MR. FLOWERS:  I -- I -- I think you

9    can view the major -- the major question

10   doctrine, the phrase is sometimes used in

11   different contexts, and sometimes it is used as

12   kind of an ambiguity clarifier, an elephants in

13   mouse holes point.

14        But another way to look at it is

15   something of a constitutional doubt canon where

16   we recognize that although our non-delegation

17   doctrine is not especially robust today, there

18   are limits on the amount of authority that

19   Congress can -- can give away.

20        And with respect to these major

21   questions that are going to affect people from

22   coast to coast and cost, you know, millions and

23   millions of dollars and potentially many jobs

24   and potentially infect -- affect public health,

25   we would expect Congress -- we would demand

1    Congress to at least speak clearly before we

2    will say an agency can exercise that power and

3    therefore before we're into the non-delegation

4    issue.

5          I -- I do want to stress

6    non-delegation.  I mean, if they're right about

7    work-related danger, because I understand their

8    rule, it's any danger you could possibly face

9    at work.  A grave danger is any danger that

10   could even conceivably result in death,

11   "necessary" means useful, and through a

12   temporary and emergency standard, you can

13   require permanent abatement.

14          If you put all that together, this is

15   among the broadest and most standardless

16   delegations of authority to an agency in the

17   United States Code.

18          CHIEF JUSTICE ROBERTS:  Justice

19   Kavanaugh?

20          JUSTICE KAVANAUGH:  Yeah, I want to

21   follow up on Justice Gorsuch's questions, which

22   I think are important, and also Justice Kagan's

23   questions about the policy arguments that are

24   present here, especially in an emergency

25   situation.

1          So, as I understand it, you're

2    invoking the major questions doctrine and your

3    statutory argument to say that based on the

4    Constitution's separation of powers, Congress

5    must act or the states must act and OSHA lacks

6    authority under the current statutes to do

7    this.  That's your basic pitch, I think.

8          MR. FLOWERS:  I -- I think so as long

9    as "this" means the vaccine mandate.  We're not

10   -- we're not disputing that they can regulate

11   COVID-19 to some degree.

12          JUSTICE KAVANAUGH:  Okay.  Yes, that's

13   what I meant by "this."

14          I want to give you an opportunity to

15   explain the value of insisting on that

16   congressional action for something like this at

17   the federal level in an emergency situation and

18   explain why we shouldn't defer more to the

19   executive or defer to the executive in what has

20   been characterized, I think appropriately, as

21   -- as a crisis or an emergency kind of

22   situation.

23          What's the value of insisting on that

24   here?

25          MR. FLOWERS:  Well, one -- one value

```
1    of it is that when there's an emergency, it's
2    especially important that it be a considered,
3    thoughtful process, and legislation is more
4    likely to yield that.  And in an emergency,
5    you're more likely to get broad agreement on --
6    on certain principles that can be enacted
7    through Congress.  And, indeed, Congress has
8    taken many steps to ensure that there are to
9    address COVID-19.
10            JUSTICE KAVANAUGH:  Thank you.
11            CHIEF JUSTICE ROBERTS:  Justice
12   Barrett?
13            JUSTICE BARRETT:  No questions.
14            CHIEF JUSTICE ROBERTS:  Thank you,
15   counsel.
16            General Prelogar.
17     ORAL ARGUMENT OF GEN. ELIZABETH B. PRELOGAR
18            ON BEHALF OF THE RESPONDENTS
19            GENERAL PRELOGAR:  Mr. Chief Justice,
20   and may it please the Court:
21            COVID-19 is the deadliest pandemic in
22   American history, and it poses a particularly
23   acute workplace danger.  Workers are getting
24   sick and dying every day because of their
25   exposure to the virus at work.
```

1          OSHA amassed substantial evidence of

2     wide-sprayed -- widespread workplace outbreaks

3     across all industries.  It studied the science

4     of how this virus is transmitted and found that

5     workers are exposed to danger when they're

6     inside together for as little as 15 minutes,

7     and OSHA considered the extensive evidence that

8     unvaccinated employees are at heightened risk

9     of contracting the virus, of transmitting it to

10    others and infecting their coworkers, and of

11    suffering the gravest consequences,

12    hospitalization and even death.

13         To protect against that grave danger,

14    the standard requires employers to adopt a

15    policy that unvaccinated employees either get

16    vaccinated or mask and test.  Those are

17    commonplace and highly effective measures that

18    OSHA determined were essential to stopping the

19    spread of this dangerous disease at work.

20         The Applicants try to portray this

21    standard as unprecedented.  But this lies in

22    the heartland of OSHA's regulatory authority.

23    Congress charged the agency with setting

24    nationwide standards to protect the health and

25    safety of employees throughout the nation, and

1   Congress specifically appropriated money to

2   OSHA to address COVID-19 in the workplace.

3          Nothing in the statute or the agency's

4   regulatory history bars the use of these

5   measures.  Just the opposite.

6   Section 669(a)(5) of the OSH Act specifically

7   contemplates that immunization requirements can

8   be imposed under the Act, and OSHA has

9   previously protected workers with measures like

10  masking, testing, and encouraging vaccination.

11         OSHA had statutory authority to rely

12  on those measures here, which it found would

13  save 6,500 lives and prevent 250,000

14  hospitalizations in just six months.

15         As the preamble to the standard

16  explains, exposure to COVID-19 on the job is

17  the biggest threat to workers in OSHA's

18  history.

19         The Court should reject the argument

20  that the agency is powerless to address that

21  grave danger.

22         I welcome the Court's questions.

23         JUSTICE THOMAS:  General, the --

24  what's the -- the -- the problem you're getting

25  at?  Is it the employer not providing -- making

1   sure that employees are vaccinated or masked,

2   or is it the employees who decline to be

3   vaccinated or masked?

4           GENERAL PRELOGAR:  Well, it's the

5   grave danger to exposure to COVID-19 --

6           JUSTICE THOMAS:  But who's --

7           GENERAL PRELOGAR:  -- at work, Justice

8   Thomas, and --

9           JUSTICE THOMAS:  -- who -- who is

10  trying -- who refuses to do that?

11          GENERAL PRELOGAR:  Ultimately, what

12  the agency is doing with these standards is

13  requiring that either through a vaccination

14  requirement or through a masking-and-testing

15  policy that unvaccinated workers who stand the

16  highest chance of contracting the virus at

17  work, of infecting others at work, and then,

18  ultimately, if they get -- if they catch COVID

19  at work, of then suffering death possibly or

20  even hospitalization are protected in all of

21  those circumstances.

22          So I think what this standard does is

23  it regulates employers by requiring them to

24  adopt a policy that will directly target that

25  grave danger.

```
 1            JUSTICE THOMAS:  I -- I understand
 2    that.  But who is declining to do that?  Is it
 3    the employer or the employee?
 4            GENERAL PRELOGAR:  I think it can be
 5    both.  There are many employers around the
 6    country that have voluntarily imposed these
 7    kinds of requirements with their workers in
 8    recognition that vaccination is the single most
 9    effective way to protect workers in the
10    workplace or that have used masking and testing
11    requirements to the same end, so many employers
12    are doing it.  But part of OSHA's function and
13    what Congress charged the agency with doing is
14    to look at those kinds of best practices and
15    impose them through standards to ensure that
16    workers, no matter what specific controls their
17    employers have in place, are maximally
18    protected.
19            JUSTICE THOMAS:  One last question.
20    You make -- I think you put quite a bit of
21    weight on the acute crisis that we're in.  But
22    do you -- would your argument also be -- would
23    your argument be the same for any infectious
24    disease that is taken into the workplace?
25            GENERAL PRELOGAR:  No.  I think that
```

1    with respect to other infectious diseases it

2    would be necessary for OSHA to develop the

3    record to demonstrate that the requisite risk

4    level that the statute requires --

5              JUSTICE THOMAS:  But you could --

6              GENERAL PRELOGAR:  -- is satisfied.

7              JUSTICE THOMAS:  -- it's not that you

8    would do it, but could you do it?

9              GENERAL PRELOGAR:  If there were, in

10   fact, a grave danger to employees posed by

11   another infectious disease, then, yes, we think

12   that Congress clearly contemplated that OSHA is

13   -- is obligated and charged with a

14   responsibility to protect workers.

15             JUSTICE THOMAS:  Have you -- has OSHA

16   ever done that?

17             GENERAL PRELOGAR:  OSHA has enacted

18   any number of standards --

19             JUSTICE THOMAS:  Example?

20             GENERAL PRELOGAR:  -- that address

21   those kinds of threats.  For example, the

22   bloodborne pathogen standard that we have

23   pointed to before was intended to protect

24   employees from the risk of viruses that they

25   can contract through bloodborne transmission.

78

1      So it's not --
2            JUSTICE THOMAS:  Is that in -- is that
3      in the general workplace or just in healthcare
4      sectors?
5            GENERAL PRELOGAR:  That standard
6      applied anywhere where employees can
7      predictably encounter bloodborne pathogens.  So
8      it wasn't just the healthcare context.  It can
9      apply to flight attendants.  It can apply to
10     janitors.  It was a standard that directly
11     targeted the exposure wherever it exists, just
12     like this one does.
13           JUSTICE THOMAS:  Thank you.
14           CHIEF JUSTICE ROBERTS:  General, you
15     said just a short while ago that this presented
16     -- COVID presented a grave danger to people in
17     the workplace.  In a few minutes, we'll hear an
18     argument in the CMS case, and it will be that
19     it presents a grave danger in Medicare and
20     Medicaid facilities.
21           Not here, but in the lower courts, the
22     federal contractor mandate, the argument is
23     going to be it's a grave danger to federal
24     contractors.
25           Could you give me examples of some

1   federal agencies where you would be willing to

2   say COVID is not a grave danger in their -- in

3   that context?

4          GENERAL PRELOGAR:  Well, Mr. Chief

5   Justice, I haven't, of course, surveyed the

6   landscape of all of the different authorities

7   that federal agencies can invoke.  I -- I take

8   the point of the question --

9          CHIEF JUSTICE ROBERTS:  Well, but you

10  represent them on a regular basis here, so you

11  have a pretty general idea of some other

12  examples of federal agencies.

13         And my point obviously is that I don't

14  think, as more and more mandates, more and more

15  agencies come into place, it's a little hard to

16  accept the idea that this is particularized to

17  this thing, that it's an OSHA regulation, that

18  it's a CMS regulation, that it's a federal

19  contractor regulation.

20         It seems to me that it's that the

21  government is trying to work across the

22  waterfront and it's just going agency by

23  agency.  I mean, this has been referred to, the

24  approach, as a workaround, and I'm wondering

25  what it is you're trying to work around.

1          GENERAL PRELOGAR:  What we're trying
2     to do here and what OSHA did was rely on its
3     express statutory authority to provide -- to
4     provide protection to America's workforce from
5     grave dangers like this one.
6          So I take the point and don't dispute
7     that COVID-19 is a danger in many contexts and
8     falls within the jurisdiction of other agencies
9     as well, but I think to suggest that because
10     this disease is so prevalent, because it
11     presents such a widespread harm, somehow OSHA
12     has less power to do anything about it with
13     respect to the --
14          CHIEF JUSTICE ROBERTS:  No, it's not
15     so much that OSHA has less power.  It's that
16     the idea that this is specific to particular
17     agencies really doesn't hold much water when
18     you're picking them off one by -- one by one.
19          I think maybe it should be analyzed
20     more broadly as this is, in effect, an effort
21     to cover the waterfront.  I'm not saying it's a
22     bad thing.
23          But I don't know that we should try to
24     find, okay, what specific thing can we find to
25     say, oh, this is covered by OSHA?  What

1     specific thing can we find to say that this is

2     covered by the hospitals?  What specific thing

3     can we find to say, oh, no, we're doing this

4     because this is a federal contractor?

5              It seems to me that the more and more

6     mandates that pop up in different agencies,

7     it's fair -- I wonder if it's not fair for us

8     to look at the Court as a general exercise of

9     power by the federal government and then ask

10    the questions of, well, why doesn't Congress

11    have a say in this, and why don't the -- why

12    doesn't this be the primary responsibility of

13    the states?

14             GENERAL PRELOGAR:  Congress absolutely

15    has a say in this, and it spoke here.  It

16    passed the OSH Act and -- and promulgated

17    Section 655(c) specifically to empower OSHA to

18    take action to protect workers from grave

19    dangers from physically --

20             CHIEF JUSTICE ROBERTS:  When did it --

21    when did it do that?

22             GENERAL PRELOGAR:  The OSH Act was

23    enacted in 1970, I believe.  And the agency, as

24    it explained in the preamble to this rule,

25    documented substantial evidence to show why

Official Subject Final Review

1   this constitutes a grave danger in the

2   workplace.

3          CHIEF JUSTICE ROBERTS:  Well, I don't

4   think you can say that that's specifically

5   addressed -- addressed to this problem.

6          GENERAL PRELOGAR:  Well, Mr. Chief

7   Justice, the Court obviously has a statute in

8   front of it that it needs to examine.  I think

9   that there is no doubt that COVID-19

10  constitutes a physically hazardous agent within

11  the meaning of this provision.  I think that

12  the immediacy and magnitude of harm here

13  clearly constitutes a grave danger.

14  Unvaccinated workers stand a 1-in-14 chance of

15  being hospitalized, a 1-in-200 chance of dying.

16  The country hasn't --

17         CHIEF JUSTICE ROBERTS:  It sounds like

18  the sort of thing --

19         GENERAL PRELOGAR:  -- seen numbers

20  like that --

21         CHIEF JUSTICE ROBERTS:  -- it sounds

22  like the sort of thing that states will be

23  responding to or should be or -- and that

24  Congress should be responding to or should be,

25  rather than, agency by agency, the federal

83

1    government, the executive branch, acting alone,

2    is responding to it.  And we're supposed to

3    say, well, yes, this is a CMS problem; yes,

4    this is an OSHA problem; yes, this is a federal

5    contractor problem.  The military is on its

6    own; they take orders.

7           But, again, I guess I'm just repeating

8    myself.  It seems to me that we should be

9    looking at it as an across-the-board issue, as

10   opposed to let's see what OSHA looks like,

11   let's see what CMS looks like.

12           GENERAL PRELOGAR:  Well, I think that

13   you --

14           JUSTICE SOTOMAYOR:  General, this

15   is -- I'm sorry.  Go ahead.

16           CHIEF JUSTICE ROBERTS:  Go ahead.

17           GENERAL PRELOGAR:  I was just going to

18   say, Mr. Chief Justice, that I think the Court,

19   in approaching issues of statutory

20   interpretation and looking at agencies'

21   regulatory authority, has always started with

22   the text that Congress enacted for purposes of

23   understanding whether the agency has power to

24   act.  And the fact that there are other

25   agencies here that likewise, we think, are

1    empowered to act to present -- to protect

2    America against what is -- what is happening in

3    this country right now shouldn't diminish the

4    force of the express statutory

5    authorization here.

6              JUSTICE BREYER:  Yeah, but I think the

7    question is this.  I mean, it is a rather deep

8    -- in a sense, a deep question.  Can you -- or

9    maybe you did.  Could the White House, say,

10   issue an order to all federal employees, and

11   what it says is every federal employee in any

12   agency who has authority under a statute, which

13   means all of them, to require those whom they

14   regulate to insist that their employees be

15   vaccinated, do it?

16             Now they can't legally tell you do it.

17   But it's a strong policy.  And that's what's

18   happened.  Now I don't know the implications of

19   that.  I never thought of that.  But I think

20   that's what you're being asked, is that -- is

21   that -- and -- and I don't know if you ever

22   thought of it.  But, I mean, has that happened?

23             GENERAL PRELOGAR:  I think it's

24   incorrect to say that that is what is happening

25   here.  This policy clearly --

85

1          JUSTICE BREYER:  Yeah, but, I mean,

2     has that happened generally?  Has that

3     happened?  Did somebody issue such an order?

4          GENERAL PRELOGAR:  Justice Breyer,

5     standing before you today, I'm not sure that I

6     can think of a precise historical example of

7     that kind of order.

8          JUSTICE BREYER:  No, no, I mean in

9     this instance.  The answer -- your answer, I

10    take it, is no, there is no such order.

11         GENERAL PRELOGAR:  That's right.  I

12    mean, certainly, I think that -- that

13    throughout this nation there is --

14         JUSTICE BREYER:  I don't want to put

15    words in your mouth.  Don't tell me there isn't

16    such an order if there is.

17         GENERAL PRELOGAR:  No, I'm not aware

18    of any such order.

19         JUSTICE BREYER:  All right.  Or

20    something like that, okay.  I have one other

21    question, which is because I'm operating

22    between two things.  One is the -- the merits,

23    which might be difficult.  I don't know.  I'm

24    not taking a view on that, but at least they're

25    difficult and could take time.

1              And the other is the question of a
2    stay.  Now, on the question of a stay, I read
3    from research that we've done, but I don't know
4    if it's right, that the argument was -- what
5    about the argument that they've made?  One is
6    that, well, if we issue a stay today, tomorrow
7    more people will stay home and things will get
8    worse.  See?  That was one of their arguments.
9              And the other argument -- well, all
10   right, what about that?  That seemed to me to
11   be the main one.
12             GENERAL PRELOGAR:  As I understand the
13   argument, they're concerned about worker
14   attrition with respect to that -- that
15   particular claim.
16             JUSTICE BREYER:  Yeah.
17             GENERAL PRELOGAR:  And the agency gave
18   sustained attention to this very issue.  It
19   spanned several pages of the Federal Register.
20   The agency looked at surveys that attempt to
21   analyze how workers will respond and looked at
22   the real, on-the-ground practical experience of
23   companies that had imposed these kinds of
24   mandates and found that there was substantial
25   compliance levels and that the concern that

Official Subject to Final Review

87

1    workers would leave in droves was -- was

2    misplaced.

3            And then the agency further emphasized

4    that it had provided flexibility to employers

5    to adopt a mask-and-test policy instead of a

6    vaccination requirement specifically because

7    the employers are best positioned to understand

8    --

9            JUSTICE BREYER:  Yeah.  Okay.  Okay.

10           GENERAL PRELOGAR:  -- their workforce

11   and to know which of these options is going to

12   ensure maximum compliance.

13           JUSTICE ALITO:  On this --

14           JUSTICE BREYER:  What about on the

15   merits?  I just have one other, which is on the

16   merits.  You've heard and you've read the

17   argument on the other side that, look, what

18   OSHA could easily have done or should have done

19   is go through industry by industry or groups of

20   industries by groups of industries and -- and

21   say there's this here and there's that there.

22           Instead, what they did is everybody

23   over a hundred employees, except for, and then

24   they had a few exceptions, working alone,

25   working at home, a religious exemption, you can

```
 1   prove to us that you have some other thing
 2   that's just as good.  You know, they went that
 3   way, across industries instead of one by the
 4   other.  That's one of their arguments.
 5          What would you say to that?
 6          GENERAL PRELOGAR:  My response to that
 7   is that the Secretary here cited overwhelming
 8   scientific and medical evidence that the grave
 9   danger exists based on how this virus is
10   transmitted anywhere people gather indoors
11   together.
12          And that applies to a lot of
13   workplaces, but that just turns on the nature
14   of how this virus is communicable between
15   people.  As -- as Justice Kagan noted, often
16   employees have little control over their work
17   environments.  They can't control whether they
18   can socially distance, who they come into
19   contact with, what precautions those people are
20   taking, what ventilation systems exist.  And,
21   ultimately, OSHA determined that anywhere there
22   is a risk of indoor transmission, there is a
23   grave danger to unvaccinated employees.
24          Now I take the point, as the Chief
25   Justice's hypothetical focused on -- I think
```

89

1    Justice Barrett focused on this as well -- that

2    there are certain workplaces -- factories,

3    assembly lines -- where the risk is even

4    graver, where the danger and the -- the chance

5    of transmission is heightened.  But I don't

6    think that that in any sense calls into

7    question the Secretary's determination that

8    there is a baseline grave danger in any

9    worksite where that inside risk of transmission

10   can occur.

11            JUSTICE ALITO:  Can I ask you a

12   question --

13            JUSTICE SOTOMAYOR:  General, can we --

14   I'm sorry.

15            CHIEF JUSTICE ROBERTS:  Justice Alito.

16            JUSTICE ALITO:  I just wanted to ask

17   you a question on this issue of the

18   commencement of enforcement and the issuance of

19   a stay.

20            This ETS was issued a couple of months

21   ago, isn't that right?

22            GENERAL PRELOGAR:  On November 5.

23   That's correct.

24            JUSTICE ALITO:  Yeah, on November 5.

25   All right.  And it hasn't been enforced during

1    that period.  These cases arrived at this Court

2    just a short time ago.  They present lots of

3    difficult, complicated issues.  We have

4    hundreds of pages of briefing.  We're receiving

5    very helpful arguments this morning.

6           Does the federal government object to

7    our taking a couple of days maybe to think

8    about this, to digest the arguments before

9    people start losing jobs?

10           GENERAL PRELOGAR:  Well, Justice

11    Alito, if you're asking whether it would be

12    appropriate for the Court to issue a brief

13    administrative stay, certainly, we think that

14    that would be within the Court's prerogative if

15    it -- if it thinks that it's necessary to do

16    that.

17           Ultimately, for the injunction that

18    they're actually asking for here, the

19    Applicants would have to show an indisputably

20    clear right to relief, which we think they

21    can't satisfy.

22           JUSTICE ALITO:  Well, I -- no, I'm

23    asking about an administrative stay.  I won't

24    get into an argument about indisputably clear.

25    But your argument -- your point is you think it

1    would be appropriate or would not be

2    appropriate if we issued a short administrative

3    stay?  Or if we do that, are you going to say,

4    well, they're causing people to die every day?

5            GENERAL PRELOGAR:  We do think that

6    the agency found that there is grave harm every

7    day, and the numbers are stark, thousands of

8    lives --

9            JUSTICE ALITO:  But there was that

10   grave harm during every single day --

11           GENERAL PRELOGAR:  -- hundreds of

12   thousands of hospitalizations over six months.

13           JUSTICE ALITO:  -- but was there not

14   that same grave harm during every single day

15   between the time when this was issued and --

16   and today?

17           GENERAL PRELOGAR:  Well, certainly, we

18   think that the harm has existed and been

19   present throughout, and the agency specifically

20   set aggressive compliance deadlines to --

21           JUSTICE ALITO:  Well, my answer -- I

22   asked a really simple question.  And you have

23   the prerogative to say, no, we think, you know,

24   horrible consequences are going to -- are going

25   to ensue if you issue even an administrative

92

 1    stay of a short period of time, and we don't

 2    think that you need to have that time to digest

 3    this case and decide it.

 4         GENERAL PRELOGAR:  I'm not going to

 5    say that, Justice Alito.  If the Court believes

 6    that it needs a brief administrative stay,

 7    then, of course, it can enter it.

 8         JUSTICE KAGAN:  But you mean "brief,"

 9    don't you?

10         GENERAL PRELOGAR:  Yes.  We think that

11    there are lives being lost every day.

12         CHIEF JUSTICE ROBERTS:  Well, brief

13    compared --

14         JUSTICE BREYER:  I thought 750 --

15         CHIEF JUSTICE ROBERTS:  I'm sorry.

16    Brief compared to what?  The months that it --

17    excuse me -- the months that it hasn't been in

18    effect since November, whatever it is, when the

19    courts have been active in this area, or

20    brief -- brief compared to what?

21         GENERAL PRELOGAR:  Well, Mr. Chief

22    Justice, I think that the agency well explained

23    that the employers who are covered by this

24    needed time to come into compliance.  The

25    agency announced that it was exercising

1    enforcement discretion because of the confusion

2    that had been created by the Fifth Circuit

3    stay.

4              Maybe it would be helpful for me to

5    explain exactly what the January 10 deadline

6    means with respect to compliance.  The agency

7    has announced that for employers who are acting

8    in good faith, it is not going to enforce any

9    of the provisions of this ETS until January 10.

10   And what that means as a practical matter is

11   that employers need to be adopting their

12   policies, they need to be ascertaining the

13   vaccination status of their employees, and as

14   of January 10, they need to be requiring

15   masking for any employees who remain

16   unvaccinated.

17             So it's not as though immediately

18   employee -- employees are going to be quitting

19   their jobs or leaving in response with the

20   worst predictions.  On January 10, if this

21   standard remains in effect, then masking will

22   immediately be required, and the testing will

23   kick in on February 9.

24             JUSTICE BREYER:  So, if we delay that

25   one day, maybe I'm wrong, and please tell me if

```
1    I am, but the numbers I read is, when they

2    issued this order, there were approximately

3    70-something thousand new cases every day.  And

4    yesterday there were close to 750,000.

5            So, if we delay it a day and if it

6    were to have effect, then 750,000 more people

7    will have COVID who otherwise, if we didn't

8    delay it, wouldn't have?  I mean, I -- I don't

9    doubt the power of the Court to issue a stay.

10   I'm just saying, what are the consequences of

11   that?

12           And if I'm wrong, you better tell me

13   I'm wrong because I -- I thought that it really

14   did make a difference to people who might get

15   -- you have the numbers.  I saw the numbers.

16           Well, all right, what -- so what --

17   what do you say?  Now you say does not --

18   that's really not a problem?

19           GENERAL PRELOGAR:  Justice Breyer, we

20   -- we absolutely agree that this pandemic has

21   been dynamic, that it is constantly evolving

22   and that the current conditions are -- are

23   posing a truly grave danger.

24           JUSTICE SOTOMAYOR:  General, am I to

25   understand from your previous answer that
```

1  enforcement qua testing doesn't occur until

2  February 9, correct?

3          GENERAL PRELOGAR:  That's correct,

4  Justice Sotomayor.

5          JUSTICE SOTOMAYOR:  The only thing

6  that would happen in the next few days or -- up

7  to now, everybody should have a plan in place,

8  correct?

9          GENERAL PRELOGAR:  Correct.

10          JUSTICE SOTOMAYOR:  There's no -- been

11  no stay.  So starting tomorrow, the only thing

12  that are required are masks, correct?

13          GENERAL PRELOGAR:  Masking for

14  unvaccinated workers, that's correct.

