# EXHIBIT 8

**Department of Justice**

FOR IMMEDIATE RELEASE
THURSDAY, MAY 13, 2004
WWW.USDOJ.GOV

CIV
(202) 514-2007
(617) 748-3139
TDD (202) 514-1888

## WARNER-LAMBERT TO PAY $430 MILLION TO RESOLVE CRIMINAL & CIVIL HEALTH CARE LIABILITY RELATING TO OFF-LABEL PROMOTION

    **WASHINGTON, D.C.** - American pharmaceutical manufacturer Warner-Lambert has agreed to plead guilty and pay more than $430 million to resolve criminal charges and civil liabilities in connection with its Parke-Davis division's illegal and fraudulent promotion of unapproved uses for one of its drug products, Associate Attorney General Robert D. McCallum, Jr. and Massachusetts U.S. Attorney Michael J. Sullivan announced today. The drug Neurontin was approved by the Food and Drug Administration in December 1993 solely for adjunctive or supplemental anti-seizure use by epilepsy patients.

    Under the provisions of the Food, Drug and Cosmetic Act, a company must specify the intended uses of a product in its new drug application to FDA. Once approved, the drug may not be marketed or promoted for so-called "off-label" uses - any use not specified in an application and approved by FDA.

    However, Warner-Lambert's strategic marketing plans, as well as other evidence, show that Neurontin was aggressively marketed to treat a wide array of ailments for which the drug was not approved. The company promoted Neurontin for the treatment of bipolar mental disorder, various pain disorders, Amyotrophic Lateral Sclerosis (ALS, a degenerative nerve disease commonly referred to as Lou Gehrig's Disease), attention deficit disorder, migraine, drug and alcohol withdrawal seizures, restless leg syndrome, and as a first-line monotherapy treatment for epilepsy (using Neurontin alone, rather than in addition to another drug).

    "The Department of Justice is committed to rooting out and prosecuting health care fraud," said Associate Attorney General Robert McCallum. "It is of paramount importance that the Department use every legal tool at its disposal to assure the health and safety of the consumers of America's health care system, and to pursue companies and individuals that steal from the taxpayers and inflict suffering on patients and families. The Department's commitment to effective health care fraud enforcement is driven by a mandate that wrongdoers be brought to justice, to deter conduct which threatens the safety and welfare of all Americans, and the need to protect the resources of the Medicare Trust Fund, state Medicaid programs, and other government health programs."

    Warner-Lambert promoted Neurontin even when scientific studies had shown it was not effective. For example, the company promoted Neurontin as effective for use as the sole drug (monotherapy) for epileptic seizures, even after solo use had been specifically rejected by the FDA. Similarly, the pharmaceutical company falsely promoted Neurontin as effective for treating bipolar disease, even when a scientific study demonstrated that a placebo worked as well or better than the drug.

    "This illegal and fraudulent promotion scheme corrupted the information process relied upon by doctors in their medical decision making, thereby putting patients at risk," stated U.S. Attorney Michael Sullivan. "This scheme deprived federally-funded Medicaid programs across the country of the informed, impartial judgment

of medical professionals -- judgment on which the program relies to allocate scarce financial resources to provide necessary and appropriate care to the poor. The pharmaceutical industry will not be allowed to profit from such conduct nor subject the poor, the elderly and other persons insured by state and federal health care programs to experimental drug uses which have not been determined to be safe and effective."

As a consequence of the unlawful promotion scheme, patients who received the drug for unapproved and unproven uses had no assurance that their doctors were exercising their independent and fully-informed medical judgment, or whether the doctor was instead influenced by misleading statements made by, or inducements provided by, Warner-Lambert. Potential problems that can arise from off-label use without the benefit of careful FDA oversight include the occurrence of unforeseen adverse effects because the drug was not studied in the type of patient it is being used for off-label and the appropriate dosage and course of treatment have not been established.

"The plea agreement and settlement announced today marks the end of an exemplary effort to use all of the appropriate anti-fraud weapons available to us in a concerted manner to send clear and unequivocal messages to the pharmaceutical industry," said Assistant Attorney General Peter D. Keisler. "To insure a just result, we in the Civil Division will vigilantly join our tools for fighting fraud on consumers with those available to remedy fraud on the federal health care programs."

Warner-Lambert used a number of tactics to achieve its marketing goals, including

encouraging sales representatives to provide one-on-one sales pitches to physicians about off-label uses of Neurontin without prior inquiry by doctors. The company's agents also made false or misleading statements to health care professionals regarding Neurontin's efficacy and whether it had been approved by the FDA for the off-label uses. Warner-Lambert also utilized "Medical Liaisons," who represented themselves (often falsely) as scientific experts in a particular disease, to promote off-label uses for Neurontin.

Warner-Lambert paid doctors to attend so-called "consultants meetings" in which physicians received a fee for attending expensive dinners or conferences during which presentations about off-label uses of Neurontin were made. These events included lavish weekends and trips to Florida, the 1996 Atlanta Olympics and Hawaii. There was little or no significant consulting provided by the physicians.

The pharmaceutical company implemented numerous teleconferences in which physicians were recruited by sales representatives to call into a pre-arranged number where they would listen to a doctor or a Warner-Lambert employee speak about an off-label use of Neurontin.

The company also sponsored purportedly "independent medical education" events on off-label Neurontin uses with extensive input from Warner-Lambert regarding topics, speakers, content, and participants.

