1

2                    **UNITED STATES DISTRICT COURT**
                     **NORTHERN DISTRICT OF FLORIDA**
3                          **PENSACOLA DIVISION**

4                                      )
    BENJAMIN COKER, et al,             )
5                                      )
                    Plaintiffs         ) Case No: 3:21cv01211
6                                      )
            v.                         ) Tallahassee, Florida
7                                      ) September 2, 2022
    LLOYD AUSTIN, III, et al,          )
8                                      ) 3:00 PM
                                       )
9                   Defendants         )
    _____   )
10
                 **TRANSCRIPT OF TELEPHONIC MOTION HEARING**
11               **BEFORE THE HONORABLE ALLEN C. WINSOR**
                     **UNITED STATES DISTRICT JUDGE**
12                       **(Pages 1 through 49)**

13  <u>APPEARANCES</u>: (By telephone)

14  For the Plaintiff:       Brandon Johnson
                             By:  BRANDON JOHNSON
15                                Attorney at Law
                                  bcj@defendingtherepublic.org
16                           2911 Turtle Creek Blvd., Suite 300
                             Dallas, Texas 75219
17
    For the Defendant:       DOJ-CIV
18                           By:  AMY POWELL
                                  Attorney at Law
19                                amy.powell@usdoj.gov
                             1100 L Street, NW
20                           Washington, DC 20530

21

22                      *LISA C. SNYDER, RPR, CRR*
                     **Official United States Court Reporter**
23            **111 North Adams Street, Tallahassee, FL 32301**
                   **(850)567-1374 * lisasnydercr@gmail.com**
24

25               *Proceedings reported by stenotype reporter.*
                 *Transcript produced by Computer-Aided Transcription.*

**P R O C E E D I N G S**

 1
 2
 3      (Call to Order of the Court at 3:01 PM on Friday, September
 4   02, 2022.)
 5             THE COURT:  Good afternoon.
 6             We are back on the record in case 3:21cv1211, Coker
 7   versus Austin.
 8             Mr. Johnson, you are on the line for the plaintiffs?
 9             MR. JOHNSON:  Yes, Your Honor.
10             THE COURT:  Very good.
11             And, Ms. Powell, I understand you are there, along
12   with Ms. Yang, but that you, Ms. Powell, will be doing the
13   presentation today.  Is that right?
14             MS. POWELL:  That is the plan, Your Honor.  With the
15   Court's leave I will be presenting on the party's motions to
16   compel.  And Ms. Yang will handle the improper contact motion.
17             THE COURT:  Okay.
18             We will start with the motions to compel and leave the
19   protective order improper contact issue for last.
20             And what we will do is start with the defendant's
21   motion to compel, which is docket entry 88.
22             I know in the response there was some indication that
23   the plaintiffs had answered the questions over their own
24   objections.  But, Ms. Powell, what is the status?  Is this one
25   still live, or have you received what you were after in document

1    88?

2            MS. POWELL:  This is still live with respect to the

3    two large issues.

4            THE COURT:  Okay.  Which issues are not live?  I

5    thought --

6            MS. POWELL:  -- personally.

7            THE COURT:  -- I thought there really only were two

8    issues, right?  You want the records they have identified in the

9    initial disclosures and you want them to answer the question

10   about what their plans are or willingness as to alternatives.

11   Is that right?

12           MS. POWELL:  That's correct.

13           THE COURT:  Okay.

14           MS. POWELL:  They have partially responded with

15   respect to their initial disclosures.

16           THE COURT:  Okay.

17           MS. POWELL:  Several plaintiffs produced additional

18   documents, including antibody test results, and things like that

19   that they had identified in their initial disclosures.  In the

20   reply we have leave to file I think we identified four other

21   plaintiffs who have identified such documents in their initial

22   disclosures but have not produced them.  And none of the

23   plaintiffs produced medical records which I think at least a few

24   of them had listed as things they were disclosing on their

25   initial disclosures which they might rely on in this case if

1    summary judgment enters and presuming trial is necessary.

2              THE COURT:  Mr. Johnson -- oh, go ahead.

3              MS. POWELL:  That's it.

4              THE COURT:  Okay.  I thought you were about to saying

5    something else.

6              Mr. Johnson, what's the status?

7              Here's the situation:  The point of these initial

8    disclosures is to let the other side know what you are pointing

9    to, what you are going to be pointing to, and I have never seen

10   a situation where someone identified things and then wouldn't

11   give them up.  I'm not sure these are things that matter at all

12   in this case but you must think so if you listed them in your

13   disclosures.

14             I guess tell me what your view of things is and why

15   this is even an issue at this point.

16             MR. JOHNSON:  Yes.  So the initial disclosures

17   reference things like religious accommodation request, medical

18   exemption request, medical records and things of nature.

19             So, as an initial matter, I believe all 18 have

20   submitted religious accommodation requests.  Those records are

21   in defendants' possession already.  They were submitted directly

22   so I really don't think that's a live issue.  I think it all

23   goes -- to the extent there is anything, it concerns medical

24   records, medical exemption -- well, medical exemption requests

25   also and the antibody tests.

1          First off, antibody tests, in our view, at least when

2     we submitted the initial disclosures, we considered antibody

3     tests to be medical records.

4          Going through what has been provided: 14 of the 18

5     have -- and, first off, 18 of 18 have provided religious

6     accommodation requests.  They have submitted them directly to

7     the defendant.  Nine have submitted medical exemption requests

8     directly to the defendants.  And 14 have submitted some

9     combination of medical records, COVID tests and other documents

10    identified in the disclosures.  And I can go down the line.

11         THE COURT:  I guess the question is: Why has not

12    everything been produced if that's what was requested?

13         MR. JOHNSON:  I would say that, first off, plaintiffs

14    have provided everything that is in their possession both

15    directly to the defendants by formally submitting religious

16    accommodation requests and medical exemption requests.

17         One exception could be Dr. Sigoloff.  While he did not

18    provide anything in the initial disclosures, he provided, I

19    don't know, 50 or 100 pages of these documents as part of his

20    declaration in the opposition to the motion to dismiss.

21         And to be honest, Plaintiff Furman has retired.  I am

22    not sure when.  It might have been before even the motion to

23    dismiss was submitted.  So I do not have anything from them --

24    from him.  Excuse me.

25         We have another round of production that we hope to

1    submit next week.  I'm not sure what all is in that but we are

2    still gathering that.  I really don't think there is anything

3    that we haven't provided that could be relevant.

4         I think to the extent that anything is relevant in

5    this case it's -- that defendants don't already have -- it is

6    these types of tests, these inquiries regarding vaccine

7    availability that are essential to, number one, our claim that

8    no licensed vaccines were available.  And, number two, that it

9    was arbitrary and capricious to eliminate the exemption for

10   natural immunity and the other medical exemptions that

11   plaintiffs would otherwise qualify for.

12        THE COURT:  All right.  Let me say this: I mean, that

13   was a long answer.  And I guess the point is you have not --

14   seems like you're acknowledging giving up everything that you

15   are obligated to.

16        I can tell you in a normal or a typical, I should say,

17   case involving a plaintiff raising issues related to his or her

18   medical condition, the answer would be pretty simple and that is

19   that you just can't use anything that you haven't provided.

