# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

| | |
|---|---|
| **BENJAMIN COKER, JOSEPH CONNELL, KALEM COSSETTE, SEAN COTHRAN, SAMUEL CRAYMER, KACY DIXON, JAY FURMAN, JORDAN KARR, NICHOLAS HARWOOD, ERIC KALTRIDER, NICKOLAS KUPPER, DAVID LUND, BLAKE MORGAN, TAYLOR ROBERTS, SAMUEL SIGOLOFF, ANDREW SNOW, BRIAN STERMER, and MICHAEL THOMPSON,** | ) ) ) ) ) ) ) ) ) ) ) |
| *Plaintiffs*, | ) ) |
| vs. | ) ) |
| **LLOYD AUSTIN, III, in his official capacity as Secretary of Defense, U.S. Department of Defense,** | ) ) ) ) |
| **FRANK KENDALL, in his official capacity as Secretary of the Air Force, Department of the Air Force,** | ) ) ) ) ) |
| **CARLOS DEL TORO, in his official capacity as Secretary of the Navy, Department of the Navy,** | ) ) ) ) |
| **ROBERT CALIFF, in his official capacity as Commissioner of the U.S. Food and Drug Administration, and** | ) ) ) ) ) |
| **CHRISTINE WORMUTH, in her official capacity as Secretary of the Army, Department of the Army,** | ) ) ) ) |
| *Defendants*. | ) ) |

**CIVIL ACTION NO. 3:21-cv-01211-AW-HTC**

**THIRD AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

DEEMED FILED AS OF 4/6/2023

## TABLE OF CONTENTS

INTRODUCTORY STATEMENT ................................................................1

PARTIES..................................................................................................8

JURISDICTION AND VENUE ...............................................................17

STATEMENT OF FACTS ........................................................................19

I.   PREVIOUS MANDATES AND INFORMED CONSENT LAWS .................19

II.  ADOPTION AND IMPLEMENTATION OF MILITARY MANDATES .......23

    A. The August 24, 2021 Mandate .......................................................23

    B. DOD Interchangeability Directives ...............................................24

    C. Mandate of Unlicensed EUA Products...........................................25

    D. Defendants' Misrepresented Availability of FDA-Licensed Products and Expiration of All FDA-Licensed Products. ...................................28

    E. Adverse Actions Taken Against Unvaccinated Service Members................31

III. RESCISSION OF THE MILITARY MANDATES...........................................32

    A. Expert Consensus That Mandated, FDA-Licensed Vaccines Are Obsolete and Ineffective. .............................................................32

    B. Adverse Impact of DOD Mandate on Military Readiness ............................34

    C. 2023 NDAA Rescission Directive....................................................35

    D. Formal Rescission of Mandate .......................................................36

    E. Remaining Restrictions and Credible Threat of Enforcement and Punishment for Non-Compliance with Rescinded Mandates............................................38

IV. FEDERAL LAWS GOVERNING LICENSING AND EMERGENCY USE AUTHORIZATION OF DRUGs AND BIOLOGICS .......................................43

    A. FDA Licensing of Drugs and Biologics .........................................43

B. "Interchangeable" Biological Products under the PHSA ............................44

C. Emergency Use Authorization Laws and Differences Between EUA and FDA-Licensed Products ......................................................................44

D. Informed Consent Requirements for EUA Products.....................................45

E. Labeling and Misbranding of FDA-Regulated Products...............................46

V. FDA INTERCHANGEABILITY GUIDANCE AND FDA WAIVERS...........47

A. FDA Interchangeability Guidance....................................................47

B. FDA Waivers and Enforcement Discretion....................................................48

VI. PLAINTIFFS HAVE SUFFERED CONCRETE, PARTICULARIZED INJURIES AND PRESENT JUSTICIABLE CLAIMS. ...................................49

FIRST CAUSE OF ACTION ..................................................................54

SECOND CAUSE OF ACTION ................................................................59

THIRD CAUSE OF ACTION ..................................................................63

FOURTH CAUSE OF ACTION ...............................................................69

FIFTH CAUSE OF ACTION ..................................................................71

SIXTH CAUSE OF ACTION ..................................................................75

SEVENTH CAUSE OF ACTION ..............................................................79

EIGHTH CAUSE OF ACTION ...............................................................83

RELIEF REQUESTED..........................................................................85

## **EXHIBITS**

EXHIBIT 1:   January 10, 2023 Secretary Austin Rescission Memo

EXHIBIT 2:   March 2023 Plaintiffs Status Table

EXHIBIT 3:   Plaintiff March 2023 Declarations

EXHIBIT 4:   Sept. 14, 2021 Pfizer/BioNTech Interchangeability Directive

EXHIBIT 5:   May 3, 2022 Moderna Interchangeability Directive

EXHIBIT 6:   MSGT Nickolas Kupper Nov. 29, 2022 Declaration

EXHIBIT 7:   COL Tanya Rans Nov. 28, 2022 Declaration

EXHIBIT 8:   Jan. 23, 2023 Defense Health Agency Guidance

EXHIBIT 9:   Sept. 15, 2022 Congressional Letter to Secretary Austin

EXHIBIT 10: Feb. 28, 2023 House Armed Services Committee Hearing Transcript

EXHIBIT 11: Feb. 27, 2023 Cisneros Response to HASC

EXHIBIT 12: Jan. 31, 2022 Moderna EUA Reissuance Letter

Plaintiffs, by and through the undersigned counsel, hereby complain and allege the following:

## INTRODUCTORY STATEMENT

1.     On August 24, 2021, Secretary of Defense Lloyd Austin, III issued the COVID-19 vaccine mandate for the Department of Defense ("DOD") ("DOD Mandate"), which was implemented shortly thereafter by each of the Armed Services (together with DOD, the "Military Defendants", and with the DOD Mandate, the "Military Mandates").

2.     On December 23, 2022, the DOD Mandate was "rescind[ed]" by Section 525 of the Fiscal Year 2023 National Defense Authorization Act (the "2023 NDAA"), which was enacted into law by veto-proof majorities in the House of Representatives (350-80) and the Senate (83-11) and signed into law by the Commander-in-Chief, President Joseph R. Biden.

3.     Congress expressly chose the term "rescind", rather than more customary language such as "repeal", "amend", or "modify", to direct the DOD and the courts that the rescission should be applied retroactively to render the DOD Mandate null and void *ab initio*; to eliminate the legal basis for the Military Mandates and any orders issued pursuant thereto; and to completely and irrevocably eradicate all legal effects of the mandates.

4.     Congress chose to legislate the remedy of rescission, because the relationship between the DOD and Armed Services and service members is ultimately contractual. In adopting the mandate, Secretary Austin unilaterally and unlawfully altered the contractual terms of service; Congress' rescission of the mandate voided that unlawful change. Rescission therefore requires the military to restore the pre-Mandate *status quo ante* and return service members substantially to the position they would have been but for the unlawful mandates and any adverse actions taken to enforce or punish non-compliance with the mandates.

5.     Congress has exercised its plenary authority under Article I, Section 8, cl. 12-14 of the U.S. Constitution to raise and regulate military forces. Where Congress has given an express directive to the military and dictated the remedy, there is no room for military discretion. The principal question before this Court—what does "rescind" mean?—is a purely legal question of statutory interpretation for which the Court need not defer to military expertise or previously asserted policy goals that Congress and the Commander-in-Chief set aside in the 2023 NDAA.

6.     On January 10, 2023, Secretary Austin issued a memorandum that formally rescinded the August 24, 2021 DOD Mandate. But at the same time, Secretary Austin retained existing vaccination policies and restrictions and adopted a *de facto* mandate by directing commands to take vaccination status into account in making assignment, deployment, and operational decisions.

7.     On February 28, 2023, the Under-Secretaries for the DOD and the Armed Services testified to the House Armed Services Committee ("HASC") that the following generally applicable policies or interpretations would be applied post-Rescission: the mandates and all orders issued and adverse actions taken thereto were and remain lawful orders; that service members who failed to comply with the mandates or vaccination orders issued pursuant thereto had disobeyed a lawful order in violation of the Uniform Code of Military Justice ("UCMJ"); and that such service members may still be involuntarily discharged and/or prosecuted under the UCMJ.

8.     Defendants have also confirmed that the Armed Services will not order or adopt procedures for reinstatement of discharged or separated members, backpay or financial compensation, reinstatement of promotions denied, or other concrete remedies. Instead, service members may contact their local recruiter or pursue the same futile and inadequate military remedies that have already failed them.

9.     Plaintiffs bring this action to challenge Defendants' unlawful implementation and enforcement of the now-rescinded mandates; their post-Rescission ratification, retention, and enforcement of the unlawful mandates and orders issued pursuant thereto; continued threats and efforts to enforce and punish service members for non-compliance with the now-rescinded mandates; their refusal to restore Plaintiffs and other service members to the pre-Mandate *status quo ante*; and their failure to irrevocably and completely eradicate the legal effects of the

rescinded mandates. Plaintiffs also challenge Defendants' pre-Rescission actions that remain in effect and purport to provide the legal basis for their post-Rescission orders and policies.

10.     The August 24, 2021 DOD Mandate directed that only products licensed by the Food and Drug Administration ("FDA") and labeled in accordance with federal law may be mandated. Because Military Defendants did not have any FDA-licensed products when the mandate was adopted, on September 14, 2021, the DOD directed that unlicensed Emergency Use Authorization ("EUA") products were legally interchangeable with, and should be mandated "as if", they were FDA-licensed products, and then on May 3, 2022 issued the same directive for Moderna EUA products (collectively, "DOD Interchangeability Directives"). Military Defendants imposed the full range of punitive and coercive measures for non-compliance, despite the fact that compliance was impossible due to the unavailability of FDA-licensed products and that mandating EUA products is expressly prohibited by federal law, 10 U.S.C. § 1107a.

11.     The FDA engaged in series of illegal and deceptive actions to provide "legal cover" for the Biden Administration's unlawful federal mandates, most of which have been struck down or are currently enjoined nation-wide, including the mandates for the three of the four Armed Services. The FDA's actions included guidance that, due to the unavailability of FDA-licensed products, EUA and FDA-

4

licensed products can be used "interchangeably" ("FDA Interchangeability Guidance"), which is expressly foreclosed by the Public Health Safety Act ("PHSA"). The FDA also unlawfully waived statutorily mandated, non-waivable labeling requirements for licensed vs. unlicensed products and recipients' statutory right to be informed of their right to refuse EUA products (the "FDA Waivers"). The combined effect of the FDA Interchangeability Guidance and FDA Waivers was to grant the legal benefits of licensure to "legally distinct" unlicensed EUA products, circumventing federal laws governing FDA review, approval, labeling of FDA-licensed products, as well as long-standing regulations, established practice and precedent confirming service members' right to refuse unlicensed EUA products.

12.    Plaintiffs are a group of service members from each branch of the Armed Services, who were subject to the Military Mandates and remain subject to the post-Rescission policies, orders and legal effects that retain, reenact or enforce pre-Rescission mandates. All plaintiffs have been subjected to adverse employment actions and discipline; all have been denied their constitutionally protected religious liberties; and many have been involuntarily separated, constructively discharged, commenced the separation process, or would have been involuntarily separated or discharged already, but for a series of nation-wide injunctions granted against the Air Force, Navy and Marine Corps for systematic violations of religious liberties.

13.    By rescinding the mandates, Congress rejected the Military Defendants' legal positions and its asserted national security and military readiness justifications. Congress has now answered the central questions previously before this Court: Are the Military Mandates lawful and may service members lawfully now be punished for non-compliance?

14.    In the 2023 NDAA, Congress answered "no" to both questions. Yet as explained below, Military Defendants have refused to comply with Congress' command and continue to impose, enforce and give legal effect to the rescinded mandates.

15.    This case is not moot, as Defendants' claim, because the legal effects of the rescinded policies live on after Rescission. Military Defendants seek to turn definitive legal and legislative defeats into a policy victory by getting court challenges dismissed as moot before courts can affirm on the merits their previous decisions that mandates likely systematically and willfully violated service members' rights. The Court and the judiciary more generally must hold them accountable through declaratory judgments finding that these actions were and are unlawful; otherwise, they will be emboldened to continue to illegally mandate experimental drugs and treatments in the belief that they can achieve 98% or 99% compliance with their unlawful goal before Courts or Congress can act.

16.     Plaintiffs file this action seeking an injunctive and declaratory relief and request that this Court:

(1)   Declare that Congress' directive to "rescind" the Military Mandates means that the August 24, 2021 DOD Mandate is null and void *ab initio*, is no longer a lawful order, and cannot provide the legal basis for any subsequent orders issued pursuant thereto;

(2)   Declare that the 2023 NDAA Rescission requires that the DOD and Armed Services restore Plaintiffs and other service members to the pre-Mandate *status quo* and return them to the position in which they would have been absent the rescinded mandates;

(3)   Declare that vaccination orders issued pursuant to the now-rescinded mandates are not lawful orders and are instead legal nullities;

(4)   Declare that Plaintiffs' non-compliance with such vaccination orders, or others based on the now-rescinded mandates, cannot constitute disobeying a lawful order or be used as the basis for discharge, punishment, or other adverse actions;

(5)   Declare unlawful and enjoin any discharge, UCMJ punishment or prosecution, or other adverse personnel action taken based on violations of the now-rescinded Military Mandates;

(6)   Order the Military Defendants to restore Plaintiffs to the pre-Mandate *status quo ante* and to return them to the position in which they would have been absent the unlawful mandates;

(7)   Declare unlawful, vacate and enjoin the DOD Interchangeability Directives;

(8)   Declare unlawful and enjoin the mandate of any EUA product without the Presidential waiver provided under 10 U.S.C. § 1107a;

(9)   Declare unlawful, vacate and enjoin the FDA Interchangeability Guidance and FDA Waivers; and

(10)  Award attorneys' fees, costs, and any other appropriate relief in the Court's discretion.

7

17.     Plaintiffs seek this relief pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702 and 705; the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 & 2202; and the All Writs Act, 28 U.S.C. § 1651.

## PARTIES

18.     Plaintiffs are current or former service members who were subject to the Military Mandates, the DOD Interchangeability Directives, and the other challenged agency actions. As summarized in the attached table in Exhibit 2 (Plaintiff March 2023 Status Chart), all Plaintiffs have submitted religious accommodation requests ("RARs"), most of which have been denied; all Plaintiffs have suffered adverse employment actions; most have been forced into early retirement, commenced proceedings for separation, discharge or involuntary transfer into the inactive reserve, or had separation halted by class-wide injunctions against the Air Force, Marine Corps, and Navy; and several served during the time when the previous anthrax vaccine mandate was subject to a nation-wide injunction or prohibited pursuant to a consent decree.

19.     Plaintiff BENJAMIN COKER is a Chief Petty Officer in the Navy. He is domiciled and stationed in Washington, D.C. He has received four "Page 13" negative counseling letters in connection with his vaccination orders. Both his initial RAR and appeal have been denied. Due to ever-present ostracization and discriminatory treatment, he will retire on April 30, 2023.