15          JUSTICE SOTOMAYOR:  That's the only

16  thing that occurs.  And so, until February 9,

17  when the testing comes into effect, that's when

18  the threat of -- of resignations or expense

19  comes into effect, correct?

20          GENERAL PRELOGAR:  Yes, as I

21  understand the -- what the Applicants are

22  arguing here, especially --

23          JUSTICE SOTOMAYOR:  So --

24          GENERAL PRELOGAR:  -- on the testing

25  aspect.

96

1          JUSTICE SOTOMAYOR:  -- so the need for

2     an administrative stay, if we're talking about

3     a few days, is really small, if -- very small,

4     correct?

5          GENERAL PRELOGAR:  I certainly myself

6     do not think an administrative stay would be

7     warranted here, but I of course defer to the

8     Court on that.

9          JUSTICE SOTOMAYOR:  All right.  One

10    other question if I might --

11         CHIEF JUSTICE ROBERTS:  I'm sorry, I

12    don't believe I was --

13         JUSTICE SOTOMAYOR:  -- counsel.

14         I want to go back to the Chief's

15    question and to Justice Thomas's question

16    and -- and in part, to Neil -- to Justice

17    Gorsuch's questions earlier, the issue of who

18    should act and who can act.

19         An agency takes a while to act, and

20    this is -- and it's acting under an emergency

21    order or an emergency statutory delegation by

22    Congress.  And the Chief says, Congress should

23    act; we shouldn't let every agency act.

24         Could you speak about the relative

25    both expertise and speed with which Congress

97

1    can act in -- to survey the countless worksites

2    in our economy to identify the health and

3    safety hazards in each one and to legislate

4    with the granular specificity necessary --

5    necessary to address the hazards in all of

6    these different workplaces?

7         I understood the fact that in an

8    emergency we should not violate the

9    Constitution, but I'm not quite sure what

10   regulation of safe and healthy, what provision

11   of the Constitution it violates.

12        But I want you to get to the -- to --

13   to the general question some of my colleagues

14   have raised.  Who's in a better position to act

15   and why and why is it in a better position to

16   act constitutionally?

17        GENERAL PRELOGAR:  Yes.  Of course,

18   Justice Sotomayor.

19        To be clear, we think that Congress

20   has already acted here in passing

21   Section 655(c) to authorize OSHA to take this

22   kind of swift action in response to an

23   emergency situation.

24        If you look at the plain text of the

25   statute, we think that OSHA's standard clearly

1    falls within the terms that Congress enacted.

2    COVID-19 is a grave danger, it's a physically

3    harmful agent, and the agency found that these

4    measures are essential to protect workers.

5         So we think that the statutory

6    language already exists.  And to the extent

7    that the Applicants are suggesting that there's

8    some kind of specific authorization requirement

9    here that Congress had to do more, I think that

10   gets to the heart of your question, which is

11   that when this Court has interpreted statutes

12   before, it hasn't departed from plain meaning

13   and imposed that kind of burden on Congress to

14   legislate with that specificity and that

15   granularity, particularly in an emergency

16   situation like this one.

17        And the Applicants have pointed to no

18   aspect of the statute that would warrant that

19   kind of result here.  It's their interpretation

20   that runs counter to express statutory

21   provisions, Section 669(a)(5), that

22   specifically contemplates that immunization

23   requirements can be imposed, the American

24   Recovery Plan Act that -- where Congress

25   specifically appropriated $100 million to OSHA

Official Subject to Final Review

99

1    and directed it in -- in the words of the

2    legislation to carry out COVID-19-related

3    worker protection activities.

4         CHIEF JUSTICE ROBERTS:  Well,

5    you're -- you're saying that Congress acted.

6    Don't -- don't complain that Congress hasn't

7    done anything and that -- you know, that was 50

8    years ago that you're saying Congress acted.  I

9    don't think it had COVID in mind.  That was

10   almost closer to the Spanish Flu than it is to

11   today's problem.

12        Now I understand the idea that

13   agencies are more expert than Congress, and I

14   understand the idea that they can move more

15   quickly than Congress.  But this is something

16   that the federal government has never done

17   before, right, mandated vaccine coverage?

18        GENERAL PRELOGAR:  It's true that

19   there has been no standard that looks exactly

20   like this one.  The federal government has

21   encouraged vaccination as this standard does in

22   other provisions like the bloodborne pathogens

23   standard.  And masking and medical testing of

24   employees are common features of OSHA

25   standards.

Official Subject to Final Review

100

```
 1              CHIEF JUSTICE ROBERTS:  Well, is --
 2    is -- is it that important consideration that
 3    we should take into effect, for example, along
 4    with the fact that the police power to take
 5    such action is more commonly exercised by the
 6    states, and we've had many cases coming out of
 7    the states and municipalities that -- that
 8    give -- that -- that evidence that.
 9              And also that it's -- yes, 50 years
10    ago Congress passed a general provision, but I
11    think it's certainly hard to argue, and you're
12    doing a good job of it, that that gives free
13    rein to the agencies to take -- I guess this is
14    invoking the major cases doctrine, that it
15    gives free rein to the agencies to enact such
16    broad regulation that is -- was certainly
17    unfamiliar to Congress in 1970.
18              GENERAL PRELOGAR:  Well, there are a
19    lot of elements to that question.  I'd like to
20    try to take them in turn.
21              I -- I -- I think that Congress did
22    specifically contemplate that there would be
23    emergency situations that posed grave dangers
24    to workers throughout America, and it
25    specifically empowered OSHA to take action in
```

1    response to that.

2         I understand the -- the suggestion

3    here that the standard is unprecedented, but I

4    don't think it withstands scrutiny.  If you

5    look at the various claims that the Applicants

6    are making, they -- they first object to the

7    scope of the standard, the number of employers

8    who are covered, but OSHA commonly issues

9    nationwide standards that govern all employers

10   throughout the nation with respect to risks

11   that exist throughout the nation, and that

12   describes COVID-19.  There is substantial

13   evidence here to justify the scope of the

14   standard.

15         With --

16         CHIEF JUSTICE ROBERTS:  Thank -- go

17   ahead.

18         GENERAL PRELOGAR:  And just to -- to

19   close the loop with one final response, which

20   is to focus on the particular mitigation

21   measures.  There too, we think that there is no

22   indication that Congress couldn't have

23   anticipated or intended OSHA to use these types

24   of measures to combat a deadly virus at work.

25         Immunization is specifically

Official Subject-to-Final-Review

102

1    referenced in Section 669(a)(5).  It is the

2    single most effective way to target the spread

3    of a deadly virus, and to think that Congress

4    would have meant to preclude OSHA from

5    encouraging vaccination, I think, is

6    inconsistent both with the text of the statute

7    and with the broader history of immunization

8    requirements in this country, which have

9    commonly been imposed.

10          CHIEF JUSTICE ROBERTS:  Thank you,

11    counsel.

12          Justice Thomas, anything further?

13          JUSTICE THOMAS:  Just I'm -- I'm

14    curious.  This probably doesn't go to the

15    disposition of this matter, but is a vaccine

16    the only way to treat COVID?

17          GENERAL PRELOGAR:  It is certainly the

18    single most effective way to target all of the

19    hazards OSHA identified, both the -- the

20    chances of contracting the virus in the first

21    place, the risk of infecting other workers on

22    the worksite, and with respect to the negative

23    health consequences, that vaccination provides

24    protection on all of those fronts.

25          JUSTICE THOMAS:  Thank you.

Official Subject to Final Review

103

1          CHIEF JUSTICE ROBERTS:  Justice

2    Breyer, anything further?

3          Justice Alito?

4          JUSTICE ALITO:  On the issue of

5    whether you're trying to squeeze an elephant

6    into a mouse hole and the question of whether

7    this is fundamentally different from anything

8    that OSHA has ever done before, I want to see

9    if it might be fundamentally different in at

10   least two respects and get your answer to -- to

11   the question.

12         Most OSHA regulations, all of the ones

13   with which I'm familiar, affect employees when

14   they are on the job but not when they are not

15   on the job.  And this affects employees all the

16   time.  If you're vaccinated while you're on the

17   job, you're vaccinated when you're not on the

18   job.

19         Isn't this different from anything

20   OSHA has done before in that respect?

21         GENERAL PRELOGAR:  So two responses to

22   that.  First, of course, there's also a

23   mask-and-test option here, so I think even --

24         JUSTICE ALITO:  Okay --

25         GENERAL PRELOGAR:  -- on that --

1           JUSTICE ALITO:  -- well, right now --

2           GENERAL PRELOGAR:  -- analysis --

3           JUSTICE ALITO:  -- I'm talking just

4     about the vaccine.

5           GENERAL PRELOGAR:  So focusing just on

6     vaccination, I think that that's a way to

7     describe it, that it also provides protection

8     when you're not at work.

9           But OSHA was directly targeting and --

10    and trying to provide the protection at work,

11    and I don't think there's any basis in the text

12    of the statute to think that this kind of --

13          JUSTICE ALITO:  All right.  Suppose

14    that --

15          GENERAL PRELOGAR:  -- protection is

16    off limits.

17          JUSTICE ALITO:  -- I mean, suppose --

18    this is a little science fiction, but maybe it

19    will illustrate a point.

20          Suppose that this protection were

21    provided not by the administration of a vaccine

22    but by waving a wand over employees when they

23    arrive at work, and suppose that wand also had

24    the capability of taking away this protection

25    when the employee leaves work.

1          Would OSHA have the authority to tell

2     employees you must -- we will -- we are going

3     to wave -- you must have this wand waved over

4     you when you arrive, but you can't have it

5     taken off when you leave?

6          GENERAL PRELOGAR:  No, I don't think

7     that OSHA would have that authority.

8          JUSTICE ALITO:  All right.  So it's

9     different in that respect.  And here's another

10    respect in which it may be different.  And I

11    don't want to be misunderstood in making this

12    point because I'm not saying the vaccines are

13    unsafe.  The FDA has approved them.  It's found

14    that they're safe.  It's said that the benefits

15    greatly outweigh the risks.  I'm not contesting

16    that in any way.  I don't want to be

17    misunderstood.  I'm sure I will be

18    misunderstood.  I just want to emphasize I'm

19    not making that point.

20          But is it not the case that this --

21    these vaccines and every other vaccine of which

22    I'm aware and many other medications have

23    benefits and they also have risks and that some

24    people who are vaccinated and some people who

25    take medication that is highly beneficial will

Oral Argument - Subject to Final Review

106

1    suffer adverse consequences?  Is that not true

2    of these vaccines?  And if that is -- is that

3    true?

4              GENERAL PRELOGAR:  That can be true,

5    but, of course, there is far, far greater risk

6    from being --

7              JUSTICE ALITO:  But there are --

8              GENERAL PRELOGAR:  -- unvaccinated --

9              JUSTICE ALITO:  -- there is -- there

10   --

11             GENERAL PRELOGAR:  -- by orders of

12   magnitude.

13             JUSTICE ALITO:  Right.  There is some

14   risk, do you dispute that?

15             GENERAL PRELOGAR:  There can be a very

16   minimal risk with respect to some individuals,

17   but -- but, again, I would emphasize that I

18   think that -- there would be no basis to think

19   that these FDA-approved and authorized vaccines

20   are not safe and effective.  They are the

21   single-most effective.

22             JUSTICE ALITO:  No, I'm not making

23   that point.  I tried to make it as clear as I

24   could.  I'm not making that point.  I'm not

25   making that point.  I'm not making that point.

```
 1              There is a risk, right?  Has any other
 2       -- has OSHA ever imposed any other safety
 3       regulation that imposes some extra risk, some
 4       different risk, on the employee, so that if you
 5       have to wear a hard hat on the job, wearing a
 6       hard hat has some adverse health consequences?
 7       Can you think of anything else that's like
 8       this?
 9              GENERAL PRELOGAR:  I can't think of
10       anything else that's precisely like this, but I
11       think that to suggest that OSHA is precluded
12       from using the most common, routine, safe,
13       effective, proven strategy to fight an
14       infectious disease at work would be a departure
15       from how this statute should be understood.
16              JUSTICE KAGAN:  Can I just say,
17       General, that regulators think of risk/risk
18       tradeoffs constantly when they make
19       regulations, that there are constant situations
20       in which there are risk/risk tradeoffs, risks
21       on both sides, but one risk vastly outweighs
22       another risk and that that comes up throughout
23       regulatory space.
24              GENERAL PRELOGAR:  That's absolutely
25       true.  And one of the risks that OSHA was
```

108

1 guarding against here was the risk that

2 unvaccinated workers posed to other workers

3 because they are so much more likely to

4 transmit --

5    JUSTICE ALITO:  To other --

6    GENERAL PRELOGAR:  -- this deadly

7 disease to them.

8    JUSTICE ALITO:  -- what type of

9 workers?  To other -- to vaccinated workers?

10    GENERAL PRELOGAR:  Yes, the grave

11 danger finding --

12    JUSTICE ALITO:  I thought the --

13    GENERAL PRELOGAR:  -- was based on

14 unvaccinated --

15    JUSTICE ALITO:  -- Secretary --

16    GENERAL PRELOGAR:  -- workers.

17    JUSTICE ALITO:  -- disclaimed that.

18    GENERAL PRELOGAR:  Yes.  The grave

19 danger finding is limited to unvaccinated

20 workers --

21    JUSTICE ALITO:  Right, so that's not

22 --

23    GENERAL PRELOGAR:  -- who are far more

24 likely to --

25    JUSTICE ALITO:  -- a concern for us?

109

1           GENERAL PRELOGAR:  -- contract it from

2     their coworkers as well.

3           JUSTICE ALITO:  That's not a concern

4     for us, is it?  We can't sustain this on that

5     ground, that this is helpful to the vaccinated

6     workers because the unvaccinated workers

7     present a risk to them.

8           GENERAL PRELOGAR:  Oh, to be clear,

9     they present a risk to other unvaccinated

10    workers --

11          JUSTICE ALITO:  All of whom have --

12          GENERAL PRELOGAR:  -- who might be

13    older --

14          JUSTICE ALITO:  -- all of --

15          GENERAL PRELOGAR:  -- who might have

16    other comorbidities --

17          JUSTICE ALITO:  -- all of whom have

18    balanced the risks differently, maybe very

19    foolishly, but they want to balance the risks

20    presented to their health in a different way.

21    And OSHA says, no, you can't do that, and that

22    applies when you're on the job and also when

23    you're not on the job and for the rest of your

24    life because you have to take these vaccines,

25    unless the testing option is viable.

1          GENERAL PRELOGAR:  Well, one small

2     factual correction if I could and then a

3     broader legal point.  I think it's wrong to say

4     that everyone who's unvaccinated is just

5     assuming the risk.  Some people can't get

6     vaccinations for medical reasons.  Some people

7     have deeply held religious beliefs and are

8     entitled to religious exemptions.  And OSHA is

9     entitled to try to protect those unvaccinated

10    workers, no matter the reason they're

11    unvaccinated.

12          Just on the broader legal point, the

13    idea that OSHA is powerless to act to protect

14    workers if they simply want to assume the risk

15    is inconsistent with how the OSH Act has been

16    understood throughout its history.  OSHA

17    frequently requires employers to require that

18    the employees use protective gear --

19          JUSTICE ALITO:  No, but isn't -- isn't

20    it --

21          GENERAL PRELOGAR:  -- or take

22    precautions.  It's not --

23          JUSTICE ALITO:  -- isn't it the case

24    that, most of the time, there's this strong

25    reason for saying that it isn't a defense to an

1    OSH Act charge, that the employers assumed the

2    risk voluntarily, that under most

3    circumstances, employers have an incentive to

4    avoid compliance with, to avoid the cost and

5    inconvenience of a regulation, and so we don't

6    want to have the -- put the employees under

7    pressure, overt or implied, to -- to waive the

8    protection of a -- a regulation, a protective

9    regulation?

10        But there's no such incentive here.

11   They're free.  The vaccines are free.  And to

12   the extent they keep workers healthy and on the

13   job, it's in the interests of the employers to

14   have them vaccinated.

15        GENERAL PRELOGAR:  Well, certainly,

16   the -- the fact that workers in the past have

17   not wanted to use certain protections has not

18   provided a defense to regulations that have

19   been issued under the OSH Act.

20        JUSTICE SOTOMAYOR:  Counsel, if I

21   might just go back to Justice Alito's question,

22   there's no vaccine mandate here, correct?

23        GENERAL PRELOGAR:  That's correct.

24   And that's what I started with, that, of

25   course, any employer can opt for the

Official Subject to Final Review

112

1    mask-and-test option instead.

2              JUSTICE SOTOMAYOR:  So, really, the

3    question is between masking and testing and/or

4    vaccine, but no employer is being put at risk

5    greater than they choose to undertake

6    themselves, correct?

7              GENERAL PRELOGAR:  Yes.  The -- the

8    employers have a choice to adopt either of

9    those policies.  And OSHA estimated that

10   40 percent of employers would adopt the

11   mask-and-test policy.

12             JUSTICE SOTOMAYOR:  Number two, with

13   respect to the issue of whether a person has

14   chosen to run the risk by being unvaccinated,

15   you point out that some people can't for a

16   variety of different reasons.  But the risk

17   here is not just to the person; it's to

18   everybody else they put at risk, correct?

19             GENERAL PRELOGAR:  That's correct.

20   The grave danger finding was premised on

21   unvaccinated individuals, but OSHA emphasized

22   that ensuring that unvaccinated individuals are

23   not spreading the virus in the workplace will

24   protect everyone they come into contact with.

25             JUSTICE SOTOMAYOR:  So they may not be

Official Subject to Final Review

113

```
 1    a grave danger to other -- other people, but I
 2    don't see why OSHA has to close its eyes to the
 3    fact that they place grave risks to
 4    unvaccinated and substantial risk to other
 5    people, correct?
 6              GENERAL PRELOGAR:  That's right, and
 7    OSHA specifically emphasized that vaccinated
 8    individuals may still be at significant risk.
 9    It wasn't ruling out that possibility.  Its
10    grave danger finding was focused on all of the
11    ways that -- that being unvaccinated
12    contributes to the spread of this disease.
13              JUSTICE SOTOMAYOR:  Thank you,
14    counsel.
15              JUSTICE ALITO:  Is the testing
16    alternative viable at the present time in light
17    of the stories that we see about the long lines
18    that are required to be tested?
19              GENERAL PRELOGAR:  The agency gave
20    sustained attention to testing capacity in the
21    preamble to the rule.  It looked at existing
22    testing capacity and projected out of what
23    additional capacity would be necessary for
24    employers that choose to adopt the
25    mask-and-test policy and concluded that there
```

114

1      would be ample testing in order to comply with

2      the rule.

3            I'm obviously familiar with the -- the

4      news stories that you're referencing, and I

5      think that the agency could adjust if that

6      proves to be a problem, but with respect to

7      reviewing this rule, there was certainly a

8      substantial basis for the Secretary to conclude

9      that this was a viable option.

10           CHIEF JUSTICE ROBERTS:  Justice Kagan?

11           JUSTICE KAGAN:  General, I'd like to

12     ask the -- the -- the government's views of the

13     major questions doctrine that a number of my

14     colleagues have asked about.

15           And as I -- I see it, there are sort

16     of two ways that such a doctrine could operate.

17     One is with respect to ambiguous statutes,

18     ambiguous either because they're vague or

19     because there are statutes that seem to have

20     conflicting provisions, you know, where they

21     point both ways, and then the major questions

22     doctrine is an aid to interpretation of that

23     statute.  It's essentially a kind of clue about

24     how you should interpret a very

25     difficult-to-understand statute.

Oral Argument 05 Final Review

115

```
1              And the second way is there's really
2    nothing difficult to understand about this.
3    The agency action falls within the scope of the
4    statutory authority.  There's just no question
5    that it does.  And yet, because the agency
6    action is kind of a big deal, we're just going
7    to ignore the fact that it falls clearly within
8    the scope of the delegated authority and say
9    that, notwithstanding that that's true,
10   Congress has to re-up it.
11             So I think I'd like you to talk about
12   those two versions of the major questions
13   doctrine with respect to this rule.  You know,
14   does -- what do you think of those two
15   versions, and which of the versions potentially
16   applies here?
17             GENERAL PRELOGAR:  I think that
18   perfectly encapsulates the two versions.  And
19   we think that this Court's precedents clearly
20   demonstrate that it's the first version that
21   you articulated is the way that the Court has
22   previously considered economic and political
23   consequences.
24             So it's never been the case that the
25   Court has started at the outset by saying does
```

Official Subject-to-Final Review

116

1    this seem like a big deal, does this agency

2    action have a lot of consequences, and then

3    used that as a basis to depart from the plain

4    language of the statute or to say Congress has

5    to specifically authorize it; we're not going

6    to give the statutory text its -- its ordinary

7    meaning.

8            Instead, in the cases where the Court

9    has looked at those kinds of consequences, it

10   has always identified a conflict with other

11   express statutory language, a conflict with

12   other statutes that Congress has enacted that

13   directly addressed the issue at question, or a

14   conflict with the entire structure of the

15   statute such that it would be unrecognizable to

16   the Congress that enacted it.

17           And it's only been in those situations

18   where the Court has identified a textual and

19   structural problem with the agency's

20   interpretation in the beginning, using those

21   traditional tools of statutory construction,

22   that the Court has then gone on to say that its

23   interpretation of the statute is confirmed by

24   the economic and political consequences that

25   would ensue.

1          So I think it would be a sea change

2     for this Court to reverse the order of

3     operations as the Applicants are asking for

4     here and to start off by asking does this seem

5     like it has economic and political

6     consequences, and it would ultimately do a

7     disservice to principles of the separation of

8     powers and to -- to Congress's ability to have

9     its clear statutory enactments, even if they're

10    broad, given the effect that they have.

11         CHIEF JUSTICE ROBERTS:   Justice

12    Gorsuch?

13         JUSTICE GORSUCH:   Yes.   So my -- my

14    question with respect to the major questions

15    doctrine is this:   We accept that it's not our

16    role to decide public health questions, but it

17    is our important job to decide who should

18    decide those questions.

19         I think we all agree on that.   And,

20    here, our choice on the one hand is a federal

21    agency and on the other hand the Congress of

22    the United States and state governments.

23         Now you argue we should not consider

24    the major questions doctrine unless and until

25    we find a statutory ambiguity.   I understand

Official Subject to Final Review

118

1    that.  But let's -- let's say the Court does

2    find such an ambiguity.  I know you'll contest

3    the premise, but let's just work on it.

4           If -- if there is an ambiguity, why

5    isn't this a major question that, therefore,

6    belongs to the people's representatives of the

7    states and in the halls of Congress, given that

8    the statute at issue here is, as the Chief

9    Justice pointed out, 50 years old, doesn't

10   address this question.

11          The rule affects, I believe, we're

12   told, 80 million people, and the government

13   reserves the right to extend it to every

14   private business in the country.

15          Traditionally, states have had the

16   responsibility for overseeing vaccination

17   mandates.  I rejected a challenge to one just

18   the other day from New Mexico.

19          Congress has had a year to act on the

20   question of vaccine mandates already.  As the

21   Chief Justice points out, it appears that the

22   federal government is going agency by agency as

23   a workaround to its inability to get Congress

24   to act.

25          The risks imposed here are not

Official Subject to Final Review

119

1    unilateral.  There are risks to those who

2    choose not to be vaccinated that they're trying

3    to avoid sometimes, as you discussed with

4    Justice Alito and conceded to him.

5            Traditionally, OSHA has had rules that

6    affect workplace hazards that are unique to the

7    workplace and don't involve hazards that affect

8    individuals 24 hours a day.

9            So that's kind of the general tick

10   list we have before us, and I'd just like you

11   to address, again, the question, assuming the

12   statute's ambiguous, why isn't this a major

13   question that normally under our Constitution

14   would reserve -- be reserved for the people's

15   representatives in the states in the first

16   instance and in the halls of Congress in the

17   second?

18           GENERAL PRELOGAR:  So accepting the

19   assumption that there's an ambiguity, which, of

20   course, we disagree with, as you know, I think

21   that many of the factors you identified are

22   just simply inconsistent with the whole premise

23   of the OSH Act.

24           So it's true that states have a police

25   power over health and safety.  But, as this

Oral Argument - Subject to Final Review

120

1        Court recognized in the Gade case, Congress in

2        enacting the OSH Act specifically brought the

3        federal government into the role of protecting

4        the health and safety of America's workers and

5        displacing and preempting state law in that

6        field.

7               And so I think the idea that simply

8        because states have that residual police power

9        provides a basis to assume that the OSH Act

10       can't have any application or that there has to

11       be a specific authorization here of each and

12       every type of mitigation measure is just

13       fundamentally inconsistent with Congress's

14       policy as embodied in that Act.

15              JUSTICE GORSUCH:  What do we make of

16       the fact that Congress -- that OSHA has not

17       traditionally mandated other vaccines for other

18       hazards that could be -- pose a graze -- grave

19       risk, some might say?  The flu kills people

20       every year.  Other grave diseases do too.  And

21       there are vaccines against many.  And -- and we

22       don't need to list them all.

23              But, traditionally, OSHA has not

24       regulated in this area.

25              GENERAL PRELOGAR:  I think that that's

Official Subject Final Review

121

1    explained by the fact that COVID-19 is an

2    unprecedented pandemic that has a magnitude and

3    proportion that --

4         JUSTICE GORSUCH:  Well, polio --

5         GENERAL PRELOGAR:  -- OSHA has never

6    seen before.

7         JUSTICE GORSUCH:  -- I mean, people

8    forget polio.  That was a pretty bad, you can

9    call it a pandemic, you can call it an endemic,

10   I don't know what you'd call it, but it was a

11   terrible scourge on this country for many

12   years.

13        We have vaccines against that -- that,

14   but the federal government through OSHA, so far

15   as I know, and you can correct me, does not

16   mandate every worker in the country to receive

17   such a vaccine.  We have flu vaccines.  The flu

18   kills, I believe, hundreds, thousands of people

19   every year.  OSHA has never purported to

20   regulate on that basis.

21        What do we make of that when we're

22   thinking about what qualifies as a major

23   question and what doesn't?