Warner-Lambert misled the medical community beforehand about the content, as well as the lack of independence from the company's influence, of many of these educational events. In at least one instance, when unfavorable remarks were proposed by a speaker, Warner-Lambert offset the negative impact by "planting" people in the audience to ask questions highlighting the benefits of the drug.

Warner-Lambert paid physicians to allow a sales representative to accompany the physician while he or she saw patients, with the representative offering advice regarding the patient's treatment which was biased towards the use of Neurontin.

These tactics were part of a widespread, coordinated national effort to implement an off-label marketing plan. At the same time, Warner-Lambert decided not to seek FDA approval for any of the new uses because it was concerned that approval for any of the non-epilepsy uses would allow generic competitors of Neurontin, which was expected to go off-patent soon, to compete with a "son of Neurontin" drug that Warner-Lambert

hoped to have approved by the FDA for both epilepsy and non-epilepsy uses.

Neurontin was launched into the marketplace in February of 1994; from mid-1995 to at least 2001, the growth of off-label sales was tremendous. While not all of these sales were the consequence of Warner-Lambert's illegal marketing, the marketing scheme was very successful in increasing Neurontin prescriptions for unapproved uses.

The state Medicaid programs were harmed by Warner-Lambert's aggressive promotion for off-label uses in numerous ways. The conduct caused doctors to write prescriptions for Medicaid patients when those medications were not eligible for Medicaid reimbursement in that the prescriptions were fraudulently obtained through false statements to doctors and by payment of illegal kickbacks, including so called "consulting fees" and trips for physicians.

The investigation was commenced in the District of Massachusetts when a former medical liaison for Warner-Lambert, Dr. David Franklin, filed a suit on behalf of the U.S. government. Private individuals like Dr. Franklin are allowed to file whistleblower suits under the federal False Claims Act to bring the United States information about wrongdoing. If the United States is successful in resolving or litigating the whistleblower's claims, the whistleblower may share in part of the recovery. As a part of today's resolution, Dr. Franklin will receive approximately $24.64 million of the civil recovery.

"Today's settlement demonstrates the government's continued scrutiny of sales and marketing practices by the pharmaceutical industry to ensure that those who do business with our programs act properly," said Acting Principal Deputy Inspector General Dara Corrigan for the Department of Health and Human Services, Office of Inspector General. "Our programs cannot afford the abuses we have seen by drug companies against our beneficiaries and the American taxpayers."

"The Health Care Fraud Squad in the Boston Office of the FBI is committed to weeding out fraud and corruption within our health care system," stated Special Agent in Charge Kenneth W. Kaiser of the Boston Office of the FBI. "Our agents will continue to work diligently along with other law enforcement agencies to protect Medicare and Medicaid from fraud and abuse to ensure that our most vulnerable citizens will continue to have health care coverage."

"This settlement achieves the goals of placing the welfare of our veterans first," stated Bruce Sackman, Special Agent in Charge of the Northeast Field Office of the Office of Inspector General for Department of Veterans Affairs. "Parke-Davis directly promoted off-label drug uses to Veterans Affairs physicians and pharmacists on a nationwide basis, in direct violation of FDA laws. From 1994 to 2002, sales of Neurontin to the Department of Veterans Affairs jumped from $287,000 to $43.2 million. These sales, in part, directly reflect the impact of Parke-Davis' illegal marketing techniques. Hopefully, this settlement will serve as a deterrent to other firms thinking of engaging in this practice. The Department of Veterans Affairs will remain vigilant in its efforts to prevent illegal activities such as this in the future."

"We believe that this settlement goes a long way to protecting Americans against unlawful and inappropriate conduct by pharmaceutical companies," stated Mark B. McClellan, M.D., Ph.D., Administrator of the Centers for Medicare & Medicaid Services. "It sends a strong message in advance of implementation of the Medicare prescription drug benefit that our first priority will be protecting beneficiaries and the programs that serve them."

"Today's action is a result of the close cooperation between the Department of Justice and FDA in investigating this matter and seeking appropriate redress for it," said Acting FDA Commissioner, Dr. Lester M. Crawford. "These fines and penalties demonstrate that there is a strong system in place for ensuring that companies comply with the laws that safeguard Americans."

The global agreement includes the following components:

(a) Warner-Lambert has agreed to plead guilty to two counts of violating the Food, Drug & Cosmetic Act with regard to its misbranding of Neurontin by failing to provide adequate directions for use and by introduction into interstate commerce of an unapproved new drug. Warner-Lambert has, as punishment for these offenses, agreed to pay a $240 million criminal fine, the second largest criminal fine ever imposed in a health care fraud prosecution. The Plea Agreement between the United States and Warner-Lambert specifically states that Warner-Lambert's criminal conduct caused losses of $150 million and that the violations are felonies as a consequence of Warner-Lambert's prior Food, Drug & Cosmetic Act conviction.

(b) Warner-Lambert has agreed to settle its federal civil False Claims Act liabilities and to pay the United States $83.6 million, plus interest, in civil damages for losses suffered by the federal portion of the Medicaid program as a result of Warner-Lambert's fraudulent drug promotion and marketing misconduct.