20        And that would seem to perhaps fix the glitch here.

21   It sounds like the defendants' concern is that you are going to

22   show up with something they haven't seen and haven't had a

23   chance to investigate.  That wouldn't be permitted.

24        I am not sure how any of the stuff you are describing,

25   necessarily, would weigh in on the claims that you are

1    presenting right now.  But I guess we will see how that unfolds.

2            Ms. Powell, if that's the answer, does that not

3    resolve your concerns?  If the answer is they can't use at any

4    stage of the litigation records that weren't timely disclosed?

5            MS. POWELL:  I think so.  I guess I would maybe add to

6    that not only could they not use the records, they couldn't

7    indirectly rely on them.  There are things they have and didn't

8    disclose.  I wouldn't want them to have a declaration saying: My

9    antibody was X, for example.

10           THE COURT:  Well, I think that's probably fair.

11           Again it sounds like most of the antibody stuff came

12   over.  I guess I am not sure why there would be some uncertainty

13   about what's come and what is extant that hasn't come, but it

14   sounds like that's our situation.

15           Mr. Johnson, I guess, I mean, if that's the ruling.

16   You are not using the stuff if it's not disclosed.  That

17   resolves the motion.  But I am not sure if that puts you in a

18   better position or a worse one than you were yesterday.

19           Any reason not to just do that?

20           MR. JOHNSON:  Overall I think that's a fair

21   resolution.  But, again, I don't think the defendants could

22   argue any unfair surprise for any documents that have been

23   directly submitted to defendants regarding, in particular,

24   medical exemption requests.

25           THE COURT:  Well, I am not sure that I agree with

1   that.  I mean, if you are relying on certain medical records,

2   and you are saying somebody has submitted it to someone in the

3   military somewhere else that's not in the hands of the lawyers

4   defending this case, I am not sure that's going to be sufficient

5   for you to say, well, I didn't hand it over to the lawyers when

6   they asked for it.

7           It may be that all of this stuff is known.  Certainly

8   you don't have to print out stuff they have already got if you

9   can point them to where it is.  But I am not sure exactly what

10  you are saying there.

11          But if you've got a client who submitted some form to

12  some official in his or her chain of command that has some

13  records that fall into the category of records that the

14  government has sought in its request for production, that you

15  have not produced, I am not sure it's going to be satisfactory

16  if we are at trial, or summary judgment, or somewhere else, for

17  you to say, well, that was in the hands of the military

18  somewhere.

19          At any rate, if you have documents like that I don't

20  know why you wouldn't produce them or haven't produced them.  I

21  thought you were saying you were still gathering things from

22  your clients.  But if you have things that are responsive to

23  this you ought to hand them over.  I don't understand why we are

24  talking about this at this point.

25          MR. JOHNSON:  We do expect to provide another round of

1  production next week so perhaps the resolution could be anything

2  not provided by Friday, September 9, would not be admissible.

3          THE COURT:  Okay.

4          Well, I am not going to bless anything that's produced

5  then.  I mean, at that point I don't know if it would be

6  prejudicial if they hadn't had it earlier, or not.  We will have

7  to leave that for another day.

8          Number 88 is denied based on what I have said here.

9          And if you have other things to produce, produce them.

10  If there are things that you are going to use.  And if we need

11  to litigate later whether the timing of it affects your ability

12  to use them I guess we will do that later.

13          That's all on 88.

14          That takes us to 89.  And this one, I guess I will

15  start by asking you, Mr. Johnson, if there has been any

16  developments on this one or if there is anything that's been

17  received that's, or anything that's changed since these papers

18  were filed, or do we need to go through each one of these one by

19  one?

20          MS. POWELL:  Your Honor, I apologize.

21          I just wasn't sure if you wanted to talk at all about

22  the interrogatories.  We skipped over those.

23          THE COURT:  Oh, yes, I did.  And you are absolutely

24  right.  Tell me where we are with those.

25          This question is for Ms. Powell.  Was there any new

1   developments on that or is that still -- you are still waiting

2   on answers?

3         MS. POWELL:  We are still in the same position.  And

4   plaintiffs have effectively declined to answer interrogatories

5   about which vaccines they will or will not take.  Understand

6   plaintiffs' position to be that they have answered them.  They

7   provided a qualified answer.  But I don't think answering it by

8   saying they would take it if the order was lawful provides a

9   useful and relevant answer to the litigation.

10        THE COURT:  Okay.

11        MS. POWELL:  The circumstances under which they would

12  take it.

13        THE COURT:  Mr. Johnson?

14        MR. JOHNSON:  Yes.  Our position does remain the same.

15        We -- first off, the questions are hypothetical as

16  discussed at length on Monday.

17        Comirnaty was not available when the responses were

18  due.  Neither was Spikevax.

19        We believe it remains unavailable and we do intend to

20  submit a response detailing why September 6, 14 days after they

21  filed their supplemental declarations.  But again it remains in

22  dispute.

23        But perhaps more importantly we do have a right to

24  submit qualified responses.

25        The defendants' questions are seeking an admission

```
1   that requires us to concede our position on a hypothetical
2   question that requires us to speculate about counterfactuals.
3   So...
4           THE COURT:  What position does it ask you to concede?
5           MR. JOHNSON:  First off, in particular the BLA -- the
6   interrogatories regarding BLA-compliant.  As discussed at length
7   Monday, that's one of the central issues.
8           We don't believe -- number one, we don't believe it's
9   a lawful order.  The lawfulness of the order is a central issue
10  in this case.  So we believe by answering the interrogatories in
11  the manner that defendants want to have it we believe would
12  cause us to concede one of the central disputed legal issues in
13  this case, as well as the factual, given the factual dispute
14  over the availability of Comirnaty and the undisputed fact that
15  Spikevax is at least not in defendant's possession currently.
16          THE COURT:  I guess I am not following this at all,
17  Mr. Johnson.
18          Here is the situation: You have -- we talked at some
19  length on Monday about what the claims were.  But you have a
20  claim that the order to take the vaccine is unlawful because at
21  one level you have a claim that requiring any vaccine is
22  arbitrary and capricious; right?
23          MR. JOHNSON:  Requiring the Comirnaty vaccine is
24  arbitrary and capricious.
25          THE COURT:  Any COVID vaccine I mean.
```

1          MR. JOHNSON:  With regard to Spikevax, we will likely

2    amend to add that claim.

3          THE COURT:  Say that again.

4          MR. JOHNSON:  We believe -- well, I guess that's a

5    fair description.  We believe the August 24, '21 DoD mandate was

6    arbitrary and capricious.

7          THE COURT:  Okay.  Having nothing to do --

8          MR. JOHNSON:  And therefore unlawful.

9          THE COURT:  Right.  And at this top level that claim

10   has nothing to do with the EUA versus BLA-compliant versus

11   licensure versus Spikevax, any of that.  Your claim is that it's

12   arbitrary and capricious to require members of the military to

13   be vaccinated for COVID under the circumstances that you lay out

14   in your claim, right?  That's your top level claim?

15         MR. JOHNSON:  Correct.

16         THE COURT:  And then underneath that you have a

17   somewhat different, and I guess, alternative claim that if it's

18   okay to require licensed vaccines it's not okay to require

19   unlicensed or EUA vaccines?