8

20.     Plaintiff JOSEPH CONNELL is a Master Sergeant ("MSGT") in the Air Force. He is domiciled and stationed at Hurlburt Field, Florida. MSGT Connell has submitted two requests for medical exemption request (due to his prior history with cancer) that were denied. He has been denied promotion to E-8 for which he is eligible due to vaccination status. Both his initial RAR and appeal have been denied. He has completed his medical board evaluation and will commence medical retirement on March 24, 2023.

21.     Plaintiff KALEM COSSETTE is a Chief Warrant Officer-3 in the Marine Corps. He is stationed in Twentynine Palms, California, and is domiciled in Flagler County, Florida. He has repeatedly confirmed that his base does not have any FDA-licensed or BLA-compliant products. His initial RAR was denied and his pending appeal was cancelled due to rescission. His command had informed him that he would be separated from the Marine Corps as soon as his appeal was denied. He was selected for promotion in 2021, but was not promoted due to vaccination status, but he has been informed that he will be permitted to promote later in 2023.

22.     Plaintiff SEAN COTHRAN is a Captain in the Air Force. He is domiciled and stationed at Hurlburt Field, Florida. He submitted two requests for medical exemption, which were both denied. Both his initial RAR and appeal have been denied. His pending separation was halted by the Air Force class injunction. Captain Cothran was removed from flight status and deemed non-deployable due to

9

his vaccination status. His flight status was restored September 2022, prior to Rescission, and he was returned to deployable status with an operational unit post-Rescission in February 2023. Nevertheless, he was denied benefits and continues to suffer permanent career and reputational harms due to the adverse actions taken against him when the rescinded mandates were in effect.

23.     Plaintiff SAMUEL CRAYMER is a Staff Sergeant in the Air Force. He is domiciled and stationed at Eielson Air Force Base, Alaska. He challenged the lawfulness of the order to take the EUA vaccine with his squadron leadership, and he filed a complaint with the DOD Inspector General. He attended a mandatory vaccination line and, upon requesting to view vials being administered, was shown only Pfizer-BioNTech EUA products. Both his initial RAR and appeal have been denied. His separation was halted by the Air Force class injunction, and post-Rescission he remains subject to deployment and travel restrictions.

24.     Plaintiff KACY DIXON is a Major in the Air Force. She is domiciled and stationed in Florida. In response to her vaccination orders to take a fully licensed vaccine, she attempted to obtain the licensed Comirnaty vaccine from pharmacists and other healthcare providers, and she was informed that it was unavailable. She sought clarification as to whether she was being ordered to take the unlicensed products that were available, and she was informed that she must take the EUA product because it is legally interchangeable with the licensed vaccine. She

submitted a request for medical exemption due to the lack of supply and because she was nursing a newborn, both of which were denied. Her initial RAR was denied and her appeal was pending when the mandate was rescinded. Due to her unvaccinated status, Major Dixon's orders for her follow-on duty assignment with Air Force Special Operations Command were cancelled in April 2022, after successfully completing an LL.M. in National Security Law to prepare for that assignment. She was also prevented from moving to her next duty station, and as a result spent several months in limbo. While she has been reassigned, it is to a slot previously held by a Captain (O-3) with four years of service, while Plaintiff Dixon is a Major (O-4) with 14 years of service. This reassignment and gap in her service record will cause permanent career and reputational harm. Further, without a finding that the DOD and Air Force's orders were not lawful, she and other vaccinated service members will continue to be deemed "refusers" who disobeyed a lawful order and will suffer further harms to their careers and reputations.

25.     Plaintiff JAMES FURMAN was a Commander in the Navy. He is domiciled and stationed in Arlington, Virginia. His initial RAR was denied. Commander Furman was constructively discharged due to his vaccination status, and he was forced to retire, ending his 22-year military career, December 7, 2021.

26.     Plaintiff NICHOLAS HARWOOD is a Major in the Marine Corps. He is stationed at Camp Pendleton, California, and domiciled in Volusia County,

Florida. He has repeatedly confirmed that Comirnaty was not available at his facility. Both his RAR and appeal were denied. He faced a Board of Inquiry ("BOI") in July 2022, which recommended separation for failure to obey a lawful order in violation of the UCMJ, despite demonstrating that no FDA-licensed products were available so that compliance was not possible. His separation was halted by the Marine Corps class injunction. On December 1, 2021, he was selected for promotion to Lieutenant Colonel. After his RAR appeal was denied December 7, 2021, his promotion was denied and he was removed from his position as Executive Officer for his unit. Following Rescission, he has applied to have his promotion reinstated, and as of the date of filing his request is still pending review and his promotion has not been granted. The delay of the promotion and the other uncorrected, adverse paperwork he received will cause permanent career damage.

27.    Plaintiff JORDAN KARR was a Captain in the Air Force. She is domiciled in and stationed at Hurlburt Field, Florida. Captain KARR repeatedly inquired regarding the availability of Comirnaty and BLA-compliant lots, and she was informed that it was not available. She sought medical exemption for a fertility disorder, which was denied. Captain Karr had submitted a separation request in 2021, which she withdrew with command approval in March 2022. In April 2022, after withdrawal had been approved, she was threatened with punishment under the UCMJ and the Air Force issued a new separation date. Captain Karr was

involuntarily separated May 1, 2022, before the end of her term of service. Her initial RAR was denied, and she was not given the opportunity to appeal due to her involuntary separation.

28.    Plaintiff ERIC KALTRIDER is a Major in the United States Marine Corps. He is domiciled in and stationed at Camp Lejeune, North Carolina. He requested a medical exemption, which was denied. Both his initial RAR and appeal were denied. Major KALTRIDER was scheduled for a BOI on August 29, 2022, which was halted by the Marine Corps class injunction.

29.    Plaintiff NICKOLAS KUPPER is a Master Sergeant in the Air Force. He is domiciled in Arizona, and he is stationed at Luke Air Force Base, Arizona. He has repeatedly confirmed with his base immunologist that his base does not have any FDA-licensed or any BLA-compliant lots, and thus would have been required to take an EUA-labeled, non-BLA-compliant vaccine to comply with the mandate. MSGT KUPPER has challenged the lawfulness of the order to take an unlicensed EUA vaccine under Article 138 of the USMJ, and he has submitted a complaint to the DOD Inspector General alleging that the mandates are unlawful. His requests for medical exemption and his initial RAR and appeal were all denied. On July 13, 2022, the Air Force commenced the process to involuntarily separate MSGT Kupper after over 19 years of services, and the Air Force refused to halt the process after the July 14, 2022 the district court in *Doster v. Kendall* issued a class-wide temporary

restraining order enjoining the Air Force from separating class members like MSGT Kupper. His involuntary separation was only halted after intercession by Florida Representative Matthew Gaetz and the *Doster* court's issuance of a class-wide preliminary injunction. MSGT Kupper will retire September 1, 2023.

30.    Plaintiff DAVID LUND is a non-commissioned officer in the Air Force. He is domiciled in and stationed at Fort Walton Beach, Florida. He was ordered to get the EUA vaccine because the licensed Comirnaty Vaccine was not available. He objected based on his previous COVID-19 infection, but was pressured into being injected with the EUA Janssen vaccine.

31.    Plaintiff BLAKE MORGAN is a Captain in the Air Force. He is domiciled in and stationed at Eglin Air Force Base, Florida. He submitted a request for medical exemption, which was denied. His initial RAR was still pending when the mandate was rescinded. Due to his vaccination status, he was subject to travel restrictions and has been required to cancel mission-critical travel.

32.    Plaintiff TAYLOR ROBERTS is a Major in the Air Force. He is domiciled and stationed in New Mexico. Major Roberts requested a medical exemption based on genetic predisposition to increased likelihood of adverse effects; he was initially granted a temporary exemption, which was revoked within five days. Both his initial RAR and appeal have been denied. He also challenged the lawfulness of his vaccination order, by submitting a complaint under Article 138 of the UCMJ,

14

which was dismissed on November 19, 2021. In July 2022, the Air Force threatened to separate him involuntarily, but separation was halted by the *Doster* class-wide preliminary injunction issued later that month.

33.     Plaintiff DR. SAMUEL SIGOLOFF is a board-certified family physician and a Major in the Army. He is domiciled and stationed in Arizona, where he served as the medical director for Fort Huachucha, Arizona. On September 13, 2021, he was relieved and suspended from treating patients for lawfully granting medical exemptions from the DOD mandate, consistent with the procedures and guidance in effect at that time, and for prescribing alternative treatments like Ivermectin. Both his initial RAR and appeal were denied. Following his approval of medical exemptions for the COVID-19 vaccines, Major SIGOLOFF received negative counseling statements and a General Officer Memorandum of Reprimand ("GOMOR"); his medical practice was suspended; he was the subject of two investigations under UCMJ Article 15-6; and he has been reported to the Texas Medical Board, which has initiated an investigation. Due to these pending investigations, he cannot apply for a medical license at his current duty station in Arizona. In October 2022, prior to Rescission, he was granted limited treating privileges in Arizona, subject to restrictive supervision requirements; however, he is still suspended from his previous duty station with recommendations to revoke his privileges.

15

34.    Plaintiff ANDREW SNOW is a Major in the Air Force Reserve. He is domiciled in and stationed in Delaware. He has confirmed that his base does not have FDA-licensed products. Both his initial RAR and appeal have been denied. He had commenced the involuntary separation process and removal to the Inactive Ready Reserve ("IRR"). His separation and transfer to the IRR was halted by the Air Force Class Injunction.

35.    Plaintiff BRIAN STERMER is a Sergeant First Class ("SFC") in the Army Reserve. He is currently stationed at Fort Leonard Wood, Missouri, and is domiciled in Santa Rosa County, Florida. He has submitted a complaint under Article 138 of the UCMJ challenging the lawfulness of several COVID-related restrictions and orders, which was denied. His initial RAR was pending when the mandate was rescinded. Post-Rescission, he has been returned to Active Guard Reserve status.

36.    Plaintiff MICHAEL THOMPSON is an MSGT in the Marine Corps. He is domiciled in North Carolina, and he is stationed at MCAS Cherry Point, North Carolina. He has repeatedly inquired as to the availability of both Comirnaty and "BLA-compliant" lots at Marine Corps facilities in North Carolina, and he has been informed that no FDA-licensed or BLA-compliant doses were available. Despite the confirmed unavailability of Comirnaty, MSGT Thompson has personally observed that the medical records for at least one fellow marine who received the EUA vaccine

16

indicate that he or she instead received Comirnaty. His initial RAR was denied and his appeal was pending when the mandate was rescinded. MSGT Thompson was constructively discharged due to the mandate, and he retired December 31, 2022.

37.    Defendant DOD is a Department of the United States Government. It is led by the Secretary of Defense, Lloyd J. Austin, III.

38.    Defendant Department of the Air Force is a Department of the United States Government. It is led by the Secretary of the Air Force Frank Kendall.

39.    Defendant Department of the Army is a Department of the United States Government. It is led by the Secretary of the Army Christine Wormuth.

40.    Defendants Marine Corps and Navy are under the Department of the Navy, which is a Department of the United States Government. It is led by Navy Secretary Carlos Del Toro.

41.    Defendant FDA is an agency of the United States Government. It is led by Commissioner Robert Califf.

## JURISDICTION AND VENUE

42.    This case arises under federal law, namely, 10 U.S.C. § 1107a; the APA, 5 U.S.C. § 551 *et. seq.*; various DOD regulations, including DOD Instruction ("DODI") 6205.02 and DODI 6200.02; the Food, Drug, and Cosmetics Act ("FDCA"), 21 U.S.C. § 301 *et seq.*; the Public Health Safety Act ("PHSA"), 42 U.S.C. § 262 *et seq.*; and FDA regulations implementing the FDCA and PHSA.

43.     The Military Mandates, DOD Interchangeability Directives, FDA Interchangeability Guidance, FDA Waivers, and other challenged agency actions are final agency actions for which there is no other adequate remedy in a court. 5 U.S.C. § 704. These actions mark the consummation of the agency's decision-making process.  Each has direct and appreciable legal and life-altering consequences for Plaintiffs and other service members.

44.     To the extent that the DOD Interchangeability Directives, FDA Interchangeability Guidance, FDA Waivers are deemed not to be final agency actions subject to APA review, this Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 2201 to review and provide declaratory and injunctive relief for these *ultra vires* actions that "wholly deprive[s] the [Plaintiffs] of a meaningful and adequate means of vindicating [their] ... rights" under federal statutes. *Rhode Island Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 41–42 (1st Cir.2002).

45.     Jurisdiction is proper in this Court under the APA, 5 U.S.C. § 702, and under 28 U.S.C. § 2201, which states that actions involving controversies with federal agencies may be pursued in any United States District Court, and under 28 U.S.C. §§ 1331 and 1346.

46.     Venue is proper in this Court pursuant to 28 U.S.C. § 1402 and 28 U.S.C. § 1391(e) because a plurality of the Plaintiffs are stationed and/or domiciled

in this district, and because a substantial part of the acts or omissions giving rise to their claims have occurred, are occurring, or will occur in this District.

## STATEMENT OF FACTS

## I.   PREVIOUS MANDATES AND INFORMED CONSENT LAWS

47.   The DOD and the other Armed Services have, for nearly a century, used service members for medical experiments and experimental drugs. *See, e.g.*, Dale Saran, *United States v. Members of the Armed Forces*, at 9-29 (2d ed., 2021). In response to these abuses, Congress has repeatedly exercised its plenary authority under Article I, Section 8, clauses 12-14 of the U.S. Constitution, to raise and regulate military forces to protect service members from these experiments; to recognize their human rights to informed consent; and to prohibit the military from ordering or mandating them to participate in medical experiments or to take experimental treatments.

48.   Prior to the first Gulf War, the DOD sought to pretreat service members with several unlicensed, "investigational" new drugs, which under U.S. law could not be administered to military members without informed consent. The DOD successfully petitioned the FDA to establish a new rule waiving U.S. servicemembers right to informed consent. In numerous hearings in the aftermath of the Gulf War, the administration of these experimental drugs has been correlated with "Gulf War Illness" or "Gulf War Syndrome," which "debilitated over 174,000

service members." *See generally* Efthimios Parasidis, *Justice and Beneficence in Military Medicine and Research*, 73 Ohio St. L.J. 723, 732-39 & 759-60 (2012).

49.    After extensive hearings in Congress across multiple committees documenting systemic, repeated failures by the DOD involving the health of America's all-volunteer force, including the ill-fated and disastrous anthrax vaccine, the U.S. Congress passed Title 10 U.S.C. §1107 in 1997. This statute requires that, in any instance in which the DOD sought to use any unlicensed product on members of the Armed Forces, no one short of the Commander-in-Chief could waive a servicemember's right to informed consent.