24        GENERAL PRELOGAR:  Well, with respect

25   to other diseases where there are effective

Oral Argument of Final Review

122

1    vaccinations, I think that the simple

2    explanation for why OSHA hasn't had to regulate

3    workplace exposure to that is because virtually

4    all workers are already vaccinated.

5           With respect to many of those

6    diseases, all of us have at one time or another

7    been subject to compulsory vaccination

8    requirements --

9           JUSTICE GORSUCH:  Is that true with

10   the flu?

11          GENERAL PRELOGAR:  -- mostly --

12          JUSTICE GORSUCH:  Do we -- do we know

13   that to be true with the flu?

14          GENERAL PRELOGAR:  The flu is an

15   exception because it's a seasonal illness, and,

16   there, I think that the explanation for the

17   failure to regulate is that it doesn't present

18   anything approximating the kind of hazard or

19   danger to workers as COVID-19.  I -- I don't

20   want to suggest that it would be --

21          JUSTICE GORSUCH:  Are you suggesting

22   that it doesn't pose a grave risk?

23          GENERAL PRELOGAR:  I think that the

24   agency would have to build the record to

25   demonstrate that it would clear that statutory

Oral Argument - Subject to Final Review

123

1    hurdle for --

2            JUSTICE GORSUCH:  But it might?

3            GENERAL PRELOGAR:  It would depend on

4    the evidence.  Certainly, if there were another

5    1918 influenza outbreak like the country

6    experienced before, yes, absolutely, I think

7    OSHA could regulate exposure to influenza in

8    the workplace.  That's similar to what's

9    happening -- happening with COVID-19 right now.

10           CHIEF JUSTICE ROBERTS:  Justice

11   Kavanaugh?

12           JUSTICE KAVANAUGH:  I want to follow

13   up on Justice Gorsuch's and Justice Kagan's

14   questions with how the major questions doctrine

15   applies and really first zero in on this

16   question of ambiguity.

17           We've used words like vague, subtle,

18   oblique, cryptic, and ambiguous to describe the

19   kind of language that would trigger the major

20   questions doctrine if it is a major question.

21           We haven't only used the word

22   ambiguous.  And it seems to me that a question

23   that I'd like your help on is applying language

24   that is subtle, cryptic, oblique to a new

25   context hasn't been done before in the last 50

124

1     years.  How do we think about a question like
2     that?  And in answering that, think about the
3     benzene case, the Brown & Williamson case with
4     tobacco, benzene with cancer, and the UARG case
5     with greenhouse gas emissions.  All three were
6     the agency was applying this broad but arguably
7     cryptic language to a new context.  I think
8     that's one way to characterize them.
9              How do we think about that?
10           GENERAL PRELOGAR:  Well, I think,
11    Justice Kavanaugh, looking at those three cases
12    in particular, that the reason the Court
13    concluded that the language was -- was cryptic
14    or oblique was because it identified other
15    textual or structural reasons that ran counter
16    to the agency's interpretation.
17             So, in the utility air case that you
18    referenced, the Court observed that the
19    asserted regulation would overthrow the entire
20    statutory scheme.  The agency had conceded that
21    it was never what Congress could have possibly
22    intended.  So that was a structural indication
23    that the agency's regulation was impermissible.
24             With respect to the benzene case,
25    there too, there was a question about whether

Official Subject to Final Review

1    there was an entitlement to regulate without

2    any finding of risk, and that was in tension

3    with other statutory provisions, so there was a

4    conflict.

5            And with the Brown & Williamson case

6    that you mentioned, the Court chronicled a long

7    line of statutes that had directly addressed

8    the issue of regulation of tobacco products and

9    would have been flatly inconsistent with the

10   agency's asserted jurisdiction.

11           So there's never been a case where the

12   Court has just confronted broad language and

13   said, oh, it seems cryptic or oblique and so

14   it's a major question and we're not going to

15   give it its plain meaning.  In all of those

16   cases, there was a -- a -- a textual and

17   structural reason for the Court to conclude

18   that there was something wrong with the

19   agency's claimed authority.

20           JUSTICE KAVANAUGH:  In all three

21   cases, there were strong dissents that said the

22   opposite of that, though, that said actually

23   the statutory language is clear and that the

24   Court -- you know, Justice Marshall's dissent

25   in the benzene case is very powerful that the

Official - Subject to Final Review

126

1    Court was simply scaling back from the plain

2    language because of its concern about the

3    significance of regulating every workplace in

4    America to take out any risk of cancer.

5              So there were dissents that made that

6    point, but the majority seemed nonetheless to

7    apply the major questions doctrine.

8              GENERAL PRELOGAR:  There were

9    certainly dissents in those cases that thought

10   that the statutory terms could get the agency

11   there.  But, here, I think the critical

12   difference is that the Applicants haven't

13   pointed to anything in this statute that

14   approximates the kind of textual or structural

15   problem that has prompted the Court to look at

16   those kinds of consequences before.

17             And it would be their interpretation

18   that creates those problems.  They would render

19   superfluous Section 669(a)(5)'s specific

20   recognition that immunization requirements can

21   be imposed under the OSH Act itself.  By saying

22   that OSHA can't regulate COVID-19 in the

23   workplace, they'd give no effect to Congress's

24   appropriation just last year directing OSHA to

25   do just that and to target that grave danger.

Official Subject to Final Review

127

```
 1             And so, in this case, we think that
 2      all of the textual clues line up on our side,
 3      in addition to the plain language of the
 4      statute.
 5             JUSTICE KAVANAUGH:  And one other
 6      question related to this -- sorry to prolong
 7      this -- but Congress has specifically referred
 8      to vaccines in a variety of contexts.
 9      Immigration contexts, those statutes authorize
10      specifically via language vaccines.  Military
11      contexts, which you would expect, at least the
12      Anthrax vaccine is referenced in the military
13      statutes.  The National Childhood Vaccine Act
14      passed in '86 refers, and it's a different
15      context, but dealing with vaccines.  And so
16      that's one point.
17             And the other is since -- not forever,
18      but 2005, President Bush gave a very detailed
19      speech kind of predicting what has happened,
20      and it's eerie to read it, and yet, in the --
21      in the years since, there has not been at least
22      a vaccine statute passed by Congress to deal
23      with this kind of thing, even though he, in --
24      in the wake of 9/11, but still was putting the
25      country on notice of this problem that was
```

Official Subject to Final Review

128

          1   going to hit us at some point.

          2          GENERAL PRELOGAR:  Well, I certainly

          3   recognize that there are other statutes where

          4   Congress has specifically referred to

          5   vaccination, and I think that maybe that would

          6   get the Applicants some traction here if, for

          7   example, this Act specifically referred to

          8   other mitigation measures and -- and

          9   illuminated what kinds of things OSHA could do

         10   and left vaccination off the list.  But it

         11   doesn't do that.

         12          And so I think to suggest that there

         13   is some negative inference to be drawn is

         14   inconsistent with how Congress drafted this

         15   statute in recognition that OSHA would be

         16   positioned to understand the kinds of control

         17   measures that are necessary against the variety

         18   of workplace hazards.

         19          And if I could make just make one

         20   additional point on that.  Of course, as I've

         21   emphasized, there is an express reference to

         22   immunization requirements in the OSH Act

         23   itself, so we think that that actually provides

         24   additional confirmation that Congress was

         25   thinking about that and could have anticipated

129

1    it and that religious exemption would have no

2    application if, in fact, immunization is just

3    off limits.

4           But I think as well it's important to

5    look at this against the backdrop of

6    immunization requirements in our country.  This

7    is not some kind of newfangled thing.  As I've

8    mentioned before, most of us have been subject

9    to compulsory vaccination requirements at

10   various points throughout our lifetime.

11          And so the idea that Congress couldn't

12   have anticipated that in dealing with the --

13   the deadliest virus that OSHA has experienced

14   in its history, it might think that vaccination

15   -- encouragement of vaccination would be an

16   appropriate way to protect workers, I think, is

17   just inconsistent with the idea that

18   vaccination is often the single-most effective

19   way to target a virus.

20          JUSTICE KAVANAUGH:  Thank you.

21          CHIEF JUSTICE ROBERTS:  Justice

22   Barrett?

23          JUSTICE BARRETT:  General Prelogar, I

24   have two questions, both of which address the

25   status of this rule as an emergency temporary

1    standard.  So my first question has to do with

2    the question with which Justice Thomas opened,

3    which is the meaning of "necessary."  So, of

4    course, when OSHA passes a rule through its

5    regular regulatory process, it has to go

6    through notice and comment, and that's a way of

7    holding an agency accountable.  All affected

8    people have an opportunity to comment, and the

9    agency develops a robust record.

10          With an ETS, of course, the agency can

11    circumvent that process so that it can act more

12    quickly.  So, for an ETS, we would want that

13    power to be the exception, not the rule.  And

14    one contrast that the Applicants point out

15    between OSHA's authority to issue an ETS versus

16    a regular regulation is that for its exercise

17    of power in the normal course, it need only

18    find that a regulation be reasonably necessary,

19    but, for an ETS, it has to satisfy a necessary

20    standard.

21          Now you've argued, and I think there's

22    a lot of intuitive appeal to this, that when

23    you're facing an emergency of the magnitude of

24    this pandemic, that this power effectively --

25    can be used most effectively as a blunt

1     instrument.  You know, we don't have time to

2     make industry by industry specific kind of

3     calculations because we want to move with

4     speed.

5               But how do you reconcile that

6     understanding of "necessary" with the broader

7     "reasonably necessary" standard in OSHA's

8     normal regulatory authority?

9               GENERAL PRELOGAR:  So we certainly

10    agree that the Emergency Temporary Standard's

11    reference to "necessary" as contrasted with

12    "reasonably necessary and appropriate" is a --

13    is a heightened burden and includes a measure

14    of tailoring that's necessary with respect to

15    the particular mitigation measures.

16              But I don't think that that helps the

17    Applicants here because they haven't come

18    forward with any alternative mitigation

19    measures that they think would equally protect

20    the workers that OSHA found were in grave --

21              JUSTICE BARRETT:  But do they have --

22              GENERAL PRELOGAR:  -- danger.

23              JUSTICE BARRETT:  -- to come forward

24    with that evidence, or did OSHA have to

25    consider it and reject it?  Because another

1    part of their contention is that OSHA did not

2    adequately explain why this measure, this

3    particular rule and its scope was necessary

4    vis-α-vis or as compared to other

5    possibilities.

6          GENERAL PRELOGAR:  Well, OSHA

7    explained that at length over dozens of pages

8    in the 150-page preamble to the rule.  OSHA

9    specifically explained why vaccination as the

10   single most effective way to target all of the

11   ways that the virus threatens workers in the

12   workplace was a necessary measure here.

13          And it further explained why masking

14   and testing would be essential if workers

15   remain unvaccinated, in order to ensure that,

16   despite their higher risk level of contracting

17   the virus, they couldn't carry it into the

18   workplace and spread it to their coworkers.

19          So I think the suggestion that this

20   wasn't adequately explained is inconsistent

21   with the -- the arguments they're making.

22          And as I understand their tailoring

23   arguments -- and this actually touches on the

24   question you asked earlier in the argument --

25   they're really focused on two things, the

Critical Subject Final Review

133

1      categories of workers and the -- the particular

2      workplaces.  And they haven't suggested that

3      there are other mitigation measures there that

4      OSHA neglected to consider.  They're saying

5      those things should have just been carved out

6      altogether.

7           But that is inconsistent with the

8      Secretary's judgment that all unvaccinated

9      workers face a grave danger and that the risk

10     exists anywhere that employees are gathered

11     indoors together.

12          And, again, there might be

13     subcategories within those groups that are in

14     graver danger, but I don't think there is any

15     basis on this record to conclude that the

16     agency lacked substantial evidence to draw the

17     lines that it did.

18          JUSTICE BARRETT:  That's helpful.

19     Thank you.

20          My -- my second question is, again,

21     about the status of this rule as an ETS.  So

22     Chief Judge Sutton pointed out in his dissent

23     from the denial of initial en banc that OSHA

24     did not adopt this rule in response to the

25     emergency qua emergency because that had been

Critical Subject 85 Final Review

134

1    ongoing since early 2020, but, instead, it

2    responded to new facts on the ground, which

3    included the widespread availability of a

4    vaccine, that maybe it was a surprise many

5    people chose to forgo, and the emergence of the

6    Delta variant.

7           And Chief Judge Sutton pointed out

8    that in an extended pandemic, or I don't know

9    if we've moved to an endemic, such as this one,

10   facts will continually change.  New variants

11   will emerge.  There might be new treatments,

12   new vaccinations.  We have boosters now, right?

13   So now full vaccination might not just be the

14   two jabs; it might include a booster as well.

15          So when does the emergency end?  I

16   mean, a lot of this argument has been about

17   Congress's failure to act.  Two years from now,

18   do we have any reason to think that COVID will

19   be gone or that new variants might not be

20   emerging?  And when -- when must OSHA actually

21   resort to its regular authority and go through

22   notice and comment and not simply be kind of

23   doing it in this quick way, which doesn't

24   afford people the voice in the process that

25   they are otherwise entitled to?

         1          GENERAL PRELOGAR:  So I think, if I

         2     could respond to that in a few different ways,

         3     Congress defined when the emergency exists.  It

         4     labeled this an Emergency Temporary Standard,

         5     but it's dictated by the statutory

         6     requirements.  So there has to be a grave

         7     danger from a physically harmful agent or a new

         8     hazard, and the measures have to be necessary

         9     to protect against that danger.  And we don't

        10     think that there is an additional free-floating

        11     requirement about emergency status that has to

        12     be taken into account.

        13          JUSTICE BARRETT:  So it could be an

        14     emergency two more years from now?

        15          GENERAL PRELOGAR:  Well, I certainly

        16     take the point that the emergency can be of

        17     substantial duration.  Of course, this is not a

        18     way to -- to bypass notice and comment

        19     permanently.  Congress further specified that

        20     the agency is expected to conduct a rulemaking

        21     process over six months, and that's why the

        22     agency estimated the lives saved, the

        23     hospitalizations prevented over the six-month

        24     life of the rule.

        25          JUSTICE BARRETT:  Sure, but I was

Oral Argument 35 Final Review

136

1    envisioning a new rule, right?  Like, you know,

2    OSHA might, two years from now, adopt something

3    that's different from this vaccine or

4    mask-and-test mandate.  I'm just talking about

5    the limits more generally on OSHA's power under

6    the ETS provision.

7              GENERAL PRELOGAR:  The limits, I

8    think, are the ones written into the statute.

9    And so, if you want to project out two years

10   from now, I think it's entirely possible, of

11   course, that the trajectory of the pandemic

12   will change.  I certainly hope so.  And in that

13   case, OSHA, I think, would have to, if it

14   wanted to regulate again, cross the high burden

15   of showing a grave danger.

16             You know, this is a -- an authority it

17   has used sparingly in cases of -- of what we

18   think are true emergencies, and I think to

19   suggest based on concern about what might

20   happen in the future that its authority should

21   be constrained or clipped now, when we are in

22   the middle of an unprecedented pandemic that is

23   claiming more lives than we've seen in a

24   shorter amount of time, would do a disservice

25   to Congress's anticipation that OSHA might need

137

```
 1    to act quickly in response to dangers like
 2    this.
 3               JUSTICE BARRETT:  Thank you.
 4               CHIEF JUSTICE ROBERTS:  Mr. Keller,
 5    rebuttal?
 6                REBUTTAL ARGUMENT OF SCOTT A. KELLER
 7             ON BEHALF OF THE APPLICANTS IN NO. 21A244
 8               MR. KELLER:  Two points, Mr. Chief
 9    Justice.
10               First, we need a stay now before
11    enforcement starts.  Our members have to submit
12    publicly their plans to how to comply with this
13    regulatory behemoth on Monday.  Vaccines would
14    need to occur by February 9.  You would need
15    two vaccines to comply.  Those vaccines would
16    have to start immediately.  Tracking and
17    recordkeeping cannot happen overnight.
18               And on tests, you heard my friend, the
19    Solicitor General, mention the media reports
20    that we've all seen about shortages of tests
21    and costs increasing.  Our declarations,
22    Appendix page 345 and 374, confirm that as
23    well.
24               And that's exactly why workers will
25    quit right away.  You don't even have to take
```

1   our word for it.  The federal government, the

2   Postal Service and Amtrak both say the same

3   things.  What OSHA did is they cherry-picked

4   one study about healthcare workers, a very

5   specific industry, and what that worker

6   attrition rate would be.  Again, two

7   declaration cites, we have plenty more, but

8   Appendix pages 351 and 374.

9          And my second point to close on is

10  about who decides in the public interest, and I

11  would submit that this Court's precedents

12  answer that.

13         We're not asking this Court to reverse

14  anything.  Industrial Union 40 years ago in

15  Justice Stevens's controlling opinion said that

16  there was an absence of a clear mandate in the

17  OSH Act, so it's unreasonable to assume that

18  Congress gave OSHA unprecedented power over

19  American industry and the emergency power is

20  also narrowly circumscribed, yet, here, OSHA

21  has never before done mandated vaccines or

22  widespread testing, much less over all

23  industries or on an emergency basis.

24         So whether we're talking about the

25  agency's failure to explain, whether we're

139

1    talking about the statutory term "necessary,"

2    whether we're talking about how this has to be

3    tethered to the workplace under the major

4    questions doctrine, under any one of those

5    theories, we are likely to succeed on the

6    merits.

7          And, finally, when it comes to the

8    public interest, as this Court just recognized

9    a few months ago, it is undisputable that the

10    public has a strong interest in combatting the

11    spread of the COVID-19 delta variant, but our

12    system does not permit agencies to act

13    unlawfully, even in pursuit of desirable ends.

14          We would respectfully request a stay

15    of this unprecedented sweeping S -- ETS before

16    Monday.

17          CHIEF JUSTICE ROBERTS:  Thank you,

18    counsel.  The applications are submitted.

19          (Whereupon, at 12:09 p.m., the

20    applications were submitted.)

21

22

23

24

25

**$**

**$100** [1] 98:25

**1**

**1** [2] 26:24 27:18
**1-in-14** [1] 82:14
**1-in-200** [1] 82:15
**1.8** [1] 35:5
**10** [11] 7:3 17:17 19:5,5 35:
11 46:23 50:20 93:5,9,14,
20
**10:00** [1] 1:25 4:2
**100,000** [1] 53:23
**12:09** [1] 139:19
**137** [1] 3:13
**15** [1] 73:6
**150-page** [1] 132:8
**18** [7] 56:15 57:12,16 58:6,
7,7 66:17
**1918** [1] 123:5
**1970** [2] 81:23 100:17
**1991** [2] 5:9 29:22

**2**

**20-year-olds** [1] 56:16
**2005** [1] 127:18
**2020** [1] 134:1
**2022** [1] 1:21
**2112** [2] 52:8,8
**21A244** [6] 2:3 3:4,13 4:8,
13 137:7
**21A247** [3] 2:5 3:7 42:6
**22-year-olds** [1] 38:23
**24** [1] 119:8
**250,000** [1] 74:13
**28** [2] 20:1 52:8
**29** [3] 27:21 57:12 58:7
**29-year-olds** [1] 66:17

**3**

**3** [3] 26:24 27:18 50:23
**308** [1] 27:1
**316** [1] 27:1
**320** [1] 27:1
**345** [1] 137:22
**351** [1] 138:8
**374** [3] 19:24 137:22 138:8
**375** [1] 23:6

**4**

**4** [1] 3:4
**40** [3] 34:18 112:10 138:14
**42** [1] 3:7
**474** [1] 50:18
**475** [1] 50:18
**49** [3] 57:16 58:6,7

**5**

**5** [3] 33:18 89:22,24
**50** [5] 57:13 99:7 100:9 118:
9 123:25

**6**

**6,500** [1] 74:13

**60** [1] 17:25
**60-year-olds** [1] 38:24
**61** [1] 50:17
**61,000** [1] 50:19
**61411** [2] 44:16 61:20
**61418** [2] 57:20 58:2
**61419** [1] 63:16
**61466** [1] 50:17
**61475** [1] 50:17
**63422** [1] 50:17
**64-year-olds** [1] 57:13
**65** [3] 57:15,17 58:4
**651** [1] 28:19
**655** [1] 27:22
**655(c** [2] 81:17 97:21
**669(a)(5** [3] 74:6 98:21 102:
1
**669(a)(5)'s** [1] 126:19

**7**

**7** [2] 1:21 26:21
**70-something** [1] 94:3
**700-and-some-odd** [1]
17:17
**72** [1] 3:10
**750** [2] 50:8 92:14
**750,000** [2] 94:4,6

**8**

**80** [3] 17:25 23:6 118:12
**84** [4] 4:17 13:14 35:7 41:9
**86** [1] 127:14

**9**

**9** [5] 33:17 93:23 95:2,16
137:14
**9/11** [2] 46:13 127:24
**90** [1] 17:24

**A**

**a.m** [1] 1:25 4:2
**abate** [1] 6:20 10:8 52:12
**abatement** [1] 70:13
**ability** [2] 41:13 117:8
**able** [3] 20:1,8 52:12
**above-entitled** [1] 1:23
**absence** [1] 138:16
**absolutely** [9] 7:6 8:20,25
36:2 55:17 81:14 94:20
107:24 123:6
**abstract** [1] 57:7
**accept** [8] 26:14,16,18 36:
6 55:14 61:3 79:16 117:15
**accepting** [1] 119:18
**accommodate** [1] 42:22
**accomplishing** [1] 11:3
**account** [4] 25:4 34:1 35:4
135:12
**accountability** [2] 31:14
32:25
**accountable** [4] 31:12,19,
23 130:7
**acknowledge** [1] 32:5
**across** [7] 5:8 20:6 26:10

**37:**15 73:3 79:21 88:3
**across-the-board** [1] 83:
9
**Act** [43] 9:14,23 19:19 27:
21 30:5,5 67:12 71:5,5 74:
6,8 81:16,22 83:24 84:1
96:18,18,19,23,23 97:1,14,
16 98:24 110:13,15 111:1,
19 118:19,24 119:23 120:2,
9,14 126:21 127:13 128:7,
22 130:11 134:17 137:1
138:17 139:12
**acted** [1] 19:19 23:18 97:
20 99:5,8
**acting** [4] 15:8 83:1 93:7
96:20
**action** [15] 7:10 18:17 51:
17,23,24 52:4,15 71:16 81:
18 97:22 100:5,25 115:3,6
116:2
**actions** [1] 52:12
**active** [1] 92:19
**activities** [2] 59:16 99:3
**actually** [6] 56:16 90:18
125:22 128:23 132:23 134:
20
**acute** [4] 43:23 44:2 72:23
76:21
**addition** [3] 22:10 35:20
127:3
**additional** [5] 13:12 113:
23 128:20,24 135:10
**address** [16] 14:24 15:10
38:4,17 55:23 56:3 61:7
62:25 72:9 74:2,20 77:20
97:5 118:10 119:11 129:
24
**addressed** [5] 54:8 82:5,5
116:13 125:7
**addresses** [1] 38:3
**addressing** [1] 15:21
**adequate** [1] 20:2
**adequately** [2] 132:2,20
**adjust** [1] 114:5
**adjusted** [1] 46:13
**adjustments** [1] 45:23
**administered** [1] 5:22
**ADMINISTRATION** [3] 1:8,
16 104:21
**administrative** [9] 33:11
67:13 90:13,23 91:2,25 92:
6 96:2,6
**adopt** [8] 73:14 75:24 87:5
112:8,10 113:24 133:24
136:2
**adopted** [1] 38:18
**adopting** [1] 93:11
**advanced** [1] 9:10
**adverse** [2] 106:1 107:6
**affect** [6] 64:6 69:21,24
103:13 119:6,7
**affected** [8] 35:6 45:20,21

**46:**3,7 53:19 67:25 130:7
**affects** [4] 24:17,18 103:15
118:11
**afford** [1] 134:24
**age** [1] 64:8
**agencies** [17] 6:4 32:18 68:
13,17,25 79:1,7,12,15 80:8,
17 81:6 83:25 99:13 100:
13,15 139:12
**agencies'** [1] 83:20
**agency** [70] 6:1 11:14,16
12:23 15:8 18:17 20:5 25:
7,23 26:1,6 28:9,25 29:4
31:11,20 32:7 34:11 35:19
37:8,11,14 43:2 57:9 59:1
64:5 67:3,15 70:2,16 73:
23 74:20 75:12 76:13 79:
22,23 81:23 82:25,25 83:
23 84:12 86:17,20 87:3 91:
6,19 92:22,25 93:6 96:19,
23 98:3 113:19 114:5 115:
3,5 116:1 117:21 118:22,
22 122:24 124:6,20 126:10
130:7,9,10 133:16 135:20,
22
**agency's** [1] 26:15,16,18
67:9 74:3 116:19 124:16,
23 125:10,19 138:25
**agent** [3] 82:10 98:3 135:7
**ages** [4] 64:8,23 65:10,18
**aggressive** [2] 15:13 91:
20
**aggressively** [1] 15:9
**ago** [9] 4:21 53:20 78:15 89:
21 90:2 99:8 100:10 138:
14 139:9
**agree** [5] 14:24 68:8 94:20
117:19 131:10
**agreement** [1] 72:5
**ahead** [3] 83:15,16 101:17
**aid** [1] 114:22
**air** [1] 124:17
**AL** [4] 1:4,9,12,17
**Alabama** [3] 35:2 51:15 52:
1
**ALITO** [47] 20:13 23:20,22
24:9,12 62:1,2 63:9,19 87:
13 89:11,15,16,24 90:11,
22 91:9,13,21 92:5 103:3,4,
24 104:1,3,13,17 105:8
106:7,9,13,22 108:5,8,12,
15,17,21,25 109:3,11,14,
17 110:19,23 113:15 119:4
**Alito's** [1] 111:21
**allow** [1] 52:5
**allows** [2] 55:23 56:2
**almost** [5] 7:4 17:20 33:22
53:21 99:10
**alone** [4] 48:20 49:22 83:1
87:24
**already** [7] 5:4 28:3 29:22
97:20 98:6 118:20 122:4