(c) Warner-Lambert has agreed to settle its civil liabilities to the fifty states and the District of Columbia in an amount of $68.4 million, plus interest, for losses the state Medicaid programs suffered as a result of Warner-Lambert's fraudulent drug promotion and marketing misconduct.

(d) Warner-Lambert has agreed to settle its civil liabilities to the fifty states and the District of Columbia in an amount of $38 million, plus interest, for harm caused to consumers and to fund a remediation program to address the effects of Warner-Lambert's improper marketing scheme. This part of the global settlement agreement was negotiated by the Consumer Protection divisions of the fifty State Attorneys General.

(e) Pfizer Inc, Warner-Lambert's parent company, has agreed to comply with the terms of a corporate compliance program, which will ensure that the changes Pfizer Inc made after acquiring Warner-Lambert in June 2000, are effective in training and supervising its marketing and sales staff, and ensures that any future off-label marketing conduct is detected and corrected on a timely basis. In addition, Warner-Lambert agreed to an injunction by a state court against continuing the improper conduct that was the subject of the States' Consumer Protection Divisions investigation.

Pfizer Inc, the owner of Warner-Lambert since June of 2000, has also agreed to institute a compliance program. The charged conduct occurred prior to the acquisition.

The case was handled by Assistant U.S. Attorneys Thomas E. Kanwit and Sara M. Bloom of the U.S. Attorney's Office for the District of Massachusetts, and by Trial Attorney Jill Furman of the Justice Department Office of Consumer Litigation. Assisting in the investigation were Jonathan Diesenhaus and Stanley Alderson of the Department of Justice's Civil Fraud section. The Corporate Integrity Agreement was negotiated by Senior Counsel Mary Riordan in the Office of Counsel to the Inspector General for the Department of Health and Human Services. The states were represented by the National Association of Medicaid Fraud Control Units and the Consumer Protection Divisions of the States Attorneys General. The investigation was conducted by the Federal Bureau of Investigation, the Veteran's Administration's Office of Criminal Investigations, the Office of Criminal Investigations for the Food and Drug Administration and the Office of Inspector General for the Department of Health and Human Services.

###

04-322

🇺🇸 An official website of the United States government  Here's how you know

## JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                                                 Wednesday, September 2, 2009

## Justice Department Announces Largest Health Care Fraud Settlement in Its History

### Pfizer to Pay $2.3 Billion for Fraudulent Marketing

WASHINGTON – American pharmaceutical giant Pfizer Inc. and its subsidiary Pharmacia & Upjohn Company Inc. (hereinafter together "Pfizer") have agreed to pay $2.3 billion, the largest health care fraud settlement in the history of the Department of Justice, to resolve criminal and civil liability arising from the illegal promotion of certain pharmaceutical products, the Justice Department announced today.

Pharmacia & Upjohn Company has agreed to plead guilty to a felony violation of the Food, Drug and Cosmetic Act for misbranding Bextra with the intent to defraud or mislead. Bextra is an anti-inflammatory drug that Pfizer pulled from the market in 2005. Under the provisions of the Food, Drug and Cosmetic Act, a company must specify the intended uses of a product in its new drug application to FDA. Once approved, the drug may not be marketed or promoted for so-called "off-label" uses – *i.e.*, any use not specified in an application and approved by FDA. Pfizer promoted the sale of Bextra for several uses and dosages that the FDA specifically declined to approve due to safety concerns. The company will pay a criminal fine of $1.195 billion, the largest criminal fine ever imposed in the United States for any matter. Pharmacia & Upjohn will also forfeit $105 million, for a total criminal resolution of $1.3 billion.

In addition, Pfizer has agreed to pay $1 billion to resolve allegations under the civil False Claims Act that the company illegally promoted four drugs – Bextra; Geodon, an anti-psychotic drug; Zyvox, an antibiotic; and Lyrica, an anti-epileptic drug – and caused false claims to be submitted to government health care programs for uses that were not medically accepted indications and therefore not covered by those programs. The civil settlement also resolves allegations that Pfizer paid kickbacks to health care providers to induce them to prescribe these, as well as other, drugs. The federal share of the civil settlement is $668,514,830 and the state Medicaid share of the civil settlement is $331,485,170. This is the largest civil fraud settlement in history against a pharmaceutical company.

As part of the settlement, Pfizer also has agreed to enter into an expansive corporate integrity agreement with the Office of Inspector General of the Department of Health and Human Services. That agreement provides for procedures and reviews to be put in place to avoid and promptly detect conduct similar to that which gave rise to this matter.

Whistleblower lawsuits filed under the *qui tam* provisions of the False Claims Act that are pending in the District of Massachusetts, the Eastern District of Pennsylvania and the Eastern District of Kentucky triggered this investigation. As a part of today's resolution, six whistleblowers will receive payments totaling more than $102 million from the federal share of the civil recovery.

The U.S. Attorney's offices for the District of Massachusetts, the Eastern District of Pennsylvania, and the Eastern District of Kentucky, and the Civil Division of the Department of Justice handled these cases. The U.S. Attorney's Office for the District of Massachusetts led the criminal investigation of Bextra. The investigation was conducted by

the Office of Inspector General for the Department of Health and Human Services (HHS), the FBI, the Defense Criminal Investigative Service (DCIS), the Office of Criminal Investigations for the Food and Drug Administration (FDA), the Veterans' Administration's (VA) Office of Criminal Investigations, the Office of the Inspector General for the Office of Personnel Management (OPM), the Office of the Inspector General for the United States Postal Service (USPS), the National Association of Medicaid Fraud Control Units and the offices of various state Attorneys General.