20         MR. JOHNSON:  Yes.

21         THE COURT:  Okay.

22         Then as to that claim you have a couple of different

23   things that you would seek.  One, to people who have not been

24   vaccinated at all, and haven't had any discipline, you would

25   say, don't make them do it.  Undo the order and don't make them

1    do it.  And the "do it" is take an unlicensed vaccine.  Correct?

2            MR. JOHNSON:  We are still on the EUA and informed

3    consent -- the 10 USC 1107(a) claims?

4            THE COURT:  Yes.  This is your subclaims --

5            MR. JOHNSON:  Yes.  And that could be through a

6    declaratory judgment or an injunction vacating the order.  There

7    are a number of forms that could take.

8            THE COURT:  Right.

9            And then separate from that form of relief would be

10   for people who have suffered consequences by virtue of their

11   earlier refusal to take an EUA vaccine you would want some

12   mechanism to undo those forms of discipline, which I recognize

13   the government disputes whether there has been any, but that

14   would be a separate form of relief; right?

15           MR. JOHNSON:  Yes.  And that's a more involved

16   discussion.  We believe this Court could provide a declaratory

17   judgment, vacate the order.  But I believe to provide any relief

18   we would have to take the judgment of this Court and that would

19   probably have to apply through -- we would have to go through

20   the military processes, or, I don't know, Court of Federal

21   Claims there.  But we are not asking this Court to intervene in

22   any individual disciplinary or discharge proceeding.

23           THE COURT:  Okay.  But at the end of the day that's

24   the situation.  That's the practical relief through some

25   mechanism that your plaintiffs would want?

1      MR. JOHNSON:  Yes.

2      THE COURT:  And then throughout all of this, and

3  throughout at great length on Monday, you were disputing the

4  availability of Spikevax, the availability of Comirnaty, the

5  availability of non-labeled Comirnaty that was actually just

6  BLA-compliant chemically identical substance.  And the point of

7  all that, I thought, was that your clients didn't really have an

8  opportunity to do anything but the EUA.  I thought that was the

9  whole point.

10      MR. JOHNSON:  Again, you know, I think you accurately

11  laid out the tiers of claims that we have.  You did leave out

12  the claims against the FDA.  But the fact that only EUA has been

13  available, at least from August of '21 through June 10 of this

14  year, EUA was the only product available.  And we believe that

15  remains the case.  That is a factual dispute issue.  Prior to

16  June 10 there is no factual dispute.

17      THE COURT:  Okay.

18      But all of that becomes completely irrelevant if a

19  particular client is unwilling to take any vaccine.  Isn't that

20  right?

21      MR. JOHNSON:  Well, that goes to the top level claim

22  as to the lawfulness of the order.  Again --

23      THE COURT:  No.  I am not talking about the top level

24  claim.  That's why I did this long exercise of sort of

25  separating out what the claims are.

1      If the top level claim is right, if you are correct

2  that they can't impose any COVID vaccine, then whether it was

3  labeled this way, or it was Spikevax, or it was Comirnaty, or it

4  was an EUA version, all of that would be irrelevant; right?  You

5  would just win.  That would be game, set, match.  Correct?

6          MR. JOHNSON:  I think so.

7          THE COURT:  Okay.  I mean, I think we would all agree

8  with that.

9          So we are really just talking about the tier two or

10  subclaim that would say, as I understood it, yes, military, you

11  can force service members to say take a vaccine, under 1107, but

12  only if it's licensed.  And, in fact, what you are doing is

13  forcing me to take an unlicensed vaccine.  I thought that was

14  your claim.

15          MR. JOHNSON:  That is one of them.  But I do --

16          THE COURT:  Wait a minute though.

17          As to that one claim why would it not be relevant if

18  your clients were unwilling to take even a licensed thing?  Then

19  what would the relief be there?  Just to say, okay, you can't be

20  forced to take an EUA vaccine but you can be forced to take a

21  licensed version, which you are also not going to take and be in

22  the exact same position.

23          It just seems like that would be a giant circle and it

24  seems peculiar to argue all of this stuff about how none of

25  these other things are really available, and don't listen to the

1   military when they say they have Comirnaty because they don't.

2   When all along there is no answer as to whether that would make

3   any difference.

4          Why are we talking about those things if they wouldn't

5   make any difference?

6          MR. JOHNSON:  Okay.  So there is two issues here.

7   There is -- one is the legal position, and as plaintiffs'

8   counsel I am articulating our claims.

9          On the other hand, we have the interrogatory responses

10  that individual plaintiffs have made based on a certain set of

11  circumstances that were present back in May 2022.  And I think

12  now I am being asked to speak on their behalf as far as that

13  position which would require a new round of interrogatories.  So

14  I'm just -- I don't know if I'm prepared to answer their

15  interrogatories for them at this time.

16         THE COURT:  No.  No.  No.  The request is for them to

17  answer the interrogatories.  And they have not done that.  I'm

18  not asking -- this is not about a legal position.  This is a

19  factual issue.

20         As a factual issue you have -- suppose there is one

21  plaintiff and he or she says, as a matter of fact, I will not

22  take any vaccine, whether licensed or not.  Then can't we stop

23  talking about the distinction and focus just on your top tier

24  claim and be done with everything else?

25         Isn't that the only logical way to treat that

1    situation?

2         MR. JOHNSON:  So we are limited to what the actual

3    responses are, or at least I am.

4         The plaintiffs have all said they will comply with the

5    lawful order but that's why we are here to determine the

6    lawfulness of the order.

7         At that time there is the hypothetical question, but

8    we do --

9         THE COURT:  No.  No.  No it's not --

10        MR. JOHNSON:  -- we came here to get that

11   determination.

12        THE COURT:  They are not asking the interrogatory

13   about lawfulness as I understand.  They are asking about

14   willingness.

15        MR. JOHNSON:  Our response is in terms of the

16   lawfulness of the order.

17        THE COURT:  I know.  That's why they are -- that's why

18   we are here.  They are saying you are not responding to the

19   factual question about whether if presented with this -- I went

20   through these emails that you submitted in connection with the

21   other motion, which we will talk about in a minute, but you have

22   someone saying, I won't take the EUA drug.  You can't make me

23   take the EUA drug.  And then someone else says, we will arrange

24   for you to take the non-EUA drug, the licensed labeled

25   Comirnaty.  We will pick you up and take you there.  Are you

1    ready to go?  And the answer is, I'm not telling.

2            Isn't that the sequence here?

3            MR. JOHNSON:  Again, these were submitted in May under

4    those circumstance that prevailed then.  It was definitely a

5    hypothetical -- a counterfactual question -- and we believe it

6    remains so.

7            It is undisputed that it was not available at that

8    time so they viewed it as a hypothetical question.

9            It was a hypothetical question requiring speculation.

10           THE COURT:  You can ask hypothetical -- it's not

11   requiring speculation.

12           I mean, this goes to the heart of your whole claim

13   here.  And at this point I guess the interrogatory is not

14   limited to May.  That's just when they happened to ask it.