50.    In 2003, the U.S. District Court for the District of Columbia issued a preliminary injunction against the DOD for mandating the unlicensed anthrax vaccine, and in 2004 that same court issued a permanent nation-wide injunction prohibiting the DOD's anthrax vaccine mandate. *See Doe v. Rumsfeld*, 297 F. Supp. 2d 119 (D.D.C. 2003) ("*Rumsfeld I*"), *modified sub nom*. *John Doe No. 1 v Rumsfeld*, 341 F. Supp. 2d 1 (D.D.C. 2004) ("*Rumsfeld II*"), *modified sub nom*. *John Doe No. 1 v. Rumsfeld*, 2005 WL 774857 (D.D.C. Feb. 6, 2005) ("*Rumsfeld III*").

51.    In the middle of that litigation in 2004, Congress passed the Project BioShield Act, the first version of the current EUA statute, 21 U.S.C. §360bbb-3. Shortly thereafter, Congress also passed mirror image statute for the protection for service members' informed consent rights, 10 U.S.C. §1107a.

20

52.     After the EUA statute's passage, the FDA granted the first ever EUA for the anthrax vaccine. Then both the DOD and FDA jointly filed an emergency petition in the D.C. District Court to modify the permanent injunction already in place to allow the vaccine to be administered to servicemembers solely on a voluntary basis and prohibited any punishment for those who refused. The court modified the injunction accordingly:

> ORDERED that the Court's injunction of October 27, 2004, is modified by the addition of the following language: 'This injunction, however, shall not preclude defendants from administering [the anthrax vaccine], on a *voluntary* basis, pursuant to the terms of a *lawful* emergency use authorization ("EUA")[.]

*See Rumsfeld III*, 2005 WL 774857, at *1 (emphasis in original). *See also* FDA, *Authorization of Emergency Use of Anthrax Vaccine Adsorbed for Prevention of Inhalation Anthrax by Individuals at Heightened Risk of Exposure Due to Attack With Anthrax; Availability*, 70 Fed. Reg. 5452, 5455 (Feb. 2, 2005) (Section IV "Conditions of Authorization").

53.     Several Plaintiffs, including MSGT Kupper, Major Snow, SFC Stermer, MSGT Thompson served during the time when the *Rumsfeld I* preliminary injunction, the *Rumsfeld II* permanent injunction, and/or the *Rumsfeld III* consent decree were in place, were subject to the enjoined anthrax mandater, and thus were beneficiaries of these protections. These Plaintiffs may be deemed to have been parties to these proceedings for purposes of estoppel.

21

54.     In 2008, the DOD issued DOD Instruction 6200.02 ("DODI 6200.02")
the currently effective regulation governing the mandate of EUA products.
Consistent with the EUA statute, 10 U.S.C. § 1107a, and the nation-wide consent
decree in *Rumsfeld III*, the instruction requires that the DOD include an option to
refuse an EUA product that may only be waived "if the President determines, in
writing, that providing to members of the armed forces an option to refuse is not in
the interests of national security." DODI 6200.02, *Application of Food and Drug
Administration (FDA) Rules to Department of Defense Force Health Protection
Programs*, ¶ E3.4 (Feb. 27, 2008).

55.     DODI 6205.02 is the extant governing regulation for routine military
immunizations. This instruction defines a "vaccine" and "vaccination" as:

> **vaccination**. The administration of a vaccine to an individual for
> inducing *immunity*.

> **vaccine.** A preparation that [1] contains one or more components of a
> biological agent or toxin and [2] induces a protective immune response
> against that agent when administered to an individual.

ECF 65-5, DODI 6205.02, ¶ G.2 ("Definitions"). The first and second clause
establish an identity relationship between the "biological agent" administered (*i.e.*,
mRNA) and "that agent" against which the vaccine "induces a protective immune
response" (*i.e.*, COVID-19 virus). The identity relationship presents a binary
choice—either the agent in [1] the same as "that agent" in [2] or it is not—with no
space in between for ambiguity. The mRNA shots do not "contain" a single molecule

of the COVID-19 virus, and therefore the mRNA shots are not "vaccines" under DODI 6205.02

## II.  ADOPTION AND IMPLEMENTATION OF MILITARY MANDATES

### A.  The August 24, 2021 Mandate

56.  On August 24, 2021, Secretary Austin issued the DOD Mandate directing the Secretaries of the Military Departments "to immediately begin full vaccination of all members of the Armed Forces … who are not fully vaccinated against COVID-19."  ECF 1-3, DOD Mandate, at 1. Mandatory vaccination was to "only use COVID-19 vaccines that receive full licensure from the [FDA], in accordance with FDA labeling and guidance." *Id.* Secretary Austin justified the mandate as necessary to "protect the Force", *id.*, and cited DOD Instruction 6205.02 as the sole legal authority for the mandate. *Id.*

57.  Each of the Armed Services issued their own mandates shortly after the issuance of the DOD Mandate. *See* ECF 1-7, "COVID-19 Mandatory Vaccination Implementation Guidance for Service Members" (Air Force Mandate); ECF 31-6, U.S. Army FRAGO 5 (Army Mandate); ECF 1-9, U.S. Marine Corps MARADMINS 462/21 (Marine Corps Mandate); ECF 1-10, U.S. Navy ALNAV 062/21 (Navy Mandate). Each of the Armed Services have issued subsequent orders implementing and modifying the initial Armed Services Mandates.

**B.     DOD Interchangeability Directives**

58.     Military Defendants have had in place at all relevant times an express policy to deceive service members—orally and in writing—by stating that unlicensed, EUA products are in fact FDA-licensed products and even referring to these unlicensed products by the proprietary name—COMIRNATY® or SPIKEVAX®—that, pursuant to federal and state law, may only be used for FDA-licensed products.

59.     On September 14, 2021, Assistant Secretary of Defense for Health Affairs Terry Adirim issued a memo stating that the Pfizer/BioNTech EUA product and the licensed COMIRNATY® "are 'interchangeable'". Ex. 4, Sept. 14, 2021 Pfizer/BioNTech Interchangeability Directive, at 1 (*quoting* ECF 1-6, FDA, Aug. 23, 2021 Pfizer/BioNTech EUA Reissuance, at 2 n.8). Assistant Secretary Adirim directed that DOD health care providers "should use doses distributed under the EUA to administer the vaccination series as if the doses were the licensed vaccine," and that "DOD health care providers will use both [products] interchangeably for the purpose of" implementing the DOD Mandate.

60.     On May 3, 2022, Assistant Secretary of Defense Seileen Mullen issued the same directives for the Moderna EUA COVID-19 product, stating that the EUA product "should" be used interchangeably with, and "as if," it was the FDA-licensed and labeled Moderna Spikevax vaccine. *See* Ex. 5, May 3, 2022 Moderna

Interchangeability Directive, at 1.

61.    The Armed Services have also directed that unlicensed EUA products be used "interchangeably" or "as if" they were FDA-licensed products. For example, while the Air Force Mandate states that "[o]nly an FDA-licensed vaccine may be mandated," ECF 1-7, Air Force Mandate, § 3.1.3, it goes on to repeat the FDA's (incorrect) claim that the EUA BioNTech Vaccine is "interchangeable" with the licensed product and that "[p]roviders can use doses distributed under the EUA to administer the vaccination series as if the doses were the licensed vaccine." *Id*., § 3.1.1; *see also id.*, § 5.3.2.1 (same). The Navy issued the same interchangeability directive, which also applies to the Marine Corps. *See* Navy Administrative Record DON AR 027, BUMED Memo 6300 6300, *Interchangeability of FDA-Approved Pfizer-BioNTech Vaccine Comirnaty and FDA-Authorized Pfizer-BioNTech Vaccine Under EUA* (Sept. 3, 2021) ("BUMED 6300"), at 1.

### C.    Mandate of Unlicensed EUA Products

62.    Military Defendants did not possess any FDA-licensed products that could be mandated when the Military Mandates were issued.

63.    It is undisputed, and this Court has found, that Military Defendants have in fact "mandate[ed] vaccines from EUA-labeled vials." *Doe #1-#14 v. Austin*, 572 F.Supp.3d 1224, 1223, 2021 WL 5816632 (N.D. Fla. 2021).

64.    Even before the DOD Mandate was announced, the DOD issued

directives to use the existing supply of unlicensed EUA products to implement the mandate. In an August 18, 2021 memorandum informed Secretary Austin that the DOD "has enough vaccine on-hand … to support … mandatory vaccination." *See* Information Memorandum from Special Assistant to the Deputy Assistant Secretary of Defense for Secretary of Defense, Subject: Mandatory Vaccination Implementation at 1 (Aug. 18, 2021), DOD Administrative Record AR, Tab 15, DOD 000109. A July 30, 2021 presentation to the DOD COVID-19 Task Force stated that providers should "administer vaccine immediately with existing … supply." DSD COVID-19 Task Force Meeting (Agenda), DOD AR, Tab 36, DOD 000166.

65.    Military Defendants also adopted generally applicable policies: (1) to misrepresent that they had FDA-licensed vaccines to service members and that EUA products are instead "FDA-licensed" or describing EUA products as COMIRNATY® or SPIKEVAX®, which Plaintiffs have repeatedly confirmed were not in fact available; (2) to misrepresent unlicensed EUA products by stating that the EUA products available "are" COMIRNATY®, *see* ECF 68-1, Cossette Decl., ¶ 7, and that "interchangeability" includes "legal interchangeability" (*i.e.,* not merely "medical interchangeability"), *see id.*, Dixon Decl., ¶ 14; and (3) to punish and discharge service members like Plaintiffs who refuse to take an unlicensed vaccine, which may not be mandated. *See infra* Section VI (summarizing Plaintiffs' injuries

standing) & Ex. 2, March 2023 Plaintiffs Status Chart.

66.    In Plaintiffs' February 4, 2022 Opposition to Defendants' Motion to Dismiss, ECF 68, several Plaintiffs submitted declarations attesting to the unavailability of COMIRNATY® or "BLA-compliant" doses. *See, e.g.,* ECF 68-1, Cothran Decl., ¶ 17 (no BLA compliant doses; EUA only); Dixon Decl., ¶ 16 (same); Kupper Decl., ¶11 (no Comirnaty or BLA-approved lots available); Roberts Decl., ¶ 11 (only EUA lots available); Connell Decl., ¶4 (no Comirnaty); Cossette Decl., ¶5 (same); Harwood Decl., ¶8 (same); Sigoloff Decl., ¶11 & Ex. X (emails); Snow Decl., ¶5 (no Comirnaty); Thompson Decl., ¶13 (no Comirnaty; confirmed all lots available were EUA only).

67.    Plaintiffs did so again in May 2022 in response to Defendants' interrogatories. Plaintiffs Cossette, Cothran, Karr, Dixon, Kupper, Stermer, and Roberts inquired and confirmed that no FDA-licensed or BLA-compliant doses were available for either Pfizer/BioNTech or Moderna products. *See* ECF 88-9, PL Response to DF Interrogatories, Response No. 11 at 8.

68.    It is undisputed that Military Defendants did not have any FDA-licensed COMIRNATY® until at least June 2022 (*i.e.*, ten months after licensure), while consistently misrepresenting unlicensed products as FDA licensed. This is an admission that Military Defendants did not have any FDA-licensed COMIRNATY® before that date. Moreover, the products that they represent as "Comirnaty-labeled,

BLA-approved" products, ECF 124-1, Oct. 18, 2022 Rans Decl., ¶ 4, are in fact

unlicensed, misbranded, expired, and/or adulterated, as discussed below.

69.    It is further undisputed that Military Defendants did not have any

SPIKEVAX® in their possession until September or October 2022 (*i.e.*, more than

a year after the adoption of the mandate). This is confirmed by Defendants' August

22, 2022 filing, which asserts that DOD could "order" SPIKEVAX®, ECF 107-16,

Aug. 22, 2022 Rans Decl., ¶ 4, but does not state that they had even a single dose in

their possession.

### D.    Defendants Misrepresented Availability of FDA-Licensed Products and Expiration Date of All FDA-Licensed Products.

70.    **Purple Cap COMIRNATY®.** At the outset of this proceeding,

Military Defendants falsely claimed to have Purple Cap COMIRNATY® (*i.e.*, the

only FDA-licensed product when the Military Mandates were issued), including in

filings with this Court. *See* ECF 31, Oct. 21, 2021 DF Opp'n to PL TRO Motion, at

46 ("DOD has a supply of Comirnaty"). Upon direct questioning by this Court,

Defendants' counsel withdrew this claim and acknowledged that they did not have

any Comirnaty and did not know when they would get any. *See* ECF 45, Nov. 3

Hearing Tr., at 47:21-48:17.

71.    In fact, it would not have been possible for Military Defendants to

acquire Purple Cap COMIRNATY® because this product does not appear to exist

at all, as it was never manufactured or marketed in the United States. *See* ECF 120,

Sept. 26, 2022 PL Hearing Mot., at 12-13 & ECF 120-8, Sept. 13, 2021 Pfizer

Announcement, at 1 (Pfizer statement that "it does not plan to produce any product

with these new NDCs [*i.e.*, for Purple Cap COMIRNATY®] and labels over the next

few months.").

72.     **Grey Cap COMIRNATY®.** The October 18, 2022 declaration of

Colonel Tanya Rans provides a list of "BLA-approved, Comirnaty-labeled"

vaccines, ECF 124-1, Oct. 18, 2022 Rans Decl., ¶ 4, that are identified as Pfizer Grey

Cap COMIRNATY. *Id*., Ex. A. The "Comirnaty-labeled, BLA-approved" products

obtained by DOD in June 2022 are from lots FW1330, FW1331, and FW1333 (the

"FW Lots"). *See id*.

73.     All vials from the FW Lots are unlicensed, misbranded, and expired.

74.     Official FDA records establish that each of these FW Lots were

manufactured at Pharmacia & Upjohn's Kalamazoo, Michigan facility ("Kalamazoo

Facility"), which was not an FDA-approved facility at any of the relevant times (*i.e.*,

date of manufacture, date of lot release, or date of order by or shipment to DOD).

*See* ECF 120, PL Hearing Mot., at 15-17 (FW1331). This is confirmed by FDA-

approved Grey Cap COMIRNATY® package inserts, which are required to list

FDA-approved manufacturing facilities but do not list the Kalamazoo Facility as an

FDA-approved manufacturing facility. *See* ECF 120, Sept. 26, 2022 PL Hearing

Mot., at 14-15 (FW1331) & ECF 120-5 (May 19, 2022 Grey Cap COMIRNATY®

Package Insert).

75.     Official records from the website of the Centers for Disease Control and Prevention ("CDC") also listed the FW Lots as EUA products. *See* ECF 120, Sept. 26, 2022 PL Hearing Mot., at 17-18 & 120-7, LT Coppin Decl., at 26 (Bashaw Decl., ¶¶ 10-11).