**alternative** [3] 12:3 113:16
131:18
**alternatives** [4] 6:18 11:15
15:13 25:5
**although** [1] 69:16
**altogether** [1] 133:6
**amassed** [1] 73:1
**ambiguity** [9] 21:6,11 22:1
69:12 117:25 118:2,4 119:
19 123:16
**ambiguous** [9] 21:2 34:14
36:12 69:6 114:17,18 119:
12 123:18,22
**America** [3] 84:2 100:24
126:4
**America's** [2] 80:4 120:4
**American** [7] 9:15 32:13
53:1 66:6 72:22 98:23 138:
19
**Americans** [4] 4:17 5:23
13:14 41:9
**amicus** [1] 52:25
**Among** [2] 19:25 70:15
**amount** [5] 26:9 27:4 35:8
69:18 136:24
**ample** [1] 114:1
**Amtrak** [2] 16:2 138:2
**analysis** [5] 25:4,6 33:7 40:
23 104:2
**analyze** [3] 8:18 35:22 86:
21
**analyzed** [1] 80:19
**and/or** [1] 112:3
**announced** [2] 92:25 93:7
**another** [10] 35:6 46:9 63:3
69:14 77:11 105:9 107:22
122:6 123:4 131:25
**answer** [14] 19:17 31:1 40:
12 44:4 46:6 50:14 62:10
64:18 85:9,9 91:21 94:25
103:10 138:12
**answered** [1] 59:17
**answering** [1] 124:2
**answers** [1] 66:14
**ante** [1] 9:20
**Anthrax** [1] 127:12
**anticipated** [3] 101:23 128:
25 129:12
**anticipation** [1] 136:25
**apologize** [1] 21:19
**appeal** [1] 130:22
**appear** [3] 53:2 66:2,3
**APPEARANCES** [1] 2:1
**appears** [2] 57:3 118:21
**appendix** [5] 19:24 23:6
27:1 137:22 138:8
**apples** [2] 64:11,19
**Applicants** [21] 1:5,13 2:3,
5 3:4,7,13 4:13 42:6 73:20
90:19 95:21 98:7,17 101:5
117:3 126:12 128:6 130:
14 131:17 137:7

Official - Subject to Final Review

**application** [4] 4:5,8 120:
10 129:2
**applications** [2] 139:18,20
119:19
**applied** [2] 34:18 78:6
**applies** [5] 44:7 88:12 109:
22 115:16 123:15
**apply** [5] 20:24 53:9 78:9,19
126:7
**applying** [4] 34:16 44:14
123:23 124:6
**approach** [5] 14:23 46:1
49:6 58:12 79:24
**approaches** [1] 28:22
**approaching** [2] 8:5 83:19
**appropriate** [9] 7:12 8:10
37:2 68:21 90:12 91:1,2
129:16 131:12
**appropriated** [2] 74:1 98:
25
**appropriately** [1] 71:20
**appropriation** [1] 126:24
**approved** [1] 105:13
**approximately** [1] 94:2
**approximates** [1] 126:14
**approximating** [1] 122:18
**arbitrary** [1] 12:1
**area** [3] 61:17 92:19 120:24
**aren't** [4] 19:15 26:15 33:
25 49:20
**arguably** [2] 37:19 124:6
**argue** [3] 8:12 100:11 117:
23
**argued** [2] 54:19 130:21
**arguing** [1] 95:22
**argument** [32] 1:24 3:2,5,8,
11 4:7,12 17:2 22:14,15
30:21 34:21 42:5 49:7 51:
16 71:3 72:17 74:19 76:22,
23 78:18,22 86:4,5,9,13 87:
17 90:24,25 132:24 134:16
137:6
**arguments** [14] 16:24,24
17:3 18:21,22 19:14 41:2
70:23 86:8 88:4 90:5,8
132:21,23
**arises** [1] 47:24
**arising** [3] 44:21 45:4 46:8
**around** [5] 8:13,14 12:14
76:5 79:25
**arrive** [2] 104:23 105:4
**arrived** [1] 90:1
**articulated** [1] 115:21
**ascertaining** [1] 93:12
**aside** [1] 25:20
**aspect** [3] 45:5 95:25 98:
18
**assembly** [3] 14:3,10 89:3
**asserted** [2] 124:19 125:10
**assume** [6] 16:23 17:1 53:
9 110:14 120:9 138:17
**assumed** [2] 67:9 111:1
**assuming** [3] 19:14 110:5

**assumption** [3] 17:6,7
119:19
**assumptions** [1] 26:20
**attempt** [1] 86:20
**attempted** [1] 20:1
**attendants** [1] 78:9
**attention** [3] 86:18 113:20
**attrition** [2] 86:14 138:6
**authorities** [1] 79:6
**authority** [21] 14:23 30:14
40:20 69:18 70:16 71:6 73:
22 74:11 80:3 83:21 84:12
105:1,7 115:4,8 125:19
130:15 131:8 134:21 136:
16,20
**authorization** [3] 84:5 98:
8 120:11
**authorize** [3] 97:21 116:5
127:9
**authorized** [1] 106:19
**availability** [1] 134:3
**available** [6] 6:18 19:23 20:
3 27:20
**avoid** [4] 22:4 111:4,4 119:
3
**avoiding** [1] 21:13
**aware** [2] 85:17 105:22
**away** [3] 69:19 104:24 137:
15
**awkwardness** [1] 52:19

**B**

**back** [6] 30:21 41:15 62:2
96:14 111:21 126:1
**backdrop** [1] 129:5
**bad** [3] 7:24 80:22 121:8
**balance** [3] 18:5 19:13 109:
19
**balanced** [2] 31:9 109:18
**balancing** [1] 23:13
**ban** [1] 15:4
**banc** [1] 133:23
**bankrupt** [1] 23:8
**Barrett** [20] 37:23,24 39:10,
22 40:8,16,25 41:10,22 72:
12,13 89:1 129:22,23 131:
21,23 133:18 135:13,25
137:3
**Barrett's** [1] 45:3
**barriers** [1] 14:17
**bars** [1] 74:4
**baseball** [3] 47:7,8,9
**based** [4] 71:3 88:9 108:13
136:19
**baseline** [1] 89:8
**basic** [1] 71:7
**basically** [2] 1:12 66:15
**basis** [4] 42:12 63:11 79:
10 104:11 106:18 114:8
116:3 120:9 121:20 133:
15 138:23
**bear** [1] 32:20

**beavers** [1] 49:18
**becoming** [1] 6:3
**beginning** [2] 9:11 116:20
**begins** [1] 6:7
**behalf** [11] 2:2,5,7 3:4,7,10,
13 4:13 42:6 72:18 137:7
**behemoth** [1] 137:13
**behind** [1] 32:24
**beliefs** [1] 110:7
**believe** [9] 9:9 19:16 22:15
36:1 45:3 81:23 96:12 118:
11 121:18
**believes** [1] 92:5
**belongs** [1] 118:6
**beneficial** [2] 51:17 105:
25
**benefits** [2] 105:14,23
**BENJAMIN** [3] 2:4 3:6 42:
5
**benzene** [5] 34:24 124:3,4,
24 125:25
**best** [11] 11:3 12:5,7,10,11,
16 14:23 15:2,3 76:14 87:
7
**better** [7] 10:19 42:21 49:6
51:23 94:12 97:14,15
**between** [11] 29:11 36:23
38:22 57:16 60:1 68:16 85:
22 88:14 91:15 112:3 130:
15
**beyond** [2] 39:12 40:13
**big** [3] 17:25 115:6 116:1
**biggest** [1] 74:17
**billions** [4] 19:21,22 22:25
35:9
**bit** [3] 48:6 49:9 76:20
**blanket** [1] 41:8
**blanket-wide** [1] 41:20
**blocked** [1] 7:4
**bloodborne** [5] 5:9 29:20
30:16 77:22,25 78:7 99:22
**blunderbuss** [2] 42:14 46:
1
**blunt** [1] 130:25
**bodies** [1] 59:15
**booster** [1] 134:14
**boosters** [1] 134:12
**borders** [1] 55:5
**both** [15] 5:10 17:2 18:4 24:
24 38:1 51:9 57:22 76:5
96:25 102:6,19 107:21
114:21 129:24 138:2
**branch** [1] 83:1
**BREYER** [29] 16:20 17:5
18:14,18,20 19:18 49:12,
16 50:5 59:19,20 60:3,11,
14,19,25 84:6 85:1,4,8,14,
19 86:16 87:9,14 92:14 93:
24 94:19 103:2
**Breyer's** [1] 26:13
**brief** [11] 16:25 26:21 53:1
66:7 90:12 92:6,8,12,16,20,

20
**briefing** [1] 90:4
**bring** [2] 43:1 59:7
**broad** [8] 36:8,10 63:7 72:5
100:16 117:10 124:6 125:
12
**broader** [4] 102:7 110:3,12
131:6
**broadest** [1] 70:15
**broadly** [2] 44:20 80:20
**brought** [4] 17:13 32:19 43:
24 120:2
**Brown** [3] 36:19 124:3 125:
5
**build** [1] 122:24
**bunch** [1] 47:14
**burden** [3] 98:13 131:13
**burdensome** [1] 4:23
**Burwell** [2] 35:9 37:7
**Bush** [1] 127:18
**BUSINESS** [9] 1:4 4:9 23:
18 45:24 49:21,21 59:11
118:14
**businesses** [13] 5:21,24 6:
13 24:14 9 19:19 20:7 22:
21 23:5,7,17 54:22 59:5
**busy** [1] 49:17
**bypass** [1] 135:18

**C**

**calculating** [1] 65:1
**calculations** [1] 131:3
**calculus** [1] 65:8
**call** [4] 55:21 121:9,9,10
**calls** [1] 89:6
**came** [1] 1:23 32:22
**cancer** [2] 124:4 126:4
**cannot** [7] 6:2 43:2 45:11
52:17 58:18 63:14 137:17
**canon** [5] 20:24 21:22 34:
11,15 69:15
**capability** [1] 104:24
**capacity** [5] 33:11 53:22
113:20,22,23
**capricious** [1] 12:2
**card** [1] 49:11
**carefully** [1] 12:3
**carry** [2] 99:2 132:17
**carved** [1] 31:24
**case** [24] 4:10 19:14 20:25
39:19 40:11 49:18 65:23
68:24 78:18 92:3 105:20
110:23 115:24 120:11 124:
3,3,4,17,24 125:5,11,25
127:1 136:13
**cases** [17] 15:16 18:11
34:19 50:9 90:1 94:3 100:
6,14 116:8 124:11 125:16,
21 126:9 136:17
**catastrophes** [2] 25:10,12
**catastrophic** [1] 23:8
**catch** [2] 61:1 75:18

**Catching** [1] 27:4
**categories** [1] 133:1
**cause** [2] 5:2 19:20
**causes** [2] 53:16 60:17
**causing** [1] 91:4
**CDC** [3] 26:19 32:10 57:11
**century** [1] 10:12
**certain** [12] 5:18 16:16 27:
7,24 28:11,10 39:14 59:16
64:23 72:6 89:2 111:17
**certainly** [17] 7:17 26:6 85:
12 90:13 91:17 96:5 100:
11,16 102:17 111:15 114:7
123:4 126:9 128:2 131:9
135:15 136:12
**challenge** [1] 118:17
**challenges** [3] 7:4 35:16,
17
**chance** [4] 75:16 82:14,15
89:4
**chances** [1] 102:20
**change** [3] 117:1 134:10
136:12
**changes** [2] 48:3 61:18
**characterize** [1] 124:8
**characterized** [1] 71:20
**charge** [1] 111:1
**charged** [3] 73:23 76:13
77:13
**charges** [1] 28:20
**cherry-picked** [1] 138:3
**CHIEF** [69] 4:3,14 7:15 13:
17,22,24 14:19 15:1,7,19
16:5,8 20:14,18 23:20 24:
13 30:18 34:4 37:22 38:1
41:23 42:2,3,7 55:25 56:5
59:18 62:1 63:20 66:11 68:
3 70:18 72:11,14,19 78:14
79:4,9 80:14 81:20 82:3,6,
17,21 83:16,18 88:24 89:
15 92:12,15,21 96:11,22
99:4 100:1 101:16 102:10
103:1 114:10 117:11 118:
8,21 123:10 129:21 133:22
134:7 137:4,8 139:17
**Chief's** [2] 38:6 96:14
**Childhood** [1] 127:13
**children** [2] 47:22 53:23
**choice** [2] 112:8 117:20
119:2
**chose** [1] 134:5
**chosen** [3] 24:4 62:19 112:
14
**chronicled** [1] 125:6
**Circuit** [3] 8:25 11:12 93:2
**circumscribed** [2] 4:20 9:
4 138:20
**circumstance** [2] 11:6,6
**circumstances** [3] 39:6
75:21 111:3
**circumvent** [1] 130:11

Official - Subject to Final Review

**cite** [2] 57:20 58:2
**cited** [1] 88:7
**cites** [1] 138:7
**citing** [1] 21:16
**claim** [1] 86:15
**claimed** [1] 125:19
**claiming** [1] 136:23
**claims** [1] 101:5
**clarifier** [1] 69:12
**Clause** [2] 55:22 68:11
**clear** [19] 9:14 21:7,20 22:5
   39:11 43:1 56:23 61:3,14
   90:20,24 97:19 106:23
   109:8 117:9 122:25 125:
   23 138:16
**clearer** [2] 28:19,24
**clearly** [11] 12:24 20:7 28:8
   29:9 70:1 77:12 82:13 84:
   25 97:25 115:7,19
**clerk** [1] 50:17
**clerks** [1] 49:17
**clipped** [1] 136:21
**close** [10] 14:6,6 25:6 43:2
   50:9 59:8 94:4 101:19 113:
   2 138:9
**closely** [2] 45:7 61:16
**closer** [1] 99:10
**clue** [3] 8:7 27:21 114:23
**clues** [2] 37:3 127:2
**CMS** [4] 78:18 79:18 83:3,
   11
**coast** [2] 69:22,22
**Code** [1] 70:17
**coffee** [1] 44:24
**colleague's** [1] 22:15
**colleagues** [2] 97:13 114:
   14
**Columbus** [1] 2:4
**combat** [1] 101:24
**combatting** [1] 139:10
**combination** [2] 46:20,24
**come** [14] 30:21 44:18 48:6
   54:11 60:21 61:22 62:2 68:
   7 79:15 88:18 92:24 112:
   24 131:17,23
**comes** [6] 66:9 69:5 95:17,
   19 107:22 139:7
**coming** [2] 15:4 100:6
**commandeer** [1] 6:2
**commencement** [1] 89:18
**comment** [9] 8:16,18 15:
   24 30:20 52:11 130:6,8
   134:22 135:18
**commerce** [3] 55:4,22 68:
   11
**Commitment** [2] 53:1 66:
   6
**common** [2] 99:24 107:12
**commonly** [3] 100:5 101:8
   102:9
**commonplace** [1] 73:17
**communicable** [4] 30:15

**32:10** 37:9 88:14
**comorbidities** [1] 109:16
**companies** [2] 33:10 86:
   23
**company** [3] 23:9,10 33:13
**comparable** [1] 66:9
**compared** [5] 6:25 92:13,
   16,20 132:4
**comparing** [1] 64:11
**comparison** [2] 9:23 57:5
**compiled** [1] 26:9
**complain** [1] 99:6
**complained** [1] 11:16
**completely** [2] 31:12 47:
   15
**compliance** [6] 86:25 87:
   12 91:20 92:24 93:6 111:4
**complicated** [1] 90:3
**comply** [3] 114:1 137:12,
   15
**compulsory** [2] 122:7 129:
   9
**conceded** [3] 35:10 119:4
   124:20
**concedes** [1] 23:2
**conceivably** [2] 18:25 70:
   10
**concept** [1] 25:1
**concern** [5] 86:25 108:25
   109:3 126:2 136:19
**concerned** [1] 86:13
**concerns** [4] 21:14,15 22:
   5,6
**concert** [1] 45:1
**conclude** [5] 26:2 63:16
   114:8 125:17 133:15
**concluded** [2] 113:25 124:
   13
**concurrence** [1] 51:25
**condition** [1] 53:25
**conditions** [7] 24:21 42:20
   49:24 64:8 65:11,19 94:22
**conduct** [2] 59:11 135:20
**confirm** [1] 137:22
**confirmation** [1] 128:24
**confirmed** [1] 116:23
**confirming** [1] 5:18
**conflict** [4] 116:10,11,14
   125:4
**conflicting** [2] 25:24 114:
   20
**confront** [1] 32:16
**confronted** [1] 125:12
**confronting** [1] 12:13
**confusion** [1] 93:1
**congregate** [1] 48:2
**Congress** [78] 15:6 20:4
   28:4,7,19,19,25 29:2,3 30:
   1,5,9,9,10,11,13 32:3,12
   39:12 40:14 52:7 68:10,13,
   16,25 69:19,25 70:1 71:4
   72:7,7 73:23 74:1 76:13

**77:12** 81:10,14 82:24 83:
   22 96:22,22,25 97:19 98:1,
   9,13,24 99:5,6,8,13,15 100:
   10,17,21 101:22 102:3 115:
   10 116:4,12,16 117:21 118:
   7,19,23 119:16 120:1,16
   124:21 127:7,22 128:4,14,
   24 129:11 135:3,19 138:18
**Congress's** [7] 5:16 29:21
   17:18 120:13 126:23 134:
   17 136:25
**congressional** [1] 71:16
**cons** [1] 51:6
**consequences** [4] 24:22
   53:6 73:11 91:24 94:10
   102:23 106:1 107:6 115:
   23 116:2,9,24 117:6 126:
   16
**consider** [8] 6:22 11:14 12:
   3 16:15 32:19 117:23 131:
   25 133:4
**consideration** [2] 20:25
   100:2
**considered** [4] 50:16 72:2
   73:7 115:22
**considers** [1] 51:18
**consistency** [1] 57:9
**consistent** [3] 64:21 68:11
**consolidated** [1] 4:10
**constant** [1] 107:19
**constantly** [2] 94:21 107:
   18
**constitutes** [3] 82:1,10,13
**Constitution** [3] 97:9,11
   119:13
**Constitution's** [1] 71:4
**constitutional** [2] 68:10
   69:15
**constitutionally** [1] 55:
   14
**constitutionally** [1] 97:16
**constrained** [1] 136:21
**construction** [1] 116:21
**construing** [1] 9:16
**consult** [1] 21:22
**consults** [1] 21:25
**contact** [8] 14:6 44:18 48:8,
   9 54:16 61:22 88:19 112:
   24
**contemplate** [1] 100:22
**contemplated** [1] 77:12
**contemplates** [2] 74:7 98:
   22
**contention** [1] 132:1
**contest** [3] 11:9 38:6 118:2
**contesting** [6] 36:2 38:19,
   20 39:24 40:1 105:15
**context** [14] 7:18 8:19 9:24
   21:7 22:12 36:20,21 40:4
   56:3 78:8 79:3 123:25 124:
   7 127:15
**contexts** [6] 13:9 69:11 80:

**7** 127:8,9,11
**continually** [1] 134:10
**continuing** [1] 66:13
**contract** [1] 77:25 109:1
**contracting** [6] 63:11 66:5
   73:9 75:16 102:20 132:16
**contractor** [4] 78:22 79:19
   81:4 83:5
**contractors** [1] 78:24
**contradicting** [1] 26:20
**contrast** [1] 130:14
**contrasted** [2] 40:18 131:
   11
**contributes** [1] 113:12
**control** [4] 47:8 86:16,17
   128:16
**controllable** [1] 47:4
**controlling** [1] 138:15
**controls** [1] 76:16
**correct** [22] 9:1 24:8 25:2
   38:14 63:12,13 89:23 95:2,
   3,8,9,12,14,19 96:4 111:22,
   23 112:6,18,19 113:5 121:
   15
**correction** [2] 5:19 110:2
**correctly** [1] 62:22
**cost** [3] 35:9 69:22 111:4
**costs** [4] 19:22 23:1 27:16
   137:21
**couldn't** [3] 101:22 129:11
   132:17
**counsel** [12] 24:15 27:2 41:
   24 53:11,14 63:22 72:15
   96:13 102:11 111:20 113:
   14 139:18
**counter** [2] 98:20 124:15
**countervailing** [1] 27:17
**countless** [1] 97:1
**country** [17] 10:11 11:7 19:
   21 20:6,10 33:4 53:19 76:
   6 82:16 84:3 102:8 118:14
   121:11,16 123:5 127:25
   129:6
**couple** [4] 20:21 66:15 89:
   20 90:7
**course** [17] 39:18 40:10 47:
   24 79:5 92:7 96:7 97:17
   103:22 106:5 111:25 119:
   20 128:20 130:4,10,17 135:
   17 136:11
**COURT** [47] 1:1,24 4:15,19
   6:5 9:3,12,16 16:23 21:15,
   24 22:16,18 42:8 51:18,21,
   22 59:9 72:20 74:19 81:8
   82:7 83:18 90:1,12 92:5
   94:9 96:8 98:11 115:21,25
   116:8,18,22 117:2 118:1
   120:1 124:12,18 125:6,12,
   17,24 126:1,15 138:13 139:
   4
**Court's** [6] 6:8 20:24 74:22
   90:14 115:19 138:11

**courts** [12] 7:4 31:22,23,23,
   24 32:1 33:1 35:18 52:8,
   11 78:21 92:19
**cover** [1] 80:21
**coverage** [1] 99:17
**covered** [8] 33:23 42:16
   48:7 49:14 80:25 81:2 92:
   23 101:8
**covering** [4] 4:17 13:13
**covers** [2] 35:5,7
**COVID** [25] 5:9,23 8:14 11:
   10 13:6 20:10 24:11 27:4
   35:15 39:15,17 41:14 45:
   20,21 47:4 54:7 57:24 62:
   15 75:18 78:16 79:2 94:7
   99:9 102:16 134:18
**COVID-19** [16] 61:14 71:11
   72:9,21 74:2,16 75:5 80:7
   82:9 98:2 101:12 121:1
   122:19 123:9 126:22 139:
   11
**COVID-19-related** [1] 99:
   2
**coworkers** [2] 73:10 109:2
   132:18
**create** [1] 47:1
**created** [2] 15:6 93:2
**creates** [4] 44:12 45:5 126:
   18
**crisis** [3] 55:4 71:21 76:21
**critical** [1] 126:11
**critique** [1] 34:15
**cross** [1] 136:14
**crushing** [3] 60:20,20,21
**cryptic** [6] 34:14 123:18,24
   124:7,13 125:13
**cubicles** [1] 48:25
**curious** [2] 59:21 102:14
**current** [3] 57:2 71:6 94:22
**cut** [1] 67:1

## D

**D.C** [3] 1:20 2:2,7
**danger** [68] 6:20 10:11 11:
   10 24:10,23 38:4,7 39:6
   40:21 42:10,11,24 43:15,
   16,23 44:6,10 45:9 57:7
   62:11,14,18 63:7,10,18 64:
   23 65:5 67:4,20,22,24 70:7,
   8,9,9 72:23 73:5,13 74:21
   75:5,25 77:10 78:16,19,23
   79:2 80:7 82:1,13 88:9,23
   89:4,8 94:23 98:2 108:11,
   19 112:20 113:11 117:12,19
   126:25 131:22 133:9,14
   135:7,9 136:15
**dangerous** [2] 12:9 73:19
**dangers** [5] 32:16 80:5 81:
   19 100:23 137:1
**data** [4] 5:18 26:10 57:10,
   11
**day** [19] 10:13,14 18:1,12
   39:2 46:23 47:12 49:10 72:

Official - Subject to Final Review

24 91:4,7,10,14 92:11 93:
25 94:3,5 118:18 119:8
**days** [4] 4:21 90:7 95:6 96:
3
**de** [1] 6:3
**deadliest** [2] 72:21 129:13
**deadline** [1] 93:5
**deadlines** [1] 91:20
**deadly** [4] 53:15 101:24
102:3 108:6
**deal** [4] 46:22 115:6 116:1
127:22
**dealing** [3] 28:22 127:15
129:12
**dealt** [1] 35:15
**death** [11] 12:9,23,25 24:20
57:22 63:25 64:9,24 70:10
73:12 75:19
**deaths** [2] 27:3,16
**debate** [1] 35:24
**debates** [1] 41:18
**debating** [1] 57:24
**decades** [1] 25:12
**decide** [14] 6:10 20:11 31:
21,22 32:1 33:3 47:8 51:
22 68:19,25 92:3 117:16,
17,18
**decided** [3] 28:3,4 42:11
**decides** [7] 30:23 31:10 34:
7 52:7,8 68:7 138:10
**decisions** [1] 68:12
**declaration** [1] 138:7
**declarations** [2] 26:25
137:21
**decline** [1] 75:2
**declining** [1] 76:2
**deep** [2] 84:7,8
**deeply** [1] 110:7
**defense** [2] 110:25 111:18
**defer** [3] 71:18,19 96:7
**define** [3] 44:5,20 57:6
**defined** [3] 48:7 65:21 135:
3
**definition** [4] 8:6,22 40:17
65:24
**degree** [4] 13:1 56:11 66:1
71:11
**delay** [3] 93:24 94:5,8
**delegated** [1] 115:8
**delegation** [1] 96:21
**delegations** [1] 70:16
**delicately** [2] 11:13 23:16
**Delta** [5] 52:21 53:17 66:4
134:6 139:11
**demand** [2] 57:8 69:25
**demographic** [1] 58:9
**demonstrate** [3] 77:3 115:
20 122:25
**denial** [1] 133:23
**denser** [1] 33:12
**dentist** [1] 38:10
**depart** [1] 116:3