"Today's landmark settlement is an example of the Department of Justice's ongoing and intensive efforts to protect the American public and recover funds for the federal treasury and the public from those who seek to earn a profit through fraud. It shows one of the many ways in which federal government, in partnership with its state and local allies, can help the American people at a time when budgets are tight and health care costs are increasing," said Associate Attorney General Tom Perrelli. "This settlement is a testament to the type of broad, coordinated effort among federal agencies and with our state and local partners that is at the core of the Department of Justice's approach to law enforcement."

"This historic settlement will return nearly $1 billion to Medicare, Medicaid, and other government insurance programs, securing their future for the Americans who depend on these programs,"said Kathleen Sebelius, Secretary of Department of Health and Human Services"The Department of Health and Human Services will continue to seek opportunities to work with its government partners to prosecute fraud wherever we can find it. But we will also look for new ways to prevent fraud before it happens. Health care is too important to let a single dollar go to waste."

"Illegal conduct and fraud by pharmaceutical companies puts the public health at risk, corrupts medical decisions by health care providers, and costs the government billions of dollars," said Tony West, Assistant Attorney General for the Civil Division. "This civil settlement and plea agreement by Pfizer represent yet another example of what penalties will be faced when a pharmaceutical company puts profits ahead of patient welfare."

"The size and seriousness of this resolution, including the huge criminal fine of $1.3 billion, reflect the seriousness and scope of Pfizer's crimes," said Mike Loucks, acting U.S. Attorney for the District of Massachusetts. "Pfizer violated the law over an extensive time period. Furthermore, at the very same time Pfizer was in our office negotiating and resolving the allegations of criminal conduct by its then newly acquired subsidiary, Warner-Lambert, Pfizer was itself in its other operations violating those very same laws. Today's enormous fine demonstrates that such blatant and continued disregard of the law will not be tolerated."

"Although these types of investigations are often long and complicated and require many resources to achieve positive results, the FBI will not be deterred from continuing to ensure that pharmaceutical companies conduct business in a lawful manner," said Kevin Perkins, FBI Assistant Director, Criminal Investigative Division.

"This resolution protects the FDA in its vital mission of ensuring that drugs are safe and effective. When manufacturers undermine the FDA's rules, they interfere with a doctor's judgment and can put patient health at risk," commented Michael L. Levy, U.S. Attorney for the Eastern District of Pennsylvania. "The public trusts companies to market their drugs for uses that FDA has approved, and trusts that doctors are using independent judgment. Federal health dollars should only be spent on treatment decisions untainted by misinformation from manufacturers concerned with the bottom line."

"This settlement demonstrates the ongoing efforts to pursue violations of the False Claims Act and recover taxpayer dollars for the Medicare and Medicaid programs," noted Jim Zerhusen, U.S. Attorney for the Eastern District of Kentucky.

"This historic settlement emphasizes the government's commitment to corporate and individual accountability and to transparency throughout the pharmaceutical industry," said Daniel R. Levinson, Inspector General of the United States Department of Health and Human Services. "The corporate integrity agreement requires senior Pfizer executives and board members to complete annual compliance certifications and opens Pfizer to more public scrutiny by requiring it to make detailed disclosures on its Web site. We expect this agreement to increase integrity in the marketing of pharmaceuticals."

"The off-label promotion of pharmaceutical drugs by Pfizer significantly impacted the integrity of TRICARE, the Department of Defense's healthcare system," said Sharon Woods, Director, Defense Criminal Investigative Service. "This illegal activity increases patients' costs, threatens their safety and negatively affects the delivery of healthcare services to the over nine million military members, retirees and their families who rely on this system. Today's charges and settlement demonstrate the ongoing commitment of the Defense Criminal Investigative Service and its law enforcement partners to investigate and prosecute those that abuse the government's healthcare programs at the expense of the taxpayers and patients."

"Federal employees deserve health care providers and suppliers, including drug manufacturers, that meet the highest standards of ethical and professional behavior," said Patrick E. McFarland, Inspector General of the U.S. Office of Personnel Management. "Today's settlement reminds the pharmaceutical industry that it must observe those standards and reflects the commitment of federal law enforcement organizations to pursue improper and illegal conduct that places health care consumers at risk."

"Health care fraud has a significant financial impact on the Postal Service. This case alone impacted more than 10,000 postal employees on workers' compensation who were treated with these drugs," said Joseph Finn, Special Agent in Charge for the Postal Service's Office of Inspector General. "Last year the Postal Service paid more than $1 billion in workers' compensation benefits to postal employees injured on the job."

**Component(s):**
Civil Division

**Press Release Number:**
09-900

*Updated September 15, 2014*

🇺🇸 An official website of the United States government   Here's how you know

## JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                                                                     Tuesday, July 30, 2013

### Wyeth Pharmaceuticals Agrees to Pay $490.9 Million for Marketing the Prescription Drug Rapamune for Unapproved Uses

Wyeth Pharmaceuticals Inc., a pharmaceutical company acquired by Pfizer, Inc. in 2009, has agreed to pay $490.9 million to resolve its criminal and civil liability arising from the unlawful marketing of the prescription drug Rapamune for uses not approved as safe and effective by the U.S. Food and Drug Administration (FDA), the Justice Department announced today.  Rapamune is an "immunosuppressive" drug that prevents the body's immune system from rejecting a transplanted organ.