15           Let me ask it in a different way.  Why shouldn't your

16   clients be obligated to respond to these interrogatories now and

17   say, I would take it, I won't take it?  Because if they won't

18   take it --

19           I mean, you are not saying it's irrelevant, I don't

20   think.  And I don't think you would get very far if you said it

21   were irrelevant.  And if they all say, we won't take Spikevax,

22   then I think we can take off the table the issue of whether

23   Spikevax is available.  We can stop spending effort on that.

24           If they say they won't take a licensed, labeled

25   Comirnaty then I think everything about your tier two claim just

1   goes away and we can look at the top tier claim.

2           I had some concerns Monday, when we were talking,

3   about whether maybe you were articulating a claim that I wasn't

4   sure whether it was pleaded or not about unwritten policy to

5   require EUA vaccines, notwithstanding the availability of

6   labeled Comirnaty.  And I think that claim would go away if, in

7   fact, the plaintiffs are unwilling to take anything.

8           Tell me where I'm wrong about any of that.  And I

9   guess also tell me why now, here in at this stage, they ought

10  not to have to answer the interrogatories.

11          MR. JOHNSON:  Well, I do first want to talk about the

12  unwritten policy.  That's never been our claim.  We pointed to

13  documents from the FDA and the DoD regarding interchangeability.

14          It is a written policy that EUA drugs are

15  interchangeable and may be mandated.  That is a written policy.

16          What's not written and non-existent is the -- this

17  BLA-compliant restriction.  That is not stated in any documents.

18  It's more the defendants' asserted restriction that's unwritten

19  or we believe non-existent.

20          THE COURT:  So your APA claim as to the mandate,

21  setting aside any claims about the FDA, your APA claim as to the

22  mandate that we talked about at length on Monday is limited to

23  the written document itself?

24          MR. JOHNSON:  Yes.  And that written document is the

25  September 14, '21 interchangeability memo.

1          THE COURT:  Okay.

2          That's what I thought before the hearing Monday and

3   then I guess maybe I thought I was hearing something a little

4   different.  I think that makes things a little easier perhaps.

5          So then your -- what I was calling your tier two or

6   sub-argument is based on your view that the September memorandum

7   authorizes mandatory EUA vaccines by virtue of this what you are

8   calling the interchangeability issue?

9          MR. JOHNSON:  That's correct.  And the Air Force

10  guidance, or Air Force mandate, the September 3, 2021 document

11  is also quite explicit on that.

12          The other --

13          THE COURT:  Are you talking about where it says, you

14  know, you could take an EUA one and satisfy it?

15          MR. JOHNSON:  No.  There is at least two places in the

16  September 3, 2021 Air Force order that repeats the

17  interchangeability language and may be mandated as if it were,

18  in fact, the licensed vaccine.

19          Off the top of my head there may have been subsequent

20  orders that used the same language as the DoD September 14, 2021

21  memo.  But it is quite clearly stated.  It's not unwritten

22  policy.

23          That's sort of been our argument that the only thing

24  in writing is the EUA is interchangeable.  The BLA compliance we

25  have not found in any record whatsoever.

1          THE COURT:  All right.

2          But getting back to my question then about why we

3     shouldn't have answers now.

4          MR. JOHNSON:  The answer is I believe we have answered

5     it.

6          If I'm hearing you correctly, if I understand

7     correctly, qualified answers are not permissible and it must be

8     a yes or no answer?

9          THE COURT:  Well, tell me what the qualification is

10    that you are saying.  I mean, they are qualifying it on the

11    lawfulness.  I mean, is that the qualification you are talking

12    about?

13         MR. JOHNSON:  Yes.  Well, it's the lawfulness as well

14    as it actually being available.  We have discussed that issue at

15    length.

16         THE COURT:  Well, I think the question is: Will they

17    take it now.  I mean, I don't understand -- when you say they

18    would take it if it's lawful, what does that mean?  If the

19    Supreme Court rules on it?  If this Court rules on it?  If some

20    court in Colorado rules on it in the meantime?  I guess I don't

21    understand what you are saying.

22         MR. JOHNSON:  We would like a ruling from this Court.

23         THE COURT:  About what?

24         MR. JOHNSON:  The lawfulness of the claims.  And that

25    would be the lawfulness of the mandate itself, the lawfulness of

1   the EUA interchangeability directive.  We realize the FDA issues

2   will probably take more time, though I do believe -- I would put

3   them in two buckets: the FDA interchangeability enforcement

4   discretion and statutory violations.  We think those are set up

5   well for summary judgment or declaratory judgment.  Declaratory

6   judgment perhaps with some limited additional discovery or

7   interrogatories we have referenced in our motion to compel.  We

8   think those issues are ready for summary adjudication in the

9   near future.

10          The FDA Comirnaty approval, because of the length of

11   time it will take to produce the record, that may be -- that may

12   take additional time and may argue for bifurcation of the

13   proceeding.

14          THE COURT:  All right.

15          Well, I feel like we are getting back to some of the

16   things that we talked about Monday.

17          The FDA piece goes away if you are -- if Comirnaty --

18   I mean, if Spikevax is available.  Does it not?

19          MR. JOHNSON:  We would disagree.  But we also think

20   that that is -- because of all of the events that may deprive

21   this Court of jurisdiction arose after the filing of the

22   complaint and the amendment deadline that we should be permitted

23   to amend to address that issue.

24          THE COURT:  All right.

25          But as things stand right now an order invalidating --

1   we went through all of this Monday -- would leave you in a

2   situation where it wouldn't help you if Spikevax is available.

3          And the question is: Would you take Spikevax?  And I

4   don't know why you wouldn't say yes or no to that.  I mean,

5   it's -- you say, it's not available.  Well, if it is.  If they

6   put it in front of the client will the client take it?  If they

7   do, then the FDA thing, as to the Pfizer version, becomes moot.

8          At any rate, I guess we will hear from you,

9   Ms. Powell.

10          You may be on mute.  I am not hearing anything if you

11  are speaking.

12          MS. POWELL:  Apologies.  I was on mute.

13          I don't have a great deal to add to that exchange,

14  Your Honor.  I agree that I think this is about their

15  willingness to take the vaccine.  We need to assess their

16  standing to bring these claims.

17          THE COURT:  Yeah.  That's where I think we are.

18          The motion to compel, this is Number 88, that I just

19  said was denied, is denied as to the request for production.

20          It is granted as to the interrogatories.  And the

21  plaintiffs will be required to answer those questions without

22  qualifying it as to the lawfulness or the availability.

23          I mean, it's a question about willingness.  And it

24  does go to standing, which is really mootness, I guess, at this

25  point.

1          That's that the ruling.  It will be granted to that

2   extent.

3          Is ten days sufficient, Mr. Johnson?

4          MR. JOHNSON:  Yes.  That will be sufficient.

5          THE COURT:  Okay.

6          Then moving on to number 89.  This is plaintiffs'

7   motion to compel.  I started us down this road before realizing

8   that we had left off part of the last.

9          Mr. Johnson, is everything still at issue in there?

10  Have you made any progress on any of this since the motion was

11  filed?

12         MR. JOHNSON:  We have not.

13         THE COURT:  Okay.

14         MR. JOHNSON:  We have not received anything since I

15  believe it's March of this year.

16         THE COURT:  Okay.  So, I guess what I'd like to know

17  is these are relevant to the first cause of action about the

18  lawfulness of the mandate.  That's what this is relevant to;

19  correct?