76.     The FW Lots also expired months before the mandate was rescinded. Official FDA records (lots release letters) and the FDA-approved product labels state that the expiration date is September 30, 2022 for Lots FW1330 and FW1331 and October 31, 2022 for Lot FW 1330. *See* ECF 108-1, Aug. 26, 2022 Burk Decl., at 3-4 (FW1331 Lot Release Letter); ECF 89-5, June 1, 2022 Rans Decl., ¶ 8 (vials ordered May 20, 2022 by DOD had an "expiration date [of] September 30, 2022").

77.     The currently effective and all previous, archived versions of the Pfizer Comirnaty Grey Cap package insert state that: "Regardless of storage condition, the vaccine should not be used after the expiration date printed on the vial and cartons." ECF 120-4, Dec. 22, 2021 Grey Cap COMIRNATY® Package Insert, at 13; ECF 120-5, May 19, 2022 Grey Cap COMIRNATY® Package Insert, at 27.

78.     **Unlicensed Bivalent Vaccines.** The October 18, 2022 Rans declaration also identifies vaccines from Lot Numbers GH9667, GH9702, and GH6665 (the "G Lots") as Grey Cap COMIRNATY®.

79.     National Drug Code ("NDC") for each of the G Lots is 59267-0304.

This is the NDC for the unlicensed, EUA Pfizer bivalent COVID-19 vaccine, rather than for Grey Cap COMIRNATY®. *See* Ex. 6, Nov. 29, 2022 Kupper Decl., ¶¶ 4-5 & Kupper Ex. A (query results from CDC database).

80.     In a separate case in the U.S. District Court for the Southern District of Texas, *Bazzrea v. Austin*, 3:22-cv-265 (S.D. Tex.) ("*Bazzrea*"), Colonel Rans submitted sworn testimony in *Bazzrea* asserting that the G Lots had been "misidentified" as FDA-licensed Gray Cap COMIRNATY® due to "human error", Ex. 7, Nov. 28, 2022 Rans Decl., ¶ 4, and excluded all G Lots from the DOD inventory of "Comirnaty-labeled" products. *Id.*, Ex. A.

81.     Defendants' sworn testimony misrepresented to this Court the licensure status of over 11,000 doses from the G Lots. As of the date of this complaint, Defendants have not corrected this misrepresentation, over five months after this testimony was submitted to the Court on October 18, 2022.

82.     **SPIKEVAX®.** All available SPIKEVAX® expired and was no longer orderable on or before January 23, 2023, the deadline for Rescission of the Mandate. *See* Ex. 8, Jan. 23, 2023 Defense Health Agency Guidance, at 1.

### E.     Adverse Actions Taken Against Unvaccinated Service Members

83.     Under the UCMJ, a service member who disobeys "any lawful general order or regulation," UCMJ § 892(2), Art. 92(2), faces sanctions up to a court-martial. UCMJ § 892. To date Military Defendants have separated several thousand

unvaccinated service members, and they likely would have separated tens of thousands more, including several Plaintiffs, if this had not been halted by the three class-wide injunctions against the Air Force, Marine Corps and Navy for systemic violations of the Religious Freedom Restoration Act ("RFRA").

84.    Military Defendants have imposed a wide range of restrictions and taken disciplinary actions against unvaccinated service members like Plaintiffs, including: training, travel, leave/liberty, and duty restrictions; denial or restriction of promotions; non-deployable status; negative counseling or reprimands; ineligibility for change of station or new assignments; forced early retirement; and/or removal from command. In addition to these deceptive measures, Military Defendants have employed a wide range of coercive measures to force service members to forfeit their right to refuse an unlicensed product. *See supra* "Parties" (Plaintiff descriptions); *infra* Section VI;  and Ex. 2, Plaintiffs March 2023 Status Chart.

## III.    RESCISSION OF THE MILITARY MANDATES

### A.    Expert Consensus That Mandated, FDA-Licensed Vaccines Are Obsolete and Ineffective.

85.    As early as January 10, 2022, Pfizer's CEO admitted that the mandated vaccines offered very limited protection if any to the then-prevalent Omicron variant. *See* ECF 68, Feb. 4, 2022 PL Opp. to DF MTD, at 40 & n. 43.

86.    Based on Plaintiff's review of official CDC data, the manufacturers long ago ceased production of their FDA-licensed products. Pfizer manufactured the

last FDA-licensed lot in COMIRNATY® in February 2022, and Moderna manufactured the last lot of SPIKEVAX® in April 2022. *See* Ex. 6, Nov. 29, 2022 Kupper Decl., ¶ 12.

87.     The U.S. government's expert public health agencies recognized the obsolescence of the FDA-licensed vaccines at least as early as August 2022.

88.     On August 11, 2022, the CDC issued updated guidance to "no longer differentiate based on a person's vaccination status." *See* ECF 120-6, Aug. 11, 2021 CDC Summary of Guidance, at 5.

89.     On August 16, 2022, the White House announced that the U.S. government would no longer purchase or provide reimbursement for the "monovalent" versions of the COVID-19 vaccines, whether EUA or FDA-licensed, and the CDC announced that the U.S. government, through HHSC, would instead purchase 175 million doses of the new "bivalent" vaccines. *See* ECF 117, Sept. 9, 2022 PL Supp. Br., at 4-5 & ECF 117-2, CDC Fall Vaccination Operational Planning Guide, at 1. In other words, the sole customer and payor for the Mandated mRNA Products expressly adopted a policy that it would no longer purchase or provide reimbursement for the mandated, FDA-licensed products.

90.     In related litigation, courts have found that Military Defendants have failed to provide any current or relevant data regarding the marginal risks and benefits of the Mandated mRNA Treatments for healthy service members under

33

current circumstances, namely, 2022 data with respect to the currently prevalent Omicron sub-variants when 98% of other service members are fully vaccinated. Instead, Defendants have provided only "historical data from the 2020 and 2021 pre-Omicron, pre-vaccine phase" that does not "address the present state of 'the force.'" *Colonel Fin. Mgmt. Officer v. Austin*, No. 8:22-CV-1275-SDM-TGW, 2022 WL 3643512, at *16 (M.D. Fla. Aug. 18, 2022) ("*CFMO*").

91. The scientific evidence demonstrating the obsolescence and ineffectiveness of the FDA-licensed vaccines is too voluminous to summarize here. It should suffice to say that these facts are now so widely recognized that the mRNA vaccines were, at best, a failed experiment, and even the creators and loudest champions like Dr. Anthony Fauci, that viruses like COVID-19 are not "vaccine preventable" even in theory. *See, e.g.,* Anthony Fauci, et al., *Rethinking next-generation vaccines for coronaviruses, influenzaviruses, and other respiratory viruses*, CELL HOST AND MICROBE at 1, Vol. 31, Iss. 2. (Feb. 8, 2023), available at: https://doi.org/10.1016/j.chom.2022.11.016 (last accessed Mar. 15, 2023).

## B. Adverse Impacts of DOD Mandate on Military Readiness

92. Nearly 8,500 service members have been discharged for non-compliance with the DOD Mandate, including 1,841 Army Soldiers, 3,717 Marines, 834 airmen and 2,041 Navy sailors. *See* Caitlin Doornbos, *Pentagon Ends COVID-19 Vaccine Mandate for US Troops* NY Post (Jan. 11, 2023), available at:

https://nypost.com/2023/01/11/pentagon-ends-covid-19-vaccine-mandate-for-us-troops/ (last accessed Mar. 23, 2023).

93.    At least 60,000 to 70,000 members of the Army National Guard, Army Reserves, Air National Guard, or Air Force Reserve were involuntarily transferred to the inactive reserves and/or denied pay or benefits.

94.    On September 15, 2022, over 50 Members of Congress wrote to Secretary Austin to express "grave concern of the effect of the" DOD Mandate because, "[a]s a major land war rages in Europe our own military faces a self-imposed readiness crisis." Ex. 9, Sept. 15, 2022 Congressional Letter to Secretary Austin, at 1. They identify the DOD Mandate as the "primary cause of the [DOD]'s recruiting difficulties," which will result in the loss of at least 75,000 from the Army alone, *id.* at 2, and effectively "disqualifies more than forty percent of the Army's target demographic from service nationwide, and over half of the individuals in the most fertile recruiting grounds." *Id.* at 2.

### C.    2023 NDAA Rescission Directive

95.    On December 23, 2022, President Biden signed into law the 2023 NDAA, which was enacted by a vote of 83-11 in the Senate and 350-80 in the House.

96.    Section 525 of the 2023 NDAA directed Secretary of Defense Lloyd Austin, III to "rescind" the August 24, 2021 DOD Mandate. H.R. 7776, Pub. L. No. 117-263, 136 Stat. 2395 (2022).

97.    Congress intentionally used the term "rescind", rather than "repeal", to instruct Secretary Austin and the courts that Section 525 must be applied retroactively. "Rescind" is derived from the Latin "rescission", which means "an annulling; avoiding, or making void; abrogation; rescission". BLACK'S LAW DICTIONARY at 1306 (6th ed. 1990).

98.    "Rescind" is normally used in the context of "rescission of contract", which means to "abrogate, annul, avoid or cancel a contract;" "void in its inception"; or "an undoing of it from the beginning." *Id.* "Rescind" thus necessarily has retroactive effect and renders the rescinded contract, policy or rule void *ab initio.* Section 525 thus reflects the determination by veto-proof majorities of Congress that Secretary Austin's Mandate was void *ab initio*.

### D.    Formal Rescission of Mandate

99.    On January 10, 2023, Secretary Austin rescinded the August 24, 2021 DOD Mandate. *See* Ex. 1, Jan. 10, 2023 SECDEF Rescission Memo. In the Rescission Memo, Secretary Austin acknowledged that Section 525 applies retroactively by ordering that all separations and discharges resulting solely from non-compliance with the DOD Mandate should be halted and that all adverse personnel actions and paperwork should be corrected. *Id.* at 1. Secretary Austin further directed the Service Secretaries to cease adjudication of RARs and medical or administrative exemptions. *Id.*

36

100.    On February 24, 2023, the DOD issued a memorandum directing DOD components to formally rescind other existing vaccination requirements and stating that the DOD would revised DODI 6205.02 to prohibit commands from taking vaccination status into account in making assignment, deployment and operational decisions, without express DOD approval. *See* ECF 134, Mar. 17, 2023 Joint Status Report, at 1-2 (*discussing* Deputy Secretary of Defense, *Guidance for Implementing Rescission of August 24, 2021 and November 30, 2021 Coronavirus Disease 2019 Vaccination Requirements for Members of the Armed Forces* (Feb. 24, 2023), available at: https://perma.cc/3MXS-2CNR) ("February 24, 2023 Guidance Memo").

101.    Each of the Armed Services has issued orders rescinding that Service's mandate. On March 17, 2023, Military Defendants provided a compilation of the rescission orders and guidance for each Armed Service and the National Guard Bureau (collectively, "Armed Services Rescission Orders"). *See* ECF 135-1, Compiled Army Guidance Documents: Fragmentary Orders 35-38 to HQDA EXORD 225-21 (various dates); HQDA EXORD 174-23 (Mar. 7, 2023); *Army Policy Implementing the Secretary of Defense COVID-19 Vaccination Mandate Rescission* (Feb. 24, 2023); ECF 135-2, Compiled Department of the Navy and Navy Guidance Documents: NAVADMIN 05/23 (Jan. 11, 2023); ALNAV 009/23 (Jan. 20, 2023); NAVADMIN 038/23 (Feb. 15, 2023); *Department of the Navy Actions to*

*Implement Coronavirus Disease 2019 Vaccine Rescission* (Feb. 24, 2023);

NAVADMIN 065/23 (March 7, 2023); ECF 135-5, Compiled Marine Corps

Guidance Documents: MARADMIN 025/23 (Jan. 18, 2023); MARADMIN 109/23

(Feb. 28, 2023); ECF 135-4, Compiled Air Force Guidance Documents: *Mem. Re:*

*Rescission of the 3 September 21 Mandatory COVID-19 Vaccination of DAF*

*Military Members and 7 December 2021 Supplemental COVID-19 Vaccination*

*Policy Memo* (Jan. 23, 2023); *AFR Guidance for COVID-19* (Feb. 10, 2023); *DAF*

*Guidance on Removal of Adverse Actions and Handling of RARs* (Feb. 24, 2023);

ECF 135-5, Compiled National Guard Bureau Guidance Documents: *Mem. re:*

*Return of Non-Federalized T32 National Guard Service Members* (Jan. 18, 2023);

*Updated NGB Official COVID-19 Travel Guidance* (Feb. 3, 2023).

### E.    Remaining Restrictions and Credible Threat of Enforcement and Punishment for Non-Compliance with Rescinded Mandates

102.    Secretary Austin's January 10, 2023 Rescission Memo retains existing

restrictions and either retains or adopts a substantially similar *de facto* mandate,

directing that "[o]ther standing Departmental policies, procedures, and processes

regarding immunization remain in effect," which includes "the ability of

commanders to consider, as appropriate, the individual immunization status of

personnel in making deployment, assignment, and other operational decisions …"

Ex. 1, Jan. 10, 2023, Secretary Austin Rescission Memo, at 2. The Armed Services

Rescission Orders also retain existing restrictions and authorize *de facto* mandates.

103.   The February 24, 2023 Guidance Memo purports to prohibit new vaccination requirements and would require the Services to obtain formal DOD approval to take vaccination status into account in making assignment, deployment and operational decisions.

104.   Based on Plaintiffs' review of Defendants' March 17, 2023 filing, Secretary Austin's new *de facto* mandate remains in place for all Armed Services.

105.   The Army, Air Force, Marine Corps and National Guard Rescission Orders are silent and do not prohibit these Services from taking vaccination status into account in making assignment, deployment and operational decisions.

106.   The Navy is the only Service that addresses this guidance, which unequivocally directs commanders to consider a Navy servicemember's vaccination status for operational decision-making purposes despite the language on the face of the policy.

107.   Paragraph 3 of NAVADMIIN 038/23 states that "COVID-19 vaccination status shall not be a consideration in assessing individual service member suitability for deployment or other operational missions," but goes on to affirm that commanders "retain the authority to implement Health Protection Measures" like vaccination requirements "at any time or manner deemed necessary …" ECF 135-2 at 6-7.

108.   Navy Commanders are directed to use the NAVADMIN 038/23's

39

"COVID-19 Operational Risk Management Matrix" in making deployment decisions. *See* NAVADMIN 038/23, ¶ 2; matrix available at: https://media.defense.gov/2023/Feb/13/2003160523/-1/-1/0/BUMED%20NAVY%20COVID19%20OPERATIONAL%20RISK%20MATRIX.PDF. Notably, five of the risk factors (or nearly half of the 13 total) for making deployment decisions explicitly consider the vaccination status of personnel, and give commanders the unfettered discretion to "emphasize specific risk factor(s)" like vaccination status. *Id.*

109.   As of March 24, 2023, one month after the issuance of the February 24, 2023 Guidance Memo, the DOD has not published the revised version of DODI 6205.02 implementing the requirement that the Armed Services must obtain DOD formal approval to adopt any new vaccination requirements or to take vaccination status into account in in making assignment, deployment and operational decisions.