**departed** [1] 98:12
**DEPARTMENT** [7] 1:7,15
2:7 4:10 32:8 37:5,6
**departure** [1] 107:14
**depend** [1] 123:3
**describe** [2] 104:7 123:18
**described** [1] 45:8
**describes** [1] 101:12
**desirable** [1] 139:13
**desire** [2] 29:21 43:1
**despite** [1] 132:16
**detailed** [1] 127:18
**determination** [1] 89:7
**determine** [2] 7:6 8:12
**determined** [2] 73:18 88:
21
**devastating** [1] 23:9
**develop** [1] 77:2
**developing** [1] 28:21
**develops** [1] 130:9
**devised** [1] 130:10
**difference** [5] 29:11 60:6,
23 94:14 126:12
**differences** [1] 56:19
**different** [34] 14:7 16:12
18:23 26:11 27:10,14 28:
16 31:1,2 36:16 38:8 39:8,
18 40:11 45:6 52:21 53:13
54:1 63:24 69:11 79:6 81:
6 97:6 103:7,9,19 105:9,10
107:4 109:20 112:16 127:
14 135:2 136:3
**differentiation** [1] 38:22
**differently** [1] 109:18
**difficult** [4] 85:23,25 90:3
115:2
**difficult-to-understand**
[1] 114:25
**difficulty** [1] 134:16
**digest** [2] 90:8 92:2
**diminish** [1] 84:3
**directed** [1] 99:1
**directing** [1] 126:24
**directly** [6] 29:5 75:24 78:
10 104:9 116:13 125:7
**disagree** [3] 22:1,2 119:20
**disclaimed** [1] 108:17
**discover** [1] 50:24
**discretion** [2] 17:12 93:1
**discussed** [1] 119:3
**discussing** [1] 14:21
**discussion** [3] 37:25 58:
13 69:3
**disease** [10] 17:21 51:1 53:
16 73:19 76:24 77:11 80:
10 107:14 108:7 113:12
**diseases** [7] 30:15 32:10

37:9 77:1 120:20 121:25
122:6
**displace** [1] 33:2
**displacement** [2] 5:2 22:
23
**displacing** [1] 120:5
**disposition** [1] 102:15
**dispute** [3] 61:9 80:6 106:
14
**disputing** [2] 39:4 71:10
**dissent** [2] 125:24 133:22
**dissents** [3] 125:21 126:5,
9
**disservice** [2] 117:7 136:
24
**distance** [1] 88:18
**distinction** [4] 36:23 39:3
55:7 60:1
**distinctions** [1] 50:3
**distributed** [1] 5:22
**doctrine** [24] 10:2 20:23
21:13,23 22:3,4,10 67:12
68:15,23 69:10,17 71:2
100:14 114:13,16,22 115:
13 117:15,24 123:14,20
126:7 139:4
**doctrines** [1] 21:22
**documented** [1] 81:25
**doing** [11] 16:13 18:7 33:9
42:13 59:6 75:12 76:12,13
81:3 100:12 134:23
**dollars** [1] 69:23
**done** [20] 12:20,23 20:8 25:
10,11 35:12,20 37:16 41:8
44:11 77:16 86:3 87:18,18
99:7,16 103:8,20 123:25
138:21
**doubt** [5] 66:20,22 69:15
82:9 94:9
**doubtful** [1] 66:7
**down** [2] 9:10 15:22
**dozens** [1] 132:7
**drafted** [1] 128:14
**dramatic** [1] 101:8
**draw** [2] 59:25 133:16
**drawn** [3] 9:6 61:4 128:13
**drew** [1] 33:7
**drop** [1] 48:10
**droves** [1] 87:1
**duration** [1] 135:17
**during** [5] 89:25 91:10,14
**dying** [4] 10:13 12:13 72:
24 82:15
**dynamic** [1] 94:21

---

## E

**each** [5] 14:4 31:9 46:22
97:3 120:11
**Earl** [1] 26:5
**earlier** [7] 36:25 38:2 58:13
96:17 132:24
**early** [1] 134:1
**earnest** [1] 35:23

**easily** [1] 87:18
**economic** [10] 19:21 23:16
26:3 31:5,8 35:4,25 115:
22 116:24 117:5
**economy** [4] 5:3 22:24 37:
16 97:2
**economy-wide** [8] 4:16 5:
1 6:3 13:13 16:13 37:14
39:21 41:20
**eerie** [1] 127:20
**effect** [15] 17:8 18:16 22:22
25:22 64:9 66:3 80:20 92:
18 93:21 94:6 95:17,19
100:3 117:10 126:23
**effective** [14] 15:10 53:3,5
57:4 73:17 76:9 102:2,18
106:20,21 107:13 121:25
129:18 132:10
**effectively** [2] 130:24,25
**effects** [4] 35:21 51:17 52:
4 63:7
**efficacious** [2] 56:11,21
**efficiently** [1] 16:9
**effort** [1] 80:20
**eight** [2] 46:22 47:11
**either** [4] 73:15 75:13 112:
8 114:18
**elected** [1] 31:24
**elements** [2] 17:12 100:19
**elephant** [1] 103:5
**elephants** [1] 69:12
**ELIZABETH** [3] 2:6 3:9 72:
17
**embodied** [1] 120:14
**emerge** [1] 134:11
**emergence** [1] 134:5
**emergencies** [1] 136:18
**emergency** [46] 4:19 6:10,
11,21 8:8,20 9:4,19 11:2,5
23:14 29:1 32:4 36:24 40:
2 41:13,16,21 42:25 63:3,4
70:12,24 71:17,21 72:1,4
96:20,21 97:8,23 98:15
100:23 129:25 130:23 131:
10 133:25,25 134:15 135:3,
4,11,14,16 138:19,23
**emerging** [1] 134:20
**emissions** [1] 124:5
**emphasize** [2] 105:18 106:
17
**emphasized** [4] 87:3 112:
21 113:7 128:21
**employee** [8] 29:6 33:8 44:
13 76:3 84:11 93:18 104:
25 107:4
**employees** [4] 5:25 7:10
16:3 20:3 24:3,3,4 26:24
28:10 32:17 33:14 38:7 42:
17,24 62:13,15 63:6,10 73:
8,15,25 75:1,2 77:10,24 78:
6 84:10,14 87:23 88:16,23
93:13,15,18 99:24 103:13,

15 104:22 105:2 110:18
111:6 133:10
**employees'** [1] 42:19
**employer** [6] 44:11 61:15
74:25 76:3 111:25 112:4
**employers** [27] 4:23 13:10
19:25 27:25 28:1 29:6,11
42:16 73:14 75:23 76:5,11,
17 87:4,7 92:23 93:7,11
101:7,9 110:17 111:1,3,13
112:8,10 113:24
**employment** [1] 33:4
**empower** [1] 81:17
**empowered** [2] 84:1 100:
25
**en** [1] 133:23
**enact** [3] 30:1,3 100:15
**enacted** [7] 72:6 77:17 81:
23 83:22 98:1 116:12,16
**enacting** [1] 120:2
**enactments** [1] 117:9
**encapsulates** [1] 115:18
**encounter** [1] 78:7
**encountering** [1] 61:23
**encouraged** [2] 5:24 99:
21
**encouragement** [1] 129:
15
**encouraging** [4] 52:16 54:
4 74:10 102:5
**end** [3] 6:20 76:11 134:15
**endemic** [2] 121:9 134:9
**ends** [1] 139:13
**enforce** [1] 93:8
**enforced** [1] 89:25
**enforcement** [6] 6:7 18:15
89:18 93:1 95:1 137:11
**enhances** [1] 61:18
**enjoin** [1] 51:20
**enough** [5] 12:4 21:20 30:
5 34:17 36:5
**ensue** [2] 91:25 116:25
**ensure** [6] 20:2 68:21 72:8
76:15 87:12 132:15
**ensuring** [1] 112:22
**enter** [2] 22:16 92:7
**entire** [3] 37:15 116:14 124:
19
**entirely** [2] 53:13 136:10
**entities** [1] 25:18
**entitled** [4] 23:18 110:8,9
134:25
**entitlement** [1] 125:1
**entity** [1] 58:25
**environment** [4] 39:2 46:
24,25 47:13
**environments** [2] 33:13
88:17
**envisioning** [1] 136:1
**epidemiological** [1] 31:25
**equal** [1] 65:22
**equally** [1] 131:19

equation [1] 64:15
equipment [1] 60:9
especially [6] 47:21 52:14
69:17 70:24 72:2 95:22
ESQ [4] 3:3,6,9,12
ESQUIRE [1] 2:2
essential [6] 6:16 8:5 21:8
73:18 98:4 132:14
essentially [2] 29:5 114:23
establishments [1] 35:5
estimated [2] 112:9 135:
22
ET [4] 1:4,9,12,17
ETA [1] 50:1
ETS [25] 5:9 6:6 7:8,12 9:6
13:6 23:25 26:21 33:23 37:
18 39:12 40:13 50:2 52:20
54:8 65:25 89:20 93:9 130:
10,12,15,19 133:21 136:6
139:15
ETS's [1] 4:22
ETSs [3] 7:3,5 35:12
even [40] 5:11,15 7:3 8:14
13:5 21:5 22:5 23:1 24:3,
22 26:17,23 30:16 32:8 33:
16,17,20 35:10,14 37:16
38:15 39:13 41:7 47:21 48:
6 55:3 57:16 58:8 64:24
66:17 70:10 73:12 75:20
89:3 91:25 103:23 117:9
127:23 137:25 139:13
evening [1] 44:25
event [2] 23:9 45:1
ever-present [2] 46:18 61:
24
everybody [5] 46:1 58:1
87:22 95:7 112:18
everyday [1] 6:25
everyone [3] 67:19 110:4
112:24
everything [2] 12:23 47:6
everywhere [1] 61:25
evidence [12] 26:2,7 40:10
73:1,7 81:25 88:8 100:8
101:13 123:4 131:24 133:
16
evolving [1] 94:21
exact [1] 47:12
exactly [5] 29:25 56:4 93:5
99:19 137:24
exaggerate [1] 18:10
examine [1] 82:8
example [11] 14:3 20:24
46:9 49:8 59:21 60:8 77:
19,21 85:6 100:3 128:7
examples [2] 78:25 79:12
except [1] 87:23
exception [2] 33:16 122:
15 130:13
exceptions [4] 49:20,20,
21 87:24
exclusively [2] 33:20,22

excuse [1] 92:17
executive [3] 71:19,19 83:
1
exemption [4] 4:24 33:20
87:25 129:1
exemptions [3] 25:13,19
110:8
exercise [3] 70:2 81:8 130:
16
exercised [4] 11:13 15:18
23:15 100:5
exercising [1] 92:25
exist [2] 88:20 101:11
existed [1] 91:18
existing [1] 113:21
exists [6] 61:6 78:11 88:9
98:6 133:10 135:3
expansive [1] 7:17
expect [2] 69:25 127:11
expected [1] 135:20
expense [1] 95:18
experience [1] 86:22
experienced [3] 23:10 123:
6 129:13
experiencing [1] 5:4
expert [3] 31:11 99:13
expertise [6] 31:20,25 32:
5,15 37:8 96:25
experts [4] 25:9,11,23,24
explain [7] 11:14 69:7 71:
15,18 93:5 132:2 138:25
explained [9] 34:2,2 81:24
92:22 121:1 132:7,9,13,20
explains [1] 74:16
explanation [4] 40:6 44:15
122:2,16
exposed [2] 24:11 73:5
exposure [6] 72:25 74:16
75:5 78:11 122:3 123:7
express [5] 80:3 84:4 98:
20 116:11 128:21
extend [1] 118:13
extended [1] 134:8
extensive [1] 73:7
extent [2] 98:6 111:12
extra [1] 107:3
extraordinary [7] 4:19 11:
2,4,6,13 23:12 27:5
eyes [1] 113:2

F

face [11] 38:8,16 43:16 44:
22 46:11,12,15 61:24 63:
10 70:8 133:9
faced [3] 10:12 11:7 38:22
faces [2] 44:13 64:22
facetious [1] 50:10
facilities [2] 5:19 78:20
facing [3] 55:3,5 130:23
fact [22] 5:8 7:8 9:18 27:17
37:4 44:1 46:15 48:15,16
49:3 54:2 61:5 77:10 83:
24 97:7 100:4 111:16 113:

3 115:7 120:16 121:1 129:
2
facto [1] 6:3
factor [4] 6:15 9:16 22:7
35:6
factories [1] 89:2
factors [8] 6:12,22 7:5 19:
4 35:21 42:19 64:12 119:
21
facts [5] 10:16 26:14,18
134:2,10
factual [1] 110:2
failed [2] 25:13 44:11
failure [3] 122:17 134:17
138:25
fair [2] 81:7,7
fairly [2] 17:2 45:8
faith [1] 93:8
fall [1] 60:19
falls [4] 80:8 98:1 115:3,7
familiar [2] 103:13 114:3
families [4] 44:23 47:20
far [12] 9:6 10:10 12:10 39:
12 40:13 42:21 57:4 62:4
106:5,5 108:23 121:14
fast [1] 30:5
faster [1] 30:6
FDA [2] 32:10 105:13
FDA-approved [1] 106:19
features [1] 99:24
February [4] 93:23 95:2,16
137:14
federal [4] 14:24 6:1 9:7 28:
2 32:7,18 36:1 37:4 44:16
55:2,8,9 57:20,21 58:3,14
61:21 63:16 69:1 71:17 78:
22,23 79:1,7,12,18 81:4,9
82:25 83:4 84:10,11 86:19
90:6 99:16,20 117:20 118:
22 120:3 121:14 138:1
federalism [2] 20:23 21:22
FEDERATION [2] 1:3 4:9
few [8] 45:19 46:4 78:17 87:
24 95:6 96:3 135:2 139:9
fiction [1] 104:18
field [1] 120:6
Fifth [1] 93:2
fight [1] 107:13
figure [1] 45:25
figures [1] 19:4
figuring [1] 34:16
filings [1] 56:14
filled [1] 18:1
final [1] 101:19
Finally [3] 52:18 58:1 139:
7
find [11] 18:12 20:2 42:12
50:12 80:24,24 81:1,3 117:
25 118:2 130:18
finding [6] 21:25 108:11,19
112:20 113:10 125:2
fine [1] 23:22

fire [4] 59:24 60:4,7,10
firm [1] 8:1
first [21] 4:7 6:15 13:2 20:
22 21:1 30:20 33:5 43:6
44:5 51:25 56:22 66:5 67:
18 101:6 102:20 103:22
115:20 119:15 123:15 130:
1 137:10
five [4] 34:18 49:9 50:20 57:
14
flatly [1] 125:9
Fletcher [1] 24:25
flexibility [1] 87:4
flight [1] 78:9
FLOWERS [50] 2:4 3:6 4:5
41:25 42:2,5,7 43:6,10,19
44:3 45:10,11,16 46:5 47:
19 48:12,14 49:5,14 50:4
51:12 53:12 54:18 55:9,15,
21 56:2,8,22 58:19 59:25
60:6,13,18,24 61:2 63:1,13
64:18 65:4,14,20 66:12,23
67:16 68:5 69:8 71:8,25
Flu [1] 99:10 120:19 121:17,
17 122:10,13,14
flying [3] 27:11 29:12,14
focus [3] 23:24 24:7 45:4
47:25 101:20
focused [6] 13:25 52:20
88:25 89:1 113:10 132:25
focusing [1] 104:5
folks [1] 64:23
follow [3] 34:6 70:21 123:
12
follow-up [2] 36:4 41:1
followed [1] 11:17
foolishly [1] 109:19
force [1] 84:4
forever [2] 61:4 127:17
forget [3] 27:23 48:19 121:
8
Forging [1] 61:4
forgo [1] 134:5
forward [2] 131:18,23
found [11] 21:1 26:4 34:25
59:10 73:4 74:12 86:24 91:
6 98:3 105:13 131:20
Foundation [2] 53:1 66:7
foundational [1] 26:20
fragile [1] 5:5
free [4] 100:12,15 111:11,
11
free-floating [1] 135:10
frequently [2] 19:23 110:
17
Friday [1] 1:21
friend [1] 137:18
friend's [1] 48:11
front [1] 82:8
fronts [1] 102:24
full [5] 17:20 31:11 34:1 53:
22 134:13

fully [1] 62:15
function [3] 10:19 32:21
76:12
fundamentally [4] 45:14
103:7,9 120:13
further [7] 20:16 63:14 87:
3 102:12 103:2 132:13
135:19
future [1] 136:20

G

Gade [1] 120:1
game [3] 47:7,8,9
gas [1] 124:5
gather [1] 88:10
gathered [1] 133:10
gave [5] 30:10 86:17 113:
19 127:18 138:18
gear [1] 110:18
geared [2] 10:18 12:22
GEN [3] 2:6 3:9 72:17
General [21] 2:4,6 24:1 36:
8,9 37:11 40:19 62:6,24
69:4 72:16,19 74:23 75:4,
7,11 76:4,25 77:6,9,17,20
78:3,5,14 79:4,11 80:1 81:
8,14,22 82:6,19 83:12,14,
17 84:23 85:4,11,17 86:12,
17 87:10 88:6 89:13,22 90:
10 91:5,11,17 92:4,10,21
94:19,24 95:3,9,13,20,24
96:5 97:13,17 99:18 100:
10,18 101:18 102:17 103:
21,25 104:2,5,15 105:6
106:4,8,11,15 107:9,17,24
108:6,10,13,16,18,23 109:
1,8,12,15 110:1,21 111:15,
23 112:7,19 113:6,19 114:
11 115:17 119:9,18 120:25
121:5,24 122:11,14,23 123:
3 124:10 126:8 128:2 129:
23 131:9,22 132:6 135:1,
15 136:7 137:19
generally [2] 88:23 136:5
gets [3] 20:10 34:8 98:10
getting [3] 10:14 72:23 74:
24
give [17] 13:10 20:4 28:4,4,
8 29:4 30:2 31:1 53:9 69:6,
19 71:14 78:25 100:8 116:
6 125:15 126:23
given [5] 50:15 68:14,24
117:10 118:7
gives [2] 100:12,15
goal [1] 43:3
goodness [1] 19:2
goodwill [1] 23:3
Gorsuch [15] 20:19,20 21:
17 22:13 68:4,5 117:12,13
120:15 121:4,7 122:9,12,
23
Gorsuch's [3] 70:21 96:17
123:13

Official - Subject to Final Review

got [1] 52:1
govern [1] 101:9
government [28] 4:24 8:15
9:7 16:25 20:22 21:10,21
23:1 28:3 32:7,18 36:2 37:
4 55:3,8,9 58:14 79:21 81:
9 83:1 90:6 99:16,20 118:
12,22 120:3 121:14 138:1
government's [2] 19:15
114:12
governmental [1] 59:15
governments [1] 117:22
governors [1] 32:4
grant [2] 22:18 40:19
granular [1] 97:4
granularity [1] 98:15
grave [64] 6:20 10:8,23,24
11:10 24:9,23 38:4 39:5
40:21 42:24 57:6,7,25 62:
11,14,18 63:18 64:13,22
65:4,18,22,23 67:20,22,24
70:9 73:13 74:21 75:5,25
77:10 78:16,19,23 79:2 80:
5 81:18 82:1,13 88:8,23
89:8 91:6,10,14 94:23 98:
2 100:23 108:10,18 112:20
113:1,3,10 120:18,20 122:
22 126:25 131:20 133:9
135:6 136:15
graver [2] 89:4 133:14
gravest [1] 73:11
gravity [1] 23:13
graze [1] 120:18
great [1] 38:16
greater [3] 47:17 106:5
112:5
greatest [4] 10:11 47:3 49:
1,4
greatly [1] 105:15
greenhouse [1] 124:5
Griffin [1] 57:19
grocery [1] 48:9
ground [3] 62:18 109:5
134:2
groups [3] 87:19,20 133:
13
growing [1] 19:4
guarding [1] 108:1
guess [6] 10:3 11:25 14:24
15:24 83:7 100:13
guidance [5] 11:17,19 14:
16 15:25 26:19
guidances [1] 11:20

## H

halls [2] 118:7 119:16
hand [4] 31:20,22 117:20,
21
handling [1] 39:17
hands [1] 59:6
happen [6] 7:25 25:13 52:5
95:6 136:20 137:17
happened [5] 84:18,22 85:

2,3 127:19
happening [4] 84:2,24 123:
9,9
hard [7] 38:5 53:8 57:6 79:
15 100:11 107:5,6
harm [6] 80:11 82:12 91:6,
10,14,18
harmful [2] 98:3 135:7
harms [2] 18:5 19:14
hat [1] 107:5,6
hazard [2] 122:18 135:8
hazardous [1] 82:10
hazards [7] 97:3,5 102:19
119:6,7 120:18 128:18
head [1] 12:24
HEALTH [31] 1:8,16 6:4 10:
11 20:5 24:1 28:9,23 29:4
31:5,7 32:8,19 37:6,6 54:
25 55:12,17,23 56:3 62:5
68:19 69:24 73:24 97:2
102:23 107:6 109:20 117:
16 119:25 120:4
healthcare [14] 5:9,12,19
13:5,6 16:16 37:18 38:9
39:14,25 40:13 78:3,8 138:
4
healthful [1] 50:1
healthy [2] 97:10 111:12
hear [4] 4:7 19:10,17 78:17
heard [5] 17:22 50:7 69:2
87:16 137:18
heart [2] 34:9 98:10
heartland [1] 73:22
heightened [6] 13:11 16:
18 37:19 73:8 89:5 131:13
held [1] 110:7
help [1] 123:23
helpful [4] 90:5 93:4 109:5
133:18
helps [1] 131:16
hence [1] 43:25
Hep [1] 29:23
high [1] 136:14
high-risk [3] 5:16 37:19 40:
15
higher [2] 5:20 132:16
highest [1] 75:16
highly [3] 66:7 73:17 105:
25
highway [1] 33:18
historic [1] 19:20
historical [1] 85:6
history [6] 72:22 74:4,18
102:7 110:16 129:14
hit [1] 128:1
hmm [1] 50:22
hold [1] 80:17
holding [1] 130:7
hole [1] 103:6
holes [1] 69:13
home [7] 45:22 46:12 49:
22 51:5 61:25 86:7 87:25

Honor [2] 26:19,22
hope [2] 62:25 136:12
horrible [1] 91:24
hospital [1] 51:4
hospitalization [8] 17:24
19:4,6 53:18 57:15 64:25
73:12 75:20
hospitalizations [3] 74:14
91:12 135:23
hospitalized [1] 82:15
hospitals [3] 17:19 53:21
81:2
hours [5] 46:22,23,23 47:
12 119:8
house [2] 48:11 84:9
however [1] 46:23
huge [1] 26:8
human [5] 29:18 32:8 37:6,
7 48:8
hundred [2] 33:14 87:23
hundred-or-more [1] 33:8
hundreds [4] 5:22 90:4 91:
11 121:18
hurdle [1] 123:1
hypothetical [1] 88:25

## I

ICU [1] 57:22
idea [12] 32:6 45:18 61:9
79:11,16 80:16 99:12,14
110:13 120:7 129:11,17
Ideas [1] 46:14
identified [10] 5:16 16:15
39:13,13 40:14 102:19
116:10,18 119:21 124:14
identifies [1] 42:9
identify [2] 43:7 97:2
ignore [1] 115:7
ill [1] 53:22
illegal [4] 51:18,23 52:4,12
illness [4] 12:9 24:20 56:
25 122:15
illuminated [1] 128:9
illustrate [1] 104:19
immediacy [1] 82:12
immediate [4] 22:17,18 51:
13,14
immediately [6] 6:5 11:21
22:17 93:17,22 137:16
Immigration [1] 127:9
immunization [6] 74:7 98:
22 101:25 102:7 126:20
128:22 129:2,6
immunocompromised
[1] 67:6
immunological [1] 24:21
impact [1] 35:4
impermissible [1] 124:23
implement [1] 22:9
implications [2] 23:17 84:
18
implied [2] 56:10 111:7
important [10] 34:20 36:22

47:25 52:14 58:23 70:22
72:2 100:2 117:17 129:4
importing [1] 25:1
impose [3] 40:3 54:21 76:
15
imposed [9] 74:8 76:6 86:
23 98:13,23 102:9 107:2
118:25 126:21
imposes [1] 107:3
inability [1] 118:23
incentive [2] 111:3,10
incentivize [1] 12:16
incentivized [1] 5:24
incentivizing [1] 10:20
include [1] 134:14
included [1] 134:3
includes [1] 131:13
including [3] 49:8 59:23
64:17
inconsistent [10] 33:25
102:6 110:15 119:22 120:
13 125:9 128:14 129:17
132:20 133:7
inconvenience [1] 111:5
incorrect [1] 84:24
increasing [1] 137:21
incredibly [2] 36:21 57:25
indeed [3] 54:20 59:9 72:7
INDEPENDENT [2] 4:1 3 4:
9
independently [1] 24:5
indication [2] 101:22 124:
22
indispensable [4] 4:18 6:
16 8:5 21:8
indisputably [2] 90:19,24
individual [4] 32:16 52:24
61:24 64:3
individuals [13] 57:12 58:4,
6,22 59:6 61:16,22 67:24
106:16 112:21,22 113:8
119:8
indoor [3] 46:21 48:23 88:
22
indoors [2] 88:10 133:11
Industrial [3] 9:13 21:16
138:14
industries [13] 5:8,18 13:
14 16:17 26:10 27:7 38:15,
24 73:3 87:20,20 88:3 138:
23
industries' [1] 5:14
industry [14] 9:15 14:14,14
16:10 27:7 50:5,6 61:5 87:
19,19 131:2,2 138:5,19
industry-by-industry [2]
33:6 40:22
infect [1] 69:24
infecting [3] 73:10 75:17
102:21
infection [2] 56:12 57:1
infectious [4] 76:23 77:1,