 "FDA's drug approval process ensures companies market their products for uses proven safe and effective," said Stuart F. Delery, Acting Assistant Attorney General for the Justice Department's Civil Division.  "We will hold accountable those who put patients' health at risk in pursuit of financial gain."

 The Federal Food, Drug and Cosmetic Act (FDCA) requires a company such as Wyeth to specify the intended uses of a product in its new drug application to the FDA.  Once approved, a drug may not be introduced into interstate commerce for unapproved or "off-label" uses until the company receives FDA approval for the new intended uses.  In 1999, Wyeth received approval from the FDA for Rapamune use in renal (kidney) transplant patients.  However, the information alleges, Wyeth trained its national Rapamune sales force to promote the use of the drug in non-renal transplant patients.  Wyeth provided the sales force with training materials regarding non-renal transplant use and trained them on how to use these materials in presentations to transplant physicians.  Then, Wyeth encouraged sales force members, through financial incentives, to target all transplant patient populations to increase Rapamune sales.

"The FDA approves drugs for certain uses after lengthy clinical trials," said Sanford Coats, U.S. Attorney for the Western District of Oklahoma.  "Compliance with these approved uses is important to protect patient safety, and drug companies must only market and promote their drugs for FDA-approved uses.  The FDA approved Rapamune for limited use in renal transplants and required the label to include a warning against certain uses.  Yet, Wyeth trained its sales force to promote Rapamune for off-label uses not approved by the FDA, including ex-renal uses, and even paid bonuses to incentivize those sales.  This was a systemic, corporate effort to seek profit over safety.  Companies that ignore compliance with FDA regulations will face criminal prosecution and stiff penalties."

Wyeth has pleaded guilty to a criminal information charging it with a misbranding violation under the FDCA.  The resolution includes a criminal fine and forfeiture totaling $233.5 million.  Under a plea agreement, which has been accepted by the U.S. District Court in Oklahoma City, Wyeth has agreed to pay a criminal fine of $157.58 million and forfeit assets of $76 million.

The resolution also includes civil settlements with the federal government and the states totaling $257.4 million.  Wyeth has agreed to settle its potential civil liability in connection with its off-label marketing of Rapamune.  The government alleged that Wyeth violated the False Claims Act, from 1998 through 2009, by promoting Rapamune for unapproved uses, some of which were not medically accepted indications and, therefore, were not covered by Medicare, Medicaid and other federal health care programs.  These unapproved uses included non-renal

transplants, conversion use (switching a patient from another immunosuppressant to Rapamune) and using Rapamune in combination with other immunosuppressive agents not listed on the label.  The government alleged that this conduct resulted in the submission of false claims to government health care programs.  Of the amounts to resolve the civil claims, Wyeth will pay $230,112,596 to the federal government and $27,287,404 to the states.

"Wyeth's conduct put profits ahead of the health and safety of a highly vulnerable patient population dependent on life-sustaining therapy," said Antoinette V. Henry, Special Agent in Charge, Metro-Washington Field Office, FDA Office of Criminal Investigations.  "FDA OCI is committed to working with the Department of Justice and our law enforcement counterparts to protect public health."

Pfizer is currently subject to a Corporate Integrity Agreement (CIA) with the Department of Health and Human Services' Office of Inspector General that it entered in connection with another matter in 2009, shortly before acquiring Wyeth.  The CIA covers former Wyeth employees who now perform sales and marketing functions at Pfizer.  Under the CIA, Pfizer is subject to exclusion from federal health care programs, including Medicare and Medicaid, for a material breach of the CIA, and the company is subject to monetary penalties for less significant breaches.

"We are committed to enforcing the laws protecting public health, taxpayers and government health programs, and to promoting effective compliance programs," said Daniel R. Levinson, Inspector General, Department of Health and Human Services.  "Our integrity agreement with Pfizer, which acquired Wyeth, includes required risk assessments, a confidential disclosure program, and auditing and monitoring to help prospectively identify improper marketing."

 The civil settlement resolves two lawsuits pending in federal court in the Western District of Oklahoma under the qui tam, or whistleblower, provisions of the False Claims Act, which allow private citizens to bring civil actions on behalf of the government and share in any recovery.  The first action was filed by a former Rapamune sales representative, Marlene Sandler, and a pharmacist, Scott Paris.  The second action was filed by a former Rapamune sales representative, Mark Campbell.  The whistleblowers' share of the civil settlement has not been resolved.

 "The success obtained in this case is an excellent example of how we address the threats to our nation's health care system; the importance of the public reporting of fraud, waste, or abuse; and the significant results that can be obtained through multiple agencies cooperating in investigations," said James E. Finch, Special Agent in Charge of the Oklahoma City Division of the FBI.

 The criminal case was handled by the U.S. Attorney's Office for the Western District of Oklahoma (USAO) and the Justice Department's Civil Division, Consumer Protection Branch.  The civil settlement was handled by USAO and the Justice Department's Civil Division, Commercial Litigation Branch.  The Department of Health and Human Services' (HHS) Office of Counsel to the Inspector General; the HHS Office of General Counsel, Center for Medicare and Medicaid Services; the FDA's Office of Chief Counsel; and the National Association of Medicaid Fraud Control Units.  These matters were investigated by the FBI; the FDA's Office of Criminal Investigation; HHS' Office of Inspector General, Office of Investigations and Office of Audit Services; the Defense Criminal Investigative Service; the Office of Personnel Management's Office of Inspector General and Office of Audit Services; the Department of Veterans' Affairs' Office of Inspector General; and TRICARE Program Integrity.