20         MR. JOHNSON:  It's relevant to the EUA and

21  BLA-compliant issues as well.  But they are all -- they do all

22  concern claims against the military defendants rather than FDA.

23         THE COURT:  Okay.

24         Why would this not be limited to what's in the

25  administrative record?  I mean, your claim is that it's an

1    arbitrary and capricious order at the time it was enacted.  The

2    availability and things like that would have come after that I

3    suppose.  And then you have -- you are seeking emails and things

4    that I guess there is a dispute about whether it's part of the

5    administrative record.  I guess somebody can help me understand

6    what constitutes the administrative record in a case like this.

7    But it seems like if it's outside of that you have got an uphill

8    climb.

9            Tell me what you want to tell me on these.

10           MR. JOHNSON:  Sure.

11           As we discussed on Monday, the administrative record

12    appears incomplete on its face.  We got into some of that with

13    the justiciability issues.  In other cases they had considered

14    everything related to individual service members to be part of

15    that record.  So we -- at a minimum that should be part of the

16    record.

17           THE COURT:  Who decides --

18           MR. JOHNSON:  There is two issues: the incomplete

19    record and discovery to supplement the records so I'd like to

20    discuss those issues separately.

21           THE COURT:  Okay.

22           Who decides what is the administrative record?  I

23    mean, in a true administrative context I guess it would be built

24    as it's going.  In something like this -- maybe I am not

25    familiar enough with how the process would work, but when the

1    military makes a decision like this it's not operating in the

2    same manner that some administrative agency might.  Maybe they

3    are.

4                But how is it that the record is compiled?  Who

5    decides what goes in it?  And I will ask Ms. Powell the same

6    thing.

7                Mr. Johnson, what's your understanding of that?  And

8    what governs that?  Is that all set out in statute?

9                MR. JOHNSON:  There is -- well, there's been

10   litigation over this for decades and if you look at the

11   treatises I think they will be quite frank that, no, there

12   isn't -- it's not a model of clarity.

13               But in the first instance it is always the

14   administrative agency's responsibility to compile the record and

15   it's quite simple.  I mean, the rule is simple.  The implication

16   is perhaps not.  But it's what did the decision maker consider

17   at the time of the decision.

18               But, one thing I think that's essential to point out

19   is the inconsistency between the four records provided.  So, the

20   Department of Defense records stop September 14, 2021.  Whereas

21   the services, like the Air Force, go through at least March 14,

22   2022, which was a week or so before the date it was produced to

23   us.  So clearly -- and the Army goes to February 18, 2022.  So

24   at least the Army and the Air Force considered it to be an

25   ongoing record.  And they just happened to stop providing it on

1  the date when they produced it to plaintiffs, but it appears

2  that it should be an ongoing record.

3          THE COURT:  Why is that?  My intuition would be that

4  it would stop when the decision was made.  And I don't know why

5  there would be inconsistent dates on these four different

6  organizations.  But why would it be continuing and when would it

7  stop if it were continuing?

8          MR. JOHNSON:  Well, again, this goes to the discussion

9  we had on Monday.  In all the other proceedings they had treated

10  it as an individual record that stopped as of the date when the

11  vaccination order was received.  So after all exemptions were

12  denied, vaccination order received, so in their view it should

13  be a different date for each individual.

14          Because again there was no -- in their view there was

15  no order to comply with the mandate until all exemptions were

16  exhausted.  So, for example, the Navy, the most recent denial in

17  our case was Ben Coker on Friday August 26th.  So arguably it

18  should go through the present and keep going on a rolling basis

19  as each individual receives their vaccination order.

20          THE COURT:  So the inquiry about whether the policy

21  from August or September of 2021, whether that's arbitrary or

22  capricious, would be different as to different individuals?

23          MR. JOHNSON:  Clearly the services thought it extended

24  past August or September of 2021.  It's the DoD that is the

25  outlier here.  And the Navy goes through, I think, December 20,

1    2021.  But, again we have --

2            THE COURT:  That doesn't --

3            MR. JOHNSON:  -- different time periods.

4            THE COURT:  That's not my question at all.  I guess my

5    question is: Are you saying it would be different for different

6    people, or different branches, and it would be determined on

7    things that happened after the policy was put into place?

8            MR. JOHNSON:  Well, so, the DoD announced a policy

9    August 24th, but that policy is executed by each service.

10   It's -- at a minimum it will differ by service.  And it's

11   perhaps -- at least, again, this is their view, this is what

12   they have done in other proceedings, they look at the record as

13   closing on the enforcement date because --

14           THE COURT:  The enforcement --

15           MR. JOHNSON:  -- yes, I do agree --

16           THE COURT:  Wait a minute.  Just a minute.

17           MR. JOHNSON:  -- for different people.

18           THE COURT:  Okay.  Well, that sounds like an as

19   applied challenge; doesn't it?

20           MR. JOHNSON:  Again, this is the approach they have

21   taken in other proceedings.  They do view it as an as applied

22   challenge.  But at a minimum --

23           THE COURT:  Do you?  I mean, we don't have

24   jurisdiction for as applied challenges, right?  I thought

25   everyone agreed to that.

1          MR. JOHNSON:  Well, so there is two standards: There

2     is the Alexander standard, and then there is the *Mindes*

3     standard, which has -- *Mindes v Seaman* justiciability test which

4     hasn't been discussed in this case but it is binding precedent

5     in the Eleventh Circuit.

6          THE COURT:  I guess my question, and maybe you can

7     answer it -- maybe I am just missing the point here -- but if

8     your claim is that the policy was arbitrary and capricious on

9     the day it was enacted, or adopted, why would we look at what

10    happened after that date if that's your claim?

11         And maybe your claim is something different and maybe

12    I need to do a better job understanding what your claim is this

13    deep into the case.  But why would we look at what happened

14    after the policy went into place if your claim is that it was

15    arbitrary and capricious when adopted?

16         MR. JOHNSON:  Well, there was the initial adoption.

17    It has been modified through time.  So whether it's a single

18    action or a series of discrete actions --

19         THE COURT:  What has been modified over time?

20         MR. JOHNSON:  The -- at least the execution of the

21    mandates.  And again I am just looking at the materials --

22         THE COURT:  Are you challenging the execution of the

23    mandate, or are you challenging the mandate?  Because I thought

24    it was the latter.

25         MR. JOHNSON:  Well, let's -- we are challenging the

mandate.  But if the mandate changes over time, but that mandate

is still generally applicable to all service members -- just for

example, imagine -- we expect to see the adoption of, you know,

the requirement to take boosters.  That's still part of the

mandate but that's a change in the mandate that will uniformly

apply to every service member.

THE COURT:  Okay.

MR. JOHNSON:  So at that point --

THE COURT:  That's a hypothetical.  That's not

happened.  What has changed?  I thought the mandate you were

challenging today was the same mandate that was adopted last

fall.

MR. JOHNSON:  Well, let's just take an example closer

in time.

THE COURT:  Well, is it not?  Maybe just answer my

question first and then you can explain.

Are you challenging a change to the mandate that's

taken place since the mandate adopted, or is this the same

mandate that's been in place the whole time?