110.   The February 24, 2023 Guidance Memo expressly declines to overrule or supersede Secretary Austin's January 10, 2023 Rescission Memo. To the extent there is any conflict "or any doubt, the Secretary's directive controls. See 10 U.S.C. § 113; 10 U.S.C. § 8013(b)." February 24, 2023 Guidance Memo at 2.

111.   Plaintiffs and class members continue to face a credible threat of involuntary discharge and even criminal prosecution for past violations of the now-rescinded mandate, that is not eliminated or mitigated by the Armed Service

Rescission Orders issued to date.

112.   This threat is neither abstract nor speculative, as demonstrated by the testimony of Under-Secretaries from the DOD and Armed Services at a February 28, 2023 hearing before the House Armed Services Committee ("HASC"), four days after the February 24, 2023 Guidance Memo was issued. *See* Ex. 10, Partial Transcript for Feb. 28, 2023 HASC Hearing. (The full video is available at: https://www.youtube.com/watch?v=TRSZsKt5j_0 and full transcript without timestamps is available at: https://www.navy.mil/Press-Office/Testimony/display-testimony/Article/3315887/house-armed-services-subcommittee-on-military-personnel-holds-hearing-on-covid/.

113.   There, the Under-Secretaries repeatedly confirmed that the military deems the service members who did not comply with the now-rescinded mandate to have disobeyed a lawful order for which they may be involuntarily discharged, without regard to their sincerely held religious objections. *See* Ex. 10, Partial Transcript for Feb. 28, 2023 HASC Hearing, at 2-3 (Chairman Banks questions and answers) & 5-7 (Rep. Gaetz questions and answers).

114.   Defendants have refused to rule out criminal prosecution for violations of either Article 90 or Article 92 of the Uniform Code of Military Justice ("UCMJ") for those who did not file some form of accommodation. *See id.* at 3 (Army Under-Secretary Camarillo at 31:00 discussing UCMJ prosecution). The statute of

limitations on Art. 90/92 charges is five years, *see* 10 U.S.C. § 843, so Plaintiffs will continue to face a credible threat of prosecution for years to come.

115.   The DOD and Service Under-Secretaries also confirmed that the military has no plans or procedures to reinstate discharged service members or to provide take specific corrective actions for current members, *see id.* at 4-5, 40:55-41:18, who must pursue the existing remedies that failed them before and that several courts have found to be futile and/or inadequate. *See also* Ex. 11, DOD Under-Secretary Cisneros Feb. 27, 2023 Response to HASC, at 3.

116.   Secretary Austin's memo and the Armed Services implementing orders direct the Services to "update the records" of service members to "remove any adverse actions" resulting from non-compliance. Ex. 1, Jan. 10, 2023 Secretary Austin Rescission Memo, at 1. The scope of required corrective actions is undefined.

117.   Defendants have not taken corrective actions for Plaintiffs to date or committed to take corrective actions in the future.

118.   There is no reason to believe that Defendants will take corrective actions in the future because Defendants insisted throughout this litigation that "no Plaintiff has been subject to final disciplinary action for non-compliance," ECF 107, Aug. 22, 2022 DF Supp. Br., at 9, and that no Plaintiff has suffered any "final adverse actions" at all. *See* ECF 115, Aug. 29, 2022 Hearing Tr., at 71:1.

119.   Military Defendants have not rescinded related and unlawful

vaccination policies and regulations, in particular, the DOD Interchangeability Directives, which remain in full force and continue to be deemed lawful directives.

## IV.   FEDERAL LAWS GOVERNING LICENSING AND EMERGENCY USE AUTHORIZATION OF DRUGS AND BIOLOGICS

### A.   FDA Licensing of Drugs and Biologics

120.   A vaccine is both a drug and a biological product and is therefore subject to regulation under both the FDCA, *see* 21 U.S.C. § 321(g), and the PHSA. *See* 42 U.S.C. § 262(i)(1). The FDCA prohibits anyone from introducing or delivering into interstate commerce any "new drug" or "biological product" unless and until the FDA has approved the drug as safe and effective for its intended use. 21 U.S.C. § 331(a).

121.   The biologics application addresses not only the safety and efficacy of the product, but also covers specific labeling and manufacturing requirements, including the manufacturing location, process, and storage requirements. The PHSA requires that a biologics manufacturer demonstrate that the biologic: (1) is "safe, pure, and potent" (where "potent" is equivalent to "effective" under the FDCA); and (2) that "the facility in which the biological product is manufactured, processed, packed, or held meets standards designed to assure that the biological product continues to be safe pure and potent." 42 U.S.C. §262(a)(2)(C).

### B.   "Interchangeable" Biological Products under the PHSA

122.   "Interchangeable" and "interchangeability" are specifically defined terms in Section 351 of the PHS Act, 42 U.S.C. § 262, in relation to a "reference product," which is a biological product licensed under Section 351(a) of the PHSA. 42 U.S.C. § 262(a). For the purposes of determining "interchangeability," the "reference product" must be an FDA-licensed product, *e.g.*, FDA-licensed COMIRNATY® or SPIKEVAX®. But the "interchangeable" product, the unlicensed EUA product, must be the subject of a later filed "abbreviated" application under 42 U.S.C. § 262(k).

123.   Neither Pfizer/BioNTech nor Moderna filed an application with the FDA for an interchangeability determination for their COVID-19 vaccines.

124.   The FDA did not make a statutory interchangeability determination.

### C.   Emergency Use Authorization Laws and Differences Between EUA and FDA-Licensed Products

125.   The FDA may issue an EUA for a medical drug, device, or biologic, where it determines that there are no adequate, approved, and available alternatives. *See* 21 U.S.C. § 360bbb-3. There are significant differences between licensed vaccines and those subject to EUA that render them "legally distinct." ECF 1-6, August 23, 2021 Pfizer/BioNTech EUA Reissuance, at 2 n.8.

126.   First, the efficacy showing is much lower for EUA products than for licensed products. EUAs require only a showing that, based on scientific evidence

"if available," "it is reasonable to believe," the product "may be effective" in treating or preventing the disease. 21 U.S.C. §360bbb-3(c)(2)(A).

127.   Second, the safety requirements are minimal. FDA need only find that the "known and potential benefits … outweigh the known and potential risks" of the product, considering the risks of the disease. 21 U.S.C. §360bbb-3(c)(2)(B).

128.   Third, EUA products are exempt from certain manufacturing and marketing standards, enjoy broader product liability protections, and cannot be mandated due to informed consent laws and regulations.

### D.   Informed Consent Requirements for EUA Products

129.   The FDA's grant of an EUA is subject to informed consent requirements to "ensure that individuals to whom the product is administered are informed" that they have "the option to accept or refuse administration of the product." 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III). The FDA imposes and enforces the "option to accept or refuse" condition by requiring distribution to potential vaccine recipients a Fact Sheet that states, "It is your choice to receive or not receive [the vaccine]."

130.   The FDCA directs that the FDA "shall … ensure that the individuals to whom the product is administered are informed … of the option to accept or refuse administration of the product …" 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III), including

the EUA Factsheet informing potential recipients that they have the "the option to

accept or refuse administration of the product."

### E.   Labeling and Misbranding of FDA-Regulated Products.

131.   The PHSA includes detailed requirements for the labeling for biologics.

*No person shall* introduce or deliver for introduction into commerce
any biological product unless –

>  (A) a biologics license under this subsection or subsection (k) is in
>       effect for the biological product; and

>  (B) each package of the biological product is plainly marked with –

>   (i)   the proper name of the biological product contained in the
>         package;

>   (ii)  the name, address, and applicable license number of the
>         manufacturer of the product; and

>   (iii) the expiration date of the biological product.

42 U.S.C. §262(a)(1).

132.   Failure to comply with these mandatory statutory labeling requirements

renders a biologic to be misbranded, which is a crime under both the FDCA and the

PHSA. *See, e.g.,* 21 U.S.C. §352(a)(1) ("A drug or device shall be deemed to be

misbranded... [i]f its labeling is false or misleading in any particular.").

133.   The misbranding statute also prohibits false or misleading use of a

licensed product's proprietary name, misrepresentations that an unlicensed product

is licensed, failure to include required information on the label, or violations of any

FDA regulations thereunder. *See* 21 U.S.C. § 352(e)-(g), (i), (p); 42 U.S.C. §262(b)

(criminal penalties and fines for falsely labeling or altering label or packaging).

134.    FDA regulations specifically prohibit "[a]ny representation that creates an impression of official approval" of an unapproved product. 21 C.F.R. § 607.39; 21 C.F.R. § 207.77(a); *see also* 21 C.F.R. § 207.77(b) ("Any representation that creates the impression that a drug is approved or is legally marketable … is misleading and constitutes misbranding."). A drug may also be misbranded is a "false or misleading representation with respect to another drug …" 21 C.F.R. § 201.6, such as an unlicensed product claiming to have the "safety" and "efficacy" findings of a licensed drug.

## V.    FDA INTERCHANGEABILITY GUIDANCE AND FDA WAIVERS

### A.    FDA Interchangeability Guidance

135.    On August 23, 2021, the FDA approved the Biologics License Application ("BLA") for Pfizer/BioNTech's original "Purple Cap" formulation of COMIRNATY®. *See* FDA, Aug. 23, 2021 Purple Cap COMIRNATY® BLA Approval Letter at 1-2, available at: https://www.fda.gov/media/151710/download (last accessed Mar. 15, 2023).

136.    Also on August 23, 2021, the FDA re-issued the EUA for the Pfizer COVID-19 vaccine. *See* ECF 1-6, Aug. 23, 2021 Pfizer/BioNTech EUA Re-Issuance Letter. In a footnote, the FDA stated that the unlicensed EUA product could be used "interchangeably" with the licensed "without presenting any safety or effectiveness concerns." *Id.* at 2 n.8.  The FDA acknowledged that the two products

were "legally distinct", but asserted that the "differences … do not impact safety or effectiveness." *Id.*

137.   On January 31, 2022, the FDA approved the BLA for Moderna's SPIKEVAX® COVID-19 vaccine. *See* FDA, Jan. 31, 2022 SPIKEVAX® BLA Approval Letter, available at: https://www.fda.gov/media/155815/download (last accessed Mar. 15, 2023).

138.   Also on January 31, 2022, the FDA re-issued the EUA for Moderna's unlicensed COVID-19 vaccine because the FDA-licensed product not available in sufficient quantities. Ex. 12, Jan. 31, 2022 Moderna EUA Re-Issuance Letter.  The Moderna EUA letter similarly acknowledged that the FDA-licensed SPIKEVAX® and EUA product were "legally distinct" and asserted that the unlicensed Moderna EUA COVID-19 vaccine "can be used interchangeably" with the FDA-licensed SPIKEVAX®. *See id*. at 3 n.9.

### B.   FDA Waivers and Enforcement Discretion

139.   The FDA implemented the statutory requirement to provide recipients the "option to accept or refuse" by requiring that FDA's "Fact Sheet for Recipients and Caregivers" be made available to every potential vaccine recipient. Each Fact Sheet includes the statement that the recipient "has the option to accept or refuse" the product. *See* ECF 1-14, Aug. 23, 2021 Pfizer/BioNTech EUA Fact Sheet, at 9.

140.   Peter Marks, the Director of the FDA's Center for Biologics Evaluation and Research ("CBER"), has submitted testimony stating that the FDA determined that EUA and FDA-licensed products are "medically" interchangeable, *see* ECF 65-14, Marks Decl., ¶ 10, but did not make a statutory interchangeability determination under the PHSA, and acknowledged the "legal distinctions" between the product categories with respect to labeling and manufacturing site approval. *Id.*, ¶ 11.

141.   Dr. Marks further stated that the FDA has used its enforcement discretion to waive mandatory statutory labeling and informed consent requirements that apply to EUA products. *See Id.*, ¶ 13 ("FDA is exercising its enforcement discretion with respect to certain labeling requirements, in that FDA is not taking enforcement with respect to vials that bear the EUA label," and not requiring providers to provide "the Fact Sheet for Recipients, which advises recipients that 'under the EUA, it is your choice to receive or not receive the vaccine.'").

## VI.   PLAINTIFFS HAVE SUFFERED CONCRETE, PARTICULARIZED INJURIES AND PRESENT JUSTICIABLE CLAIMS.

142.   All Plaintiffs suffered adverse employment or disciplinary actions, up to and including forced retirement or constructive discharge; removal from command or reassignment; denial of promotions, assignments, training, or permanent change of station ("PCS"); loss or reduction of benefits or pay; negative evaluations or fitness reports, letters of reprimand or counseling, or other negative paperwork; non-judicial punishment under the UCMJ; severe travel and personal

liberty restrictions; discriminatory, arbitrary, and hostile treatment; denial of fundamental religious liberties; and permanent damage to their careers and reputation. *See generally* Ex. 2, Plaintiffs' March 2023 Status Chart & Ex. 3, March 2023 Plaintiff Declarations.

143.   Plaintiffs Coker, Furman, Karr, Snow, and Thompson were involuntarily separated, constructively discharged, or forced into early retirement. Major Harwood has completed his Board of Inquiry, which recommended separation based on UCMJ violations, while Major Kaltrider was scheduled to commence his Board on August 29, 2022, when it was halted by the Marine Corps class injunction. SGT Craymer, Major Harwood, MSGT Kupper, Major Roberts, and Major Snow had commenced or were set to commence involuntary separation processes that were halted by the Air Force and Marine Corps class-wide injunctions.

144.   Most Plaintiffs have been subject to severe restrictions imposed on them and/or had adverse actions taken against them, that prevented them from performing their duties, attending required schools to maintain qualifications, or had career ending consequences. These restrictions and disciplinary actions taken as of the February 4, 2022 include: training, travel and duty restrictions, *see* ECF 68-1, Feb. 4, 2022 PL Decl., Connell Decl., ¶3; Cossette Decl., ¶5; Craymer Decl., ¶3; Karr Decl., ¶7; Kupper Decl., ¶8; Morgan Decl., ¶5; Roberts Decl., ¶ 6; Snow Decl., ¶4; denial or restriction of promotions, *see id.*,  non-deployable status, *see id.*,

Connell Decl., ¶3; Cossette Decl., ¶5; negative counseling letters, reprimands, or GOMOR, *see id.*, Sigoloff Decl., ¶15 (GOMOR); Thompson Decl., ¶6. SAC ¶17 (Craymer letter or reprimand); ineligibility for PCS or new assignments, *see id.*, Cossette Decl., ¶5; Craymer Decl., ¶3; Dixon Decl., ¶21; denied voluntary separation or early retirement, *see id.*, Dixon Decl., ¶23; Harwood Decl., ¶7; and/or removal from command, *see id.*, Harwood Decl., ¶4 (removed from position as battalion Executive Officer); Sigoloff Decl., ¶16 (removed from position as Medical Director).