11 107:14
inference [1] 128:13
influenza [2] 123:5,7
initial [2] 51:15 133:23
injunction [1] 90:17
injuries [1] 66:19
innovative [1] 28:21
inside [7] 39:2 48:6 49:9
59:22 61:7 73:6 89:9
insist [2] 12:17 84:14
insisting [3] 15:24 71:15,
23
instance [6] 11:11 33:8 39:
14,15 85:9 119:16
instances [1] 16:16
instead [9] 11:18 13:8 16:
12 87:5,22 88:3 112:1 116:
8 134:1
instrument [1] 131:1
intended [5] 20:4 43:14 77:
23 101:23 124:22
interact [1] 44:18
interaction [1] 68:16
interest [10] 18:6,8,25 19:
12 50:13 51:19 52:19 138:
10 139:8,10
interests [1] 111:13
internal [1] 57:9
internally [2] 33:24 64:21
interpret [3] 7:25 22:7 114:
24
interpretation [8] 21:10
83:20 98:19 114:22 116:
20,23 124:16 126:17
interpreted [1] 98:11
interrupt [3] 21:18 43:22
45:13
interstate [1] 55:4
intrastatutory [1] 8:7
intuitive [1] 130:22
invoke [1] 79:7
invoking [2] 71:2 100:14
involve [1] 119:7
irrational [3] 54:14,19 65:
24
irresponsible [1] 47:16
isn't [13] 10:7,23 12:19 18:
21 85:15 89:21 103:19
110:19,19,23,25 118:5 119:
12
isolated [1] 6:24
isolation [1] 54:6
issuance [1] 89:18
issue [34] 13:19,20 17:8,9
26:12 29:22 34:12 36:9,14
49:19 51:10 52:9 62:21 63:
5,7,8 69:5 70:4 83:9 84:10
85:3 86:6,18 89:17 90:12
91:25 94:9 96:17 103:4
112:13 116:13 118:8 125:
8 130:15
issued [5] 89:20 91:2,15

Official - Subject to Final Review

94:2 111:19

**issues** [5] 28:23 32:19 83:
19 90:3 101:8

**itself** [7] 5:17 7:1,3 22:23
67:4 126:21 128:23

**J**

**jabs** [1] 134:14

**janitors** [1] 78:10

**January** [6] 1:21 53:20 93:
5,9,14,20

**job** [11] 74:16 100:12 103:
14,15,17,18 107:5 109:22,
23 111:13 117:17

**jobs** [5] 48:2 49:8 69:23 90:
9 93:19

**Judge** [4] 8:24 52:2 133:22
134:7

**judges** [2] 25:23 68:18

**judgment** [5] 25:21 26:6,8
33:2 133:8

**judgments** [1] 31:7

**judicial** [1] 51:24

**jumped** [1] 11:21

**Jumping** [1] 15:16

**June** [5] 5:8 7:8 13:5 35:14
37:17

**jurisdiction** [2] 80:8 125:
10

**Justice** [318] 2:7 4:3,3,14 6:
9,14 7:13,15,22 8:3,11 9:
18,25 10:3,25 11:4,24 13:2,
15,17,23,24 14:19,20 15:1,
7,19 16:5,8,20 17:5 18:14,
18,20 19:18 20:12,13,14,
15,15,16,17,18,18,20,20 21:
17 22:13 23:20,20,22 24:9,
12,13,13,15 25:3,8 26:13
27:2,23 28:12,15,18 29:10,
18,24 30:3,8,18,18,19 32:
14 34:3,4,4,6,7 36:4,25 37:
10,21,22,22,24 38:1,1 39:4,
9,22 40:8,16,25 41:10,22,
23 42:2,3,7 43:5,18,21 45:
2,10,12,17 46:19 48:12,16
49:12,16 50:5 51:7,25 52:
6,25 53:11,14 54:24 55:11,
19,25 56:4,5,7,8 58:10 59:
12,18,18,20 60:3,11,14,19,
25 62:1,1,2 63:9,19,20,20,
22 65:2,6,15 66:11,11,12,
14,14,25 68:2,3,3,5 70:18,
18,20,21,22 71:12 72:10,
11,11,13,14,19 74:23 75:6,
7,9 76:1,19 77:5,7,15,19
78:2,13,14 79:5,9 80:14
81:20 82:3,7,17,21 83:14,
16,18 84:6 85:1,4,8,14,19
86:16 87:9,13,14 88:15 89:
1,11,13,15,15,16,24 90:10,
22 91:9,13,21 92:5,8,12,14,
15,22 93:24 94:19,24 95:4,
5,10,15,23 96:1,9,11,13,15,

16 97:18 99:4 100:1 101:
16 102:10,12,13,25 103:1,
1,3,4,24 104:1,3,13,17 105:
8 106:7,9,13,22 107:16
108:5,8,12,15,17,21,25
109:3,11,14,17 110:19,23
111:20,21 112:2,12,25 113:
13,15 114:10,10,11 117:11,
11,13 118:9,21 119:4 120:
15 121:4,7 122:9,12,21
123:2,10,10,12,13,13 124:
11 125:20,24 127:5 129:20,
21,21,23 130:2 131:21,23
133:18 135:13,25 137:3,4,
9 138:15 139:17

**Justice's** [1] 88:25

**justify** [1] 101:13

**K**

**KAGAN** [31] 9:25 10:3,25
11:4,24 13:2,15 14:20 20:
12 30:18,19 32:14 34:3 38:
1 39:5 45:10,12,17 46:19
48:12,16 66:11,12,25 68:2
88:15 92:8 107:16 114:10,
11

**Kagan's** [5] 34:7 51:7 52:6
70:22 123:13

**Kavanaugh** [15] 34:5,6 36:
4 37:10,21 70:19,20 71:12
72:10 123:11,12 124:11
125:20 127:5 129:20

**Kavanaugh's** [1] 51:25

**keep** [2] 58:6 111:12

**keeps** [1] 27:4

**KELLER** [65] 2:2 3:3,12 4:
11,12,14 6:9,14 7:21 8:3,
24 9:22 10:1,4,25 11:8,24
13:2,22 14:12 15:1,11 16:
1,7,11 17:4 18:14,19 19:18
20:13,21 21:4 22:2,20 23:
23 24:8 25:3 26:17 27:19
28:7,14,17 29:3,14,24 30:7,
13,19 32:3 33:5 34:3 35:2
36:18 37:13,24 39:9 40:5,
9,24 41:5,12 62:3 137:4,6,
9

**Keller's** [1] 62:9

**key** [2] 8:7 68:1

**keys** [1] 49:10

**kick** [1] 93:23

**kids** [1] 48:10

**kills** [2] 120:19 121:18

**kind** [31] 14:7,18 31:13 34:
23 36:15,17 40:3 45:2 67:
8,11 68:7,15 69:12 71:21
85:7 97:22 98:8,13,19 104:
12 114:23 115:6 119:9
122:18 123:19 126:14 127:
19,23 129:7 131:2 134:22

**kinds** [11] 31:4,6 68:14 76:
7,14 77:21 86:23 116:9
126:16 128:9,16

**King** [2] 35:8 37:7

**knowledge** [2] 32:20,21

**knows** [3] 19:2 30:1 46:2

**L**

**labeled** [1] 135:4

**LABOR** [5] 1:7,15 4:10 5:4
37:5

**laboratory** [1] 39:16

**lacked** [1] 133:16

**lacks** [1] 71:5

**landscape** [1] 79:6

**landscapers** [4] 33:18 38:
25 45:17 49:8

**language** [17] 34:13 36:7,
10,12,16 98:6 116:4,11
123:19,23 124:7,13 125:12,
23 126:2 127:3,10

**languages** [1] 22:11

**large** [1] 32:12

**larger** [1] 33:10

**Larsen** [1] 8:25

**last** [9] 10:12 30:20,22 34:
18 45:15 57:11 76:19 123:
25 126:24

**later** [1] 12:6

**latter** [1] 24:8

**laudable** [1] 43:3

**law** [4] 49:17 50:17 67:13
120:5

**laws** [1] 54:21

**lead** [1] 52:4

**leadership** [2] 31:21 32:24

**learn** [1] 59:8

**least** [8] 16:15 25:6 47:3
50:20 52:16 56:9 57:2,8,8
58:20 59:8 62:25 66:3 70:
1 85:24 103:10 127:11,21

**leave** [3] 27:18 87:1 105:5

**leaves** [1] 104:25

**leaving** [1] 93:19

**left** [1] 128:10

**legal** [3] 51:17 110:3,12

**legally** [1] 84:16

**legislate** [2] 97:3 98:14

**legislation** [2] 72:3 99:2

**length** [2] 14:5 132:7

**less** [8] 5:7 15:8,12 57:4,14
80:12,15 138:22

**lesser** [1] 65:17

**level** [5] 7:12 34:24 71:17
77:4 132:16

**levels** [2] 19:20 86:25

**lies** [1] 73:21

**life** [3] 49:3 109:24 135:24

**lifetime** [1] 120:10

**light** [3] 9:17 62:3 113:16

**likely** [5] 13:7,13,14,17 58:5
72:4,5 108:3,24 139:5

**likewise** [1] 83:25

**limited** [1] 108:19

**limits** [5] 69:18 104:16 129:
3 136:5,7

**line** [3] 9:5 14:4 33:7 39:11,
12 42:1 61:4 125:7 127:2

**line-drawing** [1] 9:8

**lines** [6] 5:5 14:10 33:9 89:
3 113:17 133:17

**list** [3] 119:10 120:22 128:
10

**little** [6] 48:6 49:9 73:6 79:
15 88:16 104:18

**live** [1] 59:8

**lives** [6] 46:2 74:13 91:8 92:
11 135:22 136:23

**living** [1] 46:2

**local** [2] 42:20,21

**lockdown** [1] 9:11

**lodge** [1] 32:12

**lodged** [1] 37:3

**logic** [1] 64:21

**long** [3] 39:2 41:19 71:8
113:17 125:6

**longer** [1] 8:14

**look** [26] 6:15,19 12:14 26:
1 34:22 35:1 36:18,20 42:
1 44:14 46:9 53:8,17 57:
10,19 66:6 69:14 76:14 81:
8 87:17 97:24 101:5 126:
15 129:5

**looked** [6] 26:9 58:8 86:20,
21 113:21 116:9

**looking** [6] 6:17 7:15 25:15,
15,16 40:21 83:9,20 124:
11

**looks** [3] 83:10,11 99:19

**loop** [1] 101:19

**loses** [1] 67:15

**losing** [1] 90:9

**lost** [4] 23:2,3,3 92:11

**lot** [12] 7:24 32:14 50:9,15
60:17 68:23 69:2 88:12
100:19 116:2 130:22 134:
16

**lots** [5] 46:20 48:21,21,22
90:2

**low** [1] 57:22

**lower** [5] 64:24 65:2,6,7 78:
21

**lunch** [1] 44:25

**M**

**machine** [2] 29:16,19

**made** [5] 11:20 27:20 31:6
86:5 126:5

**magnitude** [2] 82:12 106:
12 121:2 130:23

**main** [3] 13:18,18 86:11

**major** [36] 10:1 20:23 21:
12,23 22:3,9 34:10,12,12,
17,25 36:5 68:12,15,23 69:
1,5,9,9,20 71:2 100:14 114:
13,21 115:12 117:14,24
118:5 119:12 121:22 123:
14,19,20 125:14 126:7 139:
3

**majority** [1] 126:6

**man** [1] 15:15

**mandate** [26] 4:17,25 5:1,
14 9:14 11:22 13:7 15:17
16:14 20:5 27:9,10,15 28:
13 30:17 37:15 42:14 54:5
57:8 58:21 71:9 78:22 111:
22 121:16 136:4 138:16

**mandated** [8] 5:6 7:2 27:8
35:13,13 99:17 120:17
138:21

**mandates** [6] 5:10 79:14
81:6 86:24 118:17,20

**mandating** [1] 52:16

**mandatory** [5] 7:11 11:19,
20 41:6,6

**many** [27] 7:9 13:9 16:3 17:
18 19:2 23:7 24:20 26:10,
10,10,11 46:23 49:7 53:25
54:20 69:23 72:8 76:5,11
80:7 100:6 105:22 119:21
120:21 121:11 122:5 134:
4

**Marshall** [1] 7:15

**Marshall's** [1] 7:15

**Maryland** [1] 7:15

**mask** [3] 27:13 29:13 73:16

**mask-and-test** [6] 87:5
103:23 112:1,11 113:25
136:4

**masked** [2] 75:1,3

**masking** [12] 27:9 41:2,11
54:6 74:10 76:10 93:15,21
95:13 99:23 112:3 132:13

**masking-and-testing** [1]
75:14

**masks** [4] 12:11,18 28:2
95:12

**mass** [1] 48:25

**massive** [2] 19:21 26:9

**match** [1] 60:16

**matches** [1] 60:12

**matter** [8] 1:23 43:17 51:15
57:23 76:16 93:10 102:15
110:10

**maximally** [1] 76:17

**maximum** [2] 17:20 87:12

**McCulloch** [1] 7:14

**mean** [41] 9:2 10:15 12:6,
19 15:4 16:2,9,23 17:11,14,
23 18:12 19:8 21:8 33:7
44:5,9 45:15,18 46:8,20
47:1,24 48:8 49:17 50:8,
10 61:6 65:7 70:6 79:23
84:7,22 85:1,8,12 92:8 94:
8 104:17 121:7 134:16

**meaning** [6] 63:5 82:11 98:
12 116:7 125:15 130:3

**means** [15] 7:25 9:17 10:5,
23,23 25:6 40:20 46:17 49:
24 50:25 70:11 71:9 84:13
93:6,10

Heritage Reporting Corporation
(202) 628-4888

**meant** [2] 71:13 102:4
**measure** [5] 6:17 120:12 131:13 132:2,12
**measures** [15] 13:12 14:15 73:17 74:5,9,12 98:4 101: 21,24 128:8,17 131:15,19 133:3 135:8
**meat-packing** [3] 38:9 40: 1 45:7
**media** [1] 137:19
**Medicaid** [1] 78:20
**medical** [6] 27:7 28:10 41: 6 88:8 99:23 110:6
**Medicare** [1] 78:19
**medication** [1] 105:25
**medications** [1] 105:22
**members** [1] 137:11
**mention** [1] 137:19
**mentioned** [4] 26:19,22 125:6 129:8
**mere** [1] 43:25
**merits** [5] 51:8 85:22 87:15, 16 139:6
**methods** [2] 28:21 49:25
**Mexico** [1] 118:18
**middle** [1] 136:22
**might** [26] 15:9 21:18 27: 17 38:17,19 39:7 47:15 66: 21 85:23 94:14 96:10 103: 9 109:12,15 111:21 120:19 123:2 129:14 133:12 134: 11,13,14,19 136:2,19,25
**military** [3] 83:5 127:10,12
**million** [13] 4:17 10:10 13: 14 17:15 18:9,11 19:1 35: 5,7 41:9 50:8 98:25 118: 12
**millions** [3] 5:23 69:22,23
**mind** [4] 27:14 58:6 68:22 99:9
**minimal** [1] 106:16
**minutes** [3] 49:10 73:6 78: 17
**misplaced** [1] 87:2
**misunderstood** [3] 105: 11,17,18
**mitigation** [6] 101:20 120: 12 128:8 131:15,18 133:3
**modified** [1] 7:17
**Monday** [6] 6:6 17:10 18: 16 51:10 137:13 139:16
**money** [2] 35:8 74:1
**months** [8] 59:2 74:14 89: 20 91:12 92:16,17 135:21 139:9
**Moreover** [1] 11:23
**morning** [6] 4:5,8 43:17 46: 11 62:4 90:5
**most** [17] 10:17 12:22 23:9 35:16,17 37:19 70:15 76:8 102:2,18 103:12 107:12 110:24 111:2 129:8 130:

25 132:10
**mostly** [1] 122:11
**mouse** [2] 69:13 103:6
**mouth** [1] 85:15
**move** [3] 56:6 99:14 131:3
**moved** [1] 134:9
**much** [9] 5:7 28:19,24 49:6 53:16 80:15,17 108:3 138: 22
**municipalities** [1] 100:7
**must** [9] 8:8 14:10 43:12 63:6 71:5,5 105:2,3 134: 20
**myself** [3] 19:3 83:8 96:5

## N

**narrow** [1] 33:16
**narrower** [1] 67:20
**narrowly** [3] 4:20 9:4 138: 20
**nation** [4] 73:25 85:13 101: 10,11
**nation's** [1] 5:21
**NATIONAL** [9] 1:3 4:8 5:3 7:12 9:11 22:24 23:16 28: 6 127:13
**nationwide** [4] 41:14 42: 14 73:24 101:9
**nature** [7] 42:18 45:6 47:23 48:3 54:15 61:18 88:13
**near** [1] 19:7
**nearly** [4] 10:9 17:16 18:9, 10
**necessarily** [3] 6:17 7:20 36:12
**necessary** [58] 4:18 6:12, 19 7:16,16,19,20 8:6,8, 10,21,23 9:17,20 10:5,6,7, 22,24 11:1,11 12:20 21:7 22:8 23:25 24:2 25:1,4 29: 1 37:1,2 38:3,17 39:7 40: 18,19 42:23 63:6 70:11 77: 2 90:15 97:4,5 113:23 128: 17 130:3,18,19 131:6,7,11, 12,14 132:3,12 135:8 139: 1
**necessity** [1] 67:18
**need** [14] 7:23 21:5 44:4 92: 2 93:11,12,14 96:1 120:22 130:17 136:25 137:10,14, 14
**needed** [4] 11:8 16:14 20:6 92:24
**needs** [3] 13:11 82:8 92:6
**negative** [2] 102:22 128:13
**neglected** [1] 133:4
**Neil** [1] 96:16
**never** [15] 5:6 7:1 11:7 15: 17 37:16 41:7 53:24 84:19 99:16 115:24 121:5,19 124:21 125:11 138:1
**new** [15] 17:15,16 18:11 50: 9 94:3 118:18 123:24 124:

7 134:2,10,11,12,19 135:7 136:1
**newfangled** [1] 129:7
**news** [1] 114:4
**next** [2] 14:4 95:6
**nobody** [2] 52:12 64:22
**non-delegation** [7] 21:14, 14 22:4,6 69:16 70:3,6
**non-mandatory** [2] 11:17 15:15
**non-recoverable** [2] 19: 22 23:1
**none** [3] 35:12,13 54:7
**nonetheless** [2] 50:19 126: 6
**normal** [3] 46:2 130:17 131:8
**normally** [1] 119:13
**noted** [1] 88:15
**nothing** [4] 10:18 59:14 74: 3 115:2
**notice** [9] 8:16,17 15:23,23 52:10 127:25 130:6 134: 22 135:18
**notion** [1] 8:22
**notwithstanding** [1] 115: 9
**November** [3] 89:22,24 92: 18
**number** [5] 35:5 77:18 101: 7 112:12 114:13
**numbers** [10] 53:8,15,17 57:3 66:8 82:19 91:7 94:1, 15,15
**numerical** [1] 65:21

## O

**object** [2] 90:6 101:6
**objections** [1] 13:19
**obligated** [1] 77:13
**oblique** [5] 34:14 123:18, 24 124:14 125:13
**observed** [1] 124:18
**obtain** [1] 50:2
**obviously** [5] 12:21 56:18 79:13 82:7 114:3
**OCCUPATIONAL** [9] 1:7, 15 6:1 16:19 20:5 28:9,22, 23 29:4
**occupations** [1] 33:21
**occur** [3] 89:10 95:1 137: 14
**occurring** [1] 11:5
**occurs** [1] 95:16
**October** [1] 57:11
**odd** [1] 32:11
**office** [2] 16:9 25:14
**offices** [1] 48:24
**officials** [1] 42:21
**often** [2] 88:15 129:18
**OHIO** [7] 1:1 2:5 4:6 22: 15 58:11,17,20
**okay** [21] 15:22 16:21 17:3,

17,21 18:2,23 19:16 40:25 50:2 51:1 60:3,22 66:25 68:2 71:12 80:24 85:20 87: 9,9 103:24
**old** [1] 118:9
**older** [5] 56:17 58:4 63:25 67:5 109:13
**Omicron** [4] 24:19 52:22 53:15 66:9
**on-the-ground** [1] 86:22
**one** [60] 13:1,17,18 25:15, 16 28:11 31:1,20 32:25 34: 23 35:14 36:4 44:10 46:21 47:19 52:19 59:1 63:5,17 65:22 67:17 68:24,25 71: 25,25 76:19 78:12 80:5,18, 18,18 85:20,22 86:5,8,11 87:15 88:3,4 93:25 96:9 97:3 98:16 99:20 101:19 107:21,25 110:1 114:17 117:20 118:17 122:6 124: 8 127:5,16 128:19 130:14 134:9 138:4 139:4
**one-size-fits-all** [1] 4:16
**ones** [5] 32:4 33:10,19 103: 12 136:8
**ongoing** [1] 134:1
**only** [20] 6:23 13:6 20:1 21: 21,24 24:3 33:19 35:14 45: 19 50:14 58:21,25 69:5 95: 5,11,15 102:16 116:17 123: 21 130:17
**opened** [1] 130:2
**operate** [1] 114:16
**operating** [1] 85:21
**operations** [2] 49:25 117: 3
**opinion** [1] 138:15
**opinions** [1] 25:24
**opportunity** [3] 69:7 71:14 130:8
**opposed** [3] 25:11 26:15 83:10
**opposite** [2] 74:5 125:22
**opt** [1] 111:25
**option** [4] 103:23 109:25 112:1 114:9
**options** [1] 87:11
**oral** [7] 1:23 3:2,5,8 4:12 42:5 72:17
**oranges** [2] 64:11,19
**order** [12] 23:21 84:10 85:3, 7,10,16,18 94:2 96:21 114: 1 117:2 132:15
**orders** [2] 83:6 106:11
**ordinary** [2] 49:3 116:6
**OSH** [15] 9:23 27:21 67:12 74:6 81:16,22 110:15 111: 1,19 119:23 120:2,9 126: 21 128:22 138:17
**OSHA** [134] 4:22 5:6,17 6:7 7:1,7,8,9 8:9 9:9,13 11:8,

23 13:5,9 14:1,9,13,22 15: 4,6,17 16:14 17:18 24:9 25:11,16 26:23 28:4,5,20 29:21,22 30:2,4,10 32:6,14, 17 33:6 35:10,12 38:18 39: 13,20 40:2 41:7,13,21 42:9, 12 43:11 50:16 55:14 58: 18,24 59:10,23,24 61:14 71:5 73:1,7,18 74:2,8,11 77:2,12,15,17 79:17 80:2, 11,15,25 81:17 83:4,10 87: 18 88:21 97:21 98:25 99: 24 100:25 101:8,23 102:4, 19 103:8,12,20 104:9 105: 1,7 107:2,11,25 109:21 110:8,13,16 112:9,21 113: 2,7 119:5 120:16,23 121:5, 14,19 122:2 123:7 126:22, 24 128:9,15 129:13 130:4 131:20,24 132:1,6,8 133:4, 23 134:20 136:2,13,25 138: 3,18,20
**OSHA's** [14] 4:16,18 5:1,13 6:6 43:1,6 73:22 74:17 76: 12 97:25 130:15 131:7 136:5
**other** [67] 12:25 14:5 15:13 20:25 24:17 25:18 27:16 31:9,22 32:18 38:18 42:16 43:22 46:22 48:23,25 52: 18 59:15 64:7 65:23 66:21 67:4,8,24 68:14 77:1 79: 11 80:8 83:24 85:20 86:1, 9 87:15,17 88:1,4 96:10 99:22 102:21 105:21,22 107:1,2 108:2,5,9 109:9,16 113:1,1,4 116:10,12 117: 21 118:18 120:17,17,20 121:25 124:14 125:3 127: 5,17 128:3,8 132:4 133:3
**others** [8] 50:25 56:12 64:4, 17 65:13,15 73:10 75:17
**otherwise** [4] 15:9 16:17 94:7 134:25
**ought** [1] 31:8
**out** [32] 22:21 23:5,21 27:5 32:22 34:17 36:11,15,17 38:8 41:15 44:21 45:4,25 60:2,9,9 64:15 67:10 99:2 100:6 112:15 113:9,22 118:9,21 126:4 130:14 133:5,22 134:7 136:9
**out-in-the-world** [1] 13:20
**outbreak** [1] 123:5
**outbreaks** [1] 73:2
**outdoors** [3] 39:1 48:19 49:23
**outset** [1] 115:25
**outside** [6] 14:8 33:20,22 45:18 59:22 61:6
**outweigh** [1] 105:15
**outweighs** [1] 107:21

Official - Subject to Final Review

**over** [19] 9:15 32:6,9,13 35:
24 37:9 41:9 53:23 87:23
88:16 91:12 104:22 105:3
119:25 132:7 135:21,23
138:18,22
**overall** [2] 35:4 65:4
**overnight** [1] 137:17
**overseeing** [1] 118:16
**overt** [1] 111:7
**overthrow** [1] 124:19
**overwhelming** [1] 88:7
**own** [10] 4:25 9:8 44:14 48:
24 54:21 55:5 57:10 64:21
65:25 83:6

**P**

**p.m** [1] 139:19
**packed** [1] 45:7
**packing** [1] 61:16
**PAGE** [4] 3:2 19:24 26:21
137:22
**pages** [7] 23:6 50:18,20 86:
19 90:4 132:7 138:8
**pandemic** [14] 9:12 10:9
43:2 52:21 59:2,7 72:21
94:20 121:2,9 130:24 134:
8 136:11,22
**part** [9] 15:25 24:16 30:20
43:13,22 54:8 76:12 96:16
132:1
**participating** [2] 4:4,6
**particular** [10] 13:11 41:17
45:5 80:16 86:15 101:20
124:12 131:15 132:3 133:
1
**particularized** [1] 79:16
**particularly** [4] 40:18 56:
14 72:22 98:15
**party** [1] 68:21
**passed** [4] 81:16 100:10
127:14,22
**passes** [1] 130:4
**passing** [1] 97:20
**past** [2] 9:6 111:16
**pathogen** [2] 5:10 77:22
**pathogens** [3] 30:16 78:7
99:22
**patients** [1] 39:16
**people** [88] 10:10,13,14,20
12:8,9,13,18 15:4 18:2,9,
11 19:1 24:4 27:5,11 31:
15,16 32:13 35:6 38:16,25
44:18 46:21,25 47:14,17
48:2,6,18,18,19,21,22,23
50:15,22 53:7,19,22 54:6,
16 57:25 60:11,20 63:23,
24 64:1,5,6,7,14,17 65:10,
16,16,18 66:20,21 67:5,5,6,
8,22 69:21 78:16 86:7 88:
10,15,19 90:9 91:4 94:6,14
105:24,24 110:5,6 112:15
113:1,5 118:12 120:19
121:7,18 130:8 134:5,24