 Except for conduct admitted in connection with the criminal plea, the claims settled by the civil agreement are allegations only, and there has been no determination of civil liability.  The civil lawsuits are captioned United States ex rel. Sandler et al v. Wyeth Pharmaceuticals, Inc., Case No. 05-6609 (E.D. Pa.) and United States ex rel. Campbell v. Wyeth, Inc., Case No. 07-00051 (W.D. Okla.).

---

**Topic(s):**
Consumer Protection

**Press Release Number:**
13-860

**Component(s):**
Civil Division

*Updated October 22, 2014*

🇺🇸 An official website of the United States government  Here's how you know

### JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                         Wednesday, April 27, 2016

### Wyeth and Pfizer Agree to Pay $784.6 Million to Resolve Lawsuit Alleging That Wyeth Underpaid Drug Rebates to Medicaid

The Department of Justice announced today that pharmaceutical companies Wyeth and Pfizer Inc. have agreed to pay $784.6 million to resolve allegations that Wyeth knowingly reported to the government false and fraudulent prices on two of its proton pump inhibitor (PPI) drugs, Protonix Oral and Protonix IV.  Pfizer, which is headquartered in New York City, acquired New Jersey-based Wyeth in 2009, approximately three years after Wyeth had ended the conduct that gave rise to the settlement.

"This settlement demonstrates our unwavering commitment to hold pharmaceutical companies responsible for pursuing pricing schemes that attempt to manipulate and overcharge federal health care programs – programs that protect the poor and disabled – for drugs sold to commercial customers at much lower prices," said Principal Deputy Assistant Attorney General Benjamin C. Mizer, head of the Justice Department's Civil Division.

"This significant settlement illustrates that the government will not permit drug companies to dodge their obligations to the Medicaid program or create elaborate pricing schemes to deceive Medicaid into paying more than it should for drugs," said U.S. Attorney Carmen Ortiz for the District of Massachusetts.  "This settlement, after years of hard-fought litigation, shows our commitment to ensuring that healthcare businesses do not take advantage of the federal health insurance programs which serve those who need assistance most."

PPI drugs are used to treat symptoms of, among other things, acid reflux.  In a complaint filed in 2009, the government alleged that Wyeth failed to report deep discounts on Protonix Oral and Protonix IV that it made available to thousands of hospitals nationwide.  As part of the settlement, Wyeth and Pfizer do not deny the government's allegations.

According to the government's complaint, Wyeth sold Protonix Oral and Protonix IV through a bundled sales arrangement in which a hospital could earn deep discounts on both drugs if it placed them on formulary and made them "available" within the hospital.  Through this bundled arrangement, Wyeth sought to induce hospitals to buy and use Protonix Oral, which hospitals otherwise would have had little incentive to use, because other pre-existing oral PPI drugs were priced competitively and were considered to be as safe and effective.  Wyeth wanted to control the hospital market because patients discharged from the hospital on Protonix Oral were likely to stay on the drug for long periods of time, rather than switch to competing PPIs, during which time payers, including Medicaid, would pay nearly full price for the drug.

Under the Medicaid program, which is the nation's provider of health insurance to the poor and disabled, drug companies must report to the government the best prices they offer other customers for their brand name drugs.  Based on these reported best prices, the drug companies pay rebates to the state Medicaid programs so that Medicaid, a large purchaser of drugs, receives the benefit of the same discounts drug companies offer to other large customers in the marketplace.

The government alleged that Wyeth hid from Medicaid the bundled discounts Wyeth gave to hospitals on Protonix

Oral and Protonix IV. As a result, Wyeth wrongfully avoided paying hundreds of millions of dollars in rebates to Medicaid during the period from 2001 to 2006. Under the terms of today's settlement, Wyeth will pay $413,248,820 to the federal government and $371,351,180 to state Medicaid programs.

"When we make agreements with others we expect follow-through," said Special Agent in Charge Phillip Coyne of the U.S. Department of Health and Human Services Office of Inspector General (HHS-OIG). "Similarly, taxpayers rightly expect large pharmaceutical companies will not falsely report prices to boost profits. Any drug company shirking those responsibilities can expect to be held accountable for its deception."

"This litigation and settlement demonstrate the commitment of my office and other state attorneys general across the country to ensuring that pharmaceutical companies live up to their obligations to the Medicaid program," said New York Attorney General Eric T. Schneiderman.

The settlement resolves allegations filed under the False Claims Act by Lauren Kieff, a former hospital sales representative for the pharmaceutical company AstraZeneca Pharmaceuticals, LP, and William St. John LaCorte, a physician practicing in New Orleans, Louisiana. Under the False Claims Act, private parties may sue on behalf of the government for false claims for government funds and to receive a share of any recovery. The relator share in this case will be $98,058,190 and will be paid from the proceeds of the federal and state settlements.