MR. JOHNSON:  Well, for example -- and I am trying to

answer your question.

August 24th the mandate was adopted.

September 14th -- on August 24th it was FDA-licensed

only.

September 4th it became EUA-labeled vaccines may be

1  mandated.

2          On May 3, 2022 that was extended to EUA labeled

3  Moderna.

4          So, it's the original mandate but it has been modified

5  over time and applied uniformly against all service members.

6          So, I don't believe it's an as applied challenge.  It

7  is a rule that has -- a generally applicable rule that has been

8  modified over time.

9          THE COURT:  And by over time you are just talking

10 about the post-pleading May 3rd change to include the Spikevax?

11 That's the only change that there has been; correct?

12         MR. JOHNSON:  I don't know if that's the only one but

13 that is one that is significant and --

14         THE COURT:  Is there another one?

15         MR. JOHNSON:  There have been -- we believe there were

16 changes to the exemption policies.

17         There may be others but those are the two that I

18 think -- the September 14 change, which was before the

19 plaintiffs filed and certainly the May 3 change which was after

20 the date of filing and the amended deadline.

21         THE COURT:  Okay.

22         So you are seeking records post-September to support a

23 claim that relates to amendments that you haven't challenged?

24         MR. JOHNSON:  I don't know if I would put it that way.

25 I would just stick with the fact that the services have provided

1    records with different end dates.  But there is a clear

2    inconsistency.  And again that goes to the record.

3            As far as discovery, that's a different set of

4    questions.

5            THE COURT:  All right.  Let's pause there on the

6    record.

7            Ms. Powell, who decides what goes in the record and

8    how is that decision made and is that statutorily driven or tell

9    me how that works.

10           MS. POWELL:  Sure.

11           It is driven, in the first instance, by the

12   identification of the final agency action being challenged.

13           The APA only permits claims that challenge a final

14   agency action.  Typically that's identified as complaints.  Then

15   the agency has the responsibility in the first instance to

16   compile an administrative record.

17           There is Black Letter Law in this circuit, and

18   everywhere else, stemming from the Supreme Court decision in

19   *Overton Park;* the administrative record consists of all of the

20   materials considered directly or indirectly by the decision

21   maker at the time that the decision was made.

22           I don't know that there is any disagreement in the

23   courts about that standing.  That is a basic standard for what

24   goes in the record.

25           So the agency compiles that information and then

1 certifies it as a complete record of the information that was

2 before the decision maker at the time.

3         THE COURT:  Okay.

4         So when you are objecting to email communications with

5 the FDA, and the military, and things like that, that is based

6 on your assertion that those were not before the decision maker?

7         MS. POWELL:  Correct.

8         We have compiled and certified the record here for the

9 final agency actions which we understood to be challenged.

10         The way that plaintiffs framed it in the complaint was

11 the mandate itself from August, the interchangeability policy,

12 and -- I forget how they framed it exactly but it was something

13 like implementation of the type of services, which is why it's

14 not clear to me that is a final agency action.  It's also not

15 clear to me that they are actually challenging anything, any

16 decisions in there, as opposed to the actual DoD decisions.

17         THE COURT:  Okay.

18         So if there is an email that's not in the record

19 between FDA and DoD, or anyone in DoD about vaccines, vaccine

20 availability, EUA, anything like that, that means it was not

21 considered at all by the decision maker?

22         MS. POWELL:  Directly or indirectly.  That's correct.

23         THE COURT:  Okay.  All right.

24         So then I guess back to you, Mr. Johnson, tell me

25 about the claims where you are saying you want to add things to

1   the record.  If that's the standard how do you make that showing

2   when you are seeking these things if they are saying it was not

3   something that was part of the consideration?

4           MR. JOHNSON:  Sure.

5           So, I don't recall exactly where but the claim has

6   been made that extra record evidence can only be considered or

7   discovered when there is a showing of improper purpose or bad

8   faith.  We do believe that is present.  But there are several

9   other circumstances --

10          THE COURT:  Wait a minute.

11          MR. JOHNSON:  -- where extra record --

12          THE COURT:  -- before we get to that.  That's a

13  different thing, I think, where you are asking me to consider

14  extra record activity.  You were saying you want to expand the

15  record, put things into the administrative record, I thought.

16          Is that what not what you were saying?

17          MR. JOHNSON:  Well, again, there is two issues.

18  What's properly in the record?  We believe there are things

19  properly in the record that have not been produced.  But we also

20  have requested discovery, extra record discovery, both for

21  consideration as part of the Court's review and also pursuant to

22  the Court's January 6 order permitting discovery, which

23  defendants have not complied with.

24          THE COURT:  But as to the first thing, where you are

25  seeking to expand the administrative record, what is it that you

1   are seeking there?

2          MR. JOHNSON:  We are seeking the completion of the

3   record.

4          THE COURT:  To include what?

5          MR. JOHNSON:  Again, we don't know what's in the

6   record.  We can only speculate what's in the record and that

7   is...

8          THE COURT:  Well, then wouldn't that be a problem for

9   me?  I mean, what would be the order say?  Defendant must

10  supplement the record with blank?  What would I put in that

11  blank?

12         MR. JOHNSON:  Well, again, it would require

13  speculation on our part.  That's why we --

14         THE COURT:  Okay.  So we can --

15         MR. JOHNSON:  -- our discovery request complied with.

16         THE COURT:  All right.  So you don't have any live

17  request to expand the administrative record then; correct?

18         MR. JOHNSON:  Well, we detail some, yes.

19         For example, you pointed out FDA communications.  If

20  there were, in fact, FDA communications that were considered by

21  the decision maker then those should certainly be part of the

22  record.

23         THE COURT:  Ms. Powell just said they have certified

24  there is not.  And that she is saying, as an officer of the

25  court, there are no communications with the FDA that were

1  considered indirectly or directly by the decision maker that are

2  not in the administrative record.  So what would I be ordering

3  them to do other than certify what she has just certified?

4          MR. JOHNSON:  Well, what we are requesting is

5  discovery to discover additional evidence that will allow us to

6  identify materials that were, in fact, before the decision

7  maker.

8          THE COURT:  Okay .

9          MR. JOHNSON:  And have those included in the record.

10          THE COURT:  All right.

11          So right now you are seeking only extra record

12  evidence that then would allow you to potentially form a claim

13  that the record is insufficient.  But right now you have no

14  claim at all that the record is insufficient.  Is that a fair

15  statement?

16          MR. JOHNSON:  That is correct.  It is the defendant

17  agency's, in the first instance, it's their job to compile the

18  record and that is presumptively complete if they certify it as

19  complete.  And that is why we are seeking discovery for

20  additional evidence that will allow us to show that it is, in

21  fact, incomplete and to add to that record.