145.   Plaintiffs continued to suffer additional adverse actions from February 2022 through the date that most such actions were halted by the class-wide injunctions issued against the three of the four Armed Services. In addition to the most serious actions that did or would have resulted in discharge or separation detailed above in paragraph 143, Plaintiffs faced additional adverse or disciplinary actions after February 2022. *See* Ex. 3, Mar. 2023 PL Decl., Dixon Decl. ¶¶ 12-16 (new assignment cancelled and PCS denied April-May 2022 due to vaccination status); Kupper Decl. ¶¶ 4, 6, 10 (issued multiple letters of reprimand and counseling); Sigoloff Decl, ¶¶ 15-20 (clinical privileges suspended, relieved for cause, negative evaluations, UCMJ investigation initiated); Stermer Decl., ¶ 4 (training and travel restrictions while RAR pending through rescission). *See also* Ex. 2, March 2023 Plaintiff Status Chart.

146.    Notably, all or nearly all of these adverse and punitive actions were completed or commenced before June 2022, during the time period for which it is undisputed that there were no FDA-licensed products available so that compliance with the mandate was impossible.

147.    Three of four Armed Services Defendants are subject to class-wide injunctions based on findings of "systemic" violations of service members' religious liberties. Accordingly, the only reason that their injuries are not worse—and that most Plaintiffs have not been discharged—is that courts have found that Defendants have engaged in systemic misconduct and taken the nearly unprecedented steps of issuing class-wide injunctions against three branches. All Plaintiffs have suffered the same harms as those enjoined in these and other challenges to the DOD Mandate.

148.    This Court has already found that Plaintiffs satisfy ripeness and exhaustion requirements for their claims. *See* ECF 126, Nov. 8, 2022 Order, at 7-8.

149.    Exhaustion is not required for Plaintiffs' APA claims. In any case, there are there are no military administrative procedures for challenging generally applicable rules or regulations issued by Secretary Austin or a Service Secretary. *See* ECF 119, Pl. Sept. 26, 2022 Response, at 2-3. Nevertheless, each Plaintiffs has pursued available military remedies

150.    All Plaintiffs have submitted a Religious Accommodation Request. Plaintiffs Coker, Connell, Cothran, Craymer, Harwood, Kaltrider, Kupper, Roberts,

Sigoloff, and Snow have had their final appeal denied, while Furman and Karr were discharged before they could file an appeal. Plaintiffs Cossette, Dixon, Stermer, and Thompson had their initial RARs denied and had RAR appeals pending when the mandate was rescinded and processing of RARs ceased. *See id.*

151. Several have had medical exemption requests denied once if not twice: Connnell (denied twice for cancer); Cothran (denied twice for lack of supply); Craymer (twice); Dixon (twice – nursing and lack of supply); Kaltrider (twice – natural immunity and lack of supply); Karr (fertility); Morgan; Roberts; Sigoloff. *See id.* & ECF 106, Aug. 22, 2022 PL Supp. Br., at 9 & n.11.

152. Plaintiffs have also pursued other remedies such as complaints to the Department of Defense's Inspector General ("IG") (Craymer and Kupper) and submitting complaints under Article 138 of the UCMJ (Kupper, Roberts, Stermer, Sigoloff). *See* ECF 117, Sept. 26, 2022 PL Supp. Br., at 6. These complaints have been denied or ignored.

153. Plaintiffs' claims have not been rendered moot by Congress' rescission of the mandate. In fact, Congress' rescission confirms that the mandates are unlawful and have no rational or legal basis. Defendants' generally applicable post-Rescission orders and policies give rise to supplemental claims, in particular, Defendants' express refusal to restore the pre-Mandate *status quo* and to return Plaintiffs' and

other service members to the position in which they would have been absent the unlawful mandates.

154.   Defendants' insistence that all pre-Rescission orders were lawful orders and that unvaccinated service members may continue to be punished for failure to disobey a lawful order demonstrates that claims are not moot because the government has not "completely and irrevocably eradicated the effects of the alleged violation." *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979).

### FIRST CAUSE OF ACTION
### POST-RESCISSION VACCINATION ORDERS VIOLATE 2023 NDAA

155.   Plaintiffs reallege the facts in Sections II, III, and VI as if fully set forth in this Count.

156.   Military Defendants' generally applicable post-Rescission orders and policies retaining existing restrictions (or reenacting substantially similar, a *de facto* mandate or restrictions), continuing to enforce pre-Rescission requirements and punish past violations, and refusal to restore the pre-Mandate *status quo* are actions "in excess of statutory jurisdiction [and] authority," 5 U.S.C. § 706(2)(C), because these actions directly contravene Congress' directive to rescind the August 24, 2021 mandate.

157.   In Section 525 of the 2023 NDAA, Congress exercised its "plenary authority" to raise and regulate the military forces under Article I, Section 8, clauses 12-14 of the U.S. Constitution, *Chappell v. Wallace*, 462 U.S. 296, 301 (1982), by

directing Secretary Austin to "rescind" the August 24, 2021 mandate. President and Commander-in-Chief Biden signed that directive into law on December 23, 2022.

158.   "Rescind" means "an annulling; avoiding, or making void; abrogation; rescission", while "rescission" means "void in its inception"; or "an undoing of it from the beginning." BLACK'S LAW DICTIONARY at 1306 (6th ed. 1990).

159.   Congress chose this term to direct Military Defendants and the courts to apply the rescission with full retroactive effect to eliminate any legal basis for the Military Mandates and any order issued pursuant thereto.

160.   Rescission further requires the Military Defendants restore the pre-Mandate *status quo* and return service members substantially to the position in which they would have been but for the unlawful mandates. *See, e.g., GE Life & Annuity Assurance Co. v. Combs*, 191 F.Supp.2d 1364, 1373 (M.D. Ga. 2002).

161.   Congress' directive means that the Military Mandates and all orders issued pursuant thereto are now a legal nullity; are not lawful orders; can no longer be enforced; and cannot be used as the basis for discharge, separation, punishment, prosecution.

162.   Where, as here, Congress has exercised its plenary authority to raise and regulate military forces under Article I, Section 8, cl. 12-14, and it has expressly directed a specific action and remedy—rescission—Congress has eliminated any

scope for military discretion and the questions before the Court are purely matters of statutory interpretation without deference to military expertise.

163.   Secretary Austin and the Military Defendants have formally rescinded the mandates. However, in the very document rescinding the mandates, Secretary Austin directs that "[o]ther standing Departmental policies, procedures, and processes regarding immunization remain in effect," which includes "the ability of commanders to consider, as appropriate, the individual immunization status of personnel in making deployment, assignment, and other operational decisions …" Ex. 1, Jan, 10, 2023 Rescission Memo, at 2.

164.   Even with a service-wide injunction in place prohibiting punishment or discharge, such broad, sweeping language "allow[s] the [military] to do just about anything it wants short of punishing [Plaintiffs] and drumming them out of service," *Austin v. U.S. Navy Seals 1-26*, 142 S. Ct. 1301, 1305–06 (2022) (Alito, J., dissenting).

165.   The February 24, 2023 Guidance Memo purports to eliminate remaining restrictions; to prohibit commands from considering vaccination status in making assignment, deployment, and operational decisions; and to revise DODI 6205.02 to bar the imposition of new restrictions without formal DOD approval.

166.   The Army, Air Force and National Guard have not adopted any such limitation on their authority, while the only Service that has, the Navy,

unequivocally directs commanders to consider vaccination status in making deployment decisions. *See supra* ¶¶ 106-108. DOD does not appear to have revised DODI 6205.02. Because Secretary Austin's January 10, 2023 directive "controls" if there is any conflict or ambiguity, February 24, 2023 Guidance at 2, Secretary Austin's *de facto* mandate remains in place.

167.    On February 28, 2023, Military Defendants repeatedly affirmed to Congress that they will ignore Congress' directive and statutory rescission by maintaining that the mandates and orders issued pursuant thereto are lawful orders, despite the elimination of the legal basis therefor; that service members who have not complied with the now-rescinded mandates have disobeyed a lawful order in violation of the UCMJ; that currently serving unvaccinated service members may still be discharged or punished under the UCMJ; and that they will not require service members discharged or forced into retirement will not be reinstated or compensated. *See supra* ¶¶ 112-115; Ex. 10, Partial Transcript of Feb. 28, 2023 HASC Hearing.

168.    Military Defendants have unequivocally confirmed that they have adopted a generally applicable policy not to restore the pre-Mandate *status quo* or return Plaintiffs or other service members to the position in which they would have been absent the unlawful mandate. In particular, Military Defendants will not require reinstatement of those discharged or forced into retirement; provide backpay or other

compensation; convene selection boards to retroactively promote those selected for, but denied promotions due to unlawful mandates; or correct other career-ending or career damaging actions. *See generally* Ex. 10, Partial Transcript of Feb. 28, 2023 HASC Hearing; Ex. 11, Cisneros Feb. 27, 2023 Response to HASC, at 3.

169.   Secretary Austin and the Military Defendants have stated that they will take corrective actions for adversely affected service members, but to date have not taken corrective action to restore Plaintiffs to the position in which they would have been absent the unlawful mandates.

170.   There is no reason to believe that Defendants will take corrective actions in the future because Defendants insisted throughout this litigation that "no Plaintiff has been subject to final disciplinary action for non-compliance," ECF 107, Aug. 22, 2022 DF Supp. Br., at 9, and that no Plaintiff has suffered any "final adverse actions" at all. *See* ECF 115, Aug. 29, 2022 Hearing Tr., at 71:1.

171.   As a result of Defendants' unlawful actions, Plaintiffs have already suffered forced retirement, adverse personnel actions, and deprivation of religious liberties, and those who continue to serve face the credible threat of involuntary discharge, punishment under the UCMJ, and loss of retirement and other benefits.

## SECOND CAUSE OF ACTION
## POST-RESCISSION ORDERS ARE ARBITRARY AND CAPRICIOUS
### 5 U.S.C. §§ 706(2)(A)

172.   Plaintiffs reallege the facts in II, III, and VI and the First Cause of Action as if fully set forth in this Count.

173.   The Military Defendants' generally applicable post-Rescission orders and policies retaining pre-Rescission restrictions (or reenact a substantially similar *de facto* mandates or restrictions), continuing to enforce pre-Rescission mandates and punish service members for past non-compliance, and refusing to restore the pre-Mandate *status quo* must be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

174.   In Section 525 of the 2023 NDAA, Congress and the President directed Secretary Austin to rescind the mandate. Rescission eliminated any legal basis, governmental interest, or military discretion to continue to impose or enforce the rescinded mandates, to punish service members for non-compliance, or not to restore the pre-Mandate *status quo*.

175.   Congress has directed that the Military Defendants take specific actions and provide the specific remedy rescission. Congress' directive eliminated any scope for military discretion or judicial deference to military judgments.

176.   Military Defendants have failed to implement Congress' directive and have therefore abused their discretion and acted contrary to law, namely, the 2023 NDAA for the reasons set forth in the First Cause of Action. *See supra* ¶¶ 156-171.

177.   Military Defendants' post-Rescission orders are arbitrary and capricious, an abuse of discretion, and otherwise contrary to law for the following additional reasons.

178.   First, Military Defendants' post-Rescission orders and continued enforcement of the August 24, 2021 mandate is contrary to law because it violates the DOD's own vaccination regulations, DODI 6205.02, which is the sole legal authority cited in Secretary Austin's August 24, 2021 memo, *see* ECF 1-3, Aug. 24, 2021 SECDEF Memo, at 1. The mandated, FDA-licensed COMIRNATY® and SPIKEXVAX® products are not and were not "vaccines" as that term is defined in the DOD's immunization regulation, DODI 6205.02, ECF 65-5, because these mRNA products do not include a single molecule of COVID-19. *See supra* ¶ 55.

179.   Second, the post-Rescission orders and continued enforcement of the August 24, 2021 mandate is contrary to the current scientific consensus that the mandated, FDA-licensed vaccines are obsolete, ineffective, and cannot prevent transmission or infection by the Omicron variant; the guidance and actions of the expert public health agencies, the CDC and HHS; the business judgment of manufacturers who have long recognized their obsolescence and appear to have

ceased production of these products one year ago; and judicial findings that the Military Defendants have not provided current, post-Omicron scientific evidence supporting the efficacy of the mandated vaccines. *See supra* ¶¶ 85-91.

180.   Third, Military Defendants' generally applicable post-Rescission orders and policies to continue enforcement of the Military Mandates are arbitrary and capricious because compliance was impossible due to the unavailability of the mandated products.

181.   The original Purple Cap COMIRNATY®, the product that was the proximate cause of and provided the sole legal basis for the mandate, apparently was never produced and the FDA withdrew its marketing authorization on the same day it was approved. *See supra* ¶¶ 70.

182.   The first so-called doses of Grey Cap COMIRNATY® were not even manufactured until at the earliest January 2022 and were not acquired until June 2022, long after all applicable vaccination deadlines had passed and after Military Defendants had constructively discharged, commenced separation proceedings, ordered BOIs, punished and taken other adverse actions against Plaintiffs and other service members.

183.   The supply of "Comirnaty-labeled" vaccines that they did obtain was in fact unlicensed, misbranded EUA vaccines from the FW Lots or bivalent vaccines from the G Lots, which Defendants subsequently acknowledged were not licensed.

Defendants continued to mandate these unlicensed, EUA vaccines from the FW Lots for months after they expired in September or October 2022. *See supra* ¶¶ 72-81.

184.   SPIKEVAX® was not available, in any quantity, until September 2022 at the earliest, and all available lots had expired as of the date the mandate was rescinded. *See supra* ¶ 82.

185.   Finally, the Military Defendants have refused to comply with Congress' rescission directive by restoring Plaintiffs and other service members to the pre-Mandate *status quo* or return them to the position in which they would have been absent the unlawful mandates.

186.   Congress' directive leaves no room for discretion or deference with respect to the remedy. Military Defendants' express refusal to comply is necessarily arbitrary to and capricious, an abuse of discretion, and contrary to Section 525 of the 2023 NDAA.

187.   As a result of Defendants' unlawful actions, Plaintiffs have already suffered forced retirement, adverse personnel actions, and deprivation of religious liberties, and those who continue to serve face the credible threat of involuntary discharge, punishment under the UCMJ and loss of retirement and other benefits.

## <u>THIRD CAUSE OF ACTION</u>
## ARMED SERVICES EUA MANDATES VIOLATE 10 U.S.C. § 1107a
## 5 U.S.C. § 706(2)(C); 10 U.S.C. § 1107a

188.   Plaintiffs reallege the facts in Sections I through VI as if fully set forth in this Count.

189.   In 10 U.S.C. § 1107a, Congress exercised its plenary constitutional authority to regulate the military forces by expressly prohibiting the mandate of an unlicensed EUA product. While Congress and the President have delegated the Secretary of Defense broad authority, Congress expressly withheld in 10 U.S.C. § 1107a the authority to mandate an EUA product without Presidential authorization, which Secretary Austin has neither received nor requested.