**people's** [2] 118:6 119:14
**percent** [11] 17:24,25,25
18:1 20:1 26:24 27:18 33:
17,18 50:23 112:10
**perfectly** [1] 115:18
**perform** [1] 10:19
**period** [3] 62:12 90:1 92:1
**periods** [1] 27:6
**permanent** [3] 5:2 22:23
70:13
**permanently** [1] 135:19
**permit** [1] 139:12
**person** [5] 33:14 47:5,6
112:13,17
**phone** [1] 52:24
**phrase** [1] 69:10
**physically** [4] 81:19 82:10
98:2 135:7
**picking** [1] 80:18
**pitch** [1] 71:7
**place** [11] 12:15 13:13 15:
1 53:21 66:5 67:12 76:17
79:15 95:7 102:21 113:3
**places** [1] 61:10
**plain** [9] 9:22 22:11 36:18
97:24 98:12 116:3 125:15
126:1 127:3
**plan** [5] 5:16 13:10 40:15
95:7 98:24
**plans** [3] 15:14 22:21 137:
12
**plant** [3] 38:9 40:1 45:8
**play** [1] 69:5
**please** [5] 4:15 26:11 42:8
72:20 93:25
**plenty** [2] 22:9 138:7
**plus** [1] 64:4
**point** [42] 10:4 12:6 15:12
17:20 20:15 29:25 36:1 38:
6 52:7,18 58:1,23 59:12
60:22 64:2 67:17 68:1,8
69:13 79:8,13 80:6 88:24
90:25 104:19 105:12,19
106:23,24,25,25 110:3,12
112:15 114:21 126:6 127:
16 128:1,20 130:14 135:16
138:9
**pointed** [7] 63:24 77:23 98:
17 118:9 126:13 133:22
134:7
**points** [5] 21:4 67:18 118:
21 129:10 137:8
**police** [12] 54:25 55:10,16,
20,22 58:14,16 59:16 68:9
100:4 119:24 120:8
**policies** [4] 13:3,4 93:12
112:9
**policy** [24] 10:17 12:5,12,
15,21,25 31:6,13,15,19 32:
23 33:3 41:14,20 70:23 73:
15 75:15,24 84:17,25 87:5
112:11 113:25 120:14

**policymakers** [1] 31:11
**polio** [2] 121:4,8
**political** [8] 31:14,21 32:23,
24 35:25 115:22 116:24
117:5
**politically** [4] 31:12,18,23
35:24
**polls** [1] 31:16
**poorly** [1] 61:17
**pop** [1] 81:6
**portion** [1] 41:3
**portray** [1] 73:20
**pose** [3] 64:16 120:18 122:
22
**posed** [3] 77:10 100:23
108:2
**poses** [1] 72:22
**posing** [1] 94:23
**position** [3] 36:6 58:20 97:
14,15
**positioned** [3] 42:21 87:7
128:16
**positions** [1] 33:25
**positive** [1] 66:3
**possibilities** [1] 132:5
**possibility** [1] 113:9
**possible** [2] 14:23 136:10
**possibly** [3] 70:8 75:19
124:21
**post** [2] 16:8 25:14
**Postal** [4] 4:21,25 16:2 25:
14,17 138:2
**posture** [1] 23:19
**potentially** [6] 14:13,17 21:
9 69:23,24 115:15
**power** [55] 4:19 8:8,9 9:3,4,
15 11:2,5,10,13 15:5,18 20:
5 23:15 28:5,9 29:5,21 30:
2 32:4,5,13 36:24,24 37:11,
17 40:2 41:21 54:25 55:7,
10,12,16,20,22,23 67:9,15,
21 68:9 70:2 80:12,15 81:
9 83:23 94:9 100:4 119:25
120:8 130:13,17,24 136:5
138:18,19
**powerful** [1] 125:25
**powerless** [2] 74:20 110:
13
**powers** [6] 37:3 58:14,16
59:16 71:4 117:8
**practical** [2] 86:22 93:10
**practices** [2] 49:24 76:14
**preamble** [4] 74:15 81:24
113:21 132:8
**precautions** [2] 88:19 110:
22
**precedents** [2] 115:19 138:
11
**precise** [2] 63:5 85:6
**precisely** [2] 62:7 107:10
**preclude** [1] 102:4
**precluded** [1] 107:11

**predictably** [1] 78:7
**predicting** [2] 25:10 127:
19
**predictions** [1] 93:20
**preempting** [1] 120:5
**preexisting** [1] 24:21
**prefer** [1] 67:14
**PRELOGAR** [100] 2:6 3:9
72:16,17,19 75:4,7,11 76:4,
25 77:6,9,17,20 78:5 79:4
80:1 81:14,22 82:6,19 83:
12,17 84:23 85:4,11,17 86:
12,17 87:10 88:6 89:22 90:
10 91:5,11,17 92:4,10,21
94:19 95:3,9,13,20,24 96:5
97:17 99:18 100:18 101:
18 102:17 103:21,25 104:2,
5,15 105:6 106:4,8,11,15
107:9,24 108:6,10,13,16,
18,23 109:1,8,12,15 110:1,
21 111:15,23 112:7,19 113:
6,19 115:17 119:18 120:25
121:5,24 122:11,14,23 123:
3 124:10 126:8 128:2 129:
23 131:9,22 132:6 135:1,
15 136:7
**premise** [3] 67:2 118:3
119:22
**premised** [1] 112:20
**prerogative** [2] 90:14 91:
23
**presence** [2] 44:1 52:23
**present** [9] 61:10 70:24 84:
1 90:2 91:19 109:7,9 113:
16 122:17
**presented** [3] 78:15,16
109:20
**presents** [4] 14:7 62:18 78:
19 80:11
**President** [3] 31:13 42:11
127:18
**pressed** [1] 38:5
**pressing** [2] 15:20,20
**pressure** [1] 111:7
**presumably** [2] 29:15
**pretty** [2] 79:11 121:8
**prevalent** [1] 80:10
**prevent** [4] 12:7,8,25 74:13
**prevented** [1] 135:23
**preventing** [2] 12:22 56:11
**previous** [2] 66:4 94:25
**previously** [2] 74:9 115:22
**primarily** [1] 39:1
**primary** [1] 81:12
**principles** [2] 72:6 117:7
**prior** [7] 3:5 35:11
**Private** [8] 13:4 16:10 19:
19 25:18 35:8 54:22 59:5
118:14
**probabilities** [1] 65:22
**probably** [3] 25:17 58:8
102:14

**problem** [23] 14:25 15:10,
21 16:19 34:1 38:21 39:24
43:8 44:13 48:14 65:21 66:
24 74:24 82:5 83:3,4,5 94:
18 99:11 114:6 116:19
126:15 127:25
**problems** [4] 9:8 24:22 43:
13 126:18
**procedure** [1] 41:7
**proceed** [1] 42:4
**proceeds** [2] 13:9 43:11
**process** [6] 15:25 72:3
130:5,11 134:24 135:21
**processes** [1] 49:25
**products** [1] 125:8
**profits** [1] 23:3
**profound** [1] 35:23
**project** [1] 136:9
**projected** [1] 113:22
**prolong** [1] 127:6
**promise** [1] 49:18
**promoters** [1] 56:24
**prompted** [1] 126:15
**promulgated** [1] 81:16
**proof** [2] 24:19 27:6
**proper** [6] 7:16,18,18 10:6
24:6 51:20
**proportion** [1] 121:3
**proposed** [2] 30:4,9
**pros** [1] 51:5
**protect** [7] 4:10 24:1,2 28:
6 42:17,24 54:25 55:16,20
63:6 73:13,24 76:9 77:14,
23 81:18 84:1 98:4 110:9,
13 112:24 129:16 131:19
135:9
**protected** [3] 74:9 75:20
76:18
**protecting** [5] 10:12 120:3
**protection** [10] 63:9 80:4
99:3 102:24 104:7,10,15,
20,24 111:8
**protections** [1] 111:17
**protective** [2] 110:18 111:
8
**prove** [1] 88:1
**proven** [1] 107:13
**proves** [2] 29:25 114:6
**provide** [4] 29:9 80:3,4
104:10
**provided** [4] 27:13 87:4
104:21 111:18
**providers** [1] 20:2
**provides** [4] 102:23 104:7
120:9 128:23
**providing** [2] 60:8 74:25
**provision** [6] 42:25 63:4
82:11 97:10 100:10 136:6
**provisional** [1] 16:21
**provisions** [5] 93:9 98:21
99:22 114:20 125:3
**public** [24] 6:3 10:11 18:5,

Official - Subject to Final Review

7,25 **19**:12 **24**:1 **25**:18 **31**:
4,7 **32**:19 **46**:12 **50**:13 **51**:
19 **52**:18 **55**:17 **62**:5,6 **68**:
19 **69**:24 **117**:16 **138**:10
**139**:8,10
**publicly** [2] **31**:18 **137**:12
**punch** [1] **49**:10
**purported** [1] **121**:19
**purpose** [1] **62**:16
**purposes** [2] **14**:24 **83**:22
**pursue** [1] **43**:3
**pursuit** [1] **139**:13
**put** [18] **12**:15 **13**:12 **15**:16
**17**:18 **22**:21 **23**:5 **31**:2 **54**:
16 **60**:9,9 **65**:12,13 **70**:14
**76**:20 **85**:14 **111**:6 **112**:4,
18
**puts** [1] **54**:16
**putting** [2] **25**:20 **127**:24

## Q

**qua** [2] **95**:1 **133**:25
**qualifies** [1] **121**:22
**qualify** [1] **33**:19
**question** [81] **16**:22 **18**:24,
24 **19**:9 **20**:9 **21**:5,19 **23**:
25 **26**:13 **30**:22,24 **32**:2 **34**:
7,13 **35**:24 **36**:5,7,9,15,17
**43**:23 **44**:8 **45**:3 **50**:6 **51**:
13 **52**:6 **55**:24 **59**:17,20 **62**:
3,8,11,24 **64**:3 **67**:3 **68**:6,
19,22 **69**:1,9 **76**:19 **79**:8
**84**:7,8 **85**:21 **86**:1,2 **89**:7,
12,17 **91**:22 **96**:10,15,15
**97**:13 **98**:10 **100**:19 **103**:6,
11 **111**:21 **112**:3 **115**:4
**116**:13 **117**:14 **118**:5,10,20
**119**:11,13 **121**:23 **123**:16,
20,22 **124**:1,25 **125**:14 **127**:
6 **130**:1,2 **132**:24 **133**:20
**questioning** [2] **29**:20 **56**:
6
**questions** [35] **6**:8 **10**:2 **20**:
21,23 **21**:12,23 **22**:3,10 **34**:
10 **43**:4 **51**:8 **68**:15,23 **69**:
5,21 **70**:21,23 **71**:2 **72**:13
**74**:22 **81**:10 **96**:17 **114**:13,
21 **115**:12 **117**:14,16,18,24
**123**:14,14,20 **126**:7 **129**:24
**139**:4
**quibble** [1] **24**:16
**quick** [2] **59**:20 **134**:23
**quickly** [3] **99**:15 **130**:12
**137**:1
**quit** [8] **16**:3 **22**:22 **26**:25
**50**:15,22,23 **51**:2 **137**:25
**quite** [7] **8**:13 **12**:24 **21**:19
**41**:25 **67**:17 **76**:20 **97**:9
**quitting** [1] **93**:18
**quotes** [1] **23**:7

## R

**raised** [2] **33**:17 **97**:14

**ramifications** [1] **26**:3
**ran** [1] **124**:15
**rate** [2] **63**:25 **138**:6
**rates** [1] **53**:18
**rather** [6] **29**:6 **37**:5 **51**:22
**59**:13 **82**:25 **84**:7
**re-up** [1] **115**:10
**reach** [2] **21**:5,10
**read** [5] **50**:19 **86**:2 **87**:16
**94**:1 **127**:20
**real** [1] **86**:22
**realize** [1] **36**:15
**really** [15] **7**:19,20 **16**:22 **50**:
6 **52**:20 **68**:22 **80**:17 **91**:22
**94**:13,18 **96**:3 **112**:2 **115**:1
**123**:15 **132**:25
**Realtors** [3] **35**:2 **51**:16 **52**:
1
**reason** [10] **8**:4 **17**:11 **18**:
16 **44**:17 **52**:9 **110**:10,25
**124**:12 **125**:17 **134**:18
**reasonably** [6] **8**:9 **37**:1 **40**:
19 **130**:18 **131**:7,12
**reasons** [3] **110**:6 **112**:16
**124**:15
**Rebone** [1] **26**:5
**REBUTTAL** [3] **3**:11 **137**:5,
6
**receive** [1] **121**:16
**receiving** [1] **90**:4
**recited** [1] **5**:17
**recognition** [3] **76**:8 **126**:
20 **128**:15
**recognize** [3] **52**:10 **69**:16
**128**:3
**recognized** [4] **4**:20 **21**:15
**120**:1 **139**:8
**recognizes** [1] **7**:9
**reconcile** [1] **131**:5
**record** [7] **19**:7,7 **26**:8 **77**:3
**122**:24 **130**:9 **133**:15
**recordkeeping** [1] **137**:17
**Recovery** [1] **98**:24
**reduce** [1] **66**:2
**reference** [2] **128**:21 **131**:
11
**referenced** [2] **102**:1 **124**:
18 **127**:12
**references** [1] **17**:22
**referencing** [1] **114**:4
**referred** [4] **79**:23 **127**:7
**128**:4,7
**refers** [1] **127**:14
**refuses** [1] **75**:10
**regard** [1] **26**:23
**regardless** [8] **9**:5 **21**:12
**22**:8 **26**:23 **42**:16,18,19,20
**regime** [1] **41**:8
**Register** [6] **44**:16 **57**:21
**58**:3 **61**:21 **63**:17 **86**:19
**regular** [8] **8**:8 **36**:24 **37**:17
**41**:7 **79**:10 **130**:5,16 **134**:

21
**regulate** [26] **14**:1 **28**:5 **29**:
5 **30**:15 **42**:11 **43**:8,15 **48**:
18 **58**:25 **59**:16,24,24 **60**:4,
5 **61**:13,14 **68**:11 **71**:10 **84**:
14 **121**:20 **122**:2,17 **123**:7
**125**:1 **126**:22 **136**:14
**regulated** [4] **43**:25 **61**:11
**67**:15 **120**:24
**regulates** [3] **42**:10 **68**:16
**75**:23
**regulating** [3] **61**:20 **68**:20
**126**:3
**regulation** [15] **43**:7 **79**:17,
19 **97**:10 **100**:16 **107**:3
**111**:5,8,9 **124**:19,23 **125**:8
**130**:16,18
**regulations** [6] **25**:11 **29**:
23 **30**:4 **103**:12 **107**:19
**111**:18
**regulators** [1] **107**:17
**regulatory** [7] **73**:22 **74**:4
**83**:21 **107**:23 **130**:15 **131**:8
**137**:13
**rein** [1] **100**:13,15
**reject** [2] **74**:19 **131**:25
**rejected** [2] **5**:10 **118**:17
**related** [1] **127**:6
**relative** [1] **96**:24
**relevant** [1] **64**:25
**relief** [3] **22**:18,19 **90**:20
**religious** [4] **87**:25 **110**:7,8
**129**:1
**rely** [5] **34**:13 **40**:2 **63**:14 **74**:
11 **80**:2
**relying** [1] **34**:10
**remain** [3] **65**:11 **93**:15 **132**:
15
**remains** [2] **65**:18 **93**:21
**remember** [1] **56**:14
**remotely** [2] **4**:4,6
**removed** [1] **67**:23
**render** [1] **126**:18
**repeat** [2] **19**:3,9
**repeating** [1] **83**:7
**reply** [1] **26**:21
**reports** [2] **16**:4 **137**:19
**represent** [1] **79**:10
**representatives** [2] **118**:6
**119**:15
**reputation** [1] **23**:4
**request** [1] **139**:14
**require** [6] **6**:17 **28**:10 **67**:
22 **70**:13 **84**:13 **110**:17
**required** [3] **93**:22 **95**:12
**113**:18
**requirement** [12] **19**:13 **28**:
13 **38**:3 **40**:3 **41**:3 **43**:12
**54**:19 **59**:9 **75**:14 **87**:6 **98**:
8 **135**:11
**requirements** [14] **4**:22 **7**:
11 **18**:4 **74**:7 **76**:7,11 **98**:

23 **102**:8 **122**:8 **126**:20
**128**:22 **129**:6,9 **135**:6
**requires** [5] **42**:15,25 **73**:
14 **77**:4 **110**:17
**requiring** [7] **27**:25 **28**:2
**54**:5,6 **75**:13,23 **93**:14
**requisite** [1] **77**:3
**rescue** [2] **5**:16 **40**:15
**research** [1] **86**:3
**researching** [1] **39**:17
**reserve** [1] **119**:14
**reserved** [1] **119**:14
**reserves** [1] **118**:13
**residual** [1] **120**:8
**resignations** [1] **95**:18
**resolves** [1] **34**:12
**resort** [1] **134**:21
**respect** [24] **29**:23 **47**:4 **54**:
3 **55**:12 **69**:20 **77**:1 **80**:13
**86**:14 **93**:6 **101**:10 **102**:22
**103**:20 **105**:9,10 **106**:16
**112**:13 **114**:6,17 **115**:13
**117**:14 **121**:24 **122**:5 **124**:
24 **131**:14
**Respectfully** [2] **30**:25
**139**:14
**respects** [1] **103**:10
**respond** [2] **86**:21 **135**:2
**responded** [1] **134**:2
**Respondents** [5] **1**:10,18
**2**:8 **3**:10 **72**:18
**responding** [2] **82**:23,24
**83**:2
**response** [8] **47**:23 **88**:6
**93**:19 **97**:22 **101**:1,19 **133**:
24 **137**:1
**responses** [1] **103**:21
**responsibility** [4] **30**:11
**77**:14 **81**:12 **118**:16
**rest** [2] **35**:15 **109**:23
**restrictive** [3] **8**:1 **9**:21 **25**:
6
**result** [2] **70**:10 **98**:19
**resulted** [1] **42**:13
**return** [2] **37**:25 **68**:6
**reverse** [2] **117**:2 **138**:13
**reviewing** [1] **114**:7
**ripple** [1] **22**:24
**rippling** [1] **5**:3
**rises** [1] **34**:24
**risk** [95] **5**:20 **6**:25 **10**:8 **14**:
7 **16**:18 **38**:16,17,22 **42**:19
**44**:12,15,17,20,22 **45**:4,6
**46**:10,16,17,18 **47**:1,3,4,18,
23,24 **48**:1,4,7 **49**:2,2,4 **54**:
17 **57**:25 **59**:22 **60**:5 **61**:5,
10,18,19,21,23,24 **63**:15
**64**:3,4,4,12,13,15,16,24 **65**:
2,6,7,7,9,12,16,17,18 **67**:9
**73**:8 **77**:3,24 **88**:22 **89**:3,9
**102**:21 **106**:5,14,16 **107**:1,
3,4,21,22 **108**:1 **109**:7,9

**110**:5,14 **111**:2 **112**:4,14,
16,18 **113**:4,8 **120**:19 **122**:
22 **125**:2 **126**:4 **132**:16
**133**:9
**risk/risk** [2] **107**:17,20
**risks** [15] **6**:23,24 **57**:22 **59**:
24 **60**:4 **101**:10 **105**:15,23
**107**:20,25 **109**:18,19 **113**:3
**118**:25 **119**:1
**ROBERTS** [50] **4**:3 **13**:17,
24 **14**:19 **15**:7,19 **16**:5,8
**20**:14,18 **23**:20 **24**:13 **30**:
18 **34**:4 **37**:22 **41**:23 **42**:3
**55**:25 **56**:5 **59**:18 **62**:1 **63**:
20 **66**:11 **68**:3 **70**:18 **72**:11,
14 **78**:14 **79**:9 **80**:14 **81**:20
**82**:3,17,21 **83**:16 **89**:15 **92**:
12,15 **96**:11 **99**:4 **100**:1
**101**:16 **102**:10 **103**:1 **114**:
10 **117**:11 **123**:10 **129**:21
**137**:4 **139**:17
**robust** [2] **69**:17 **130**:9
**role** [2] **117**:16 **120**:3
**room** [2] **22**:9 **60**:21
**routine** [1] **107**:12
**rule** [37] **5**:10 **13**:16 **17**:18
**18**:9 **28**:6 **30**:16 **34**:12,23,
24,25 **38**:19 **39**:6 **41**:8,14,
16,21 **42**:14,23 **43**:14 **48**:
17 **63**:12 **70**:8 **81**:24 **113**:
21 **114**:2,7 **115**:13 **118**:11
**129**:25 **130**:4,13 **132**:3,8
**133**:21,24 **135**:24 **136**:1
**rulemaking** [1] **135**:20
**rules** [4] **54**:3,14 **68**:20 **119**:
5
**ruling** [1] **113**:9
**run** [1] **112**:14
**runs** [2] **67**:9 **98**:20

## S

**safe** [4] **50**:1 **97**:10 **105**:14
**106**:20 **107**:12
**safely** [1] **59**:10
**safer** [1] **56**:17
**SAFETY** [12] **1**:8,16 **28**:5,
22,23 **55**:13 **60**:9 **73**:25 **97**:
3 **107**:2 **119**:25 **120**:4
**sake** [2] **17**:1 **36**:6
**same** [12] **5**:15 **25**:12 **41**:1
**42**:15 **55**:4 **60**:21 **62**:24 **63**:
25 **76**:11,23 **91**:14 **138**:2
**samples** [1] **39**:17
**SARS** [1] **62**:15
**satisfactory** [1] **40**:12
**satisfied** [1] **77**:6
**satisfies** [1] **36**:3
**satisfy** [2] **90**:21 **130**:19
**save** [2] **46**:3 **74**:13
**saved** [1] **135**:22
**saw** [2] **7**:16 **94**:15
**saying** [30] **9**:1,13 **11**:18 **16**:
3 **23**:7 **25**:7 **30**:12 **34**:11

**38:**11,12,14 **39:**23 **40:**17 **43:**5 **54:**1 **55:**1,2 **58:**11 **65:** 8 **67:**7,10 **80:**21 **94:**10 **99:** 5,8 **105:**12 **110:**25 **115:**25 **126:**21 **133:**4

**says** [15] **12:**12 **13:**10 **20:**22 **21:**21 **43:**12 **48:**17 **49:**16 **52:**8 **63:**4 **65:**25 **67:**4 **69:**4 **84:**11 **96:**22 **109:**21

**scaling** [1] **126:**1

**scenarios** [1] **39:**14

**scheme** [1] **124:**20

**school** [2] **47:**22 **48:**10

**science** [2] **73:**3 **104:**18

**scientific** [1] **88:**8

**scientist** [1] **39:**16

**scope** [13] **7:**6 **23:**14 **35:**3, 11,19 **38:**21 **39:**7 **42:**15 **101:**7,13 **115:**3,8 **132:**3

**SCOTT** [5] **2:**2 **3:**3,12 **4:**12 **137:**6

**scourge** [1] **121:**11

**Scovy** [1] **58:**2

**scrutiny** [2] **25:**2 **101:**4

**sea** [1] **117:**1

**searching** [1] **59:**21

**seasonal** [1] **122:**15

**second** [5] **12:**11 **115:**1 **119:**17 **133:**20 **138:**9

**secondly** [2] **22:**13 **64:**13

**Secretary** [4] **62:**13 **88:**7 **108:**15 **114:**8

**Secretary's** [2] **89:**7 **133:**8

**Section** [6] **74:**6 **81:**17 **97:** 21 **98:**21 **102:**1 **126:**19

**sectors** [1] **78:**4

**see** [11] **11:**25 **46:**13 **63:**2 **65:**8 **83:**10,11 **86:**8 **103:**8 **113:**2,17 **114:**15

**seeing** [1] **43:**13

**seek** [1] **25:**18

**seeking** [3] **4:**24 **51:**12,14

**seem** [7] **8:**21 **24:**25 **55:**1 **67:**7 **114:**19 **116:**1 **117:**4

**seemed** [3] **59:**13 **86:**10 **126:**6

**seems** [8] **56:**10 **59:**13 **62:** 10 **79:**20 **81:**5 **83:**8 **123:**22 **125:**13

**seen** [4] **82:**19 **121:**6 **136:** 23 **137:**20

**select** [1] **45:**19

**self-evident** [1] **54:**9

**sense** [3] **64:**12 **84:**8 **89:**6

**sent** [1] **45:**22

**sentence** [1] **30:**22

**separation** [2] **71:**4 **117:**7

**sequential** [1] **56:**6

**serious** [7] **9:**8 **53:**16,24 **56:** 25 **57:**24 **64:**9 **66:**18

**seriousness** [1] **25:**21

**Service** [7] **4:**22,25 **16:**2 **21:**

---

13 **25:**14,17 **138:**2

**Services** [2] **32:**9 **37:**7

**set** [4] **41:**13,19 **47:**13 **91:** 20

**setting** [2] **6:**22 **73:**23

**settings** [4] **33:**4 **46:**24 **48:** 3 **49:**1

**several** [2] **17:**12 **86:**19

**severe** [2] **24:**22 **53:**6

**severely** [1] **53:**22

**share** [2] **43:**1 **51:**8

**Sharepoint** [1] **21:**16

**sheer** [2] **23:**14 **35:**3

**shift** [1] **19:**21

**short** [5] **22:**20 **78:**15 **90:**2 **91:**2 **92:**1

**shortages** [2] **5:**4 **137:**20

**shorter** [1] **136:**24

**shouldn't** [6] **28:**2 **54:**12 **60:**15 **71:**18 **84:**3 **96:**23

**show** [5] **12:**24 **49:**23 **53:**15 **81:**25 **90:**19

**showed** [2] **58:**3 **63:**23

**showing** [1] **136:**15

**shown** [1] **64:**5

**shows** [2] **16:**12 **53:**2

**shut** [1] **9:**10

**sick** [4] **10:**14 **51:**4 **54:**10 **72:**24

**sickness** [2] **12:**22,25

**side** [6] **19:**15 **31:**7,8 **87:**17 **127:**2

**sides** [1] **107:**21

**significance** [2] **35:**25 **126:** 3

**significant** [3] **14:**5 **26:**25 **113:**8

**similar** [1] **123:**8

**similarly** [1] **13:**8

**simple** [3] **48:**8 **91:**22 **122:** 1

**simply** [8] **43:**16 **61:**5,11 **110:**14 **119:**22 **120:**7 **126:** 1 **134:**22

**since** [4] **92:**18 **127:**17,21 **134:**1

**single** [9] **5:**25 **33:**14 **48:**5 **76:**8 **91:**10,14 **102:**2,18 **132:**10

**single-most** [2] **106:**21 **129:**18

**sit** [1] **15:**21

**sitting** [2] **14:**4 **59:**5

**situation** [12] **6:**24 **12:**1,2 **16:**1 **18:**8 **23:**13 **52:**19 **70:** 25 **71:**17,22 **97:**23 **98:**16

**situations** [3] **100:**23 **107:** 19 **116:**17

**six** [4] **34:**18 **74:**14 **91:**12 **135:**21

**six-month** [1] **135:**23

**Sixth** [1] **8:**25

---

**size** [3] **23:**14 **35:**3,3

**skewed** [1] **58:**8

**small** [3] **96:**3,3 **110:**1

**smoke** [2] **60:**13,14

**socially** [1] **88:**18

**societal** [2] **57:**23 **63:**7

**society** [1] **43:**24

**Solicitor** [5] **2:**4,6 **62:**24 **69:** 4 **137:**19

**solution** [1] **67:**20

**somebody** [2] **67:**14 **85:**3

**somehow** [2] **9:**2 **80:**11

**someone** [1] **33:**21

**something's** [1] **9:**1

**Sometime** [1] **60:**14

**sometimes** [4] **69:**10,11 **119:**3

**somewhere** [1] **33:**15

**soon** [2] **15:**11 **22:**21

**sorry** [15] **21:**18 **23:**21 **25:** 16 **35:**17 **43:**20,21 **45:**12, 12 **55:**23 **67:**1 **83:**15 **89:**14 **92:**15 **96:**11 **127:**6