The settlement was the result of close cooperation between the Civil Division's Commercial Litigation Branch, the U.S. Attorney's Office for the District of Massachusetts, the state attorneys general and other law enforcement entities including Medicaid Fraud Control Units, and the HHS-OIG.

This settlement illustrates the government's emphasis on combating health care fraud and marks another achievement for the Health Care Fraud Prevention and Enforcement Action Team (HEAT) initiative, which was announced in May 2009 by the Attorney General and the Secretary of Health and Human Services. The partnership between the two departments has focused efforts to reduce and prevent Medicare and Medicaid financial fraud through enhanced cooperation. One of the most powerful tools in this effort is the False Claims Act. Since January 2009, the Justice Department has recovered a total of more than $29 billion through False Claims Act cases, with more than $17.5 billion of that amount recovered in cases involving fraud against federal health care programs. The case is captioned *United States ex rel. Kieff and LaCorte v. Wyeth and Pfizer, Inc.*, Nos. 03-12366 and 06-11724-DPW (D. Mass.).

**Topic(s):**
False Claims Act
Health Care Fraud

**Component(s):**
Civil Division

**Press Release Number:**
16-498

*Updated April 27, 2017*



**October 22, 2008**

# MADIGAN, 33 AGs REACH $60 MILLION SETTLEMENT WITH PFIZER

*Agreement Concludes Investigation Into Improper Marketing of Pain Relievers*

Chicago—Attorney General Lisa Madigan announced today that she has reached a $60 million settlement with Pfizer Inc., resolving a five-year investigation into the allegedly improper marketing for Bextra and Celebrex. The settlement, which includes 33 other Attorneys General, requires Pfizer to significantly restrict its promotional practices and will protect consumers from deceptive and misleading marketing tactics that obscure a medication's negative health effects.

"Pfizer's misleading claims and deceptive actions put consumers' health at risk," said Madigan, who was one of the leaders of the multi-state investigation. "This settlement should send a strong message to the pharmaceutical industry that we won't tolerate deceptive and dangerous marketing promotions and tactics."

In a complaint filed today along with the settlement agreement, Madigan and the other states alleged that Pfizer engaged in unfair and deceptive practices in marketing its second-generation pain reliever, Bextra, for unapproved "off-label" uses, including acute and surgical pain. While physicians may prescribe drugs for any uses, the law clearly prohibits pharmaceutical manufacturers from marketing their products for off-label uses.

The multi-state investigation initially began in 2003 in an effort to determine whether Pfizer had misrepresented that its first-generation pain reliever, Celebrex, was safer and more effective than traditional non-steroidal anti-inflammatory drugs (NSAIDS), such as Ibuprofen and naproxen. As the investigation proceeded, Madigan's office and the other states became concerned about Pfizer's marketing and promotion of it second-generation pain reliever, Bextra. The investigation concluded that Pfizer engaged in an aggressive, deceptive and unlawful campaign to promote Bextra "off label" for uses that had been expressly rejected by the U.S. Food and Drug Administration (FDA).

In 2001, the FDA rejected Pfizer's application to prescribe Bextra for acute and surgical pain symptoms due to concerns about its negative side effects. Studies have shown that drugs like Bextra increase the risk of heart attacks and strokes. Bextra is also known to cause a serious and sometimes fatal skin condition. Despite the FDA's rejection, Pfizer allegedly continued to aggressively market Bextra for acute and surgical pain.

As part of the settlement, Pfizer will cease the following conduct in all subsequent drug promotion and marketing campaigns:

- The "ghost writing" of articles and studies by medical practitioners paid by Pfizer;
- Failing to adequately disclose conflicts of interest for Pfizer promotional speakers when these consultants also speak at supposedly independent Continuing Medical Education sessions;
- Distributing samples to doctors with the intent to encourage off-label prescribing;
- Distributing information to doctors about an off-label use when the FDA has rejected the off-label use, unless Pfizer clearly discloses that (1) FDA rejected the use and (2) the FDA's reason for rejecting the use;
- Distributing off-label studies and articles in a promotional manner to doctors;
- Providing incentives to sales staff to increase off-label prescribing;
- Promoting the off label use of drugs for inclusion in hospital standing orders and protocols;
- Using "mentorships" to pay physicians for time spent with Pfizer sales reps;
- Using grants to encourage use of Pfizer products;

- Using sales personnel to make grant decisions that are supposedly unrelated to promotions and marketing; and
- Using patient testimonials to misrepresent a drug's effectiveness.

The settlement also requires that Pfizer submit all "direct-to-consumer" (DTC) television drug advertisements to the FDA for approval and comply with any FDA comments before running the advertisements. For any new pain relief drugs, Pfizer also must delay DTC advertising for up to 18 months if the FDA recommends this delay. Additionally, the settlement generally prohibits Pfizer from deceptive and misleading advertising or promotion of any Pfizer drug, requires Pfizer to register all clinical trials and results, and mandates that Pfizer ensure that all participants in sponsored clinical trials have provided adequate informed consent. Finally, as part of this settlement agreement, Illinois will receive $3 million exclusively for future consumer education and enforcement actions.

The Attorneys General of the following states also participated in today's settlement: Alaska, Arizona, Arkansas, California, Connecticut, Florida, District of Columbia, Idaho, Iowa, Kansas, Kentucky, Maine, Maryland, Massachusetts, Michigan, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington and Wisconsin.