22          THE COURT:  Okay.

23          I think we are making some progress here then.

24          So let's go through them.  Is that the case of all of

25  your pending requests in document 89?

```
 1              MR. JOHNSON:  As we explained, these are documents
 2     that we think would -- should be part of the record.  They are
 3     documents that should --
 4              THE COURT:  But you --
 5              MR. JOHNSON:  -- have been considered by a decision
 6     maker.
 7              THE COURT:  Well, those are two different things.  You
 8     are saying they should have been in the record.  That would be
 9     true only if they were considered by the decision maker; right?
10              MR. JOHNSON:  Yes.  And we think they were most
11     likely -- they were aware of those records.  Yes.
12              THE COURT:  And you -- well, this is what we -- I feel
13     like we are going in circles here.
14              You have no basis, I thought, to say that they
15     considered any materials that were not in the record.  I thought
16     you had essentially agreed to that just now.
17              MR. JOHNSON:  I'm sorry?
18              THE COURT:  I thought just now --
19              MR. JOHNSON:  I don't think I contradicted my previous
20     position, but...
21              THE COURT:  What is the legal basis for you saying the
22     administrative record is incomplete?
23              MR. JOHNSON:  A review of the record, I guess.  There
24     is just -- there is nothing in there that -- there is very
25     little in there that would justify the decision.
```

1          Look, it may be complete and they closed their eyes to

2     a lot of evidence and then we can win our arbitrary and

3     capricious claim because they failed to consider important

4     aspects of the problem.

5          THE COURT:  I mean, that's -- I would think you would

6     welcome that.  Your top line claim is: It was arbitrary.  They

7     didn't consider all of this important information.  They just

8     kind of made this up on the fly and that's why it's unlawful

9     under the APA.

10          Then they certify the record.  Here is everything we

11     considered.  And you say, well, that can't be right because I am

12     sure you did a thorough deep-dive evaluation of all these

13     important considerations and they are not in the record, ergo

14     the record must be incomplete.  So it does seem like you are

15     contradicting yourself there.

16          But I guess if the only basis is that it's missing

17     documents that you would have expected to be in there I am not

18     sure that's sufficient.

19          MR. JOHNSON:  Well, that's one category.

20          The second category does go to their defenses, in

21     particular the BLA-compliant issue.  There is nothing in there.

22     And it may be that there -- that it was never considered, in

23     which case we should win on that issue.

24          There is RFP Number 9 on communications regarding

25     Comirnaty.  Maybe they never classified it.  We have the

1    statements from the November 3 hearing that it sounds like there

2    were a lot of communications going back and forth as to the

3    availability of Comirnaty and the DoD.  And I think that should

4    be part of the record.  But at a minimum it does go to their

5    defenses and to our claim that it was not available.

6           Now, I think subsequently the June 10 offer, and the

7    statements at the hearing on Monday, I think there is no

8    question that it wasn't available before June 10.  But it would

9    be relevant to claims.

10          In particular some of the -- for example, cause of

11   action number three, the armed services guidance, it's not clear

12   if that's final agency action or not.  We think it is.  But in

13   the event that it's not that is a reason we explained we are

14   making ultimately a non-statutory ultra vires claim in the

15   opposition to the motion to dismiss.

16          And ongoing communications with Pfizer as to why can't

17   we get Comirnaty ten months after it was approved would be

18   relevant to proving our claims or disproving the defendants'

19   defenses and therefore should be discoverable.

20          THE COURT:  Okay.

21          Not the APA claim, right?

22          MR. JOHNSON:  Yes.  There is -- we concede that most

23   of our claims are APA claims, but defendants have consistently

24   stated these are non-final agency actions.  And the

25   non-statutory ultra vires claim may be the only way for us to

1    challenge a non-final agency action.

2           THE COURT:  Okay.

3           Ms. Powell, I will let you respond to any and all of

4    that and then we will move on.

5           MS. POWELL:  Okay.  I'm making sure I am not on mute

6    again.

7           THE COURT:  I hear you loud and clear.

8           MS. POWELL:  Excellent.

9           As the Court opined on the preliminary injunction

10   itself there isn't a great deal of dispute about the actual

11   facts here.  We think the Court can grant the currently pending

12   dispositive motion on the basis of allegation and judicially

13   noticeable documents.

14          But if the Court disagrees the specific information

15   sought by plaintiffs here should still be denied.

16          We are not, and have not since we lost our motion to

17   stay discovery, argued that no extra record discovery could

18   happen at all.

19          We produced a great many documents outside the record.

20   And attempted to engage with plaintiffs on their questions about

21   availability of Comirnaty and provide targeted responses on the

22   information needed.

23          To discuss, briefly, at least the two requests that

24   Mr. Johnson specifically discussed -- and I am happy to answer

25   questions about them or about the availability of Comirnaty at

1    this point.  I wanted to touch on the first request for

2    production.

3           It was originally a broad request for information

4    about shipping records and contracts and things like that, which

5    was narrowed, I take it, in the motion to compel to information

6    about the BLA-compliant vaccines.

7           As reflected in plaintiffs' filing, I think,

8    defendants provided to them during a meet and confer process in

9    June, I believe, pretty much all of the information they claim

10   they absolutely need in the motion to compel.

11          There is a chart attached to the supplemental Rans

12   declaration that they filed on the docket at 89-5, I believe,

13   Exhibit C to that declaration, and there is a chart of all of

14   the BLA-compliant vaccines, dates of shipping, and where it was

15   located.

16          Also provided locations of current doses.  And we have

17   since provided the current locations of the Comirnaty-labeled

18   doses that we have as well.

19          In other words, the information that plaintiffs claim

20   they actually need about the availability of Comirnaty and the

21   Court said was relevant is information we have absolutely

22   provided at this point.

23          The other two requests for production that got

24   mentioned in Mr. Johnson's presentation were RFPs 8 and 9; 8 was

25   for communications between the defendants -- military defendants

1   and FDA.

2         And, again, as the Court stated, I just do not see a

3   basis for extra record discovery here.  The request certainly

4   was not limited to information that could conceivably be in the

5   record.  Nor is there any reason to think that the certification

6   of the record is wrong in this instance.

7         To answer his questions about the record: First, he

8   claimed that there is something inconsistent about what we are

9   doing here because there is nothing about the individual service

10  members in the record.

11        Again we understood their claim to be an attempt to

12  make a facial challenge and provided the record for the broader

13  agency action.

14        Second, he said he thought there was some

15  inconsistency in what was in the record date-wise.  Again, I

16  think that flows from my explanation from before.  But if not,

17  the DoD record covers the mandate and the initial

18  interchangeability memo, which is, I think, the only conceivable

19  things that are calling final agency actions.

20        But the complaint also identified a challenge to

21  certain implementation of those.  So we did certify a record of

22  the service implementation of the mandate up to a certain date

23  at which they were provided.

24        I don't understand plaintiffs to have challenged any

25  act within those implementations that is not actually part of

1    the DoD records.

2              So hopefully that answers those questions.

3              And as for why we didn't provide the individual

4    service member-type records, as we have in other cases, it's

5    because we understood the claim to be a different one here.

6              And, of course, there is not necessarily a final

7    agency action with respect to the individual service members so

8    it's not yet been disciplined or finally separately.

9              THE COURT:  Okay.

10             Well, here is the -- on 89, I am going to -- this has

11   been somewhat helpful.  I think I have a little bit better idea

12   of what we are dealing with here.  But I am going to take this

13   one under advisement.  And I will get an order out on that

14   hopefully before too long.

15             We will move on then to the last issue which is this

16   motion for protective order relating to alleged contacts with a

17   client.

18             I guess I will start by asking about that the same as

19   I have with the others.  Has there been any update?  Is this

20   still a live situation?  A lot of these things happened, I

21   guess, in May and June.