190.   The Armed Services implementation of the DOD Mandate, in conjunction with the DOD Interchangeability Directives, are actions "in excess of statutory jurisdiction [and] authority," 5 U.S.C. § 706(2)(C), insofar as they mandated unlicensed, EUA product and punished Plaintiffs and other service members for refusal to take an unlicensed, EUA product.

191.   The DOD and the Armed Services are departments and agencies of the United States Government. As such, they are agencies created by statute, and "it is axiomatic that an administrative agency's power to promulgate legislative regulations," like the DOD Mandate, "is limited to the authority delegated by

Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S. Ct. 468 (1988).

192.   The DOD Mandate itself states that only FDA-licensed vaccines may be mandated. *See* ECF 1-3, Aug. 24, 2021 Secretary Austin Memo, at 1 & ECF 126, November 8 Order, at 17.

193.   The DOD Interchangeability Directives direct each Armed Service and DOD component that EUA products "should be used interchangeably" with FDA-licensed products and to mandate EUA products "as if" they were FDA-licensed products. Ex. 4, September 14, 2021 Pfizer/BioNTech Interchangeability Directive, at 1; Ex. 5, May 3, 2022 Moderna Interchangeability Directive, at 1.

194.   The Armed Services implementation of the DOD Mandate, in conjunction with the DOD Interchangeability Directives, "authorize[d] the forced administration of EUA vaccines," ECF 126, November 8 Order, at 17, "as if" they were the FDA-licensed product. *See* ECF 1-7, Air Force Mandate, §§ 3.1.1 & 5.3.2.1; *see also* Navy AR, DON AR 27, BUMED 6300, at 1. *See generally supra* ¶¶ 58-69.

195.   It is undisputed that the EUA and the licensed product are "legally distinct". The EUA mRNA Products are subject to the laws governing EUA products, including 10 U.S.C. § 1107a guaranteeing services members' rights to informed consent and the option to refuse the product, as well as mandatory statutory

labeling requirements for unlicensed products, and numerous federal and state laws that prohibit misbranding and misrepresenting an unlicensed product as one licensed by the FDA.

196.   The licensed products, COMIRNATY® and SPIKEVAX®, are subject to the laws governing FDA-licensed products, including entirely distinct mandatory (*i.e.*, non-waivable) statutory requirements for FDA licensure and distinct statutory regimes governing labeling, misbranding, marketing, and patient disclosures. *See generally supra* Section IV.

197.   These two regulatory and labeling regimes are mutually exclusive and prohibit an unlicensed, EUA-labeled product from being an FDA-licensed product at the same time, or otherwise being granted the legal status or benefits of licensure.

198.   An FDA-licensed biologic product must be labeled as such for the approved indications. *See* 42 U.S.C. § 262(a).

199.   The FDCA, PHSA, and FDA regulations all address the requirements stated on the product "package", "container" or "label" of the licensed product. In particular, the PHSA directs that "each package" of the licensed product must state the "proper name" of the licensed product "contained in the package" and the "license number of the manufacturer." 42 U.S.C. § 262(a)(1)(B)(i)-(ii). *See also* 21 U.S.C. § 352 (misbranding requirements defined in terms of contents of "label" or "package"); 21 C.F.R. Pt. 610, Subpt. G ("Labeling Standards").

200.   The sole authority cited by Military Defendants—a footnote in the FDA's EUA letters that is not part of statutorily required product labeling and does not purport to constitute a "statutory" interchangeability determination—does not allow the FDA itself to override these mandatory statutory labeling requirements. Nor could this footnote grant that authority to the DOD officials who issued the directives, Assistant Secretary of Defense Adirim or Mullen.

201.   It is further undisputed that Defendants were in fact "mandating vaccines from EUA-labeled vials," *Doe #1-#14 v. Austin*, 572 F.Supp.3d 1224, 1233, 2021 WL 5816632 (N.D. Fla. 2021), as this Court found in its November 12, 2021 Order.

202.   Military Defendants could not have implemented the mandates without using EUA products because Military Defendants did not possess any FDA-licensed products. This was not because there was "not sufficient approved vaccine available" for the entire U.S. adult population, or even service members. ECF 1-6, Aug. 23, 2021 Pfizer/BioNTech EUA Reissuance, at 5 n.9. It was because there was no FDA-approved product at all.

203.   The original FDA-licensed Purple Cap COMIRNATY®, which provided the legal basis for the DOD Mandate apparently was never manufactured and the FDA withdrew its marketing authorization on the same day that it was approved. *See supra* ¶¶ 70-71.

204.   The Military Defendants have further acknowledged that they did not have any FDA-licensed product, which they refer to as "Comirnaty-labeled", until at the earliest June 2022. *See supra* ¶¶ 62-69.

205.   Plaintiffs repeatedly confirmed that no FDA-licensed products were available to them up through at least May 2022 and informed their commands and healthcare providers that no FDA-licensed products were available. *See supra* ¶¶ 66-67.

206.   Despite the unavailability of FDA-licensed products and impossibility to comply with the DOD Mandate, the Armed Services relied on the DOD Interchangeability Directives as the legal basis to order Plaintiffs and other service members to take unlicensed EUA products and to punish them for refusing to take an unlicensed EUA product.

207.   All or nearly all adverse actions taken against Plaintiffs commenced or were completed in the period prior to June 2022, when only unlicensed EUA products were available.

208.   Military Defendants' administrative records filings, statements in oral arguments, and confirm that they have violated 10 U.S.C. § 1107a by mandating EUA products and treating all EUA products as legally interchangeable with the FDA-licensed product.

209.  In    the    Military    Administrative    Records, all    references    to interchangeability in the record indicate that all unlicensed EUA-labeled COVID-19 products are interchangeable with the FDA-licensed product. *See* ECF 79, Apr. 22, 2022 PL Supp. Brief, at 2 & ECF 79-1 (table listing all occurrences of "interchangeable" and "interchangeability"). In their response to Plaintiffs' supplemental brief on the administrative record, Defendants acknowledged that "Plaintiffs are correct that Defendants consider the Pfizer EUA and BLA labelled vaccines" [*i.e.,* "Comirnaty-labeled, BLA-approved" products] to be interchangeable." ECF 82, DF May 2, 2022 Supp. Br., at 3.

210.   In the November 3, 2021 hearing before this Court, Defendants' counsel acknowledged that EUA product cannot lawfully be mandated, but insisted that "we're only mandating the fully approved" product. ECF 45, Nov. 3, 2021 Hearing Tr., 52:18-19. This could not have been the case because the FDA-licensed Purple Cap COMIRNATY® was not only not available, but did not exist because it was never made. *See John Doe #1-#14*, 572 F.Supp.3d at 1233 ("Indeed, defense counsel could not even say whether vaccines labeled 'Comirnaty' exist at all.").

211.   In the August 29, 2022 hearing, Defendants' counsel acknowledged that they had mandated the Pfizer/BioNTech EUA product "even before the Comirnaty vaccine was available," ECF 115, Aug. 29, 2022 Hearing Tr., at 27:20-

21, and that "even the non-BLA compliant doses were interchangeable with Comirnaty." *Id.* at 31:11-12.

212.   As a result of the Armed Services' violations of 10 U.S.C. § 1107a, as well as the FDCA, the PHSA and FDA regulations, Plaintiffs have already suffered forced retirement, adverse personnel actions, and deprivation of religious liberties, and those who continue to serve face the credible threat of involuntary discharge, punishment under the UCMJ and loss of retirement and other benefits.

## FOURTH CAUSE OF ACTION
## ARMED SERVICES EUA MANDATES ARE *ULTRA VIRES*

213.   Plaintiffs reallege the facts in Sections I through VI as if fully set forth in this Count.

214.   No federal statute authorized the mandate of unlicensed EUA products, the DOD Interchangeability Directives, or the Armed Services implementation thereof.

215.   "An agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986). Agency actions that exceed the agency's authority are *ultra vires* and must be invalidated.

216.   In 10 U.S.C. § 1107a, Congress exercised its plenary authority to regulate the military forces, and protect service members' rights to informed consent by expressly prohibiting the mandate of an unlicensed EUA vaccine, except where the Secretary of Defense has requested, and receives, express written Presidential

authorization to do so on national security grounds.

217.   Secretary Austin did not request or receive Presidential Authorization for the COVID-19 EUA vaccines. *See Doe #1-#14*, 572 F.Supp.3d at 1235.

218.   This Court has found that Secretary Austin's August 24, 2021 mandate did not authorize or require the mandate of unlicensed, EUA vaccines. *See* ECF 126, November 8 Order, at 17.

219.   The Defense Secretary and the President are the only officials authorized to take action pursuant to 10 U.S.C. § 1107a. Neither did.

220.   Accordingly, the basis for mandating unlicensed EUA products were the Pfizer/BioNTech and Moderna Interchangeability Directives, issued by Assistant Secretary of Defense Adirim and Mullen, respectively, and the respective officials in the Departments of the Army, Air Force, and Navy.

221.   None of these officials and officers of the United States had any authority to mandate unlicensed EUA products in violation of 10 U.S.C. § 1107a.

222.   Accordingly, each of these officials acted *ultra vires*.

223.   The Military Defendants' officials and officers of the United have acted without any lawful authority whatsoever, and without any colorable basis for the exercise of authority.

224.   The Armed Services implementation of the DOD Mandate, in conjunction with the DOD Interchangeability Directives, violated 10 U.S.C.

§ 1107a, as well as the FDCA, PHSA, and FDA labeling and misbranding regulations, for the reasons set forth above in the Third Cause of Action. *See supra* ¶¶ 189-212.

225.   Where, as here, an agency or officer of the United States has acted *ultra vires* in violation of a statute or otherwise in excess of its delegated authority, or where agency action is deemed not to be final and not subject to review under the APA, a person injured by such action may assert a claim for specific relief.

226.   Plaintiffs' injuries are due to the *ultra vires* actions of Military Defendants' officials and officers of the United States, which have wholly deprived them of their rights under 10 U.S.C. § 1107a, the FDCA, PHSA, and FDA labeling and misbranding regulations.

227.   Military Defendants' *ultra vires* actions have and continue to inflict harm on Plaintiffs, as alleged herein.

228.   Plaintiffs' *ultra vires* claims are not barred by sovereign immunity where these federal officers have acted outside the scope of their authority. *See, e.g., Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 691 & n.11 (1949).

**FIFTH CAUSE OF ACTION**
**ARMED SERVICES EUA MANDATE IS ARBITRARY AND CAPRICIOUS**
**5 U.S.C. § 706(2)(A); DODI 6200.02**

229.   Plaintiffs reallege the facts in Sections I-III and VI as if fully set forth in this Count.

230.    The Armed Services implementation of the DOD Mandate, in conjunction with the DOD Interchangeability Directives, must be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), because they constitute an unannounced and unexplained departure from a prior policy prohibiting the mandate of unlicensed EUA products and are directly contrary to the currently effective DOD regulation on EUA products, DODI 6200.02.

231.    The consistent policy of the Military Defendants since the enactment of the EUA statute and 10 U.S.C. § 1107a in 2004 through at least July 2021 (*i.e.*, the month before the DOD Mandate was issued) has been that EUA products may not be mandated.

232.    The first vaccine that Defendant FDA ever granted EUA status was the anthrax vaccine during the course of litigation over the DOD's anthrax vaccine mandate, where the Defendants DOD and FDA took the exact opposite legal position of their position for the COVID-19 vaccines. There, after D.C. District Court preliminarily enjoined the anthrax mandate in *Rumsfeld I*, and then granted summary judgment and a permanent injunction in *Rumsfeld II*, both the DOD and FDA jointly filed an emergency petition in the D.C. District Court to modify the permanent injunction already to allow the vaccine to be administered to servicemembers solely on a voluntary basis. *See Rumsfeld III*, 2005 WL 774857, at *1.

233.   This was the Military Defendants' consistent position through at least July 6, 2021, as set forth a July 6, 2021 memorandum from the Office Legal Counsel, the DOD interpreted the informed consent requirements in 10 U.S.C. § 1107a "to mean that DOD may not require service members to take an EUA [vaccine]" without first obtaining a Presidential Waiver under 10 U.S.C. § 1107a. *See* ECF 33-4, Office of Legal Counsel, *Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization* at 16 (July 6, 2021).

234.   "[A]gencies must typically provide a 'detailed explanation' for contradicting a prior policy;" they may not, as DOD has done here, "depart from a prior policy *sub silentio*." *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 614 (5th Cir. 2021) (*quoting FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, 129 S. Ct. 1800, 173 L.Ed.2d 738 (2009)). The Defendants' "established practices" on informed consent are due greater deference than sudden, unexplained reversals because the long-standing and consistent refusal to exercise a claimed power (*i.e.*, to mandate an EUA product) is "significant in determining whether such a power was actually conferred." *W. Va. v. EPA*, 142 S. Ct. 2587, 2610 (2022) (citation and quotation marks omitted).

235.   The Armed Services' EUA mandate and Defendants' litigation position also directly contradicts the DOD's currently effective regulations on EUA products,

which have from at least 2008 through the present continuously provided a right of refusal for EUA products. *See* DODI 6200.02, § E3.4 (Feb. 27, 2008) (under the EUA statute, "potential recipients are provided an option to refuse administration," but "the President may . . . waive the option to refuse"). There has been no Presidential Waiver, yet the Defendants are mandating use of EUA vaccines.

236.   Defendants should be estopped from taking a contrary position here to that taken in the *Doe v. Rumsfeld* litigation, and in particular, the *Rumsfeld III* consent decree. These cases should be given preclusive effect here because those cases and the instant case involve: (a) the same Defendants (DOD and FDA); (b) the same statute, issues, and product, namely, an unlicensed EUA product sought to be mandated in violation of 10 U.S.C. § 1107a; (c) these issues were fully litigated, resulting in a 2004 permanent injunction in *Rumsfeld II* against the same Defendants that was voluntarily modified pursuant to an emergency request by DOD and FDA, resulting in the 2005 *Rumsfeld III* consent decree, prohibiting mandate of EUA products or any disciplinary action against service member for refusal; (d) some of the same Plaintiffs, namely, those who were subject to anthrax mandate and covered by DOD-wide injunction and consent decree; and (e) engendered significant reliance interests for those plaintiffs.

237.   As a result of Defendants' and unannounced and unexplained departure from long-standing precedent and violations of currently effective governing

regulations, Plaintiffs have already suffered forced retirement, adverse personnel actions, and deprivation of religious liberties, and those who continue to serve face the credible threat of involuntary discharge, punishment under the UCMJ and loss of retirement and other benefits.