**sort** [11] **9:**19 **10:**15 **14:**20, 21 **31:**2 **36:**11,14,17 **82:**18, 22 **114:**15

**Sotomayor** [15] **4:**4 **24:**14, 15 **25:**3,8 **27:**2,23 **28:**12,15, 18 **29:**10,18,24 **30:**3,8 **52:** 25 **53:**11,14 **54:**24 **55:**11, 19 **56:**4 **63:**21,22 **65:**2,6,15 **66:**15 **83:**14 **89:**13 **94:**24 **95:**4,5,10,15,23 **96:**1,9,13 **97:**18 **111:**20 **112:**2,12,25 **113:**13

**sounds** [2] **82:**17,21

**space** [2] **46:**21 **107:**23

**spaces** [1] **48:**23

**Spanish** [1] **99:**10

**spanned** [1] **86:**19

**sparingly** [1] **136:**17

**sparks** [3] **27:**11 **29:**12,14

**speaking** [1] **26:**3

**special** [1] **14:**24

**specific** [9] **76:**16 **80:**16, 24 **81:**1,2 **98:**8 **120:**11 **126:** 19 **131:**2 **138:**5

**specifically** [22] **36:**8,13 **63:**4 **74:**1,6 **81:**17 **82:**4 **87:** 6 **91:**19 **98:**22,25 **100:**22, 25 **101:**25 **113:**7 **116:**5 **120:**2 **127:**7,10 **128:**4,7 **132:**9

**specificity** [2] **97:**4 **98:**14

**specified** [1] **135:**19

**speech** [1] **127:**19

**speed** [2] **96:**25 **131:**4

**spend** [2] **47:**20 **49:**9

**spewing** [1] **29:**19

**spoke** [1] **81:**15

**sporting** [1] **45:**1

**spread** [10] **12:**7 **53:**3 **65:**

---

25 **66:**19,20 **73:**19 **102:**2 **113:**12 **132:**18 **139:**11

**spreading** [1] **112:**23

**squeeze** [1] **103:**5

**stand** [3] **12:**24 **75:**15 **82:** 14

**Standard** [24] **6:**11 **11:**1 **15:** 2 **63:**5 **70:**12 **73:**14,21 **74:** 15 **75:**22 **77:**22 **78:**5,10 **93:** 21 **97:**25 **99:**19,21,23 **101:** 3,7,14 **130:**1,20 **131:**7 **135:** 4

**Standard's** [1] **131:**10

**standardless** [1] **70:**15

**standards** [8] **6:**2,11 **73:**24 **75:**12 **76:**15 **77:**18 **99:**25 **101:**9

**standing** [1] **85:**5

**stark** [1] **91:**7

**start** [3] **90:**9 **117:**4 **137:**16

**started** [3] **83:**21 **111:**24 **115:**25

**starting** [1] **95:**11

**starts** [1] **137:**11

**state** [11] **5:**17 **28:**8 **42:**20 **54:**21 **58:**10,15,17,20 **67:**2 **100:**6,7 **117:**22 **118:**7,15 **119:**15,24 **120:**8

**stating** [1] **10:**16

**status** [4] **93:**13 **129:**25 **133:**21 **135:**11

**statute** [25] **21:**1 **22:**7 **28:**8 **30:**1,4 **74:**3 **77:**4 **82:**7 **84:** 12 **97:**25 **98:**18 **102:**6 **104:** 12 **107:**15 **114:**23,25 **116:**4, 15,23 **118:**8 **126:**13 **127:**4, 22 **128:**15 **136:**8

**statute's** [2] **69:**6 **119:**12

**statutes** [9] **71:**6 **98:**11 **114:**17,19 **116:**12 **125:**7 **127:**9,13 **128:**3

**statutory** [30] **9:**24 **21:**25 **22:**6,12 **30:**14 **34:**13 **36:**7, 20,21 **71:**3 **74:**11 **80:**3 **83:** 19 **84:**4 **96:**21 **98:**5,20 **115:** 4 **116:**6,11,21 **117:**9,25 **122:**25 **124:**20 **125:**3,23 **126:**10 **135:**5 **139:**1

**stay** [31] **6:**5 **17:**8,9 **18:**4,15 **22:**16 **23:**12,18 **26:**12 **50:**7 **51:**5,10,14,21 **86:**2,2,6,7 **89:**19 **90:**13,23 **91:**3 **92:**1, 6 **93:**3 **94:**9 **95:**11 **96:**2,6 **137:**10 **139:**14

**stays** [1] **52:**9

**step** [2] **43:**6 **52:**11

---

**steps** [4] **42:**17 **44:**5 **64:**19 **72:**8

**Stevens's** [1] **138:**15

**still** [12] **12:**13 **16:**22 **17:**7 **33:**23 **40:**6 **41:**6 **42:**1 **51:**9 **53:**9 **54:**23 **113:**8 **127:**24

**stop** [6] **17:**8 **18:**8 **44:**23 **50:** 14 **56:**24 **66:**4

**stopping** [7] **10:**18 **27:**24 **28:**1 **53:**3,5 **57:**1 **73:**18

**store** [1] **48:**9

**stories** [2] **113:**17 **114:**4

**strategy** [1] **107:**13

**stress** [2] **58:**24 **70:**5

**strict** [1] **25:**2

**strong** [5] **56:**23 **84:**17 **110:** 24 **125:**21 **139:**10

**strongly** [4] **10:**20 **12:**16 **52:**16 **53:**7

**structural** [3] **116:**19 **124:** 15,22 **125:**17 **126:**14

**structure** [1] **116:**14

**studied** [1] **73:**3

**studies** [2] **17:**22 **64:**6

**study** [3] **57:**19 **58:**2 **138:**4

**subcategories** [1] **133:**13

**subject** [3] **54:**20 **122:**7 **129:**8

**submit** [3] **9:**12 **137:**11 **138:** 11

**submitted** [2] **139:**18,20

**substantial** [12] **26:**1,7 **40:** 10 **73:**1 **81:**25 **86:**24 **101:** 12 **113:**4 **114:**8 **133:**16 **135:**17

**substantially** [1] **49:**23

**subtle** [2] **123:**17,24

**succeed** [1] **139:**5

**suddenly** [1] **50:**13

**suffer** [1] **106:**1

**suffering** [2] **73:**11 **75:**19

**suggest** [7] **36:**14 **57:**3 **80:** 9 **107:**11 **122:**20 **128:**12 **136:**19

**suggested** [3] **14:**16 **58:**15 **133:**2

**suggesting** [2] **98:**7 **122:** 21

**suggestion** [4] **56:**9 **59:**14 **101:**2 **132:**19

**suggests** [3] **7:**19 **52:**24, 25

**Sunday** [1] **17:**9

**super-necessary** [1] **8:**2

**superfluous** [1] **126:**19

**supply** [1] **5:**5

**support** [1] **26:**7

**Suppose** [7] **8:**12 **36:**5,7 **104:**13,17,20,23

**supposed** [5] **11:**12 **23:**15 **26:**15 **68:**18 **83:**2

**SUPREME** [2] **1:**1,24

**surprise** [1] 134:4
**surrounded** [1] 48:22
**survey** [1] 97:1
**surveyed** [1] 79:5
**surveys** [1] 86:20
**susceptible** [1] 8:17
**sustain** [1] 109:4
**sustained** [3] 62:17 86:18
  113:20
**Sutton** [2] 133:22 134:7
**sweeping** [3] 32:12 42:23
  139:15
**swift** [1] 97:22
**system** [4] 68:10,20 69:2
  139:12
**systems** [1] 88:20

**T**

**table** [1] 51:18
**tailoring** [2] 131:14 132:22
**talked** [1] 32:17
**target** [6] 75:24 102:2,18
  126:25 129:19 132:10
**targeted** [4] 38:19 40:22
  41:17 78:11
**targeting** [3] 5:12 37:18
  104:9
**tasked** [1] 6:1
**techniques** [1] 28:21
**temp** [1] 9:19
**Temporary** [9] 6:10,11,21
  9:2 26:12 70:12 129:25
  131:10 135:4
**tension** [1] 125:2
**term** [5] 21:7,9 22:6,8 139:
  1
**terms** [8] 44:9 57:1,5 58:19
  64:11 65:25 98:1 126:10
**terrible** [1] 121:11
**terrorism** [2] 46:10,10
**test** [2] 12:18 73:16
**tested** [2] 54:7 113:18
**testing** [25] 5:7,11 7:2 19:
  23 20:3 30:17 35:14 41:3,
  6,8 74:10 76:10 93:22 95:
  1,17,24 99:23 109:25 112:
  3 113:15,20,22 114:1 132:
  14 138:22
**tests** [2] 137:18,20
**tethered** [1] 139:3
**text** [9] 9:23 22:12 36:19 83:
  22 97:24 102:6 104:11
  116:6
**textual** [8] 8:7 27:21 37:3
  116:18 124:15 125:16 126:
  14 127:2
**thanks** [1] 51:13
**that'll** [1] 44:7
**themselves** [4] 10:21 45:
  14 54:22 112:6
**theories** [1] 139:5
**theory** [1] 9:9
**there's** [33] 8:6 10:18 16:

18 21:6 22:9 27:8,20 28:
  12 29:16 31:14 38:21 43:
  11 44:17 46:10 51:22 54:
  23 56:8 60:7 72:1 87:21,
  25 95:10 98:7 103:22 104:
  11 110:24 111:10,22 115:1,
  4 119:19 125:11 130:21
**therefore** [3] 8:20 70:3
  118:5
**they'll** [5] 31:15,17 51:2,3,4
**they've** [6] 17:21 25:10 42:
  17 48:7 65:21 86:5
**thinking** [2] 121:22 128:25
**thinks** [1] 90:15
**Third** [1] 11:11
**THOMAS** [34] 6:9,14 7:13,
  22 8:3,11 9:18 20:16,17
  37:1 43:5,18,21 56:7,8 58:
  10 59:12 66:14 74:23 75:6,
  8,9 76:1,19 77:5,7,15,19
  78:2,13 102:12,13,25 130:
  2
**Thomas's** [1] 96:15
**though** [8] 11:9 14:13 55:3
  58:24 66:17 93:17 125:22
  127:23
**thoughtful** [1] 72:3
**thousand** [2] 17:17 94:3
**thousands** [4] 12:13 91:7,
  12 121:18
**threat** [2] 74:17 95:18
**threatens** [1] 132:11
**threats** [1] 77:21
**three** [4] 4:21 124:5,11 125:
  20
**three-quarters** [4] 17:15,
  16 18:11 19:1
**throughout** [9] 73:25 85:
  13 91:19 100:24 101:10,11
  107:22 110:16 129:10
**throw** [2] 60:11,16
**tick** [1] 119:9
**tobacco** [3] 34:25 124:4
  125:8
**today** [11] 16:23 17:9,19 19:
  2 51:10 53:10,20 69:17 85:
  5 86:6 91:16
**today's** [1] 99:11
**together** [8] 14:6 45:7 50:
  24 61:16 70:14 73:6 88:11
  133:11
**tomorrow** [4] 17:9 51:10
  86:6 95:11
**took** [2] 55:15 62:9
**tools** [1] 116:21
**totally** [1] 28:16
**touches** [1] 132:23
**toxins** [1] 35:16
**Tracking** [1] 137:16
**traction** [1] 128:6
**tradeoffs** [3] 31:5 107:18,
  20

**traditional** [1] 116:21
**Traditionally** [4] 118:15
  119:5 120:17,23
**trajectory** [1] 136:11
**transformed** [1] 45:14
**transmission** [7] 53:4 57:
  2 66:2 77:25 88:22 89:5,9
**transmit** [1] 108:4
**transmitted** [2] 73:4 88:10
**transmitting** [1] 73:9
**treat** [1] 102:16
**treating** [1] 39:15
**treatment** [1] 28:11
**treatments** [1] 134:11
**treats** [1] 5:14
**tried** [1] 106:23
**trigger** [1] 123:19
**triple** [1] 52:23
**true** [11] 27:3 99:18 106:1,3,
  4 107:25 115:9 119:24
  122:9,13 136:18
**truly** [3] 40:15 43:14 94:23
**try** [5] 59:7 73:20 80:23 100:
  20 110:9
**trying** [9] 41:19 45:25 75:
  10 79:21,25 80:1 103:5
  104:10 119:2
**Tuesday** [1] 17:10
**turn** [2] 50:7 100:20
**turns** [2] 68:23 88:13
**twice** [1] 58:5
**two** [26] 12:6 21:4 31:8 44:
  5 45:15 51:5 64:19 67:18
  85:22 103:10,21 112:12
  114:16 115:12,14,18 129:
  24 132:25 134:14,17 135:
  13 136:2,9 137:8,15 138:6
**two-thirds** [1] 35:7
**type** [3] 29:14 108:8 120:12
**types** [3] 29:7 33:24 101:23
**typical** [2] 12:1 14:8
**typically** [3] 11:23 42:9 43:
  10

**U**

**U.S** [1] 4:21
**U.S.C** [1] 27:21
**UARG** [1] 124:4
**Ultimately** [5] 75:11,18 88:
  21 90:17 117:6
**unbelievable** [3] 18:13 19:
  10 50:12
**unclear** [1] 66:1
**under** [17] 9:9 32:8 37:11
  68:9 69:1 71:6 74:8 84:12
  96:20 111:2,6,19 119:13
  126:21 136:5 139:3,4
**undermine** [1] 8:22
**underscores** [1] 54:2
**understand** [27] 10:4 19:8
  22:14 23:12,24 38:13 39:
  22 42:22 55:6 60:22 62:7
  66:13,16 70:7 71:1 76:1

**86** [2] 87:7 94:25 95:21 99:
  12,14 101:2 115:2 117:25
  128:16 132:22
**understanding** [7] 21:3
  62:21,23 63:2,3 83:23 131:
  6
**understands** [1] 21:24
**understood** [4] 62:22 97:7
  107:15 110:16
**undertake** [1] 112:5
**undisputable** [1] 139:9
**undone** [1] 52:17
**unfamiliar** [1] 100:17
**unilateral** [1] 119:1
**Union** [3] 9:13 21:16 138:
  14
**unique** [2] 29:16 119:6
**UNITED** [4] 1:1,24 70:17
  117:22
**Universal** [1] 59:22
**unlawfully** [2] 43:3 139:13
**unless** [4] 20:25 52:11 109:
  25 117:24
**unmasked** [2] 54:13 65:11
**unprecedented** [9] 6:6 18:
  17 27:4 73:21 101:3 121:2
  136:22 138:18 139:15
**unreasonable** [1] 138:17
**unrecognizable** [1] 116:
  15
**unsafe** [1] 105:13
**until** [5] 59:2 93:9 95:1,16
  117:24
**unvaccinated** [53] 12:17
  24:4,10,17,17 38:23,23 50:
  25 53:17 56:16 57:12,21
  58:5 62:12,14,19,20 63:23
  64:5,6,7,14,17,23 65:10,12,
  16,19 67:5,8 73:6,15 75:15
  82:14 88:23 93:16 95:14
  106:8 108:2,14,19 109:6,9
  110:4,9,11 112:14,21,22
  113:4,11 132:15 133:8
**unwind** [1] 51:23
**up** [17] 17:13 18:1 33:2 34:
  7 43:17 44:23 46:11 47:13
  57:15,18 66:18 70:21 81:6
  95:6 107:22 123:13 127:2
**upheld** [1] 35:17
**ups** [1] 9:19
**urge** [1] 53:7
**urgency** [1] 15:20
**USC** [1] 52:8
**useful** [1] 70:11
**using** [2] 107:12 116:20
**utility** [1] 124:17

**V**

**vaccinate** [2] 10:20 67:21
**vaccinated** [38] 12:8,10 14:
  11,12 18:2 24:5,6,18,23 52:
  24 56:18 57:13,15,17,21
  58:4 62:16 63:10,15,17,25

**64** [22] 65:17 67:19,23 73:
  16 75:1,3 84:15 103:16,17
  105:24 108:9 109:5 111:
  14 113:7 119:2 122:4
**vaccination** [24] 12:17 18:
  9 33:3 52:17 56:24 74:10
  75:13 76:8 87:6 93:13 99:
  21 102:5,23 104:6 118:16
  122:7 128:5,10 129:9,14,
  15,18 132:9 134:13
**vaccinations** [7] 50:14 56:
  10 58:21 66:1 110:6 122:1
  134:12
**vaccine** [24] 5:10 27:9,15
  28:13 41:3 42:13 54:5 56:
  21 62:5 71:9 99:17 102:15
  104:4,21 105:21 111:22
  112:4 118:20 121:17 127:
  12,13,22 134:4 136:3
**vaccine's** [2] 27:13 27:8
**vaccine-and-testing** [1]
  5:13
**vaccine-or-test** [1] 38:2
**vaccine-or-testing** [4] 11:
  21 15:17 16:13 37:15
**vaccines** [32] 5:7,23,25 7:2
  13:7 20:6 27:19,25 30:17
  32:6 35:13 53:2 54:4,4 62:
  6 105:12,21 106:2,19 109:
  24 111:11 120:17,21 121:
  13,17 127:8,10,15 137:13,
  15,15 138:21
**vague** [3] 34:14 114:18
  123:17
**value** [4] 62:5 71:15,23,25
**variance** [1] 50:2
**variant** [6] 52:22 54:1 57:3
  66:10 134:6 139:11
**variants** [3] 66:4 134:10,19
**variety** [3] 112:16 127:8
  128:17
**various** [2] 101:5 129:10
**vary** [2] 17:23 64:7
**vast** [2] 35:24,25
**vastly** [1] 107:21
**ventilated** [1] 61:17
**ventilation** [1] 88:20
**ventilators** [2] 53:23,25
**version** [4] 22:20 26:14 31:
  2 115:20
**versions** [4] 115:12,15,15,
  18
**versus** [6] 4:9 7:14 35:9 37:
  1,7 130:15
**via** [1] 127:10
**viable** [3] 109:25 113:16
  114:9
**view** [6] 50:21 52:3,15 69:7,
  9 85:24
**views** [1] 114:12
**vindicated** [1] 35:18
**violate** [1] 97:8

violates [1] 97:11
virtually [2] 5:14 122:3
virtue [1] 31:19
virus [17] 29:20 62:15 63:
 11 72:25 73:4,9 75:16 88:
 9,14 101:24 102:3,20 112:
 23 129:13,19 132:11,17
viruses [2] 29:20 77:24
vis-à-vis [1] 132:4
vital [1] 64:20
voice [1] 134:24
voluntarily [2] 76:6 111:2
vote [2] 31:16,17
vulnerable [1] 66:21

**W**

waive [1] 111:7
wake [3] 44:22 46:11 127:
 24
waking [1] 43:17
wall [1] 19:15
wand [3] 104:22,23 105:3
wanted [5] 28:8 67:1 89:16
 111:17 136:14
wants [2] 30:2 34:11
warrant [1] 98:18
warranted [1] 96:7
Washington [3] 1:20 2:2,7
water [1] 80:17
waterfront [2] 79:22 80:21
wave [1] 105:3
waved [1] 105:3
waving [1] 104:22
way [30] 11:3 12:7 15:10,13
 31:16,17 44:10,24 45:23
 46:5 48:21 51:23 69:14 76:
 9 88:3 102:2,16,18 104:6
 105:16 109:20 115:1,21
 124:8 129:16,19 130:6
 132:10 134:23 135:18
ways [6] 59:10 113:11 114:
 16,21 132:11 135:2
wear [6] 12:11,18 27:12,13
 29:13 107:5
wearing [1] 107:5
week [1] 57:11
weekly [1] 20:2
weeks [1] 51:5
weight [1] 76:21
welcome [3] 6:8 43:4 74:
 22
welfare [1] 55:1
well-supported [1] 32:23
Whatever [5] 10:5,22,23
 67:6 92:18
Whereupon [1] 139:19
wherever [3] 9:5 39:11 78:
 11
whether [19] 10:5,6 21:6
 23:25 24:2 26:1 38:2 58:
 13 62:11 83:23 88:17 90:
 11 103:5,6 112:13 124:25
 138:24,25 139:2

White [1] 84:9
who's [4] 63:17 64:22 67:
 19 75:6 97:14 110:4
whole [1] 119:22
whom [3] 84:13 109:11,17
wide [2] 9:14 68:9
wide-sprayed [1] 73:2
widespread [1] 5:7,11 7:
 2 30:17 35:14,20 41:8 73:
 2 80:11 134:3 138:22
wielding [2] 11:12 32:4
wields [1] 8:9
will [41] 4:6,7 10:19 12:18,
 25 13:1 14:1 16:3,3 22:22,
 23,24 26:24 28:6 50:15 51:
 2 52:4,5 54:16 62:25 64:9
 70:2 75:24 78:18 82:22 86:
 7,7,21 93:21,22 94:7 104:
 19 105:2,17,25 112:23 134:
 10,11,18 136:12 137:24
Williamson [3] 36:19 124:
 3 125:5
willing [1] 79:1
wind [1] 66:18
wish [1] 32:25
within [9] 9:23 27:21 29:8
 32:18 37:4,5 54:24 55:5
 80:8 82:10 90:14 98:1 115:
 3,7 133:13
without [6] 48:24 52:10 54:
 2,3 59:9 125:1
withstands [1] 101:4
wonder [1] 81:7
wonderful [1] 50:17
wondering [1] 79:24
word [2] 123:21 138:1
words [4] 38:18 85:15 99:1
 123:17
work [38] 9:11 38:25 39:1
 44:24,24 45:18 46:8,12,15,
 16 48:18,19,21,22 49:22
 50:24 54:11 60:2 61:25 68:
 13,14 70:9 72:25 73:19 75:
 7,17,17,19 79:21,25 88:16
 101:24 104:8,10,23,25 107:
 14 118:3
work-related [5] 42:12 44:
 6,10 45:9 70:7
workaround [2] 79:24 118:
 23
worker [8] 5:2 22:23 24:10,
 17 86:13 99:3 121:16 138:
 5
workers [69] 5:12,15 13:7
 14:4,10 16:16 22:22 24:18,
 27:12,18 28:6 29:13 33:
 18 37:18 39:1,25 40:14 45:
 22 55:1,13,20 56:15,17 58:
 21 62:12,19 63:15 72:23
 73:5 74:9,17 75:15 76:7,9,
 16 77:14 81:18 82:14 86:
 21 87:1 95:14 98:4 100:24

102:21 108:2,2,9,9,16,20
 109:6,6,10 110:10,14 111:
 12,16 120:4 122:4,19 129:
 16 131:20 132:11,14 133:1,
 9 137:24 138:4
workforce [17] 35:8 43:7,8,
 24 58:15 80:4 87:10
workforces [2] 32:15,16
working [7] 14:5 33:12,15,
 20,22 87:24,25
workplace [69] 13:19,25
 14:14,14,25 15:5 16:19 27:
 5,12 28:5 29:8,12,15,17 35:
 15 37:20 38:4 41:17 42:9
 43:15 44:17,19,22 45:5,21,
 22,23 46:3,7,8,17 47:3,13,
 18,25 48:5 54:3,11,12,15
 56:3,21 59:23,23 60:1,8
 61:6,8,12,15 72:23 73:2
 74:2 76:10,24 78:3,17 82:
 2 112:23 119:6,7 122:3
 123:8 126:3,23 128:18
 132:12,18 139:3
workplace-tethered [1]
 22:11
workplaces [16] 5:15,17
 13:12 16:12 32:17 38:4 40:
 15 42:18 45:13,19 47:10
 50:1 88:13 89:2 97:6 133:
 2
works [2] 12:15
worksite [2] 89:9 102:22
worksites [1] 97:1
world [4] 14:8 32:1 38:9 54:
 10
worry [1] 48:20
worse [1] 86:8
worst [1] 93:20
written [1] 136:8

**Y**

year [5] 53:20 118:19 120:
 20 121:19 126:24
years [15] 12:6 34:19 45:15
 59:2 99:8 100:9 118:9 121:
 12 124:1 127:21 134:17
 135:14 136:2,9 138:14
yesterday [6] 17:16,19 18:
 1 19:1 50:9 94:4
yield [1] 72:4
young [2] 57:17 63:24
younger [2] 56:15 58:9
yourself [1] 65:12

**Z**

zero [1] 123:15