Bureau Chief James Kole and Assistant Attorneys General Ryan Tyrrell Lipinski and Sean Morales-Doyle are handling the case for Madigan's Consumer Protection Division.

-30-

Return to October 2008 Press Releases



© 2020 Illinois Attorney General          Home • Privacy Policy • Contact Us

The Wayback Machine - https://web.archive.org/web/20161130121010/http://ag.ny.gov/press-release/ag-schneiderman-announces-...

# A.G. Schneiderman Announces Settlement With Pfizer To End Deceptive Advertising Practices And Off-label Promotion Of Immunosuppressive Drug Rapamune

*Wyeth Pharmaceuticals, A Subsidiary of Pfizer, Marketed Drug For Purposes Unapproved By U.S. Food And Drug Administration, Lobbied Doctors And Hospitals To Prescribe Drug For Off-Label Uses*

NEW YORK -- Attorney General Eric T. Schneiderman today announced that he, along with 40 other state Attorneys General and the District of Columbia, reached a $35 million settlement with Pfizer arising from alleged improper marketing and promotion of the immunosuppressive drug Rapamune.  New York's share of the settlement is over $1.7 million.  Pfizer, as parent of Wyeth Pharmaceuticals Inc., agrees to be bound by the judgment and to resolve allegations that Wyeth unlawfully promoted Rapamune. Attorney General Schneiderman's office served on the Executive Committee of this multi-state investigation.

"There has to be one set of rules for everyone, no matter how rich or powerful, and that includes big pharmaceutical companies that make unapproved and unsubstantiated claims about products in order to boost profits," said **Attorney General Schneiderman.** "Patients and consumers need to have confidence in the truthfulness of claims made to them by medical providers without having to worry about drug companies manipulating the doctor-patient relationship. Their health and well-being depend on it."

Rapamune is an immunosuppressive drug that prevents the body's immune system from rejecting a transplanted kidney.  Its label, as approved by the Food and Drug Administration (FDA), authorizes its use only immediately after kidney transplants in limited combinations with other specified drugs.

In the settlement, filed today in New York County Supreme Court, Attorney GeneralSchneiderman alleges that Wyeth engaged in off-label marketing, promoting the drug for uses that were not FDA-approved.  Wyeth improperly promoted Rapamune (1) for liver, heart and lung transplants when the drug was approved only for use after kidney transplants: (2) for conversion use (switching a patient from another drug to Rapamune), which was also unapproved; and (3) in unapproved drug combinations.  The complaint further alleges that Wyeth violated state consumer protection laws by misrepresenting Rapamune's uses and benefits through an orchestrated campaign of promotional talks by Wyeth-retained doctors, misleading presentations of data, and funding of studies at hospitals and transplant centers designed to encourage off-label uses of Rapamune.

The settlement prohibits Pfizer from:

- Promoting any FDA-approved prescription drug or biological product manufactured, distributed, sold, marketed, or promoted by Pfizer in the United States ("Pfizer product") for off-label uses;
- Making any claim comparing the safety or efficacy of a Pfizer product to another product when that claim is not supported by substantial evidence;
- Providing financial incentives for sales attributable to off-label uses of any Pfizer product;
- Making, or causing to be made, any written or oral claim that is false, misleading, or deceptive regarding any Pfizer product;
- Affirmatively seeking the inclusion of Rapamune in hospital protocols or standing orders for which Rapamune has not

been approved by the FDA;

- Disseminating information describing any off-label or unapproved use of Rapamune unless such information and materials complies with applicable FDA regulations;
- Seeking to influence the prescribing of Rapamune in hospitals or transplant centers in any manner (including through funding clinical trials) that does not comply with the Federal anti-kickback statute.

States participating in the settlement are Alabama, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, South Dakota, Oregon, Pennsylvania, Tennessee, Texas, Utah, Virginia, Washington, and Wisconsin, as well as the District of Columbia.

The case was handled by Assistant Attorney General Benjamin J. Lee, Deputy Bureau Chief Laura J. Levine, Bureau Chief Jane M. Azia, all of the Consumer Frauds Bureau, and Executive Deputy Attorney General of Economic Justice Karla G. Sanchez.

**New York City Press Office: (212) 416-8060**

**Albany Press Office: (518) 776-2427**

**nyag.pressoffice@ag.ny.gov**

**The People of the State of New York v. Maurice R. Greenberg & Howard I. Smith**

**A.G. Schneiderman Issues Fraud Alert On Immigration Scams**

**Amid Surge Of Bias Crimes, A.G. Schneiderman Stands With Dozens Of Civil Rights Leaders To "Stand Up To Hate," Issues Urgent Bulletin To Local Law Enforcement Offering Guidance In Identifying And Prosecuting Hate Crimes**

**A.G. Schneiderman & Western NY Law Enforcement Leaders Stand Together In Fight Against Illegal Guns**

**A.G. Schneiderman And Rochester Leaders Stand Together In Fight Against Illegal Guns**

**A.G. Schneiderman Announces First-Of-Its-Kind Analysis Illustrating Gun Trafficking Into NY**

VIEW ALL VIDEOS

## Press Release Archive

- November 2016
- October 2016
- September 2016
- August 2016
- July 2016
- June 2016
- May 2016
- April 2016
- March 2016
- February 2016
- January 2016
- December 2015

VIEW ALL PRESS RELEASE ARCHIVES

Loading