22             Mr. Johnson, is this still something you are seeking

23   and has there been any change in circumstance at all that's

24   relevant to this?

25             MR. JOHNSON:  Yes; there are.

1          First off, the events in May, and around that time

2    period, were very concerning for the reasons we laid out.  We

3    would note that as far as we are aware defendants have not made

4    any further improper contacts.

5          Second, since this was filed the Doster class has been

6    certified.  Class counsel has been appointed.  And so all Air

7    Force members -- well, Master Sergeant Kupper is covered by the

8    Doster preliminary injunction and class counsel.  So I'm not

9    sure what the Doster court has done, but I think they are sort

10   of -- it's in their court, so to speak, to address

11   communications with class members.

12         As far as our motion I think the facts speak for

13   themselves.  There was a confluence of events that were very

14   concerning at the time.  But, it has not been repeated since

15   that time.

16         THE COURT:  Okay.

17         Are you seeking relief now, or is that your way of

18   saying you are withdrawing the motion, or where are we with

19   that?

20         MR. JOHNSON:  You know, the order would be helpful but

21   it does seem that the message has been received.  And I am not

22   sure that further court action is required on this.

23         THE COURT:  Okay.

24         So then that one, 91, will be denied as moot then.

25         You know, you mentioned the class and one of the

1   things you said in your motion was -- you talked a lot about the

2   class issues.  And, of course, if there are problems with

3   contacts related to class actions that would be something for

4   the judges in those cases to tend to here.  So really here we

5   would be dealing with this one situation.  And it does seem like

6   it's -- to the extent there was an issue it's behind us.  So I

7   am not sure I would be inclined to do anything on that one

8   anyway.

9           Given what you have said, 91 will be denied as moot.

10          All right.  That's all the motions I wanted to talk

11  about today.

12          We did have the lengthy hearing Monday.  I don't want

13  to necessarily revisit any of that, but is there any procedural

14  issues or anything else we need to talk about while we are all

15  here together, Mr. Johnson?

16          MR. JOHNSON:  There are no procedural issues -- well,

17  apart from our request for leave to amend --

18          THE COURT:  But you have not made that request, right?

19          MR. JOHNSON:  -- file that (Indiscernible crosstalk).

20          THE COURT:  I do think, for what it's worth, it makes

21  sense to get a resolution of the current motion to dismiss.  Of

22  course, we are waiting on -- there is some more briefing on this

23  APA issue that I identified.

24          If you amended today -- I guess the amendment you are

25  anticipating would be to add a contention that the Spikevax

1    approval was arbitrary.  Is that the claim?

2              MR. JOHNSON:  We would add that, yes.

3              Again, the relevant issues happened after the --

4              THE COURT:  No.  I get that.

5              What I was saying is that, without saying any

6    amendment would be allowed or not, it would seem to make sense

7    to wait until there is a ruling on the current motion, which may

8    narrow issues, may eliminate issues, it may broaden issues.  I

9    guess we will see.  And that's not going to happen until this

10   briefing comes in.

11             The timeliness of your proposed amendment is something

12   the government raised the other day.  I will say if you wait

13   until there is an order I won't hold against you the delay from

14   say today until when that happens.  And I will invite the

15   government to weigh in on that.

16             In other words, it seems like we would be taking maybe

17   two steps forward and three steps backward if you amended right

18   now in a way that would moot the motion to dismiss that's been

19   argued and briefed.  And a lot of the issues would come right

20   back up.  Maybe there would be some different ones.

21             But what I was going to suggest is that if the

22   government, when you do -- hypothetically, suppose there is a

23   partial grant of the motion to dismiss -- or a full grant -- and

24   you say, well, I'd like to amend -- or a denial -- and you say

25   I'd like amend.  And the government says, well, it's too late,

1    as they said the other day.  I think what would make sense would

2    be to disregard the time from now until whenever you make that

3    motion and basically consider the timeliness as if you made it

4    today but not actually make it today to simplify things.

5             Does that make sense to you, Mr. Johnson?

6             MR. JOHNSON:  Yes.

7             THE COURT:  Ms. Powell, or Ms. Yang, do you have any

8    objection to doing it that way?

9             It seems like if he files a motion to amend today,

10   briefs it up, you would respond and say either it's futile or

11   it's late, and all of these things, and then we'd just have more

12   issue to tend to and probably ultimately delay things.

13            Do you have any view as to what I just sort of

14   outlined?

15            MS. POWELL:  I think that makes sense, Your Honor.

16            The government is likely to oppose amendment as

17   untimely and futile now.  I suppose it's slightly more untimely

18   and futile, but if the Court is not going to hold that against

19   them then I don't object to that -- the additional length of

20   time.  I don't object to that approach.

21            THE COURT:  That's what we will do then.

22            So, again, I think it's two weeks on the brief from

23   the government and then you'd have a chance to respond to that.

24   This is the supplement brief on the APA issues that we

25   identified.  And that will be that.

```
1              Anything else, Mr. Johnson?

2              MR. JOHNSON:  I would like to just bring to the

3    Court's attention, if you are not already aware, that the FDA

4    just approved a new vaccine with an EUA.  And the CDC will be

5    procuring a 175 million doses of it for both the primary series

6    and boosters, according to August 16 announcement.  We will

7    provide this as supplemental authority to the Court.

8              But that may impact our claims because it looks like

9    the same -- there is some likelihood that this will be mandated.

10             We think that shows the capable of repetition and

11   evades review.  It looks like this is going to happen again

12   either with boosters or with the primary series.

13             So we will submit that to the Court in a separate

14   filing.

15             THE COURT:  Okay.

16             Anything else from the government's side, Ms. Powell,

17   or Ms. Yang?

18             MS. POWELL:  I am reluctant to let that go without

19   some response, Your Honor.  I will be very brief.

20             THE COURT:  Okay.

21             MS. POWELL:  I see no reason to think, at this point,

22   that the EUA vaccine will likely be mandated at all.  That seems

23   to be purely speculation.  It's not the same formulation as any

24   like-vaccine.  The new Vivariant (phonetic) vaccine is, you

25   know, exciting and desirable, of course, but I haven't seen any
```

1   indication that seems it's likely to be mandated at this point.

2   And it's not licensed or approved at this time.

3           It, at most, will be subject to an EUA in the short

4   term.  I could be wrong, of course, but I see no reason to think

5   that is likely.  It seems like pure speculation.

6           THE COURT:  All right.

7           Anything else from the government's side?

8           MS. POWELL:  No, Your Honor.

9           THE COURT:  Okay.  Well, thank you all for the

10  argument.

11          We are adjourned.

12          Have a good weekend.

13      (Proceedings concluded at 4:12 PM on Friday, September 02,

14  2022.)

15                      * * * * * * * *

16          I certify that the foregoing is a correct transcript
    from the record of proceedings in the above-entitled matter.
17  Any redaction of personal data identifiers pursuant to the
    Judicial Conference Policy on Privacy are noted within the
18  transcript.

19  /s/ Lisa C. Snyder                      9/6/2022

20  Lisa C. Snyder, RPR, CRR                Date
    Official U.S Court Reporter

21

22

23

24

25