<u>SIXTH CAUSE OF ACTION</u>
**FDA INTERCHANGEABILITY GUIDANCE VIOLATES FEDERAL LAW**
**5 U.S.C. § 706(2)(C); 42 U.S.C. § 262**

238.   Plaintiffs reallege the facts in Sections II.B, IV, and V as if fully set forth in this Count.

239.   The FDA acted "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), and contrary to law and the FDA's own rules and policies, where it found that the EUA and FDA-licensed products "can be used interchangeably" ("FDA Interchangeability Guidance"). *See* ECF 1-6, Aug. 23, 2021 Pfizer/BioNTech EUA Reissuance; Ex. 12, Jan. 31, 2022 Moderna EUA Reissuance, at 3 & n.9.

240.   "Interchangeable" and "interchangeability" are statutorily defined in relation to a "reference product," which is a biological product licensed under Section 351(a) of the PHSA, 42 U.S.C. § 262(a). For the purposes of determining "interchangeability," the "reference product" must be an FDA-licensed product (*i.e.*, COMIRNATY® or SPIKEVAX®). But the unlicensed "interchangeable" product for which licensure or legally equivalent treatment is sought—here, the EUA

product—must be the subject of a later filed "abbreviated" application under 42 U.S.C. § 262(k).

241.   Neither Pfizer/BioNTech nor Moderna filed an abbreviated application required for an interchangeability determination under the PHSA.

242.   The FDA disclaims having made a statutory interchangeability determination under the PHSA.

243.   The FDA instead describes its actions as finding that the two are "medically interchangeable", ECF 65-14, Marks Decl., ¶ 11, an invented term that either has no legal significance, or if it does, explicitly contradicts the requirements of the PHSA.

244.   The PHSA grants the FDA the authority only to make "statutory" interchangeability determinations, which is governed by an "intricate process," *Texas v. U.S.*, 809 F.3d 134, 179 (5th Cir. 2015) ("*Texas*"), *aff'd* 136 S.Ct. 2271 (2016), set forth by Congress in the PHSA.

245.   The PHSA does not authorize the FDA to create new, alternative categories or criteria for "interchangeable" products. As such, the FDA's action must be held unlawful and *ultra vires.*

246.   The FDA use of "interchangeable" and "interchangeably" is incompatible with the PHSA's statutory framework and the publicly available record. At a minimum, this Court must remand the matter to the FDA to explain its

decisions. *See, e.g., A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995) (remanding to the FDA to explain what "bioequivalency" means in the animal drug context and how the evidence relied on by the FDA satisfied the standard).

247.   The FDA's Interchangeability Guidance was included in its letters extending or modifying the EUA for the Pfizer/BioNTech and Moderna COVID-19 EUA products, but this guidance was not issued pursuant to the FDA's statutory authority to grant EUAs in the EUA statute, 21 U.S.C. § 360bbb-3.

248.   The PHSA is the sole statutory authority for the FDA to make an interchangeability determination. The EUA statute does not even mention the terms "interchangeable" and "interchangeably", much less grant the FDA the authority to make such determinations under the EUA statute, or override the PHSA's requirements for doing so.

249.   Because the FDA's non-statutory "interchangeability" determinations were not issued pursuant to the EUA statute, it is not an action exempt from judicial review under the EUA statute's standard for actions "committed to agency discretion." 21 U.S.C. § 360bbb-3(i).

250.   The FDA also exceeds its statutory authority, abuses its discretion, and acts contrary to law when it applies two distinct and mutually exclusive regulatory regimes to the same product. *See, e.g., Genus Med. Techs. LLC v. FDA*, 994 F.3d 631 (D.C. Cir. 2020).

251. The FDA unlawfully treated as equivalent, or "interchangeable", "legally distinct" products subject to distinct and mutually exclusive regulatory regimes.

252. The EUA mRNA Products are subject to the laws governing EUA products, including the right to informed consent in 21 U.S.C. §§ 360bbb-3 (and 10 U.S.C. § 1107a for service members); mandatory statutory labeling requirements for unlicensed products; and numerous federal and state laws that prohibit misbranding, in particular, misrepresenting an unlicensed product as one licensed by the FDA.

253. The licensed products, COMIRNATY® and SPIKEVAX®, are subject to the laws governing FDA-licensed products, including entirely distinct mandatory (*i.e.*, non-waivable) statutory requirements for FDA licensure and distinct statutory regimes governing labeling and misbranding. *See generally supra* Section IV.

254. These two regulatory and labeling regimes are mutually exclusive and prohibit an unlicensed, EUA-labeled product from being an FDA-licensed product. An FDA-licensed biologic product must be labeled as such for the approved indications. *See* 42 U.S.C. § 262(a). In particular, the PHSA directs that "each package" of the licensed product must state the "proper name" of the licensed product "contained in the package" and the "license number of the manufacturer." 42 U.S.C. § 262(a)(1)(B)(i)-(ii). *See also* 21 U.S.C. § 352 (misbranding requirements defined in terms of contents of "label" or "package"); 21 C.F.R. Pt.

610, Subpt. G ("Labeling Standards").

255.   In the extensive briefing presented in this proceeding, Defendants have cited no statute or any other legal authority that would allow a footnote in an FDA letter that grants emergency use authorization—and that is not part of the product labeling—to override these mandatory statutory labeling requirements.

256.   As a result of Defendants' violations of numerous federal laws and regulations, Plaintiffs have already suffered forced retirement, adverse personnel actions, and deprivation of religious liberties, and those who continue to serve face the credible threat of involuntary discharge, punishment under the UCMJ and loss of retirement and other benefits.

<u>SEVENTH CAUSE OF ACTION</u><br><strong>FDA WAIVERS VIOLATE MANDATORY STATUTORY REQUIREMENTS<br>5 U.S.C. §§ 706(2)(A) & (C); 21 U.S.C. § 352; 42 U.S.C. § 262</strong>

257.   Plaintiffs reallege the facts in Sections II.B, IV, and V as if fully set forth in this Count.

258.   The FDA Waivers of non-waivable mandatory statutory labeling, informed consent, and misbranding requirements must be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

259.   The FDA Waivers unlawfully waived nonwaivable mandatory

statutory requirements and prohibitions to grant the legal benefits or status of FDA licensure to unlicensed EUA products and to wholly deprive recipients and potential recipients like Plaintiffs of their statutory informed consent right to refuse to take an EUA product.

260.   To justify the FDA Waivers, the FDA has stated that it has exercised its "enforcement discretion", ECF 65-14, Marks Decl., ¶ 13, not to enforce labeling requirements—or the requirement to provide the EUA factsheet that includes the "option to accept or refuse" the EUA vaccine—so that unlicensed, EUA vaccines may be treated "as if" they were licensed vaccines and eliminating the statutory right to refuse the unwanted treatment.

261.   In doing so, the FDA went far beyond permissible agency enforcement discretion, which pertains to enforcement priorities and agency inaction. Instead, the FDA's purported nonenforcement decision amounted to "affirmative acts of approval"—treating unlicensed, misbranded products as if they were licensed and labeled in accordance with FDA regulations—"rather than refusal to take enforcement action." *Cook v. FDA*, 733 F.3d 1, 7 (D.C. Cir. 2013).

262.   While agencies have "law-enforcement discretion", such "discretion does not 'set agencies free to disregard legislative direction'". *Florida v. United States*, --- F.Supp.3d ---, 2023 WL 2399883, at *25 (N.D. Fla. Mar. 8, 2023) (*quoting Heckler v. Chaney*, 470 U.S. 821, 832-33 (1985)).

263.   It is not within the FDA's discretion to confer a legal benefit for a product (*i.e.*, licensure), or to exempt categories of unlicensed products from labeling requirements applicable to them, when Congress has already established an "intricate process," *Texas*, 809 F.3d at 179, governing licensure and the benefits thereof in the PHSA.

264.   The same conclusion applies to the FDA's waiver of the requirement to include the EUA Factsheet advising recipients of their right to refuse the EUA product. The requirement to provide the EUA Factsheet is mandatory: the FDA "shall … ensure that the individuals to whom the product is administered are informed … of the option to accept or refuse administration of the product …" 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III). "The word 'shall' does not convey discretion"; "where Congress uses the word 'shall' …, Congress intends to command rather than suggest." *United States v. Quirante*, 486 F.3d 1273, 1275 (11th Cir. 2007).

265.   This applies *a fortiori* to prohibit the FDA from granting third parties—like the Military Defendants here—the authority to waive requirements that the FDA itself may not waive.

266.  The FDA Waivers and related statutory violations, including its approval of false, misleading and deceptive product labeling, caused these mRNA Products to be misbranded in violation of 21 U.S.C. § 352 and applicable FDA labeling regulations. *See, e.g.,* 21 C.F.R. § 201.1 - 201.328 (for drugs), and 21 C.F.R.

§610.60 - 610.68 (for biologics).

267.   The FDA-approved product labeling required to be included with every package is misleading and deceptive insofar as it unlawfully asserts that the EUA and FDA-licensed products are equivalent in terms of both safety and efficacy. The EUA Factsheets for both products state that the products "can be used interchangeably … without presenting any safety or effectiveness concerns." ECF 1-14, Aug. 23, 2021 Pfizer/BioNTech EUA Factsheet, at 1 n.1. This would lead the reasonable consumer to believe that the unlicensed product is equivalent to the licensed product, or that it is the licensed product, which is practically a *per se* violation of statutes and regulations prohibiting misbranding.

268.   The Military Defendants have admitted that they expressly "relied" on the FDA's unlawful actions to mandate unlicensed EUA products. *See* ECF 65, Jan. 14, 2022 DF Mot. to Dismiss, at 28 & 32. This admission is sufficient to establish causation, redressability and traceability required for Plaintiffs to have standing to challenge the FDA actions with respect to both FDA-licensed vaccines and their EUA versions.

269.   Even if the Defendants' position that the EUA-labeled products are in fact licensed products were correct, then these EUA-labeled products would still be misbranded for non-compliance with the PHSA and FDCA mandatory labeling requirements, in particular, the requirement that the product label include the

proprietary name (*i.e.*, COMIRNATY® or SPIKEVAX®) and license number. *See* 42 U.S.C. § 262(a)(1)(B)(i)-(ii); 21 U.S.C. §§ 352(b), (e), (f); 21 C.F.R. §§ 610.61-610.62.

270.   As a result of Defendants' violations of numerous federal laws and regulations, Plaintiffs have already suffered forced retirement, adverse personnel actions, and deprivation of religious liberties, and those who continue to serve face the credible threat of involuntary discharge, punishment under the UCMJ and loss of retirement and other benefits.

<strong><u>EIGHTH CAUSE OF ACTION</u></strong><br><strong>FDA INTERCHANGEABILITY GUIDANCE & WAIVERS ARE <em>ULTRA VIRES</em></strong>

271.   Plaintiffs reallege the facts in Sections II.B, IV, and V as if fully set forth in this Count.

272.   No federal statute authorized the FDA Interchangeability Guidance or the FDA Waivers.

273.   The FDA Interchangeability Guidance and FDA Waivers violate the Informed Consent Laws, the FDCA, PHSA, and FDA labeling and misbranding regulations.

274.   "An agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986). Agency actions that exceeded the agency's authority are *ultra vires* and must be invalidated.

275.   Where an agency or officer of the United States has acted *ultra vires* in

violation of a statute or otherwise in excess of its delegated authority, or where agency action is deemed not to be final and not subject to review under the APA, a person injured by such action may assert a claim for specific relief.

276.   None of these officials and officers of the United States had any authority to make a finding that the FDA-licensed and EUA versions of the COVID-19 vaccines are interchangeable, without first following the procedures set forth in the PHSA.

277.   None of these officials and officers of the United States had any authority to waive the mandatory requirements in 21 U.S.C. § 360bbb-3, which require that each EUA product package include the EUA factsheet and that each recipient be informed of the statutory right to refuse administration of the product.

278.   None of these officials and officers of the United States had any authority to waive mandatory statutory labeling and misbranding requirements in the FDCA and PHSA or the corresponding provisions of the FDA's labeling and misbranding regulations.

279.   Accordingly, each of these officials  and officers of the United States acted *ultra vires.*

280.   The FDA officials and officers of the United have acted and are acting without any lawful authority whatsoever, and without any colorable basis for the exercise of authority.

281.   Plaintiffs' *ultra vires* claims are not barred by sovereign immunity where these federal officers have acted outside the scope of their authority. *See, e.g., Larson*, 337 U.S. at 691 & n.11 (1949).

282.   Plaintiffs' injuries are due to the *ultra vires* actions of FDA officials and officers of the United States, including Peter Marks, who have wholly deprived of their rights under the Informed Consent Laws, the FDCA, PHSA, and FDA labeling and misbranding regulations.

283.   Defendants' *ultra vires* actions have and continue to inflict harm on Plaintiffs, as alleged herein.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiffs respectfully ask this Court to:

(1)   Declare that Congress' directive to "rescind" the Military Mandates means that the August 24, 2021 DOD Mandate is null and void ab initio, is no longer a lawful order, and cannot provide the legal basis for any subsequent orders issued pursuant thereto;

(2)   Declare that the 2023 NDAA Rescission requires that the DOD and Armed Services restore Plaintiffs and other service members to the pre-Mandate *status quo ante* and return them to the position in which they would have been absent the rescinded mandates;

(3)   Declare that vaccination orders issued pursuant to the now-rescinded mandates are not lawful orders and are instead legal nullities;

(4)   Declare that Plaintiffs' non-compliance with such vaccination orders, or others based on the now-rescinded mandates, cannot constitute disobeying a lawful order or be used as the basis for discharge, punishment, or other adverse actions;

85

(5)  Declare unlawful and enjoin any discharge, UCMJ punishment or prosecution, or other adverse personnel action taken based on violations of the now-rescinded Military Mandates;

(6)  Order the Military Defendants to restore Plaintiffs to the pre-Mandate *status quo ante* and to return them to the position in which they would have been absent the unlawful mandates;

(7)  Declare unlawful, vacate and enjoin the DOD Interchangeability Directives;

(8)  Declare unlawful and enjoin the mandate of any EUA product without the Presidential waiver provided under 10 U.S.C. § 1107a;

(9)  Declare unlawful, vacate and enjoin the FDA Interchangeability Guidance and FDA Waivers;

(10) Award attorneys' fees, cost, and any other appropriate relief in the Court's discretion.

Dated: March 24, 2023                    Respectfully submitted,

                                        */s/ Brandon Johnson*
                                        DC Bar No. 491370
                                        Defending the Republic
                                        2911 Turtle Creek Blvd., Suite 300
                                        Dallas, Texas 75219
                                        Tel. (214) 707-1775
                                        Email: bcj@defendingtherepublic.org

                                        *Attorney for Plaintiffs*

86

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have on this day e-filed the foregoing Plaintiffs' Third Amended and Supplemental Complaint for Declaratory and Injunctive Relief using the CM/ECF system providing service to all counsel of record.

This 24th day of March, 2023.

Respectfully Submitted,

*<u>/s/ Brandon Johnson</u>*
Brandon Johnson